IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Rooterman, LLC | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) |
| | ) |
| Klodian Belegu, Quality Air Care | ) |
| Corporation and RM Water Damage | ) |
| Restoration LTD | ) |
| | ) |
| *Defendants*. | ) |
| | ) |

Civil Action No.

## VERIFIED COMPLAINT

Plaintiff Rooterman, LLC, by its attorneys, O'Hagan Meyer, LLC, for its Verified

Complaint ("Complaint") against Defendants, Klodian Belegu, Quality Air Care Corporation and

RM Water Damage Restoration LTD, hereby alleges as follows:

## INTRODUCTION

1.     This is a case for trademark infringement and violation of post-franchise restrictive

covenants. Specifically, defendants are using, without permission or approval, the "Rooterman"

trademarks by, *inter alia,* their use of the website www.rootermanplumberservices.com for over

two months post-termination.[1] See Exhibit A hereto. Plaintiff, the owner of the Rooterman brand

since 2022, is the lawful holder of such trademarks as demonstrated herewith. See Exhibit B hereto.

Plaintiff's actual Rooterman website is www.rooterman.com. Defendant Belegu was warned on

---

[1] Following a failed mediation on December 4, 2024, it is possible defendants have now disabled this website. This
matter continues to be monitored, however.

September 16, 2024 and on November 13, 2024, to cease and desist, but did not do so (but see Note 1 supra). In fact, defendant Belegu has been, individually, and through the corporate defendant, brazenly and unfairly competing not just through his use and misuse of Plaintiff's trademarks, but through the violation of his restrictive covenants, which all survived the termination of his franchise agreements. Plaintiff seeks injunctive and monetary relief as a result.

## PARTIES

2.    Plaintiff is the successor in interest to A. Corp.'s (a Massachusetts Corporation in Billerica) ownership of the "Rooterman" intellectual property rights, and plaintiff, Rooterman, LLC ("Rooterman") now owns all of those rights.

3.    Plaintiff acquired the Rooterman assets of A. Corp. from Donald MacDonald by way of an asset purchase agreement dated January 20, 2022 ("APA").

4.    Defendant Klodian Belegu ("Belegu") is a former Rooterman franchise owner, and upon information and belief, he resides in Toms River, New Jersey. He is the sole owner of defendant, Quality Air Care Corporation, a New Jersey Corporation, through which he also purchased franchises, but which purchases were guaranteed by him individually.

5.    Belegu is also the sole owner of the defendant corporation, RM Water Damage Restoration LTD which was established and registered with the New Jersey Secretary of State in December 2022.  As set forth below, Belegu is using RM Water Damage Restoration LTD in violation of his contractual and legal obligations and, therefore, RM Water Damage Restoration is liable as well.

2

## JURISDICTION AND VENUE

6.      This Court has federal question jurisdiction arising from the claims asserted herein, pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338. This Court can exercise supplemental jurisdiction over the contract claims that arise out of the same transactions and occurrences under 28 U.S.C. § 1367.  Moreover, the franchise contracts between the parties call for the application of Massachusetts law, where A. Corp. was based, and required court actions (if any) to be brought in a proper Massachusetts court. As such, venue is proper in this district pursuant to 28 U.S.C. § 1391.

## FACTS

7.      Rooterman has used its trademarks continuously in United States commerce since August 2, 1991.

8.      Rooterman's services have attained a substantial amount of sales throughout the United States.

9.      As the result of Rooterman's extensive and exclusive use of the Rooterman trademarks and wide-ranging national marketing efforts, the Rooterman trademarks are widely recognized by the general consuming public of the United States. The consuming public in the United States uses the Rooterman trademarks to identify Rooterman's services and associates the mark exclusively with Rooterman.

10.     The Rooterman trademarks are distinctive and famous within the meaning of 15 U.S.C. § 1225(c).

11.     Belegu became a multi-unit franchisee of A. Corp. buying a total of thirteen (13) franchise territories from September 2019 to January 2021:  9 territories in New Jersey, 3 territories

3

in New York and 1 in Pennsylvania.  Certain of these were purchased through his corporation, which he solely owned, defendant Quality Air Care Corporation, but when Belegu purchased franchises through such corporation, he personally guaranteed the obligations of the franchise.

12.     Belegu's 13 franchise agreements with Rooterman are summarized as follows:

(i)     A franchise agreement for the "Ocean County" territory in New Jersey, signed by Belegu and his corporation, Quality Air Care Corporation, September 5, 2019 ("NJ-1").

(ii)     A franchise agreement for various zip codes in the counties of Essex, Monmouth, and various other counties in New Jersey, signed by Belegu in June 2020 ("NJ-2").

(iii)     A franchise agreement for the "Morris County" and "Passaic County" territories in New Jersey, signed by Belegu in August 2020 ("NJ-3").

(iv)     A franchise agreement for additional zip codes in Monmouth County and Ocean County New Jersey signed by Belegu and his corporation, Quality Air Care Corporation, in January 2021 ("NJ-4").

(v)     A franchise agreement for various zip codes in the "Hudson County" and "Essex County" territories in New Jersey, signed by Belegu and his corporation, Quality Air Care Corporation, November 2019 ("NJ-5").

(vi)     A franchise agreement for "Somerset County" and for various zip codes in "Middlesex County" in New Jersey, signed by Belegu and his corporation, Quality Air Care Corporation, November 2019 ("NJ-6").

(vii)     A franchise agreement for various zip codes in the "Hudson County" and "Essex County" territories in New Jersey, signed by Belegu and his corporation, Quality Air Care Corporation, December 30, 2020 ("NJ-7").

(viii)     A franchise agreement for additional zip codes in the "Middlesex County" territory in New Jersey, signed by Belegu on December 30, 2020 ("NJ-8")

(ix)     A franchise agreement for the "Bergen County" territory in New Jersey, signed by Belegu and his corporation, Water Damage Solution of Bergen LLC in February 2020 ("NJ-9")

(x)     A franchise agreement for various zip codes in the "Rockland County" territory in New York, signed by Belegu in December 2020 ("NY-1").

(xi)     A franchise agreement for the "West Chester County" territory in New York, signed by Belegu and his corporation, Quality Air Care Corporation, September 2019 ("NY-2").

(xii)    A franchise agreement for various zip codes in the "Richmond County" territory in New York, signed by Belegu in June 2020 ("NY-3")

(xiii)    A franchise agreement for various zip codes in the "Bucks County" and "Montgomery County" territories in Pennsylvania, signed by Belegu in June 2020 ("PA-1")

All of Belegu's (or his solely owned entity, Quality Air Care Corporation's) franchise agreements contained identical relevant terms addressed herein, and one sample copy is attached hereto as Exhibit C.

13.    By notice dated September 16, 2024, all 13 franchise agreements were terminated as a result of default, following a default notice sent to Belegu on August 12, 2024, for his failure to pay royalties and other fees.

14.    Belegu failed to return any operations manuals or other confidential, proprietary and trade secret materials to Plaintiff upon the termination of his franchisees.

15.    Moreover, Plaintiff has become aware of Belegu misusing the Rooterman trademarks and competing in violation of the exclusivity/non-competition/non-solicitation/confidentiality protections in his franchise agreements. Specifically, Belegu does so through a company that goes by the name above, RM Water Damage Restoration LTD.  Exhibit A hereto details flagrant violations and misuse of numerous trademarks identified as owned by Plaintiff in Exhibit B using the website, www.rootermanplumberservices.com

16.    Belegu as franchisee was obligated to completely disassociate from the franchise and not use any trademarks of the franchise whatsoever, but he has failed and refused to do that. See Exhibit C Section 16(A)-(B). He was also obligated to return all proprietary manuals and materials that belonged to the franchisor as well, but he failed and refused to do that. Id. at Section 16(C); see also id. at Section 12.1.B.

17.    Each of Belegu's (or Quality Air Care Corporation's) franchise agreement carried a 3-year non-competition/non-solicitation restriction, and the area applicable was within 100 miles of the territory of the franchise and 100 miles of the territory of any other franchisee. See Exhibit C, Section 18.1. Each franchise agreement provided protections for the confidential information/trade secrets of the franchise system, as well as the mandate that these materials be returned upon termination. See Exhibit C Section 18.2, 16.C

18.    Defendants have been, since termination, flagrantly engaged in the identical business they were engaged in as franchisees of Rooterman, with no changes, and pervasive throughout the restricted territory. This is not just a trademark violation; it is a violation of the non-compete/non-solicit/misuse of confidential information and trade secrets inherent in the franchise. These trade secrets include, without limitation, the franchisor's methods of operation, pricing, customers, prospects, marketing and advertising plans and methods, and other sensitive and proprietary matters that Belegu would only know due to his former franchisee status.

19.    Defendant Belegu, individually and through his company, continues to use Rooterman trademarks and other intellectual property and while Exhibit A is one substantial such misuse, other misuses include, without limitation:

    a.    https://x.com/rootermannj

    b.    https://maps.app.goo.gl/d8x4Y4eMCPXoSZ46A

    c.    https://www.yelp.com/biz/Rooterman-of-nj-toms-river

    d.    https://www.homeadvisor.com/rated.RooterMan.130537299.html

20.    Further, it is even notable, curious and questionable that Belegu has chosen "RM" (the initials of Rooterman) to lead his company's name, RM Water Damage Restoration. This RM is one of Plaintiff's franchise marks as well. See Exhibit B.

21.    Belegu even employs persons who hold themselves out as working for his company, and that this company is "d/b/a Rooterman".  See Exhibit D hereto.

22.    In no uncertain terms, Belegu was warned to cease and desist and to undertake all of his post-termination covenants referenced herein, by termination letter dated September 16, 2024. See Exhibit E hereto. Through at least December 4, 2024 (see Note 1 supra), Belegu failed and refused.  Upon information and belief, even if he has taken some steps to comply, he has not taken all step to comply.

## Count I: Violation of 15 U.S.C. § 1125

23.    Plaintiff repeats the allegations set forth above and below as if fully contained herein.

24.    Belegu's service marks and infringing domain names are identical or extremely similar to the famous Rooterman trademarks.

25.    Belegu knowingly and willfully had and has a bad faith intent to profit from the use of infringing domain names and the goodwill associated with the Rooterman trademarks.

26.    Belegu knowingly and willfully registered, renewed, and/or used infringing domain names, with content on the domains which are identical to, and/or confusingly similar to, the Rooterman trademarks in Exhibit B, which were distinctive and famous at the time of registration and renewal of the infringing domain names.

27.    Belegu had a bad faith intent in using the infringing domain names as evidenced by at least the following:

        a.    Belegu, as a former franchisee, knew of the A-Corp's trademark rights in the Rooterman trademarks;

  b.  The infringing domain and use of trademarks on it are identical or nearly identical to the Rooterman trademarks; and

  c.  Belegu intended to divert consumers seeking Rooterman's online location at rooterman.com to the infringing domain names by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the sites at the infringing domain names.

28. Belegu's use in commerce of the Rooterman trademarks and similar marks is likely to cause confusion, mistake, or deceive the public into believing that the infringing domain names, websites, and advertisements are authorized, sponsored or approved by Plaintiff.

29. Belegu's activities in registering, renewing, and/or using the infringing domain names are in violation of 15 U.S.C. § 1125(d).

30. Belegu's registration and use of the infringing domain names, and use of the infringing service marks, is greatly and irreparably damaging Rooterman and will continue to damage Rooterman, which has no adequate remedy at law, and which will continue until preliminarily and permanently enjoined by this Court.

31. Belegu's actions constitute unfair competition in violation of 15 U.S.C. § 1125(a).

32. As a direct and proximate result of Belegu's acts of unfair competition, Belegu has unfairly acquired and will continue to unfairly acquire income, profits and goodwill.

33. Belegu's unauthorized use of the Rooterman trademarks in the sale, advertising, and promotion of its goods and services causes dilution by blurring the distinctiveness, strength, and value of the famous Rooterman trademarks.

34.     Belegu's unauthorized use of the Rooterman trademarks, as alleged herein, with knowledge of Rooterman's famous mark, constitutes a willful intent to trade on the reputation and recognition of the famous Rooterman trademarks in violation of 15 U.S.C. § 1125(c).

35.     Belegu's actions in violation of 15 U.S.C. § 1125 are willful and in wanton disregard of the Plaintiff's rights in the Rooterman trademarks.

## Count II: Violation of 15 U.S.C. § 1114

36.     Plaintiff repeats the allegations set forth above and below as if fully contained herein.

37.     Plaintiff's federally registered Rooterman trademarks are distinctive marks that are associated with Rooterman and exclusively identify Rooterman's services to consumers. Plaintiff's federally registered Rooterman trademarks are distinctive and signified Rooterman as a source of services before Defendant used a reproduction, copy, or colorable imitation of the Rooterman trademarks.

38.     Belegu has used and continues to use the Rooterman trademarks or confusingly similar marks in its domain name, websites, and advertising for goods or services in commerce. This use is likely to cause confusion, mistake, or deception as to the origin, sponsorship, or approval of such goods or services. Belegu's actions constitute service mark infringement under 15 U.S.C. § 1114.

39.     Belegu's uses of the Rooterman trademarks are likely to cause initial interest confusion among users and potential users of Rooterman's services.

40.    Belegu's uses of the infringing service marks are greatly and irreparably damaging Rooterman and will continue to damage Rooterman, which has no adequate remedy at law, and which will continue until preliminarily and permanently enjoined by this Court.

41.    Belegu's actions in violation of 15 U.S.C. § 1114 are willful and in wanton disregard of the Plaintiff's rights in the Rooterman trademarks.

## Count III: Breach of Contract

42.    Plaintiff repeats the allegations set forth above and below as if fully contained herein.

43.    Plaintiff has 13 valid contracts with Belegu or his solely owned entity, Quality Air Care Corporation, acquired by and assigned to Plaintiff, reflected by the Franchise Agreements, each in the form of Exhibit C.

44.    Belegu breached or violated his contract(s) by using Plaintiff''s confidential and trade secret information post-termination, by failing to return proprietary and confidential materials to Plaintiff, by competing with Plaintiff post-termination (and, perhaps, pre-termination, as discovery may reveal), by soliciting Plaintiff's customers for Defendants' own separate business, and by failing to disassociate from Plaintiff's trademarks (and in contrast, continuing to associate with them and misuse them).

45.    As a result of these breaches of contract, Plaintiff suffered, and continues to suffer, ongoing damages in an amount to be proved at trial.

## **VERIFICATION**

I, Nathan King, General Counsel for Plaintiff, hereby state under oath, and under the pains and penalties of perjury, that I have personal knowledge of the facts above, and as to the accuracy of the exhibits hereto and representations about them.  The above is true and correct to the best of my knowledge.

_____

Nathan King

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendant as follows:

A. A finding that Belegu has violated 15 U.S.C. §§ 1114 and 1125 by the acts complained of;

B. A finding that Belegu has breached his contracts in the ways set forth above;

C. Belegu, his principals, agents, servants, employees, attorneys, successors, assigns, and all persons in privity, active concert or participation with them, be temporarily, preliminarily, and permanently enjoined as follows and as permitted by such statutes above, as well as 15 U.S.C. § 1116:

   a. From registering and/or using any domain name containing the words "ROOTERMAN" or any other confusingly similar words or phrases that infringe on the trademarks of Plaintiff in Exhibit B to the Complaint;

   b. From imitating, copying or making unauthorized use of the distinctive Rooterman trademarks, trade names, and any other confusingly similar marks in Exhibit B to the Complaint;

   c. From using any false designation of origin or false description which does, can, or is likely to, lead the trade or public to believe that any products, services, or materials, distributed or sold by Defendants, is in any manner associated or connected with Rooterman, or is offered, sold, manufactured, licensed, sponsored, approved, published, or authorized by Rooterman;

   d. From engaging in any activity constituting an infringement of the Rooterman trademarks or trade names or Plaintiff's sole rights to use or exploit the same;

12

e.  From affixing, applying, annexing and/or using in connection with any accessories, clothing and other related goods and services any false designation of origin or any false description or representation of the Rooterman trademarks or trade names or Plaintiff's sole rights to use or exploit the same; and

f.  From violating any restrictive covenants, including the non-competition and non-solicitation covenant identified above.

D.  And, further, that Belegu, his principals, agents, servants, employees, attorneys, successors, assigns, and all persons in privity, active concert or participation with them, be Ordered to affirmatively:

a.  take immediate steps to transfer his infringing domain names, such as but not limited to, www.rootermanplumberservices.com to Plaintiff along with any others it may have registered that include the word "ROOTERMAN" or any other confusingly similar words, no later than within five (5) business days of this Court's Order;

b.  take immediate steps to transfer telephone numbers and any other third party or public references previously associated with any of Belegu's operations that utilized the Rooterman trademarks and trade names to Plaintiff, no later than within five (5) business days of this Court's Order.

c.  take immediate steps to return all manuals, proprietary, confidential or copyrighted materials of Plaintiff to Plaintiff, no later than within five (5) business days of this Court's Order.

d.  take immediate steps and best efforts to direct others, such as employees like those identified in Exhibit D to the Company, to take-down, remove, and cease and desist

13

claiming association with the Rooterman name, and report back to the Court with a Declaration under 28 U.S.C. Section 1746 no later than within five (5) business days of this Court's Order on the efforts taken in that regard.

e.  take immediate steps to preserve the status quo, retain and not destroy all individual records and all corporate records of Quality Air Care Corporation, and all records of RM Water Damage Restoration LTD, such that all of them can provide a complete and accurate accounting of all revenues derived since the termination of his franchise agreements, for purposes of calculating damages on the Counts in this Complaint.

E.  For Defendants' violations of 15 U.S.C. §§ 1114 and 1125, Plaintiff be awarded statutory damages under 15 U.S.C. § 1117 per violation, as the Court considers just, and premised upon an accounting of all revenues derived from the using and misusing of Plaintiff's trademarks in Exhibit B to the complaint; and that, upon an award of damages, damages be trebled under 15 U.S.C. § 1117 because of the willful and egregious nature of Defendants' activities;

F.  Award Plaintiff its costs in this action;

G.  Award Plaintiff treble damages and/or statutory damages, as well as its reasonable attorneys' fees pursuant to 15 U.S.C. § 1117; and

H.  Grant Plaintiff all other relief to which it is entitled and such other or additional relief as this court deems just and proper.

I.  Cease and desist from using and misusing of Plaintiff's trademarks in Exhibit B to the complaint.

J.  Such other and further relief this Court deems necessary and proper.

14

Respectfully submitted,

ROOTERMAN, LLC

By its Counsel,


Dated: December 5, 2024

*Jeffrey M. Rosin*

Jeffrey M. Rosin, BBO# 629216
O'HAGAN MEYER, PLLC
140 Kendrick Street, Bldg. C
Needham, MA 02494
Telephone: (617) 843-6800
Fax: (617) 843-6810
jrosin@ohaganmeyer.com

# EXHIBIT A



CALL US NOW! |
24/7

📞 (888) 317-1702    ✉ info@rootermanplumberservices.com    f 𝕏 ⊙ ᯤ

24/7 EMERGENCY SERVICE    SERVICES ⌄    BLOG    CONTACT

SCHEDULE SERVICE

📞 CALL US NOW!

Rooter Man of NJ is the number one choice for **professional plumbers** and **drain cleaners**. We offer fast, reliable services that will help you when it matters most!

Serving all of **New Jersey**, **Staten Island New York**, and **Bucks County Pennsylvania**

BOOK A PLUMBER YOU






## RESIDENTIAL PLUMBING

Rooter-Man residential plumbers install, repair, and maintain pipes in the drainage system for homes.



24/7 EMERGENCY SERVICE    SERVICES ⌄    BLOG    CONTACT

SCHEDULE SERVICE



## COMMERCIAL PLUMBING

Our commercial plumbers are specialized plumbers who work on retail & commercial businesses.

📞 (888) 317-1702     ✉ info@rootermanplumberservices.com     f  X  📷  🔊

**ROOTER MAN**
*"TO THE RESCUE"*

24/7 EMERGENCY SERVICE     SERVICES ⌄     BLOG     CONTACT

SCHEDULE SERVICE



## EMERGENCY REPAIR

Our emergency plumbers can find the cause of backups, leaks, sump pump failures, and flooding fast!

# Rooter-Man Plumber Services

- 24/7 Emergency Plumbing Services
- Drain Cleaning & Clog Removal
- Garbage Disposal Services



24/7 EMERGENCY SERVICE    SERVICES ⌄    BLOG    CONTACT

SCHEDULE SERVICE

- And Much More!

VIEW ALL SERVICES



## 📞 NEED A 24/7 EMERGENCY PLUMBER?

Call Us Direct To Speak With One Of Our Coordinators & Have A Rooter Man of NJ Plumber Immediately Dispatched To Diagnose & Repair Your Plumbing Emergency!

Case 1:24-cv-13015-PBS   Document 1   Filed 12/06/24   Page 22 of 88




## We Work With Your Budget

We understand that plumbing repairs and emergencies can incur unexpected costs which is why we strive to offer the lowest prices throughout New Jersey when compared to our competitors. We offer a service guarantee and same-day plumbing services.

CALL NOW TO SCHEDULE AN APPOINTMENT

## Schedule Your Same-Day Appointment & Let Us Do the Rest

We have plumbers available 24/7 ready to help you with almost any plumbing repair, clogged drain, leaky pipes, water damage & flooding, garbage disposals, toilets and much more!

SPEAK TO ONE OF OUR BOOKING AGENTS NOW

📞 (888) 317-1702    ✉ info@rootermanplumberservices.com   f X ⦿ 🅇



24/7 EMERGENCY SERVICE    SERVICES ⌄    BLOG    CONTACT

SCHEDULE SERVICE





# Find A Rooter-Man Plumber Near You

Contact us now to quickly dispatch a certified Rooter-Man technician near you!

CLICK HERE TO SCHEDULE

# We Fix All Types Of Plumbing Problems

We know that you want the best for your home, family, and business, which is why we strive to provide quality workmanship. Our plumbing technicians are certified in inspections as well as repairs – guaranteed!

CALL US NOW! |
24/7

📞 (888) 317-1702   ✉ info@rootermanplumberservices.com   f  X  ⊙  ⧉



**24/7 EMERGENCY SERVICE**      **SERVICES** ⌄      **BLOG**      **CONTACT**

**SCHEDULE SERVICE**



Learn More

## Leak Detection

We can help you locate the problem and repair it quickly and affordably.



Learn More

## Drain Cleaning

Rooter-Man has over 50+ years of experience unclogging drains of all types.

Case 1:24-cv-13015-PBS    Document 1-1    Filed 12/06/24    Page 25 of 88





Learn More

## Video Inspections

Video pipe inspections check the insides of pipes in your home or business.



Learn More

## Water Jetting

Affordable water jetting services that can immediately clear debris from your lines.



24/7 EMERGENCY SERVICE    SERVICES ⌄    BLOG    CONTACT

SCHEDULE SERVICE



Learn More

## Toilet Repair

Rooter-Man provides a wide range of toilet repair and installation services.



Learn More

## Sump Pumps

We provide sump pump installation, maintenance, and repair services.

VIEW ALL SERVICES



CALL US NOW! | 24/7

📞 (888) 317-1702    ✉ info@rootermanplumberservices.com    🇫 𝕏 📷 🔊

**24/7 EMERGENCY SERVICE**    **SERVICES** ⌄    **BLOG**    **CONTACT**

SCHEDULE SERVICE

out some of our reviews below; we think this will help make sure your decision about who handles your plumbing repairs goes smoothly (and without any surprises!).

# Latest Reviews



**Shore D.**

2/11/2024

Rooter man of nj is the best plumbing service I've ever used, the reason why is because of employees like Everest who was outstanding and very professional from every aspect I will most definitely be using this service again thank you so much

read more

**Elizabeth**

1/10/2024

I am very pleased with the quality of work and integrity of the Plummer sent out for the job. He showed up on a Friday night and diagnosed and repaired a major clog in my kitchen "P" pipe. He worked meticulously and took his time to make sure the clog was resolved. I high...

read more

**Mikel H.**

7/09/2024

Incredible service plumbing job was awesome!

# 24/7 "Plumber Near Me" Technicians You Can Trust

 (888) 317-1702    ✉ info@rootermanplumberservices.com    f  X  ⊙  ⟫



24/7 EMERGENCY SERVICE    SERVICES ⌄    BLOG    CONTACT

SCHEDULE SERVICE

### NO HIDDEN FEES

We take pride in offering plumbing services with no trip charges (during regular business hours) and no hidden fees.



### GUARANTEED WORKMANSHIP

Our friendly, professional plumbing technicians are ready to help the same day. Guaranteed to get you the prompt, effective service you deserve.

### SERVING YOUR AREA

Rooter-Man has local plumbers that serve your area 24/7. Don't hesitate to give us a call as we can dispatch a plumber to help the same day!

# Latest Blog Posts

Rooter Man of Plumbing & Drain Cleaning Free E Images

CALL US NOW! |
24/7

📞 (888) 317-1702    ✉ info@rootermanplumberservices.com    f X 📷 🔊



24/7 EMERGENCY SERVICE    SERVICES ⌄    BLOG    CONTACT

SCHEDULE SERVICE



## Find Reliable 24 Hour Sump Pump Repair Near Me

by Blog | Dec 4, 2024 | Plumber Services

```html Find Reliable 24 Hour Sump Pump Repair Near Me When it comes to safeguarding your home from potential water damage, having a reliable sump pump in place is crucial. Sump pumps play a vital role in redirecting excess water away from your foundation, especially...

read more



📞 (888) 317-1702    ✉ info@rootermanplumberservices.com    f  X  📷  ⅗



24/7 EMERGENCY SERVICE    SERVICES ⌄    BLOG    CONTACT

SCHEDULE SERVICE



### Finding a Natural Gas Plumber Near Me: Your Local Guide

by Blog | Dec 2, 2024 | Plumber Services

```html Finding a Natural Gas plumber near me: Your Local Guide When it comes to maintaining the safety and efficiency of your home's gas systems, finding a reliable natural gas plumber near me is essential. Natural gas plumbing requires specialized knowledge and...

read more

« Older Entries

# WHY CHOOSE ROOTER MAN OF NJ?

In the plumbing business, experience matters. Our team of **certified plumbers** has successfully resolved countless emergencies. When you choose **Rooter Man of NJ**, you're choosing expertise, reliability, and peace of mind.

Case 1:24-cv-13015-PBS    Document 1    Filed 12/06/24    Page 31 of 88



CALL US NOW! | 24/7

📞 (888) 317-1702    ✉ info@rootermanplumberservices.com    f  X  ⌾  ⌁

24/7 EMERGENCY SERVICE    SERVICES ⌄    BLOG    CONTACT

SCHEDULE SERVICE

**TO SCHEDULE SERVICE CLICK HERE**

# ROOTER MAN OF NJ IS TRUSTED BY:

        

## AREAS WE SERVICE

Atlantic County | Bergen County | Burlington County | Camden County | Cape May County | Cumberland County | Essex County | Gloucester County | Hudson County | Hunterdon County | Mercer County | Middlesex County | Monmouth County | Morris County | Ocean County | Passaic County | Salem County | Somerset County | Sussex County | Union County | Warren County

## "Plumbers You Can Rely On."

-5 Star Google Reivews

CALL NOW TO SCHEDULE

CALL US NOW! |
24/7

📞 (888) 317-1702    ✉ info@rootermanplumberservices.com    f  X  ⊙  ⌁



**24/7 EMERGENCY SERVICE**    **SERVICES** ⌄    **BLOG**    **CONTACT**

SCHEDULE SERVICE

*"Plumbers You Can Rely On."*

-5 Star Google Reivews

CLICK HERE TO SCHEDULE

📞 (888) 317-1702    ✉ info@rootermanplumberservices.com    f    X    📷    🔊



24/7 EMERGENCY SERVICE    SERVICES ⌄    BLOG    CONTACT

SCHEDULE SERVICE







📞 (888) 317-1702    ✉ info@rootermanplumberservices.com    f  X  ⊙  ⌁

24/7 EMERGENCY SERVICE    SERVICES ⌄    BLOG    CONTACT

SCHEDULE SERVICE



## QUICK LINKS

Plumber Services

24/7 Emergency Plumbers

Water Damage Restoration

Drain Cleaning

Pipe Repair Services

Sump Pump Repair & Installation

Leak Detection

Toilet Repair & Installation

Hydro Jetting / Water Jetting

Video Inspections

Sewer Pump Repair & Installation

Garbage Disposal Repair & Installation

## CONTACT US

Main Office:

**Rooter Man of NJ**

1049 Church Rd.

Toms River, NJ 08755

T. 888-317-1702

E. info@rootermanplumberservices.com

Hours:

Mon-Thurs: 5:00am – 10:00pm

Friday: 5:00am – 6:00pm

Saturday: 9:00am – 5:00pm

Sunday: 9:00am – 3:00pm

Serving all of New Jersey




CALL US NOW! | 24/7

☎ (888) 317-1702    ✉ info@rootermanplumberservices.com



24/7 EMERGENCY SERVICE    SERVICES ⌄    BLOG    CONTACT

SCHEDULE SERVICE



Copyright 2023 Rooter-Man Plumbing & Drain Cleaning. All rights Reserved.

Operated as an Independent Franchise All available services, hours of operations, pricing structure, and guarantees may vary by location.

**Privacy Policy**

# EXHIBIT B

# TRADEMARK ASSIGNMENT AGREEMENT

This Assignment Agreement effective January 20, 2022 is made by and between:

**A CORP.,** a Massachusetts stock corporation, having a principal office address located at 268 Rangeway Road, P.O. Box 290, North Billerica, MA 01862 (the "Assignor"); AND

**ROOTERMAN, LLC**, a Delaware limited liability company, having a principal office address located at 126 Garrett Street, Suite J, Charlottesville, Virginia 22902 (the "Assignee").

The Assignor and the Assignee are hereinafter referred to, individually, as "Party" and collectively, as "Parties".

WHEREAS, the Assignor is the proprietor and beneficial owner of the trademarks (the "Trademarks") of which the particulars are set forth as follows and in <u>Exhibit A</u> hereto:

"ROOTER-MAN"
Registration Date:  September 3, 1991
Registration No.:  1,655,782



"A ROOTER-MAN TO THE RESCUE"
Registration Date:  August 20, 1991
Registration No.:  1,654,512



"ROTOR-MAN"
Registration Date:  August 2, 1991
Registration No.:  1,848,341



DocuSign Envelope ID: 0C7AE0C8-4E75-483A-AEEA-1898865298A8

"ROOTER-MAN PLUMBERS TO THE RESCUE"
Registration Date:  August 14, 2012
Registration No.: 4,189,503



DocuSign Envelope ID: 0C7AE0CB-4E75-483A-AEEA-1898855298A8

"SEWER MAN"
Registration Date: January 18, 2000
Registration No. 2308796



"ROOTERMAN (words only)"
Registration Date: October 12, 2010
Registration No. 3,859,654



"ROOTERMAN TO THE RESCUE"
Registration Date: March 17, 2020
Registration No. 6,013,446



"RM"
Registration Date: March 17, 2020
Registration No. 6,013,441



"RM (and design)"
Registration Date: April 7, 2020
Registration No. 6,027,468



"RM (and design)"
Registration Date: April 7, 2020
Registration No. 6,027,470



The trademarks listed below were registered with Canadian Intellectual Property Office by A CORP.:

"ROOTER-MAN"
Registration Date: June 25, 2002
Registration No.:  TMA563953



"ROOTER-MAN PLUMBERS TO THE RESCUE"
Registration Date: October 2, 2002
Registration No.:  TMA568429



"SEWER MAN"
Application Date: October 2, 2019
Application No. 1988014



Whereas, The Assignee desires to acquire from the Assignor all of Assignor's right, title and interest in and to the Trademark registrations, together with the benefit of any use of the Trademarks by the Assignor, and the goodwill of the business relations to the Trademarks and to the wares or services associated with them, to hold unto the Assignee absolutely.

NOW THEREFORE, in consideration of the payment of $250,000 for federal registrations and $38,000 for state registrations, totaling Two Hundred Eighty-Eight Thousand Dollars ($288,000.00), and for good and valuable consideration, the receipt, sufficiency, and adequacy of which is hereby acknowledged the Assignor and the Assignee hereby agree as follows:

1.   The Assignor hereby sells, transfers and assigns to the Assignee, its successors and assigns, the Assignor's entire right, title and interest in and to the Trademark s application and/or registrations, together with (i) the benefit of any use of the Trademark by the Assignor (ii) the goodwill of the business relations to the Trademark and to the wares or services associated with it, (iii) all income, royalties and damages hereafter due or payable to Assignor with respect to the Trademark(s) to hold unto the Assignee absolutely. Nevertheless, Parties agree that Assignee shall not be entitled to any settlement proceeds and/or award in connection with *A Corp. v Palmetto Investments LLC, et al.,* United States District Court, District of Massachusetts, Civil Action No. 20-cv-11901-MLW.

2.   The Assignor incorporates by reference its ownership rights, representations, and warranties set forth in the Asset Purchase Agreement by and between A Corp., Donald MacDonald, as Beneficial Owner of A Corp., and Rooterman, LLC with respect to the Trademarks, subject to all conditions, limitations, limitations on liability and restrictions as set forth therein.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed on their behalf by their duly authorized officers and representative on this 20th day of January 20, 2022.

For and on behalf of the Assignor:

**A Corp., a Massachusetts corporation**

DocuSigned by:

*Donald MacDonald*

5273E2256A59407...

Donald MacDonald, President

## Exhibit A

### U.S. and Canadian Marks

| No. | Description | Registration Number | Notes |
|---|---|---|---|
| 1 | Rooterman Marketing and Advertising Promotions Materials | In Commerce Protection Only | P. 1-20 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 2 | Trademark (TM): Rooterman Plumbers to the Rescue (and Design) | 2433386 | P. 21 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 3 | TM: Sewer Man (and Design) | 2308796 | P. 21 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 4 | TM: A Rooterman to the Rescue (and Design) | 1654512 | P.21 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 5 | Rooter-Man (and Design) | 1655782 | P.21 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 6 | Termanator (and Design) | 1688486 | P. 22 , 70-71 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 7 | Shopper Saver | 1735676 | P. 22 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |

| 8 | Shopper Saver (and Design) | 1770022 | P. 22 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
|---|---|---|---|
| 9 | Liquid Rooter | 1846083 | P. 22 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 10 | Rotor-Man (and Design) | 1848341 | P. 23 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 11 | Rooter-Man (Design Mark) | 3,859,654 | P. 24 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 12 | Rooter-Man (Design Mark) | 1,655,782 | P. 26 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 13 | Rooter-Man (Design Mark) | 1,654,512 | P. 29 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 14 | TM: Shopper Saver | 1,7355, 676 | P. 30 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 15 | TM: Liquid Rooter | 1,846,083 | P. 31 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |

| 16 | Service Mark (SM): Rotor-Man | 1,848,341 | P. 32 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
|----|------------------------------|-----------|-----------------------------------------------------------------|
| 17 | TM: Shopper Saver | 1,770,022 | P. 33 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 18 | Canadian Mark: Rotor-Man Plumbers to the Rescue | TMA563,902 File No.: 1057892 | P. 34, 74-78 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 19 | Canadian Mark: Rotor-Man Plumbers to the Rescue | TMA568,429 File No. 1057895 | P. 36 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 20 | SM: Sewer Man | 1,580,576 | P. 49 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 21 | SM: Sewer Man | 1,218,615 | P. 50 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 22 | SM: Sewer Man | 2,308,796 | P. 51 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 23 | SM: Termanator | 1,688,486 | P. 55 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |

| 24 | SM: Rooterman "To The Rescue" | 6,013,446 | P. 56 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
|----|-------------------------------|-----------|----------------------------------------------------------------|
| 25 | SM: RM Guy with Plunger | 6,027,468 | P. 57 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 26 | SM: RM Guy with Pipe Cleaner | 6,027,470 | P. 58 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 27 | SM: RM Logo | 6,013,441 | P. 59 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 28 | TM: Shopper Saver | 1,770,022 | P. 60, 68-69 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 29 | TM: Liquid Rooter | 1,846,083 | P. 61 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 30 | TM: Shopper Saver | 1,735,676 | P. 62, 66-67 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 31 | SM: Rooter-Man | 3,859,654 | P. 79 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |

| 32 | SM: Drain Pro | 1664949 | P. 86-87 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 33 | Rooterman Website Content 2014 | TX8-253-353 | P. 87-141 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |

**Seller also includes, by reference all marks, protections and materials set forth in Schedule 1 to Exhibit A of Rooterman APA dated January 20, 2022 pages 001-141, which is attached to this Assignment and incorporated in its entirety.**

**State Marks**

| A Corp. State Trademark Registrations | | | | | |
|---|---|---|---|---|---|
| State | Mark Registered | Registration Numbers | Registration and renewal dates | Expiration Dates | Comments |
| Alabama | N/A | N/A | N/A | N/A | |
| Alaska | RooterMan, man w/ pipe | 3924 | 27-Sep-05 | 27-Sep-10 | Expired |
| Arizona | RooterMan, man w/ pipe | 58161 | 9-Jun-14 | 9-Jun-24 | |
| Arkansas | RooterMan, man w/ pipe | 500001521 | 7-Feb-20 | 7-Feb-25 | |
| California | RooterMan, man w/ pipe | 52304 | 20-Oct-99 | 20-Oct-24 | |
| Colorado | N/A | N/A | N/A | N/A | |
| Connecticut | RooterMan, man w/ pipe | 39465648 | 25-Jun-20 | 25-Jun-25 | |
| Delaware | N/A | N/A | N/A | N/A | |
| Florida | RooterMan, man w/ pipe | T99000001430 | 5-Jul-19 | 1-Dec-24 | |
| Georgia | RooterMan, man w/ pipe | 1655782 | 3-Sep-91 | 3-Sep-01 | Expired |
| Hawaii | RooterMan, man w/ pipe | 4118950 | 1-Jul-18 | 30-Jun-23 | |
| Idaho | RooterMan, man w/ pipe | 18506 | 7-Jul-15 | 26-Sep-25 | |
| Illinois | RooterMan, man w/ | 84790 | 19-Nov-19 | 22-Feb-25 | |

| | pipe | | | | |
|---|---|---|---|---|---|
| Indiana | RooterMan, man w/ pipe | 2000-0026 | 24-Feb-00 | 25-Feb-25 | |
| Iowa | RooterMan, man w/ pipe | W01225995 | 14-May-19 | 14-May-24 | |
| Kansas | RooterMan, man w/ pipe | 16967 | 28-Mar-20 | 28-Mar-25 | |
| Kentucky | RooterMan, man w/ pipe | 17523 | 9-Jan-15 | 9-Jan-20 | Expired |
| Louisiana | RooterMan, man w/ pipe | 56-4798 | 9-Dec-99 | 9-Dec-29 | |
| Maine | RooterMan, man w/ pipe | 20000097 | 28-May-19 | 20-Oct-39 | |
| Maryland | RooterMan, man w/ pipe | 2000/00918 | 9-Jan-20 | 6-Mar-30 | |
| Massachusetts | RooterMan, man w/ pipe | 57845 | 10-Jun-19 | 10-Jun-24 | |
| Michigan | RooterMan, man w/ pipe | M02498 | 7-May-10 | 9-May-20 | Expired |
| Minnesota | RooterMan, man w/ pipe | 29736 | 14-Mar-00 | 14-Mar-20 | |
| Mississippi | RooterMan, man w/ pipe | 14327 | 3-Apr-20 | 27-Mar-26 | |
| Missouri | N/A | N/A | N/A | N/A | |
| Montana | RooterMan, man w/ pipe | 5.042E+10 | 4-May-20 | 4-May-25 | |
| Nebraska | N/A | N/A | N/A | N/A | |
| Nevada | RooterMan, man w/ pipe | 202100034394-37 | 2-Mar-21 | 11-Mar-26 | |
| New Hampshire | RooterMan, man w/ pipe | 5460 | 13-Dec-11 | 13-Dec-31 | |
| New Jersey | N/A | N/A | N/A | N/A | |
| New Mexico | N/A | N/A | N/A | N/A | |
| New York | RooterMan, man w/ pipe | S24757 | 8-Dec-99 | 8-Dec-19 | Expired |
| North Carolina | | | | | |
| North Dakota | RooterMan, man w/ pipe | 2549996 | 1-Feb-20 | 19-Mar-30 | |
| Ohio | RooterMan, man w/ pipe | 1564852 | 9-Jun-15 | 9-Jun-25 | |
| Oklahoma | RooterMan, man w/ pipe | N/A | 31-Dec-93 | 2-Nov-95 | Expired |
| Oregon | RooterMan, man w/ pipe | 33974 | 3-Jan-00 | 3-Jan-20 | Expired |
| Pennsylvania | RooterMan, man w/ pipe | 3342610 | 19-Sep-05 | 17-Jun-13 | Expired |

| | | | | | |
|---|---|---|---|---|---|
| Rhode Island | RooterMan, man w/ pipe | 19961004 | 22-Apr-16 | 10-Oct-26 | |
| South Carolina | RooterMan, man w/ pipe | 15851-R18715 | 13-Jan-17 | 10-Feb-22 | |
| South Dakota | RooterMan, man w/ pipe | 13408 | 2-Jul-21 | 2-Jul-25 | |
| Tennessee | RooterMan, man w/ pipe | 41812 | 20-Apr-20 | 20-Apr-25 | |
| Texas | RooterMan, man w/ pipe | 803743230 | 14-Jan-21 | 14-Jan-26 | |
| Utah | | | | | |
| Vermont | N/A | N/A | N/A | N/A | |
| Virginia | N/A | N/A | N/A | N/A | |
| Washington | RooterMan, man w/ pipe | 28436 | 8-Dec-20 | 16-Dec-25 | |
| West Virginia | RooterMan, man w/ pipe | 1006450 | 24-May-20 | 26-Feb-30 | |
| Wisconsin | N/A | N/A | N/A | N/A | |
| Wyoming | N/A | N/A | N/A | N/A | |

# EXHIBIT C

EXHIBIT B.1

**A CORP.**

**ROOTER-MAN FRANCHISE AGREEMENT**

FA 4/18 – Copyright © 2000-2018 A CORP.  All rights reserved.

## TABLE OF CONTENTS

| ITEMS | PAGE |
|---|---|
| A CORP FRANCHISE AGREEMENT | 1 |
| 1. FUNDAMENTAL FRANCHISE AGREEMENT PROVISIONS | 2 |
| 1.1 Date of Franchise Agreement | 2 |
| 1.2 Parties | 2 |
| 1.3 Licensed Territory | 2 |
| 1.4 Total Population | 2 |
| 1.5 Commencement Date | 2 |
| 1.6 Expiration Date | 2 |
| 1.7 Initial Franchise Fee | 2 |
| 1.8 Licensed Businesses | 2 |
| 1.9 Continuing Royalty | 2 |
| 1.10 Advertising Contribution | 2 |
| 1.11 Renewal Fee | 2 |
| 1.12 Transfer Fee | 2 |
| 1.13 Active Owners | 2 |
| 1.14 Franchise Termination Fee | 2 |
| 2. GRANT OF FRANCHISE | 3 |
| 2.1 Grant | 3 |
| 2.2 Limited License | 3 |
| 3. LICENSED TERRITORY | 3 |
| 3.1 Territory Defined | 3 |
| 3.2 Interterritorial Policy | 3 |
| 3.3 Rights Retained | 3 |
| 4. TERM OF FRANCHISE AGREEMENT, RENEWAL OPTION | 4 |
| 4.1 Term | 4 |
| 4.2 Renewal | 4 |
| 4.3 Notice Required by Law | 4 |
| 5. FRANCHISE FEE AND CONTINUING ROYALTY | 5 |
| 5.1 Initial Fee | 5 |
| 5.2 Continuing Royalty | 5 |
| 6. FRANCHISE SYSTEM MARKETING MATERIAL FUND | 5 |
| 6.1 Contribution by Franchisee | 5 |
| 6.2 Advertising Report | 5 |
| 7. FRANCHISEE ADVERTISING, PROMOTION AND IDENTIFICATION | 5 |
| 7.1 Local Advertising | 5 |
| 7.2 Interterritorial Advertising | 6 |
| 7.3 Display | 7 |
| 7.4 Identity as Franchisee | 7 |
| 7.5 Sale of Franchise | 7 |
| 8. TRADEMARKS | 7 |
| 8.1 Grant of License | 7 |

FA 4/18 – Copyright © 2000-2018 A CORP. All rights reserved.

8.2   Name of Business ........................................................................... 7
8.3   No Other Names ........................................................................... 7
8.4   Change of the Trademarks ........................................................... 8
8.5   Trademark Prosecution ............................................................... 8

9.    TRAINING AND OPERATING ASSISTANCE ................................. 8
      9.1   Initial Training Program ......................................................... 8
            A. The Program ..................................................................... 8
            B. Expenses ........................................................................... 8
            C. Waiver ............................................................................... 8
      9.2   Staff Training ......................................................................... 8
      9.3   Additional Assistance ............................................................. 9
            A. Operating Manual ............................................................ 9
            B. Grand Opening Promotional Program .............................. 9
            C. Advertising Materials ...................................................... 9
            D. Seminars .......................................................................... 9
            E. On-Going Assistance and Supervision .............................. 9
            F. Initial Sales Assistance .................................................... 9
            G. Product Offerings ............................................................ 9

10.   FRANCHISE OFFICE LOCATION ................................................ 9

11.   VEHICLES, EQUIPMENT AND SUPPLIES .................................. 10
      11.1   Vehicles ................................................................................ 10
      11.2   Equipment ........................................................................... 10
      11.3   Uniforms .............................................................................. 10

12.   OPERATION of the FRANCHISE ................................................ 10
      12.1   Operations Manual ............................................................. 10
            A. Incorporation of Operations Manual .............................. 10
            B. Confidentiality of Operations Manual ............................ 10
            C. Modifications .................................................................. 11
      12.2   Hours of Operation ............................................................. 11
      12.3   Resolution of Customer Problems ...................................... 11
      12.4   Cleaning and other Supplies ............................................... 11
      12.5   Franchise Management ....................................................... 11
      12.6   Insurance ............................................................................ 11
            A. Notice ............................................................................. 12
            B. Insurance and Step-In-Rights ......................................... 12
      12.7   Bookkeeping Standards ...................................................... 12
      12.8   Franchisor Inspection ........................................................ 12
      12.9   Compliance with Law ......................................................... 12
      12.10  No Suggested Service Fees ................................................. 12
      12.11  Franchise Telephone Service and Directory Listings .......... 12

13.   RECORDS .................................................................................... 13
13.1  Sales Records and Tax Returns .................................................. 13
13.2  Periodic Reports ....................................................................... 13
13.3  Additional Recording Systems ................................................... 13
13.4  Inspection and Audit ................................................................. 13

FA 4/18 – Copyright © 2000-2018 A CORP.  All rights reserved.

**14. ASSIGNMENT AND RIGHT OF FIRST REFUSAL** ................................ 14
    14.1 Assignment by A CORP ................................................ 14
    14.2 Assignment by Franchisee ............................................ 14
        A. Permitted Transfers ................................................ 14
        B. Transfer Upon Death or Permanent Incapacity .................. 15
        C. Transfer to Franchisee's Corporation .......................... 15
        D. Non-Waiver of Claims ............................................ 16

**15. DEFAULT AND TERMINATION** ...................................... 16
    15.1 Immediate Termination ............................................ 16
    15.2 Termination with Notice .......................................... 17
    15.3 Conformity with Law .............................................. 18
    15.4 Cross Default ...................................................... 18
    15.5 Franchise Termination Option .................................... 18

**16. RIGHTS AND DUTIES OF PARTIES UPON EXPIRATION OR TERMINATION** ...... 19

**17. STEP-IN-RIGHTS** .................................................... 20
    17.1 Cause for Step-In ................................................ 20
    17.2 Duties of Parties ................................................ 20

**18. NON-COMPETITION AND NON-DISCLOSURE COVENANTS** ............ 20
    18.1 Non-Competition .................................................. 20
    18.2 Non-Disclosure .................................................... 20

**19. GENERAL CONDITIONS AND PROVISIONS** ........................ 21
    19.1 Titles for Convenience ............................................ 21
    19.2 Entire Agreement .................................................. 21
    19.3 Amendment in Writing ............................................ 21
    19.4 Relationship ...................................................... 21
    19.5 No Waiver ........................................................ 21
    19.6 Governing Law .................................................... 22
    19.7 Mediation and Arbitration ........................................ 22
    19.8 Notices ............................................................ 23
    19.9 Indemnification .................................................... 24
    19.10 Limitation of Liability of A CORP ................................ 24
    19.11 Late Payment Fees ................................................ 24
    19.12 Survival of Covenants ............................................ 24

**20. CAVEAT** ............................................................ 24

**21. RELEASE** .......................................................... 25

**APPENDIX 1 – LICENSED TERRITORY** ................................ 27
**EXHIBIT A – GUARANTY OF PERFORMANCE** .......................... 28
**EXHIBIT B – POWER OF ATTORNEY** ................................ 29
**EXHIBIT C – PROMISSORY NOTE** .................................... 30
**EXHIBIT D – WAIVER OF TRAINING PROGRAM PARTICIPATION** ...... 31
**EXHIBIT E -- AUTHORIZATION TO CHARGE CREDIT CARD OR CHECKING ACCOUNT** ..... 32

FA 4/18 – Copyright © 2000-2018 A CORP. All rights reserved.

**A CORP.**
**FRANCHISE AGREEMENT**

**AGREEMENT** entered into this **24th** day of **September, 2019**, by and between:

**A CORP.**
a Massachusetts Corporation
268 Rangeway Road
Box 290
North Billerica, MA  01862
("A CORP.")

and

**Quality Air Care Corporation**
**692 Sussex Ct**
**Toms River, NJ 08753**

_____

**("FRANCHISEE")**

**WHEREAS:**

 **A CORP.** has developed and is continuing to develop certain unique training, marketing and management methods relating to various service industries which offer services to the public through a franchise system (the " **A CORP. System** ") as it evolves from time to time; and

 **A CORP.** has successfully established a reputation, demand and goodwill for its System under various registered names and marks which **A CORP.** owns, including without limitation, **Rooter-Man, Rooter-Man to the Rescue, Rotor-Man** and such other valuable trade names, service marks, trademarks, logotypes and designs (the "Trademarks") which **A CORP.** may develop and license for use through the **A CORP. System**; and

 **A CORP.**'s trademarks and methods of operations and other business practices and policies relating to the operation of the **A CORP.** System (collectively the "Business System") constitute confidential and valuable trade secrets; and

 **FRANCHISEE** desires to enter into the business of operating an **A CORP.** franchise utilizing some or all the Trademarks, the Business System and all advantages of the **A CORP.** System franchise program upon the terms and conditions contained in this agreement.

 **THEREFORE**, in consideration of the mutual agreements, covenants and promises contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree to be bound legally as follows:

# 1.    FUNDAMENTAL FRANCHISE AGREEMENT PROVISIONS

**1.1    Date of Franchise Agreement**:                September 24, 2019

**1.2    Parties**:        **FRANCHISOR**:              **FRANCHISEE**:
                          A CORP.                       Quality Air Care Corporation
                          268 Rangeway Road             692 Sussex Ct
                          N. Billerica, Ma  01862       Toms River, NJ 08753

**1.3    Licensed Territory**:                         Defined in the attached Appendix 1

**1.4    Total Population**:                            292,729

**1.5    Commencement Date**:                          September 24, 2019

**1.6    Expiration Date**:                            September 24, 2024

**1.7    Initial License Fee**:                        $3,975.00
                                                       ($31.80 per thousand of population)

**1.8    Businesses Licensed (By Trademark)**:         **Rooter-Man**
                                                       **Rooter-Man to the Rescue**
                                                       **Rotor-Man**

**1.9    Continuing Royalty**:                         $220.00 per month.
                                                       ($0.88 per  thousand of population)

**1.10    Marketing Fund Contribution**:              $30.00 per month.
                                                       ($ .12 per thousand of population monthly)

**1.10.1    Locally Optimized Website**               $89.00 per month

**1.11    Franchise Renewal Fee**:                    $2500.00

**1.12    Transfer Fee**:                             Greater of 5% of Franchise Selling
                                                      Price or $2,500.00

**1.13    Active Owners**:                            Klodian Belegu

**1.14    Franchisee Termination Fee: (Opt Out)**    $25.00 per thousand population

# 2.  GRANT OF FRANCHISE

**2.1**    **GRANT**. **A CORP.** hereby grants to **FRANCHISEE**, and **FRANCHISEE** hereby accepts, a license to conduct the business listed in Section 1.8 (the "**A CORP.** System Franchise") for the term described below, according to the provisions of this Agreement and any related agreements.

**2.2**    **LIMITED LICENSE**.   This franchise is a limited grant of rights. Upon termination for any reason or upon expiration of this Agreement, all rights of **FRANCHISEE** to operate the **A CORP.** System franchise shall cease and the license set forth above shall terminate.

## 3. LICENSED TERRITORY

### 3.1   TERRITORY DEFINED

**A.** The franchise granted by this Agreement to operate the **A CORP.** System franchise shall be within the Territory set forth in Section 1.3 (the "Territory"). **FRANCHISEE** shall offer the services of the **A CORP.** System franchise **only** in the Territory.

**B.** **FRANCHISEE** agrees to diligently, faithfully and in a business like manner, promote, market and conduct the franchised business within the Territory so as to fully develop and maximize the business potential of the Territory and shall devote **FRANCHISEE's** full time, attention and best efforts to achieve that end. **FRANCHISEE's** failure to do so shall be deemed a material breach of this Agreement as specified in Section 15.2.

**C.** **FRANCHISEE** shall not engage in marketing activities or solicitation of business outside the Territory. In order for **FRANCHISEE** to engage in such activities within an unlicensed territory, **FRANCHISEE** must execute a separate Franchise Agreement and pay an additional franchise fee.

**D.** **FRANCHISEE** shall establish and maintain an office within the Territory to conduct his or her franchise. **FRANCHISEE** shall not establish an office outside of the Territory.

**E.** **A CORP.** agrees that during the term it will not license any other person or entity to operate the same **A CORP.** system franchise in the Territory, and will not itself establish the same **A CORP.** system franchise in the Territory.

**3.2**    **INTERTERRITORIAL POLICY**. **A CORP.** shall have the right to adopt and implement policies and procedures prohibiting or strictly limiting **FRANCHISEE's** conduct and solicitation of business and marketing activities outside the Territory. With the exception of interterritorial advertising, as described in Section 7.2 of this Agreement, **FRANCHISEE** is prohibited from advertising, soliciting or maintaining a business phone number or office outside of the Territory.

**3.3**    **RIGHTS RETAINED**. Notwithstanding Section 3.2, **A CORP.** shall, however, have the right to: a) refer work to other franchisees, to itself, its parent, subsidiary or affiliated companies or to unaffiliated subcontractors, whether within or outside of the Territory, which **FRANCHISEE** is not licensed, not equipped or not expressly authorized to render; and b) sell, rent or authorize others to sell or rent, drain cleaning, products, and equipment, or render services which are not the subject of this Agreement within or outside of the Territory.

## 4. TERM OF FRANCHISE AGREEMENT AND RENEWAL OPTION

**4.1**    **TERM**.  The term of this Franchise Agreement shall be 5 years from the date of execution of this Agreement, unless terminated sooner for a reason set forth in Section 15. At the expiration of this term, **FRANCHISEE** may exercise the Renewal Option set forth in Section 4.2.

**4.2**    **RENEWAL**.    **FRANCHISEE** shall have the option to renew this franchise for additional 10 year terms subject to the following conditions:

**A.**  **FRANCHISEE** shall give **A CORP.** written notice of his or her desire to exercise the option to continue as a franchisee no later than 6 months prior to the expiration of the initial term of this Agreement and each renewal term.

**A CORP.** shall furnish **FRANCHISEE** with a copy of **A CORP.**'s then current Franchise Agreement (and related agreements), which Agreement **FRANCHISEE** must execute no later than 3 months prior to the expiration of this Agreement.  The Renewal Franchise Agreement shall not include an Initial License Fee but may include an increase in the Continuing Royalty and Marketing Contribution.  Such increase, if any, shall be calculated by multiplying the current fee by the percentage change in the Consumer Price Index (hereinafter, "Change In CPI") if any.  The Change In CPI shall be calculated using the formula set forth in Section 4.2 B.

**B.**  **A CORP.** shall calculate the Change In CPI by creating a fraction, the numerator of which is the Consumer Price Index for December of the most recently completed year and the denominator of which is the Consumer Price Index for December of the year in which the Franchise Agreement became effective.

The fraction will then be determined by dividing the numerator by the denominator.  If the fraction is less than or equal to 1, then no change in fees will occur.  If the fraction is greater than 1 (a "CPI Increase"), then a Change in CPI shall have occurred in the amount of the CPI Increase.

**C.**  **FRANCHISEE** shall pay to **A CORP.** upon execution of the renewal Franchise Agreement, the Renewal Fee set forth in Section 1.11.

**D.**  Notwithstanding the foregoing, **FRANCHISEE** shall not have the right to exercise the Renewal Option unless **FRANCHISEE** has paid in full all monies then currently due to **A CORP.**, and no other default under the terms of this Agreement exists uncured.  **A CORP.** may elect to revoke the renewal option if **FRANCHISEE** shall have received 3 or more notices of default within any 12-month period during the initial term of this Agreement.

**E.**  As a condition to this renewal, **FRANCHISEE** shall be required to maintain the services that he is licensed for and to invest in the proper equipment or vehicles to provide those licensed services.

**4.3**    **NOTICE REQUIRED BY LAW**.  If applicable law requires that A CORP. give notice to **FRANCHISEE** prior to the expiration of the initial term, then the Franchise Agreement shall remain in effect on a month to month basis until **A CORP.** has given **FRANCHISEE** the notice required by applicable law.

## 5.  INITIAL LICENSE FEE AND CONTINUING ROYALTY

**5.1     INITIAL FEE.   FRANCHISEE,** upon execution of this Agreement, shall pay to **A CORP.** the Initial License Fee set forth in Section 1.7. **FRANCHISEE** acknowledges that the sole consideration for such fee is the grant of the franchise.  Such fee shall be fully earned upon execution of this Agreement and shall not be refunded or forgiven.

**5.2     CONTINUING ROYALTY.     FRANCHISEE** shall pay to **A CORP.** each month the Continuing Royalty set forth in Section 1.9, subject to a $110.00 per unit each month. **FRANCHISEE** shall also pay to **A CORP.** each month the marketing fund contribution in the amount of $15.00 per unit. The Continuing Royalty will commence thirty (30) days after the execution of the Franchise Agreement.   When **A CORP.** adopts an electronic funds transfer program, all Continuing Royalty payments shall be made by electronic funds transfer, pursuant to the program established and amended from time to time by **A CORP.** Each payment shall be accompanied by the financial reports specified in Section 13.2.

## 6.   FRANCHISE SYSTEM MARKETING MATERIALS FUND

**6.1     CONTRIBUTION BY FRANCHISEE.    FRANCHISEE** agrees to pay to **A CORP.** the Marketing Fund Contribution set forth in Section 1.10 for the design of marketing materials. **FRANCHISEE** shall pay such Marketing Fund Contribution in the same manner specified in Section 5.2. **A CORP.** shall have the sole right to determine how to expend these funds, and shall expend all Marketing Materials funds collected.    All monies collected from **FRANCHISEE** pursuant to this Section shall be placed in a separate account.

**6.2     MARKETING   MATERIALS   FUND   REPORT.  A CORP.**  shall   furnish   to **FRANCHISEE** within 90 days of each calendar year end, a Fund financial report for the preceding year, prepared and certified to be correct by an officer of **A CORP.**, setting forth the funds collected, and the expenditures made during such calendar year.

## 7.   FRANCHISEE ADVERTISING, PROMOTION AND IDENTIFICATION

**7.1     LOCAL ADVERTISING.   FRANCHISEE** acknowledges that advertising and promotion represents the major source of new clientele for the **A CORP.** System franchise and a major expense of the franchise operation.   **FRANCHISEE** shall formulate and effect local advertising and promotion subject to the format, content and media designations contained in the Operations Manual.

A. **FRANCHISEE** shall list itself in those telephone directories which are usually and customarily distributed in the Licensed Territory, under the appropriate headings, as designated by **A CORP.    FRANCHISEE** shall not place advertisements or listings in telephone directories which are usually and customarily distributed only outside of the Licensed Territory.   **FRANCHISEE** shall expend a minimum of 15% of the franchise's Gross Revenues on local advertising, which advertising will include yellow page listings, local newspaper advertising, marketing and sales materials and the Marketing Fund Contribution.  For the purposes of this Agreement, the term "Gross Revenues" shall mean all revenues generated by **FRANCHISEE**'s business conducted upon, from, or with respect to **FRANCHISEE**'s franchise, whether such sales are evidenced by cash, check, credit, charge account or exchange.   Gross Revenues shall include, without limitation, monies or credit received, for services, from the sale of products, from tangible property of every kind and nature, promotional or otherwise, and for other services performed by **FRANCHISEE** in

accordance with the Business System. Gross Revenues shall not include sales or service taxes or municipal or private disposal fees.

**B.** **FRANCHISEE** understands and acknowledges that local and telephone directory advertising and internet advertising are the major sources of new clientele. At the end of the calendar year, **FRANCHISEE** must furnish proof to the **A CORP.** of all local advertising expenditures and copies of all advertisement used during that year ended. **A CORP** provides free listing of **FRANCHISEE** through **A CORP.**'s franchisor website at www.rooterman.com (the "Franchisor Website"). If **FRANCHISEE** desires to have a local optimized website to promote the System using **ACORP.**'s Trademarks, **FRANCHISEE** must use the internet advertisement services provided through the "Franchisor Website". Upon **FRANCHISEE**'s purchase of the **A CORP** System Franchise, **A CORP** shall design certain website pages linked to the Franchisor Website with **FRANCHISEE**'s information (the "**FRANCHISEE** Webpages") and shall activate the **FRANCHISEE** Webpages in a timely manner. To maintain the consistency of the brand image of **A CORP**, **FRANCHISEE** is not allowed to independently design, develop, and maintain any other locally optimized website or register any domain name using **A CORP's** trademarks including without limitation the Rooter Man trademark.

**C.** **FRANCHISEE** agrees to advertise and promote actively and continuously the System and the Trademarks within the Licensed Territory. **A CORP.** reserves the right to direct **FRANCHISEE** to modify or discontinue advertisements that **A CORP.** believes to present a risk of misleading prospective customers as to the authorized services which **FRANCHISEE** can offer or to the territory in which **FRANCHISEE** can operate. **FRANCHISEE** shall promptly comply with any such directive.

**7.2** **INTERTERRITORIAL ADVERTISING.** In areas (the "Region") where advertising media reach prospective clientele in more than 1 licensed territory, the franchisees operating in this Region may enter into an interterritorial advertising agreement (the "Interterritorial Agreement"). Such Interterritorial Agreements shall provide for the following:

**A.** Advertising fees shall be shared by participating franchisees based upon the percentage of the Region's population that falls within each individual franchisee's Territory. The failure of **FRANCHISEE** to pay his pro rata share under an agreed-upon program shall be considered a default under this Franchise Agreement.

**B.** The format, content and media designations chosen by the participating franchisees for use in the Region shall conform to those requirements specified by **A CORP.** in the Operations Manual; and

**C.** **FRANCHISEE** shall indemnify **A CORP.** from and against any and all claims, demands, losses, damages (including punitive damages), costs, suits, judgments, penalties, expenses and liabilities of any kind or nature arising directly or indirectly out of or in connection with the operation of the Interterritorial Agreement.

**D.** Local advertising shall be FRANCHSIEE's sole responsibility and FRANCHISEE shall not list A CORP. as a party of its local advertising agreement or as list A CORP. under any billing information.

**7.3** **DISPLAY.** **FRANCHISEE** acknowledges that vehicle advertising is an important source

for promotion of the Trademarks and shall maintain all vehicles displaying such Trademarks in accordance with the standards established from time to time by **A CORP.** **FRANCHISEE** agrees to display prominently at all times on all of **FRANCHISEE's** vehicles such advertising and signage as shall be specified from time to time in the Operations Manual or in operating and marketing memoranda furnished by **A CORP.**

7.4 **IDENTITY AS FRANCHISEE.** **FRANCHISEE** agrees that at all times and in all advertising, promotions, signage and other display materials, on its letterheads, business forms, and in all of **FRANCHISEE's** business dealings and to the general public, **FRANCHISEE** will identify himself only as an **A CORP.** System franchisee utilizing only the Trademarks licensed by this Agreement. **FRANCHISEE** further agrees that **FRANCHISEE** shall not identify himself as being **A CORP.**, a subsidiary, division, partner, joint venturer, agent or employee of **A CORP.** or of any other of **A CORP.'s** franchisees.

7.5 **SALE OF FRANCHISE.** In the event that **FRANCHISEE** places advertising seeking a buyer for all or part of **FRANCHISEE's** franchise, **FRANCHISEE** shall not include nor allow use of any of the Trademarks to appear in such advertisement. **FRANCHISEE** may, however, describe the business in general generic terms. **FRANCHISEE** agrees to enforce this restriction on the activities of the **FRANCHISEE's** sales agent, broker or representative. In addition, the **FRANCHISEE** shall comply with the provisions of Section 14.2.

## 8. TRADEMARKS

8.1 **GRANT OF LICENSE.** **A CORP.** hereby grants to **FRANCHISEE** the right during the term of this Agreement to use and display the Trademarks, set forth in Section 1.8, in accordance with this Agreement and the Operations Manual. **FRANCHISEE** acknowledges that the Trademarks which have been licensed exclusively by **A CORP.** are valid, and that valuable goodwill is attached to such Trademarks. All goodwill associated with the Trademarks, including the goodwill generated by **FRANCHISEE** and all other franchisees while conducting business under the Trademarks, is and shall remain the property of **A CORP.** **FRANCHISEE** expressly agrees during the term of this Agreement and following the Agreement's expiration or termination, that **FRANCHISEE** shall not directly or indirectly contest or aid in contesting the validity or ownership of the Trademarks. **FRANCHISEE** shall not modify or use the Trademarks in any fashion, including without limitation on products, tools or supplies, unless authorized in a prior writing by **A CORP.** **FRANCHISEE** shall not file for or acquire any state, federal or international registration of the Trademarks or any trademark or service mark (or variation thereof) which is confusingly similar to the Trademarks including without limitation the Rooter Man trademark.

8.2 **NAME OF BUSINESS.** If **FRANCHISEE** operates the franchise business through a corporation, **FRANCHISEE** shall not use the Trademarks, or any similar names, in its corporate name. Upon expiration or termination of this Agreement, **A CORP.** may, if **FRANCHISEE** does not do so, execute in **FRANCHISEE's** name and on **FRANCHISEE's** behalf any and all documents necessary in **A CORP.'s** judgment to end and cause the discontinuance of **FRANCHISEE's** use of the Trademarks and **A CORP.** is hereby irrevocably appointed and designated as **FRANCHISEE's** attorney-in-fact to do so.

8.3 **NO OTHER NAMES.** **FRANCHISEE** shall not display the trademark, service mark, trade name, insignia or logotype of any other person, firm or corporation in connection with the franchise business without the express prior written consent of **A CORP.**

8.4     **CHANGE OF THE TRADEMARKS**.   If it appears to **A CORP.** that any of the names or marks are no longer viable commercially or legally, **A CORP.** has the right to change any of its names or marks to others of similar marketing impact.   In such event, **FRANCHISEE** agrees to cooperate with **A CORP.** in changing all signs, graphics, and supplies, including those painted onto **FRANCHISEE's** vehicles.   **FRANCHISEE** agrees to assume all reasonable costs connected with such changes, and to effectuate such changes within the reasonable time frame established by **A CORP.**

8.5     **TRADEMARK PROSECUTION**

A.     In the event that **FRANCHISEE** shall learn that a third party, who not a licensee of **A CORP**, is using **A CORP's** Trademarks or any variation, **FRANCHISEE** shall promptly notify **A CORP** of the facts relating to infringing use.

B.     With **A CORP's** permission, **FRANCHISEE** may institute litigation to protect **FRANCHISEE's** interest in the Trademark.   In the event that the **FRANCHISEE** chooses to bring action, and **A CORP**, in its sole discretion, grants permission, **FRANCHISEE** shall be responsible for all costs of litigation and shall have a right to any damages collected for infringing use in **FRANCHISEE's** Territory.

9.   **TRAINING AND OPERATING ASSISTANCE**

9.1     **INITIAL TRAINING PROGRAM**.   **A CORP** shall furnish, and **FRANCHISEE** shall complete to **A CORP's** satisfaction, in its sole discretion exercised in good faith, **A CORP's** training program on the operation of the **A CORP** System franchise.

A.     **THE PROGRAM.**    Such training shall consist of 2 days of instruction at **A CORP's** headquarters or at such place or places designated by **A CORP**.   Participation of **FRANCHISEE** in the training program shall be required unless participation is waived by **A Corp** as specified in Section 9.1C below.   If **A CORP** determines that **FRANCHISEE** requires additional training, the **FRANCHISEE** shall attend such additional program at **FRANCHISEE's** own expense.

B.     **EXPENSES. FRANCHISEE's** shall be solely responsible for **FRANCHISEE's** own travel, living expenses and salary during the training period.

C.     **WAIVER.   FRANCHISEE's** participation in the **A CORP** training program, as described in Section 9.1A, may be waived by **A CORP** if **A CORP** determines in its sole discretion that **FRANCHISEE** has sufficient prior business experience to excuse him from participation in **A CORP's** training program.

9.2     **STAFF TRAINING.**    **FRANCHISEE** shall implement a training program for his  other employees, in accordance with the training standards and procedures prescribed by **A CORP.** **FRANCHISEE** shall employ at all times during the term of this Agreement only employees so trained to offer the franchised services.   **FRANCHISEE** alone shall assume all expenses associated with staff training.

9.3     **ADDITIONAL ASSISTANCE.**        **A CORP** shall furnish **FRANCHISEE** with the

following additional operating assistance.

A.  **OPERATIONS MANUAL.**     A **CORP** will provide a copy of its Operations Manual (as defined in Section 12.1), which at all times will remain the property of **A CORP**, for use by **FRANCHISEE** in the operation of the **A CORP's** System franchise.

B.  **GRAND OPENING PROMOTIONAL PROGRAM.**     A **CORP** shall consult with **FRANCHISEE** concerning a grand opening promotional program, which program shall be conducted by **FRANCHISEE** at his or her sole cost and expense.

C.  **ADVERTISING MATERIALS.**     A **CORP** may, from time to time, at its discretion, develop and provide **FRANCHISEE** with the art work for advertising materials to be used by **FRANCHISEE** in the promotion of **FRANCHISEE's A CORP** System franchise.

D.  **SEMINARS.**     A **CORP** may from time to time, at its sole discretion, conduct refresher training seminars for the purpose of informing franchisee's of new developments and improvements in the Business System relating to various aspects of the franchise operations, including new product lines and profit centers, new marketing techniques, and revised operational and management standards and techniques.  Unless otherwise approve in writing by **A CORP**, **A CORP** shall have the right to require **FRANCHISEE** to attend at least 1 such seminar or a regional meeting during each year of this Agreement.  There shall be no additional charge for such seminars or meetings,  but all travel and living costs incurred by **FRANCHISEE** shall be borne by **FRANCHISEE.**

E.  **ON-GOING ASSISTANCE AND SUPERVISION.**     A **CORP** shall furnish to **FRANCHISEE** from time to time such operating assistance and training, as is, in **A CORP's** sole discretion, reasonably necessary.  Operating assistance and training may include, by way of illustration, advice and guidance with respect to modifications or additions in the Business System, new marketing programs, the establishment of administrative, bookkeeping, accounting and general operating procedures, and such other advice as shall reasonably pertain to the operation of the franchise.   **A CORP** retains the right to license additional services and programs which **FRANCHISEE** might offer to its customers.

F.  **INITIAL SALES ASSISTANCE.**    Upon **FRANCHISEE's** written request and **A CORP's** consent,     A **CORP** shall furnish, for not less than 2 days during the first weeks of **FRANCHISEE's** operations, a representative to train and assist **FRANCHISEE** and his sales staff by calling on prospective customers within the Territory.  **A CORP** shall require a reasonable fee for providing such initial sales assistance.  Such fee shall include, without limitation, all expenses incurred by **A CORP** in providing initial sales assistance.

G.  A **CORP** presently offers products through **A CORP's** affiliate, **Rooter-Man Corp.,** which is a supplier and distributor of various tools and supplies needed in the operation of a **Rooter-Man** franchise.  These tools and supplies consist of drain cleaning machines, cables, cutters, various hand tools, drain cleaning products, logo patches, truck decals, and other such items. **FRANCHISEES** are not required to purchase these or any items from the **Rooter-Man Corp.** nor is **A CORP** or the **Rooter-Man Corp.** required to continue supplying, selling or distributing these or any items.

10. **FRANCHISE OFFICE LOCATION.**    Since the location of **FRANCHISEE's** office is not an important aspect of the operation of the **A CORP** System franchise, **FRANCHISEE** shall only be

obligated to secure an adequate facility to house **FRANCHISEE's** vehicles, equipment and supplies. Such facility must be located within the Territory and such facility shall comply with all local, state and federal regulations as well as A CORP's Operations Manual. Specifically, but without limitation, such facility shall be maintained by **FRANCHISEE** in strict compliance with all local, state and federal regulations pertaining to the storage of hazardous and non-hazardous chemicals.

## 11. VEHICLES, EQUIPMENT AND UNIFORMS

**11.1    VEHICLES**. Prior to the commencement of business by **FRANCHISEE, FRANCHISEE** shall purchase or lease the number and variety of vehicles to be used in the operation of the **A CORP.** System franchise as reasonably prescribed by **A CORP.** All vehicles must meet **A CORP.'s** requirements for appearance, color and other appropriate specifications and must be fully equipped as required by the Operations Manual. **FRANCHISEE** expressly agrees to display all Trademarks required by **A CORP.** on such vehicles. All vehicles must be maintained in sound physical condition and the appearance of such vehicles must be well maintained at all times in order to uphold the integrity of the Trademarks. **FRANCHISEE** shall promptly, upon request, provide **A CORP.** with photographs, copies of invoices and other evidence satisfactory to **A CORP.**, confirming that such vehicles conform to **A CORP.'s** specifications.

**11.2    EQUIPMENT**. Prior to the commencement of the business, **FRANCHISEE** shall at its sole cost and expense lease or purchase, all of the tools, equipment, uniforms, drain cleaning products, supplies, computer equipment, software, forms and other equipment and materials recommended by **A CORP.**, but purchased from suppliers of **FRANCHISEE's** choice.

**11.3    UNIFORMS**. In order to present a neat and clean appearance while performing the services of the **A CORP.** System franchise, **FRANCHISEE** and each employee of **FRANCHISEE** shall wear a uniform approved by **A CORP.**

## 12.    OPERATION OF THE FRANCHISE

**12.1    OPERATIONS MANUAL**. **FRANCHISEE** acknowledges that nationwide uniform standards of service are vital to the protection of the **A CORP.** System and the Trademarks, and are necessary to ensure that the public receives the quality of service associated with the **A CORP.** System and the Trademarks. **FRANCHISEE** therefore agrees that in order to protect the reputation and the goodwill associated with the Trademarks, and to maintain the uniform standards of operation by all **A CORP.** System franchisees, **FRANCHISEE** shall conduct the franchise in strict accordance with **A CORP.'s** proprietary Operations Manual (the "Operations Manual").

**A.    INCORPORATION OF OPERATIONS MANUAL.** The Operations Manual is intended to further the purposes of this Agreement, and is specifically incorporated into this Agreement.

**B.    CONFIDENTIALITY OF OPERATIONS MANUAL.** **FRANCHISEE** shall at all times treat as confidential and shall not at any time disclose, copy, duplicate, record or otherwise reproduce in whole or in part, or otherwise make available to an unauthorized person or persons, the contents of the Operations Manual. The Operations Manual, including all new updated and old superseded pages, shall at all times remain the sole property of **A CORP.** **A CORP.** shall amend and update the Operations Manual and shall provide such updated

version to **FRANCHISEE** at no cost to **FRANCHISEE**. **FRANCHISEE** agrees to insert all new pages immediately in their proper places and to remove completely the superseded pages at the same time for return to **A CORP.** **FRANCHISEE** shall promptly return the Operations Manual upon the expiration or other termination of this Agreement.

C.  **MODIFICATIONS.** **FRANCHISEE** recognizes and agrees that **A CORP.** may from time to time change or modify its standards of operation, including the adoption of new procedures and programs, as outlined in the Operations Manual. **FRANCHISEE** shall accept and conform to such changes or modifications, and shall make all reasonable expenditures necessitated by the changes or modifications, within the time periods reasonably established by **A CORP.**

12.2    **HOURS OF OPERATION**. **FRANCHISEE** shall provide prompt and courteous service at all times during normal working hours and shall provide emergency service that will adequately meet the needs of customers for such service within the Licensed Territory. During customary business hours, **FRANCHISEE** agrees to have its telephone(s) answered by a trained employee. **FRANCHISEE** agrees to use a telephone answering service only after customary business hours.

12.3    **RESOLUTION OF CUSTOMER PROBLEMS**. **FRANCHISEE** and his employees shall provide prompt, competent and courteous service to customers. **FRANCHISEE** shall respond to any dissatisfied customers within 24 hours after the complaint is received, whenever possible.

12.4    **DRAIN CLEANING PRODUCTS AND OTHER SUPPLIES**. **FRANCHISEE** shall utilize only those drain cleaning products and other supplies, including forms, authorized by **A CORP.**

12.5    **FRANCHISEE MANAGEMENT**. **FRANCHISEE** shall at all times during the term of this Agreement operate the **A CORP.** System franchise on a full-time basis or employ on a full-time basis at least one trained individual. **FRANCHISEE** or such individual shall devote his entire time during normal business hours, as defined in the Operations Manual, to the management, operation and development of **FRANCHISEE's A CORP.** System franchise. The individual managing the franchise shall not engage in any other business or investment requiring active participation during normal business hours. **A CORP.** has entered into this Agreement in reliance upon the representation of **FRANCHISEE** that during the term of the Agreement, the individuals named in Section 1.14 will be the owners who are in active, full-time charge of **FRANCHISEE's** franchise and who are responsible for adhering to the terms of this Agreement.

12.6    **INSURANCE.** It is understood and agreed that the protection of the goodwill of the **A CORP.** system, Trademarks and the financial security of both **FRANCHISEE** and **A CORP.** requires the existence of public liability insurance coverage for **FRANCHISEE**. **FRANCHISEE** shall procure and maintain in full force and effect Commercial General Liability insurance coverage (including premises/operations coverage, product liability coverage, completed operations coverage and contractual liability coverage) and comprehensive motor vehicle liability insurance coverage (including hired and non-owned motor vehicle coverage) in the name of **FRANCHISEE**, with **A CORP.** named as an additional insured, at **FRANCHISEE's** sole cost and expense. The insurance coverage shall be in the following minimum amounts:

| | | |
|---|---|---|
| 1. Bodily Injury | $1,000,000.00 | Each person |
| | $1,000,000.00 | Each occurrence |
| 2. Property damage | $500,000.00 | Each occurrence |
| 3. Workers' Compensation coverage | | As required by law |

As an alternative to the foregoing, **FRANCHISEE** may obtain a single limit policy in the amount of no less than $1,000,000.00.

    **A. NOTICE.** All insurance purchased by **FRANCHISEE** shall provide that **A CORP.** be given at least 30 days prior written notice of any termination, amendment, cancellation or modification. **FRANCHISEE** shall promptly provide **A CORP.** with certificates of insurance evidencing such coverage no later than 14 days prior to the date that **FRANCHISEE** shall be open for business to the public, as well as annual certificates throughout the term of the franchise evidencing continuing coverage.

    **B. INSURANCE AND STEP-IN-RIGHTS.** If **FRANCHISEE** fails or refuses to purchase insurance conforming to the standards and limits prescribed in Section 12.5, **FRANCHISEE** shall be in default of this Agreement as set forth in Section 15.2A and E.

**12.7 BOOKEEPING STANDARDS. FRANCHISEE,** all financial statements prepared by or for **FRANCHISEE,** and all reports submitted by **FRANCHISEE** shall conform to the current standards and requirements as described in the Operations Manual. All such bookkeeping and accounting records and financial statements, for such periods as may from time to time be prescribed in the Operations Manual, shall be made available for inspection by **A CORP.** during normal business hours.

**12.8 FRANCHISOR INSPECTION. A CORP.** shall have the right from time to time, and without prior notice to **FRANCHISEE** to send representatives to **FRANCHISEE'S** office in order to inspect **FRANCHISEE's** operations and records and to determine the faithfulness of **FRANCHISEE's** compliance with the provisions of this Agreement and the Operations Manual.

**12.9 COMPLIANCE WITH LAW. FRANCHISEE** shall operate his **A CORP.** System franchise in strict compliance with applicable laws, rules and regulations of all governmental authorities. **FRANCHISEE** shall comply with all applicable laws and regulations of the federal, state or local governments, and shall prepare and file all necessary tax returns, and pay promptly all taxes imposed upon **FRANCHISEE** and upon **FRANCHISEE's** franchised business. **FRANCHISEE** may be required to be licensed for some or all of the components of the **A CORP.** System and is solely responsible for securing and maintaining such licenses

**12.10 NO SUGGESTED SERVICE FEES. FRANCHISEE** acknowledges that any and all service fees included in the Operations Manual or other operating memoranda, are intended by **A CORP.** to be illustrative only and are not intended to be suggestive of fees to be charged by **FRANCHISEE** for particular services. **FRANCHISEE** further acknowledges that **A CORP.** does not set or enforce a fee schedule of any type. **FRANCHISEE,** in its sole discretion, shall determine the fees to be charged for licensed services performed under the **A CORP.** System.

**12.11 FRANCHISEE TELEPHONE SERVICE AND DIRECTORY LISTINGS. FRANCHISEE** shall at its sole expense maintain telephone service for the franchise and

shall have all of **FRANCHISEE**'s telephone numbers continuously listed and advertised in those "white pages" and "yellow page" directories which are usually and customarily distributed within the Licensed Territory, as **A CORP**. may designate or approve. All such listings shall be in the manner, style and type size and shall contain all other characteristics as **A CORP**. may designate in the Operations Manual or in operating memoranda. In all advertising placed by **FRANCHISEE** in which such listed numbers appear, there shall not appear any other telephone numbers subscribed for by **FRANCHISEE** for personal use or for the conduct of any other business. **FRANCHISEE** shall not, without **A CORP**.'s express written consent, cause or allow itself to be listed in any directories outside of the Territory. **A CORP**. shall have the right to recommend the type of telephone service, the number of telephone lines, and all matters related to the telephone service for the franchise, and **FRANCHISEE** shall promptly comply with all specifications and directives of **A CORP**. as established or modified from time to time. **FRANCHISEE** hereby irrevocably appoints **A CORP**. as its Attorney-in-Fact to assign all such telephone numbers to **A CORP**. and expressly authorizes the applicable telephone company to make such assignment upon termination or expiration of this Franchise Agreement. **FRANCHISEE** agrees to indemnify **A CORP**. as specified in Section 19.9.

## 13.   RECORDS.

**13.1**    **SALES RECORDS AND TAX RETURNS. FRANCHISEE** shall record all sales and shall keep and maintain accurate records. **FRANCHISEE** shall provide **A CORP**. annually with copies of federal, state and local (if applicable) income tax returns.

**13.2**    **PERIODIC REPORTS. In** order to assist and advise **FRANCHISEE** with respect to the operation of his business, **A CORP**. shall, at its sole discretion, require **FRANCHISEE** to furnish **A CORP**. within 15 days after the expiration of each calendar month with a profit and loss statement of the Franchise for the preceding calendar month. All such financial statements shall be prepared in accordance with the format established by **A CORP**. in the Operations Manual, and shall be certified by **FRANCHISEE** or in the case of a corporate **FRANCHISEE**, by **FRANCHISEE**'s chief executive officer or chief financial officer, as being true and correct and as being prepared in accordance with generally accepted accounting principles consistently applied from applicable period to period. In addition, within 90 days after the end of each calendar year, **FRANCHISEE** shall furnish **A CORP**. with an annual balance sheet, profit and loss statement and statement of changes in financial position, which have been certified as correct by **FRANCHISEE** and which have been prepared by an independent accountant. **A CORP**. agrees to maintain in confidence **FRANCHISEE**'s financial information and shall not disclose **FRANCHISEE**'s identity in connection with **FRANCHISEE**'s financial information.

**13.3**    **ADDITIONAL RECORDING SYSTEMS. FRANCHISEE** agrees to furnish to **A CORP**. all other information pertaining to the franchised business and clientele through the system developed by **A CORP**. or as **A CORP**. may, from time to time, specify in the Operations Manual. **A CORP**. shall be granted full and complete access to all records and information created by such system, including without limitation, by direct telephone, the Internet or other data communications links.

**13.4**    **INSPECTION AND AUDIT. FRANCHISEE** shall keep and preserve for 5 years all business records, including ledgers, credit card statements and other tax returns, bank statements, duplicate deposit slips and other evidence of gross revenues and business transactions for each such year. **A CORP**. shall have the right at any time during regular

business hours to enter **FRANCHISEE's** premises to inspect, audit and make copies of any books of accounts, bank statements, documents, records, tax returns, papers and files of **FRANCHISEE** relating to gross revenues and business transactions. Upon the request by **A CORP.**, **FRANCHISEE** shall make any such material available for inspection at **FRANCHISEE's** premises and **FRANCHISEE** shall allow **A CORP.** and its representatives to remove temporarily **FRANCHISEE's** records solely for copying, review and/or audit purposes. If **A CORP.** determines that there has been an underpayment of fees by **FRANCHISEE, FRANCHISEE** shall pay the amount of understatement plus interest at the rate of 18% per annum and the cost of the audit.

## 14. ASSIGNMENT AND RIGHT OF FIRST REFUSAL

14.1     **ASSIGNMENT BY A CORP.**    **A CORP.** may freely transfer or assign its rights and obligations under this Agreement to any person, corporation or other entity. Such transfer or assignment shall be binding upon and inure to the benefit of **A CORP.**, its successors and assigns.

14.2     **ASSIGNMENT BY FRANCHISEE.**    **FRANCHISEE** acknowledges that the rights provided for in this Agreement are personal to **FRANCHISEE** and that this franchise has been granted by **A CORP.** in reliance upon the particular skills, knowledge and business ability of **FRANCHISEE. FRANCHISEE** agrees that he shall not sell, assign, transfer, give, mortgage, pledge or otherwise encumber any interest in the assets of the franchise or **FRANCHISEE** collectively referred to herein as a "transfer" except as permitted herein. Any sale, assignment, transfer or encumbrance of this Agreement, of any of the rights granted under this Agreement, or in the ownership of the **FRANCHISE**, which is not in accordance with the terms and conditions provided in this Section 14.2 shall constitute a breach of this Agreement and shall permit **A CORP.** to terminate this Agreement immediately as provided for in Section 15.1 of this Agreement.

    A.    **PERMITTED TRANSFERS.**    **A CORP.** shall not unreasonably withhold its consent to a Transfer of any interest of **FRANCHISEE** or the franchise, but shall, as a condition precedent to such consent, require that:

      1.    **FRANCHISEE** first offers to sell such interest to **A CORP.** at the same price and on the same terms and conditions as it proposes to sell such interest to a third party. **FRANCHISEE** shall furnish a signed and notarized copy of the third party's offer to purchase. **A CORP.** shall have 30 days after receipt of such bona fide offer in which to exercise its right of first refusal. The failure by **A CORP.** to exercise its option shall in no way be construed to affect **A CORP.**'s decision to approve a proposed transferee. If **A CORP.** fails to exercise its option and the Franchise is not subsequently sold to the proposed transferee for any reason, **A CORP.** shall continue to have, upon the same conditions, a first option to purchase the Franchise upon the terms and conditions of a subsequent offer.    **A CORP.** shall have 30 additional days following **A CORP.**'s rejection of its right of first refusal to review the Transfer, based upon the qualifications set forth in Section 14.2A (4).

      2.    All monetary obligations of **FRANCHISEE** to **A CORP.** as of the proposed date of the Transfer have been or will be paid as of such date.

      3.    By the closing date for said transfer, **FRANCHISEE** shall have executed a general

release under seal, in a form satisfactory to **A CORP.**, of all claims against **A CORP.**, its stockholders, directors, officers, employees and assigns.

4.  The transferee, in the reasonable judgment of **A CORP.**, has the financial resources, relevant work experience, character and ability to conduct successfully the business of the Franchise. The transferee shall fully disclose its financial position and obligations and other background information prior to any such Transfer.

5.  The transferee shall execute **A CORP.**'s then current Franchise Agreement and related documents to govern the remaining term of the Franchise, including a copy of the Guaranty to this Agreement executed by each shareholder of the transferee, if the transferee is a corporation.

6.  **FRANCHISEE** shall pay to **A CORP.** the Transfer Fee as set forth in Section 1.12; unless the transfer is to an immediate family member of **FRANCHISEE** (i.e., spouse, children or parents only); and

7.  The transferee shall complete **A CORP.**'s training programs in the manner then required of new franchisees, and shall pay **A CORP.** the then required fee, unless **A CORP.** shall waive **FRANCHISEE**'s participation in the training program as specified in Section 9.1C.

B.  **TRANSFER UPON DEATH OR PERMANENT INCAPACITY.** Immediately upon the death or permanent incapacity of **FRANCHISEE** or if **FRANCHISEE** is a corporation, upon its dissolution or upon the death of any person with a substantial or controlling interest in the Franchise, if requested by **FRANCHISEE**'s heirs, **A CORP.** or its agent, at its sole discretion shall be entitled to assume the operation of the Franchise in accordance with Section 17. As soon as possible thereafter, and in any event within a reasonable time, the executor, administrator, trustee or other representative of such person or entity shall transfer such interest to the heirs or beneficiaries or to a third party in accordance with Section 14.2 A above. **A CORP.**'s right to assume the operation of the Franchise shall continue until the Franchise has been transferred to an accepted transferee as provided in Section 14.2. **FRANCHISEE** shall reimburse **A CORP.** for **A CORP.**'s reasonable expenses in connection with this subsection, including reasonable attorney's fees, and **A CORP.** shall receive the Transfer Fee (as specified in Section 1.12). However, if a franchise is transferred to a party who is a member of **Franchisee**'s immediate family, (i.e., spouse, children or parents only) who will continue the operation of the franchise under the terms of this Agreement, then no transfer fee shall be required. Permanent incapacity shall mean that **FRANCHISEE** cannot perform his duties under this Agreement for a period of 6 months or longer.

C.  **TRANSFER TO FRANCHISEE'S CORPORATION.** If the proposed Transfer is to a corporation at least 75% percent of the stock of which is owned by **FRANCHISEE**, then **A CORP.** shall approve such Transfer provided that the transferee corporation meets the following requirements:

1.  The Corporate charter and by-laws shall provide that its activities are limited to the operation of the Franchise. Copies of the charter, by-laws, any other agreements affecting stockholder rights, such as stock restriction agreements, and resolutions authorizing execution of this Agreement shall be delivered to **A CORP.** prior to execution of this Agreement, or when otherwise requested in writing by **A CORP.**

2. The ownership of the stock of such corporation shall be disclosed in writing prior to the execution of this Agreement and the charter and by-laws shall reflect that no stock shall be sold, transferred, pledged or otherwise similarly affected without compliance with this Agreement.

3. Each stock certificate shall bear the following legend: "THE TRANSFER OF THE SHARES REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE TERMS AND CONDITIONS OF A CERTAIN FRANCHISE AGREEMENT BETWEEN THE CORPORATION AND **A CORP.** REFERENCE IS MADE TO SUCH FRANCHISE AGREEMENT AND TO RESTRICTIVE PROVISIONS IN THE CHARTER OF THIS CORPORA TION."

4. The principal stockholders of **FRANCHISEE**, as determined by **A CORP.**, shall personally guarantee the payment and performance of all obligations of **FRANCHISEE** under this Agreement, and shall execute such documents as **A CORP.** may reasonably require to reflect such guaranty; and

5. In addition, **FRANCHISEE** must serve as the principal executive officer of the transferee corporation, all other shareholders of the transferee must meet the requirements of **A CORP.** and the transferee corporation must execute a new Franchise Agreement for the duration of the term, using **A CORP.**'s then current agreement. All acts and the delivery of all documents shall take place before the Transfer. Transfer to **A CORPORATION** shall be approved in a prior writing by **A CORP. FRANCHISEE** shall reimburse **A CORP.** for **A CORP.**'s reasonable expenses in connection with this section, including reasonable attorney's fees.

D. **NON-WAIVER OF CLAIMS. A CORP.**'s consent to a transfer of any interest in the Franchise granted herein shall not constitute a waiver of any claims that it may have against **FRANCHISEE** or against any guarantor of this Agreement.

## 15. DEFAULT AND TERMINATION

15.1 **IMMEDIATE TERMINATION. FRANCHISEE** acknowledges that the occurrence of one or more of the following events would cause harm to the franchise system and thereby lessen its value. **FRANCHISEE** agrees that **A CORP.** shall have the right upon the occurrence of one of the following events to terminate this Agreement immediately upon notice:

A. If **FRANCHISEE** becomes insolvent or surrenders substantial control of the franchised business or a major portion of its assets by virtue of a voluntary or involuntary proceeding in bankruptcy or receivership, or by assignment for the benefit of creditors, or in the event of a similar circumstance or legal process, and such proceeding is not terminated within 30 days;

B. If **FRANCHISEE** attempts to sell, assign, transfer, give, mortgage, pledge or otherwise encumber any interest in, or substantially all of the assets of the Franchise or FRANCHISEE except as permitted by Section 14.2;

C. If **FRANCHISEE** shall violate any provision of the Non-Competition Covenant contained in Section 18. 1;

D. **If FRANCHISEE** shall violate any provision of the Non-Disclosure Covenant contained in Section 18.2;

E. **If FRANCHISEE** makes any material misrepresentations relating to the acquisition of the Franchised Business;

F. **If FRANCHISEE** is convicted of a felony, a crime involving moral turpitude, or any other crime or offense that A CORP. believes is reasonably likely to have an adverse effect upon the Franchise, the Trademarks and their associated goodwill, or the A CORP. System; or

G. **If FRANCHISEE** fails, for a period of 30 days after having received notification of noncompliance from A CORP. or any governmental or quasi -governmental agency or authority, to comply with any Federal, State or Local law or regulation applicable to the operation of the Franchised Business.

15.2    **TERMINATION WITH NOTICE. FRANCHISEE** acknowledges that the occurrence of one or more of the events specified in this Section 15.2 would cause harm to the franchise system and thereby lessen its value. Therefore, **FRANCHISEE** agrees that A CORP., in addition to all other remedies at law or in equity, may terminate this Agreement if **FRANCHISEE** shall become in default of any provision of this Section 15.2 or any other provision of this Agreement, and if **FRANCHISEE** shall not cure such default within 30 calendar days for nonpayment of monies, or for other defaults after receipt of a written notice to cure from **A CORP.**, or for a longer period if so mandated by the laws of the state in which **FRANCHISEE** operates. In the event **FRANCHISEE** is in default of this Agreement within 12 months after a prior default (even if cured), and **A CORP.** has served **FRANCHISEE** with a Notice to Cure with respect to such prior default, upon notice, **A CORP.** may terminate this Agreement upon the occurrence of such subsequent default. **A CORP.** need not allow **FRANCHISEE** the opportunity to cure such subsequent default. In addition to the foregoing, **A CORP.** may, at its option, exercise its Step-In-Rights (as specified in Section 17) in the event of any default contained in this Section 15.2.

**FRANCHISEE** shall become in default under this Agreement:

A. **If FRANCHISEE** fails, refuses or neglects to pay promptly all monies owing to **A CORP.** on the date due;

B. **If FRANCHISEE** fails, refuses or neglects to pay promptly all monies owing to other Franchisees under any Interterritorial Agreement (as specified in Section 7.2) on the date due;

C. **If FRANCHISEE** fails, refuses or neglects to pay promptly all monies owing to other creditors on the date due;

D. **If FRANCHISEE** fails to submit reports or financial data which **A CORP.** requires under this Agreement, including but not limited to those specified in Section 13;

E. **If FRANCHISEE** fails to obtain and maintain in effect the minimum insurance requirements specified in Section 12.6;

F. Upon the closing of **FRANCHISEE's** operations for a period of 10 or more

consecutive days without the prior written approval of **A CORP**.;

G. **If FRANCHISEE** fails to submit to binding arbitration of disputes as specified in Section 19.7;

H. **If FRANCHISEE** changes any aspect of the **A CORP**. system or offers any service or product which has not been approved in a prior writing by **A CORP**.;

I. **IF FRANCHISEE** fails to diligently, faithfully and in a business like manor, promote, market and conduct the Franchised Business within the Territory as specified in Section 3. 1B; or

J. **If FRANCHISEE** fails to comply with any of the duties imposed by this Agreement, the Operations Manual or other operations memoranda issued by **A CORP**. including, without limitation, the failure to cure an operational problem.

**15.3    CONFORMITY WITH LAW.** Notwithstanding anything to the contrary contained in this Section, in the event any valid, applicable governmental law or regulation of a competent governmental authority having jurisdiction over this Franchise and the parties shall limit A CORP.'s rights of termination or shall require longer notice periods than those set forth above, this Agreement shall be deemed amended to conform to the minimum notice periods required by such laws and regulations. **A CORP**. shall not, however, be precluded from contesting the validity, enforceability or application of such laws or regulations in any action, hearing or dispute relating to this Agreement or its termination.

A. **FRANCHISEE**   Shall be solely responsible for the conduct of its business and for compliance with all the laws, statutes, ordinances, orders or codes of any public or governmental authority pertaining to **FRANCHISEE** and its business operated pursuant hereto and for the payment of all taxes, permits, licenses and registration fees and other charges or assessments arising out of the establishment and operation of **FRANCHISEE'S** business.

**15.4   CROSS DEFAULT. If FRANCHISEE** shall be in default of any other agreement between **A CORP**. or its affiliated companies including, without limitation, any Promissory Note, then **FRANCHISEE** shall be deemed in default of this Agreement.

**15.5   FRANCHISEE TERMINATION OPTION. FRANCHISEE** shall have the option to terminate this Agreement, only during the initial five (5) year term, subject to adherence to the following terms and conditions:

A. **FRANCHISEE** shall notify **A CORP**. in writing of his intent to terminate the Agreement no later than 90 days prior to the closing date for placement of advertisements in the yellow page book or books distributed in **FRANCHISEE's** Territory. If **FRANCHISEE** fails to notify **A CORP**. on or before such 90 day period commences, then **A CORP**. shall exercise its right pursuant to the Power of Attorney, Exhibit B, to retain all of **FRANCHISEE's** operating telephone numbers.

B. **FRANCHISEE** shall pay in full all outstanding monies due to **A CORP**., and shall as well pay a one-time Franchisee Termination Fee as specified in Section 1. 14 herein.

C. **FRANCHISEE** shall de-identify all aspects of **FRANCHISEE's** business operation,

including without limitation all forms of advertisements, all vehicle displays, and all invoices, business cards and forms, and shall choose a trade name or trade names which shall not be confusingly similar to **A CORP's** Trademarks or which might give the general public the impression that **FRANCHISEE** is continuing to operate under the **A CORP.** System. **FRANCHISEE** shall further comply with the terms of Section 16 below.

**D.**    Provided **FRANCHISEE** performs all of the foregoing obligations, **A CORP.** shall agree to waive its rights to enforce the non-competition covenant contained in Section 18.1 and its rights to enforce the Power of Attorney. If **FRANCHISEE** however, fails to perform any of the foregoing obligations or if **FRANCHISEE** attempts to utilize any aspect of **A CORP.**'s Trademarks or System, then **A CORP.** shall retain all rights of enforcement under Section 18.1.

## 16.    RIGHTS AND DUTIES OF PARTIES UPON EXPIRATION OR TERMINATION

Upon termination or expiration of this Agreement, **FRANCHISEE** shall within 30 calendar days:

**A.**    Pay all Continuing Royalty Fees, Advertising Contributions and all other charges or debts owed to **A CORP.**, including the balance due on financing or other extension of credit granted or given by **A CORP** to **FRANCHISEE**.

**B.**    Cease to hold himself or herself out as an **A CORP.** System franchise, cease the use of the Trademarks, logos, designs, materials, methods, promotional materials whether or not furnished by **A CORP.** and all other advertising, including without limitation, all forms of telephone directory advertising, and remove all signs, and Trademarks, in whatever form, from the location of the **A CORP.** office licensed by this Agreement and from all vehicles. FRANCHISEE shall contact the internet service provider or website, which provide internet advertisement services, and request the change or deletion of the Trademarks, logos, and designs from the internet advertisement, listings, or domains and, within 60 days, work to ensure that the change or deletion is completed.

**C.**    Return to **A CORP.** all manuals and printed materials belonging to **A CORP.** or bearing the Trademarks.

**D.**    Except with respect to termination under Section 15.5, at the option of **A CORP.**, **FRANCHISEE** shall:

1.    Remove all equipment, furnishings and printed materials from the office premises; or
2.    Sell such equipment, furnishings and printed materials to **A CORP.** at their then current fair market value, as determined by **A CORP.** In no event shall **A CORP.** be liable for payment to **FRANCHISEE** for intangibles including, without limitation, goodwill;
3.    Assign to **A CORP.** the lease for the franchised premises; and
4.    Execute such documents as **A CORP.** may reasonably require to effectuate termination of the Franchise and **FRANCHISEE**'s rights to use the Trademarks and the **A CORP.** System including, without limitation, release documents.

**A CORP.** retains the right to enforce the Power of Attorney executed in conjunction with this agreement.

## 17.    STEP-IN-RIGHTS

17.1 **CAUSE FOR STEP-IN.** **A CORP.**, at its sole discretion, may exercise the following Step-In Rights in order to prevent an interruption of the Franchised Business which would cause harm to the franchise system and thereby lessen its value. In the event of **FRANCHISEE's** default (as specified in Section 15 herein) or in the event of the death or permanent incapacity of **FRANCHISEE** (as specified in Section 14.2 B), **FRANCHISEE** authorizes **A CORP.** to operate his franchise for as long as **A CORP.** shall deem necessary and practical or upon transfer to an approved franchisee under Section 14.2. Such Step-In Rights shall be exercised without waiver of any other rights or remedies which **A CORP.** may have under this Agreement.

17.2 **DUTIES OF PARTIES.** **A CORP.** shall keep in a separate account all monies generated by the operation of **FRANCHISEE's** business by **A CORP.'s** representatives. **A CORP.** shall deduct all expenses of the business, including reasonable compensation and expenses for **A CORP.'s** representatives from this separate account. **FRANCHISEE** agrees to indemnify **A CORP.** as specified in Section 19.9.

18. **NON-COMPETITION AND NON-DISCLOSURE COVENANTS**

18.1 **NON-COMPETITION.** **FRANCHISEE** agrees that from the date hereof until 3 years following the termination of the Franchise for whatever reason and expiration, neither **FRANCHISEE** nor any of his family members or its officers, directors, other key personnel, employees or stockholders, if applicable, shall directly or indirectly engage in, hold any interest in, or be involved in any way with any of the services comprising the **A CORP.** System. Such obligation shall apply within the Territory, within 100 miles of the Territory or within 100 miles of any territory covered by another **FRANCHISEE** of **A CORP.** or operated by **A CORP.'s** affiliates. **FRANCHISEE** further agrees that from the date hereof until 3 years following the termination of the Franchise for whatever reason and expiration, **FRANCHISEE** and the persons covered by this section shall not attempt to solicit for employment any person who is, at the time of such solicitation, employed by **A CORP.** or any other franchisee of **A CORP.**, nor induce any such person to leave his or her employment. **FRANCHISEE** agrees that as a condition of his affiliation with **A CORP.**, its key personnel and stockholders, if applicable, shall execute covenants not to compete embodying these terms on forms provided by **A CORP.** **FRANCHISEE** acknowledges that such prohibitions are necessary to protect **A CORP.'s** trade secrets and to otherwise insure the integrity of the **A CORP.** System and the rights of **A CORP.'s** other franchisees. The amounts of time and distance set forth above may be deemed to be divisible into units of one month and one mile and may be reduced should a court find them to be unreasonable. **A CORP.**, in addition to such other rights it may have, shall have the right to injunctive relief to enforce its rights pursuant to this provision. The violation of this provision during the term of the Agreement shall result in the automatic termination of the franchise as specified in Section 15.1.

18.2 **NON-DISCLOSURE. FRANCHISEE** acknowledges that disclosure of any aspect of the System or duplication or disclosure of this Agreement, or the Operations Manual could substantially harm **A CORP., FRANCHISEE** and other franchisees of **A CORP.** **FRANCHISEE** agrees that at no time during or after the term of this Agreement or early termination for whatever reason will he or she disclose, either orally or in writing or by any other medium, or duplicate or in any way make available the contents of the Operations Manual, this Agreement, any other documents, videotapes, materials, or any trade secrets, formulas or other aspects of the System to any person, corporation or other entity other than

**FRANCHISEE** attorneys, accountants or similar parties. Such persons may have access to such materials only to the extent necessary for the transaction of business by **FRANCHISEE**. No such person shall be permitted to retain any software, materials or copies of or notes concerning any such materials. All of the foregoing shall be returned to **A CORP**. immediately upon termination or expiration of this Agreement. The prohibition of this section applies equally to all stockholders, directors, officers, and employees of **FRANCHISEE**. **A CORP**. shall have the right to injunctive relief to enforce the provisions of this Section. The violation of this provision during the term of the Agreement shall result in the automatic termination of the Franchise, as specified in Section 15. 1.

## 19. GENERAL CONDITIONS AND PROVISIONS

**19.1** **TITLES FOR CONVENIENCE**. Section and paragraph titles used in this Agreement are for convenience only and are not deemed a part of the text.

**19.2** **ENTIRE AGREEMENT**. This Agreement, including appendices and attachments, constitutes the entire agreement of the parties (and into which all prior negotiations, commitments, representations and undertakings of the parties with respect to the subject matter are merged) and except as otherwise provided, there are no other oral or written understandings or agreements between the parties relating to the Franchise. Nevertheless, nothing in this Agreement or in any related agreement is intended to disclaim the representation that we have made in the franchise disclosure document.

**19.3** **AMENDMENT IN WRITING**. No amendment or other modification of this Agreement shall be valid or binding on either party, unless reduced to writing and executed by the parties.

**19.4** **RELATIONSHIP**
A. **FRANCHISEE** is an independent contractor and is not the agent, joint venturer, partner or employee of **A CORP**. and, except as expressly provided in this Agreement, **A CORP**. shall not be obligated by any agreements, representations or warranties made by **FRANCHISEE** to any person, nor with respect to any other action of **FRANCHISEE**, nor shall **A CORP**. be obligated for any damages or monetary obligations of any sort to any person whether caused by **FRANCHISEE**'s action, failure to act, negligence, or willful conduct.

B. Except as expressly set forth herein, **A CORP**. does not reserve control over nor take responsibility for the conduct or actions of any of **FRANCHISEE**'s owners, directors, or employees, nor shall      **A CORP**. have any control over the employment, discharge, compensation or working conditions of any such owner, director or employee of **FRANCHISEE**.

C. **FRANCHISEE** shall identify himself in all aspects of his business operation, including on all forms and in all advertisements, as being: "Independently Owned and Operated".

**19.5** **NO WAIVER**. No waiver by **A CORP**. of any breach or series of breaches or defaults in performance by **FRANCHISEE**, and no failure, refusal or neglect of **A CORP**. to exercise any right, power or option given to it or to insist upon strict compliance with or performance of **FRANCHISEE**'s obligations, under this Agreement or the Operations Manual, shall constitute a waiver of any provision of this Agreement or the Operations Manual with respect to any subsequent breach or a waiver by **A CORP**. of its right at any time thereafter to

require exact and strict compliance with the provisions of this Agreement.

19.6 **GOVERNING LAW**. This Agreement shall be governed and construed under and in accordance with the laws of the Commonwealth of Massachusetts. **A CORP** and **FRANCHISEE** agree that any action arising out of or relating to this agreement will be brought by the parties only in a Massachusetts state court of Middlesex County, Massachusetts or the United States District Court for the District of Massachusetts in Boston, Massachusetts. **A CORP** and **FRANCHISEE** hereby consent to the jurisdiction of such Courts and further agree to waive any rights or objections to the jurisdiction or venue of any such actions when filed in such courts. If any part or provision of this Agreement is held or declared invalid by a court of competent jurisdiction, such holding or declaration shall affect only that particular part or provision of this Agreement and all other parts or provisions of this Agreement shall continue in full force and effect.

19.7 **MEDIATION AND ARBITRATION. A CORP**. and **FRANCHISEE** agree as a condition to this Agreement to engage in mediation and arbitration prior to the commencement of any court action, except as set forth in Section 19.7 H. **FRANCHISEE**'s failure to submit to mediation and arbitration, shall be deemed a default under Section 15.2. If **A CORP**. must engage an attorney to enforce its rights under this Agreement, **FRANCHISEE** shall reimburse **A CORP**. for all of its reasonable attorney's fees, court costs and expenses incurred in connection with such legal action.

A. Before the commencement of any arbitration, **FRANCHISEE** and **FRANCHISOR** shall submit to the following mediation process:

   1. **FRANCHISEE** shall promptly submit in writing the nature of his grievance with A CORP. along with any reasonable suggestions for the dispute's possible resolution; and

   2. Within 30 days, the **FRANCHISEE** shall attend a mediation meeting with **A CORP**. in Boston, Massachusetts to discuss in detail the dispute and to work towards its possible resolution. **A CORP**. shall select the mediator. **FRANCHISEE** and **A CORP**. shall share equally in the cost of the mediation session.

   If the parties are unable to reach an amicable solution, then the dispute shall be submitted to arbitration as described below:

B. Prior to any arbitration proceeding taking place, **A CORP**. and **FRANCHISEE** shall, have the arbitrator conduct, in a separate proceeding prior to the actual arbitration, a preliminary hearing, at which hearing testimony and other evidence may be presented and briefs may be submitted, including without limitation a brief setting forth the then applicable statutory or common law methods of measuring damages in respect to the controversy or claim being arbitrated. These hearings shall be held in Boston, Massachusetts.

C. Except as otherwise set forth in this Agreement, any controversy or claim arising out of or relating to this Agreement, or any breach, including without limitation, any claim that this Agreement or any part, is invalid, illegal or otherwise voidable or void, shall be submitted to arbitration before and in accordance with the arbitration rules of the American Arbitration Association in accordance with its commercial arbitration rules, or any other mutually agreeable arbitration association. **A CORP**. and **FRANCHISEE** agree that arbitration shall be conducted on an individual and not a class-wide basis.

**D.** If, however, a court of competent jurisdiction determines that any such provisions of this Agreement are unlawful-in any way, such court may modify or interpret such provisions to the minimum extent necessary to have them comply with the law. Notwithstanding any provision of this Agreement by which this Agreement shall be governed by and construed under Massachusetts law, all issues relating to arbitration or the enforcement of this Agreement to arbitrate contained herein shall be governed by the United States Arbitration Act, 9 U.S.C. § I et seq., and the federal common law of arbitration.

**E.** Judgment upon an arbitration award may be entered in any court having competent jurisdiction and shall be binding, final and non-appealable. Except as provided for in Sections 19.9 and 19. 10,    **A CORP**. and **FRANCHISEE** (and their respective owners and guarantors, if applicable) hereby waive to the fullest extent permitted by law, any right to or claim for any punitive or exemplary damages against the other and agree that in the event of a dispute between them each shall be limited to the recovery of any actual damage sustained by it.

**F.** This arbitration provision shall be deemed to be self-executing and shall remain in full force and effect after expiration or termination of this Agreement. In the event either party fails to appear at any properly noticed arbitration proceeding, an award may be entered against such party by default or otherwise notwithstanding said failure to appear. The arbitration proceedings shall take place in Boston, Massachusetts unless otherwise agreed by **A CORP**. and **FRANCHISEE.**

**G.** **A CORP**. and **FRANCHISEE** agree that no action (whether for arbitration, damages, injunctive, equitable or other relief, including but not limited to rescission) will be maintained by any party to enforce any liability or obligation of the other party, whether arising from this agreement or otherwise, unless brought before the expiration of the earlier of 1 year after the date of discovery of the facts resulting in such alleged liability or obligation or 2 years after the date of the first act or omission giving rise to such alleged liability or obligation, except that where state or federal law mandates or makes possible by notice or otherwise a shorter period, such shorter period shall apply.

**H.** The obligation to arbitrate or mediate shall not be binding upon either party with respect to claims relating to **A CORP**.'s trademarks, service marks, patents or copyrights; request for temporary restraining orders, preliminary injunctions or other procedures in a court of competent jurisdiction to obtain interim relief when deemed necessary by such court to preserve the status quo or prevent irreparable injury pending resolution by arbitration of the actual dispute between the parties.

**19.8**  **NOTICES.**
All written notices to **A CORP**. permitted or required to be delivered by the provisions of this Agreement or the Operations Manual shall be deemed so delivered 3 days after being placed in the United States Mail, by Certified Mail, Return Receipt Requested, or by receipted overnight carrier to **A CORP**., 268 Rangeway Road, P.O. Box 290, N Billerica, Massachusetts 01862, Attn. President or to such other address or addresses as **A CORP**. shall from time to time designate in the Operations Manual or in writing to **FRANCHISEE** at the location described in Section 1.2 above, or to such other address as **FRANCHISEE** may from time to time designate in writing to **A CORP**.

**19.9**  **INDEMNIFICATION. FRANCHISEE** agrees to hold **A CORP**. harmless and indemnify **A CORP**. and its officers, agents and employees of and from all suits, actions, claims and

other proceedings brought by any and all persons or entities as a result of services, representations, conduct or work performed by **FRANCHISEE**, its agents, employees, subcontractors or assigns, or in the event **A CORP**. exercises the Step-In-Rights specified in Section 17. **FRANCHISEE** agrees to pay any and all expenses or fees, including reasonable attorney's fees, incurred by **A CORP**., its affiliates, subsidiaries or agents, resulting from any and all claims brought by or against **FRANCHISEE**, its officers, directors, employees or stockholders.

**FRANCHISEE** shall indemnify and hold **A CORP**. harmless of and from any claim made by any telephone company, telephone directory publisher and other related persons or entities with which **FRANCHISEE** conducts business, including all costs, damages, attorney's fees, expenses and liabilities which may be incurred or sustained in connection with or as a result of any action taken in reliance of Exhibit B, Power of Attorney.

The above indemnification provisions shall not be construed, with regard to a particular claim, to apply to any claim where its operation would be against public policy. It is the intent of the provisions above to permit the maximum indemnification of **A CORP**. by **FRANCHISEE** as permitted by law.

19.10   **LIMITATION OF LIABILITY OF A CORP.** If **A CORP**. shall be found liable to **FRANCHISEE** for any claim based upon this Agreement, **A CORP**.'s liability shall be limited to the amount of the initial Franchise Fee (specified in Section 1.7 herein) that has actually been paid by **FRANCHISEE** at the time of judgment.

In no event will **A CORP**., any affiliate, agent, or employee of **A CORP**. be liable for any other damages including, but not limited to, loss of business, revenues or profits. **FRANCHISEE** agrees that this limitation of liability will apply to any claim **FRANCHISEE** shall have against **A CORP** limited to, claims based on contract violations, torts (such as negligence) or strict liability.

19.11   **LATE PAYMENT FEES.** If **FRANCHISEE** fails to pay **A CORP**. all or any portion of the Continuing Royalty, or Marketing Fund Contribution or any other obligation due to **A 1CORP**., promptly when due, **FRANCHISEE** shall pay to **A CORP**. a late payment fee equal to 18% per annum of such delinquent payments. Notwithstanding the foregoing, if the amount of the late payment fee shall be greater than any such charge permitted by applicable law, such charge shall be reduced to an amount equal to the maximum lawful charge, it being the intention of the parties that such late charge shall in no event be greater than that permitted by law.

19.12   **SURVIVAL OF COVENANTS.** The covenants contained in this Agreement which, by their terms, require performance by the parties after the expiration or termination of this Agreement, shall be enforceable notwithstanding the expiration or other termination of this Agreement for any reason whatsoever.

20.   **CAVEAT**

The success of the business venture contemplated to be undertaken by **FRANCHISEE** by virtue of this Agreement is speculative and depends to a large extent upon the ability of **FRANCHISEE** as an independent business person as well as other factors. **A CORP**. does not make any representation or warranty as to the potential success of the business venture contemplated by this Agreement.

**FRANCHISEE** recognizes and understands that he or she may incur other expenses and/or obligations as part of the initial investment in the franchised business or on an ongoing basis which the terms of this Agreement may not address, and which include without limitation initial equipment and supplies, advertising expenses, telephone, insurance, grand opening promotions and working capital necessary to commence operation.

**FRANCHISEE** acknowledges that he or she has read this Franchise Agreement as well as the Disclosure document, and that he or she has been give the opportunity to clarify provisions that he did not understand and to consult with an attorney or other professional advisor. **FRANCHISEE** represents that he or she understands and agrees to be bound by the terms, conditions and obligations of this Agreement.

**FRANCHISEE** acknowledges that he or she may have to prepare for and pass certain local and state mandated examinations in order to operate the Franchise. **FRANCHISEE** alone shall be responsible for the preparation and successful completion of all examinations.

**FRANCHISEE** acknowledges that he or she has entered into this Agreement after making an independent investigation of **A CORP.**'s operations and not upon a representation by **A CORP.** as to profits which **FRANCHISEE** might expect to realize. **FRANCHISEE** acknowledges that prior to the execution of this Agreement, **FRANCHISEE** has had the opportunity to contact existing franchisees of **A CORP.**

21.    **RELEASE**

**FRANCHISEE**, his heirs and assigns, hereby remises, releases and forever discharges **A CORP.**, its affiliated companies, their principals, officers, directors, employees and agents of and from all debts, demands, actions, causes of action, suits, accounts, covenants, contracts, warranties, agreements, damages and any and all claims, demands and liabilities whatsoever of every name and nature, both in law and in equity, which **FRANCHISEE**, his heirs and assigns now have or ever had against **A CORP.**, its affiliated companies, their principals, officers, directors, employees and agents, from the beginning of time until this day.

*[The remainder of the page intentionally left blank]*
*[Signature page follows on the next page]*

**IN WITNESS WHEREOF** the parties intending to be bound legally, have fully executed, sealed and delivered this Agreement as of the day and year first above written.

**A CORP., FRANCHISOR**

By: _____

Witness

Officer

_____
11-18-19
Date

By:    **Quality Air Care Corporation, FRANCHISEE**

Witness

Officer – Klodian Belegu

8-29-19
Date

# APPENDIX 1

The Licensed Territory defined below is granted to **FRANCHISEE** on the condition that **FRANCHISEE** performs the obligations set forth in the Agreement to which this Appendix is attached:

| STATE | COUNTY | CITY/TOWN | ZIP CODES | POPULATION |
|---|---|---|---|---|
| NY | West Chester | Amawalk | 10501 | 1,219 |
| NY | West Chester | Armonk | 10504 | 7,987 |
| NY | West Chester | Baldwin Place | 10505 | 851 |
| NY | West Chester | Bedford | 10506 | 5,790 |
| NY | West Chester | Bedford Hills | 10507 | 6,408 |
| NY | West Chester | Briarcliff Manor | 10510 | 9,988 |
| NY | West Chester | Buchanan | 10511 | 2,246 |
| NY | West Chester | Chappaqua | 10514 | 11,946 |
| NY | West Chester | Crompond | 10517 | 539 |
| NY | West Chester | Cross River | 10518 | 1,268 |
| NY | West Chester | Croton Falls | 10519 | 316 |
| NY | West Chester | Croton on Hudson | 10520 | 12,810 |
| NY | West Chester | Croton on Hudson | 10521 | 0 |
| NY | West Chester | Golden Bridge | 10526 | 1,809 |
| NY | West Chester | Granite Springs | 10527 | 908 |
| NY | West Chester | Hawthorne | 10532 | 4,931 |
| NY | West Chester | Jefferson Valley | 10535 | 555 |
| NY | West Chester | Katonah | 10536 | 10,739 |
| NY | West Chester | Lincondale | 10540 | 0 |
| NY | West Chester | Maryknoll | 10545 | 141 |
| NY | West Chester | Millwood | 10546 | 1,277 |
| NY | West Chester | Mohegan Lake | 10547 | 7,647 |
| NY | West Chester | Montrose | 10548 | 3,487 |
| NY | West Chester | Mount Kisco | 10549 | 16,638 |
| NY | West Chester | North Salem | 10560 | 4,737 |
| NY | West Chester | Ossining | 10562 | 31,796 |
| NY | West Chester | Peekskill | 10566 | 23,570 |
| NY | West Chester | Cortlandt Manor | 10567 | 19,929 |
| NY | West Chester | Pleasantville | 10570 | 12,680 |
| NY | West Chester | Pound Ridge | 10576 | 5,116 |
| NY | West Chester | Purdy's | 10578 | 681 |
| NY | West Chester | Shenorock | 10587 | 0 |
| NY | West Chester | Shrub Oak | 10588 | 2,282 |
| NY | West Chester | Somers | 10589 | 8,475 |
| NY | West Chester | South Salem | 10590 | 6,767 |
| NY | West Chester | Tarrytown | 10591 | 22,540 |
| NY | West Chester | Thornwood | 10594 | 5,117 |
| NY | West Chester | Valhalla | 10595 | 8,195 |
| NY | West Chester | Verplanck | 10596 | 1,729 |
| NY | West Chester | Waccabuc | 10597 | 968 |
| NY | West Chester | Yorktown Heights | 10598 | 28,647 |

Total Unit(s)[1] Population: 292,729

Initials: _____          Initials: _____
          **A CORP**                        **FRANCHISEE**

Date: _11-18-19_                   Date: _9-29-19_

---

[1] One unit is equal to 125,000 populations.

**EXHIBIT A**

**GUARANTY OF PERFORMANCE**

The undersigned, who each own 5% or more of **FRANCHISEE**, jointly and severally guaranty the performance of **FRANCHISEE** pursuant to this Franchise Agreement.

By: _____

Date: _____

By: _____

Date: _____

To Be Executed By Principal Stockholder(s) If Franchisee Is a Corporation.

The undersigned, principal stockholder(s) of the above Franchisee, for value received, hereby absolutely and unconditionally guarantee(s) full performance and payment when due of all of Franchisee's obligations to A CORP pursuant to the above Agreement.

**Quality Air Care Corporation, FRANCHISEE**

By: _Klodian Belegu_____

Date: _9-23-19_____

By: _____

Date: _____

# EXHIBIT D



# EXHIBIT E



September 16, 2024

**VIA FEDEX AND EMAIL (qacpic@gmail.com)**

Klodian Belegu
692 Sussex Court
Toms River, New Jersey  08753

### RE: ROOTERMAN NOTICE OF TERMINATION

Dear Mr. Belegu,

Reference is hereby made to those certain 13 franchise agreements (collectively hereinafter referred to as the "Franchise Agreements") between yourself and Rooterman, LLC ("Rooterman") for the operation of Rooterman franchised businesses in and around the state of New Jersey. This correspondence follows the Notice of Default and Demand for Cure ("Default Notice") you were sent on August 13, 2024, requiring you to bring your balance due and owing to Rooterman current within 30 calendar days.  You have failed to do so and as such, pursuant to the terms of your Franchise Agreements, **all of your Franchise Agreements are terminated effective immediately.**

As a result of this termination, I would remind you that you are required to **immediately comply** with all of the post-termination provisions of the Franchise Agreements, including your obligations to comply with the **covenant not to compete**, to **cease using our trademarks**, to **disconnect or assign to us all telephone numbers** you use in the operations of your franchised business, and **assigning us ownership of all google business profiles** you use in the operation of your franchised business (please use this email address for assigning such ownership to us: digital@premiumservicebrands.com).

Please understand that the last thing we wished to do was to terminate our franchise relationship with you, but your failure to meet your contractual obligations and cure your defaults specified in the Default Notice could not be ignored.  Rooterman hereby reserves all of its rights and remedies associated with your material default and the corresponding termination of your Franchise Agreements.

Should you have any questions, please do not hesitate to contact me.

Regards,

Nathan King
General Counsel

cc:    Finance (via Email)
        Paul Flick (via Email)
        Carter Purves (via Email)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| Rooterman, LLC | Klodian Belegu, Quality Air Care Corporation and RM Water Damage Restoration |

| **(b)**  County of Residence of First Listed Plaintiff | County of Residence of First Listed Defendant |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF<br>THE TRACT OF LAND INVOLVED. |

| **(c)**  Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| Jeffrey Rosin<br>O'Hagan Meyer, PLLC | |

## II.  BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1   U.S. Government Plaintiff
- [ ] 2   U.S. Government Defendant
- [x] 3   Federal Question *(U.S. Government Not a Party)*
- [ ] 4   Diversity *(Indicate Citizenship of Parties in Item III)*

## III.  CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV.  NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance<br>[ ] 120 Marine<br>[ ] 130 Miller Act<br>[ ] 140 Negotiable Instrument<br>[ ] 150 Recovery of Overpayment & Enforcement of Judgment<br>[ ] 151 Medicare Act<br>[ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>[ ] 153 Recovery of Overpayment of Veteran's Benefits<br>[ ] 160 Stockholders' Suits<br>[ ] 190 Other Contract<br>[ ] 195 Contract Product Liability<br>[ ] 196 Franchise | **PERSONAL INJURY**<br>[ ] 310 Airplane<br>[ ] 315 Airplane Product Liability<br>[ ] 320 Assault, Libel & Slander<br>[ ] 330 Federal Employers' Liability<br>[ ] 340 Marine<br>[ ] 345 Marine Product Liability<br>[ ] 350 Motor Vehicle<br>[ ] 355 Motor Vehicle Product Liability<br>[ ] 360 Other Personal Injury<br>[ ] 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>[ ] 365 Personal Injury - Product Liability<br>[ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>[ ] 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>[ ] 370 Other Fraud<br>[ ] 371 Truth in Lending<br>[ ] 380 Other Personal Property Damage<br>[ ] 385 Property Damage Product Liability | [ ] 625 Drug Related Seizure of Property 21 USC 881<br>[ ] 690 Other | [ ] 422 Appeal 28 USC 158<br>[ ] 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>[ ] 820 Copyrights<br>[ ] 830 Patent<br>[ ] 835 Patent - Abbreviated New Drug Application<br>[x] 840 Trademark<br>[ ] 880 Defend Trade Secrets Act of 2016 | [ ] 375 False Claims Act<br>[ ] 376 Qui Tam (31 USC 3729(a))<br>[ ] 400 State Reapportionment<br>[ ] 410 Antitrust<br>[ ] 430 Banks and Banking<br>[ ] 450 Commerce<br>[ ] 460 Deportation<br>[ ] 470 Racketeer Influenced and Corrupt Organizations<br>[ ] 480 Consumer Credit (15 USC 1681 or 1692)<br>[ ] 485 Telephone Consumer Protection Act<br>[ ] 490 Cable/Sat TV<br>[ ] 850 Securities/Commodities/ Exchange<br>[ ] 890 Other Statutory Actions<br>[ ] 891 Agricultural Acts<br>[ ] 893 Environmental Matters<br>[ ] 895 Freedom of Information Act<br>[ ] 896 Arbitration<br>[ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>[ ] 950 Constitutionality of State Statutes |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **SOCIAL SECURITY** | |
| [ ] 210 Land Condemnation<br>[ ] 220 Foreclosure<br>[ ] 230 Rent Lease & Ejectment<br>[ ] 240 Torts to Land<br>[ ] 245 Tort Product Liability<br>[ ] 290 All Other Real Property | [ ] 440 Other Civil Rights<br>[ ] 441 Voting<br>[ ] 442 Employment<br>[ ] 443 Housing/ Accommodations<br>[ ] 445 Amer. w/Disabilities - Employment<br>[ ] 446 Amer. w/Disabilities - Other<br>[ ] 448 Education | **Habeas Corpus:**<br>[ ] 463 Alien Detainee<br>[ ] 510 Motions to Vacate Sentence<br>[ ] 530 General<br>[ ] 535 Death Penalty<br>**Other:**<br>[ ] 540 Mandamus & Other<br>[ ] 550 Civil Rights<br>[ ] 555 Prison Condition<br>[ ] 560 Civil Detainee - Conditions of Confinement | [ ] 710 Fair Labor Standards Act<br>[ ] 720 Labor/Management Relations<br>[ ] 740 Railway Labor Act<br>[ ] 751 Family and Medical Leave Act<br>[ ] 790 Other Labor Litigation<br>[ ] 791 Employee Retirement Income Security Act | [ ] 861 HIA (1395ff)<br>[ ] 862 Black Lung (923)<br>[ ] 863 DIWC/DIWW (405(g))<br>[ ] 864 SSID Title XVI<br>[ ] 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>[ ] 870 Taxes (U.S. Plaintiff or Defendant)<br>[ ] 871 IRS—Third Party 26 USC 7609 | |
| | | **IMMIGRATION**<br>[ ] 462 Naturalization Application<br>[ ] 465 Other Immigration Actions | | | |

## V.  ORIGIN *(Place an "X" in One Box Only)*

- [ ] 1   Original Proceeding
- [ ] 2   Removed from State Court
- [ ] 3   Remanded from Appellate Court
- [ ] 4   Reinstated or Reopened
- [ ] 5   Transferred from Another District *(specify)*
- [ ] 6   Multidistrict Litigation - Transfer
- [ ] 8   Multidistrict Litigation - Direct File

## VI.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 USC Sec. 1114, 1125

Brief description of cause:
Trademark Infringement and Breach of Contract

## VII.  REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $
$500,000

CHECK YES only if demanded in complaint:
JURY DEMAND:  [x] Yes   [ ] No

## VIII.  RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 12.5.24 | /s/ Jeffrey M. Rosin |

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1.  **Title of case (name of first party on each side only)** Rooterman, LLC v. Klodian Belegu, et al

_____

2.  **Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.   (See local rule 40.1(a)(1)).**

    [ ]  **I.**   160, 400, 410, 441, 535, 830*, 835*, 850, 880, 891, 893, R.23, REGARDLESS OF NATURE OF SUIT.

    [✔]  **II.**   110, 130, 190, 196, 370, 375, 376, 440, 442, 443, 445, 446, 448, 470, 751, 820*, 840*, 895, 896, 899.

    [ ]  **III.**   120, 140, 150, 151, 152, 153, 195, 210, 220, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 367, 368, 371, 380, 385, 422, 423, 430, 450, 460, 462, 463, 465, 480, 485, 490, 510, 530, 540, 550, 555, 560, 625, 690, 710, 720, 740, 790, 791, 861-865, 870, 871, 890, 950.
    *Also complete AO 120 or AO 121. for patent, trademark or copyright cases.

3.  **Title and number, if any, of related cases.  (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.**

    _____

4.  **Has a prior action between the same parties and based on the same claim ever been filed in this court?**

    YES [ ]    NO [✔]

5.  **Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?    (See 28 USC §2403)**

    YES [ ]    NO [✔]

    **If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?**

    YES [ ]    NO [✔]

6.  **Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?**

    YES [ ]    NO [✔]

7.  **Do all of the parties  in this action, excluding governmental agencies of the United States and the Commonwealth of Massachusetts ("governmental agencies"),  residing in Massachusetts reside in the same division? -  (See Local Rule 40.1(d)).**

    YES [ ]    NO [✔]

    **A.**   **If yes, in which division do all of the non-governmental parties reside?**

    Eastern Division [ ]        Central Division [ ]        Western Division [ ]

    **B.**   **If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?**

    Eastern Division [✔]        Central Division [ ]        Western Division [ ]

8.  **If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If yes, submit a separate sheet identifying the motions)**

    YES [ ]    NO [ ]

**(PLEASE TYPE OR PRINT)**
**ATTORNEY'S NAME** Jeffrey Rosin
**ADDRESS** 140 Kendrick St, Building C, Needham MA 02494
**TELEPHONE NO.** 671-843-6801

**(CategoryForm11-2020.wpd )**