# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Rooterman, LLC,<br><br>             Plaintiff,<br><br>    v.<br><br>Klodian Belegu, Quality Air Care Corporation, RM Water Damage Restoration LTD and 911 Sewer & Drain Corporation.<br><br>             Defendants. | Civil Action No. 1:24-cv-13015<br><br><br>**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S REVISED MOTION FOR A PRELIMINARY INJUNCTION** |

The holding company that took over the Rooterman brand failed to perform its obligations to Mr. Belegu and Quality Air Care Corporation. Now it seeks to stop Defendants from engaging in ordinary competition, in violation of Massachusetts law, and attempt to enforce nonexistent and otherwise unenforceable marks under the Lanham Act. The Court should not be led astray by Plaintiff's shell game, wherein it vaguely points to a list of marks it owns, and Defendants should not be enjoined from engaging in their business, especially as no marks are being infringed upon. Plaintiff's Revised Motion for Preliminary Injunction (ECF No. 9) should, therefore, be denied.

## 1.0    Factual Background

In 2019 & 2020,[1] Defendants Klodian Belegu and Quality Air Care Corporation ("QAC"), along with non-party Water Damage Solution of Bergen, LLC, executed a series of franchise agreements with non-party A Corp. *See* Verified First Amended Complaint ("FAC", ECF No. 7) at ¶ 13 and Ex. C thereto. At no time were Defendants 911 Sewer & Drain Corporation or Water

---

[1] One agreement, for Monmouth and Ocean Counties, was dated September 10, 2020, with a commencement date of August 19, 2020, but was not executed until January of 2021. *See* **Exhibit 1**; Declaration of Belegu ("Belegu Decl.") at ¶¶ 3-4.

Damage Restoration Ltd f/k/a RM Water Damage Restoration Ltd[2] parties to any franchise agreement.  Declaration of Klodian Belegu ("Belegu Decl.") at ¶ 5.  On or about January 20, 2022, A Corp sold its assets to Plaintiff Rooterman, LLC.  *See* FAC at ¶ 3.  Rooterman, LLC, is but one of the businesses owned by Premium Service Brands ("PSB"), which also owns 360˚ Painting, ProLift Garage Doors, Maid Right, Kitchen Wise & Closet Wise, Window Gang, Rubbish Works Junk Removal, The Grout Medic, and House Doctors.  *See* Belegu Decl. at ¶¶ 8-9; **Exhibit 3**.[3] At all relevant times, PSB's agents operated Plaintiff Rooterman and all of Mr. Belegu's communications with Plaintiff were through PSB agents.  Belegu Decl. ¶ 10.

Mr. Belegu invested hundreds of thousands of dollars in advertising to build up his franchises; he had no interest in losing them.  *See* Belegu Decl. at ¶ 11.  PSB, however, appeared only interested in cutting corners and refused or failed to take action necessary for Mr. Belegu and QAC to succeed.  For example, in January 2023, Mr. Belegu found that the Google business result for "Rooter-Man" in Lakewood, New Jersey (one of the franchise territories) had a phone number of (732) 905-5477, which was the phone number for a competitor and prior franchisee.  *Id.* at ¶ 12. This was not an isolated listing—dozens of Google listings for Belegu & QAC Rooterman territories had phone numbers that did not direct to the actual franchisee.  *Id.* at ¶ 13.

And although things got worse upon the PSB acquisition, it was not run much better under A Corp.; Mr. Belegu had to send A Corp. an email showing a series of Google listings for QAC territories advertising "Rooterman" that were not, in fact, QAC listings.  *Id.* at ¶¶ 14-15; **Exhibit 4**.Rather than taking action, A Corp. told Mr. Belegu to try to handle it himself.  Belegu Decl. at ¶¶ 16-17; **Exhibit 5**.

---

[2]This entity changed its name on December 27, 2024.  *See* **Exhibit 2**; Belegu Decl. at ¶¶ 5-7.
[3] Available at https://www.premiumservicebrands.com/franchise-brands/

RANDAZZA | LEGAL GROUP

On February 26, 2024, PSB's marketing employees held a virtual meeting with a number of franchisees to review PSB's failures, including its deficient website. Belegu Decl. at ¶ 18. One of the most significant issues was the lack of micro-sites. *Id.* at ¶ 19. A micro-site helps a customer locate a local service provider; a customer from Lakewood, NJ (or wherever), might not want to hire a service provider, like Rooterman, that shows a NY, NJ & PA territory. *Id.* at ¶ 20. However, if there is a site for Rooterman of Ocean County, NJ, the Lakewood customer would feel that they are getting a local technician who can serve their needs. *Id.* at ¶ 21. When A Corp. ran the franchise, Mr. Belegu and QAC developed and set up their own websites, and A Corp. worked with Mr. Belegu on at least 22 micro-sites. *Id.* at ¶ 22. PSB, through Plaintiff, prohibited this and took over all website marketing. *Id.* at ¶ 23. In the process, on November 15, 2023, PSB/Plaintiff eliminated Mr. Belegu & QAC's micro-sites. *Id.* at ¶ 24-25; *see also* **Exhibit 6**. After numerous complaints, approximately half of the necessary micro-sites were launched by PSB/Plaintiff on May 19, 2024. Belegu Decl. at ¶ 26-27; *see also* **Exhibit 7**.

Despite this, and despite an arbitrary increase of $1,332 per month, Mr. Belegu and QAC continued to make their necessary payments. *See* Belegu Decl. at ¶¶ 28-29; *see also* **Exhibit 8**. PBS/Plaintiff, however, also maintained a separate accounting system that purported to double-bill Mr. Belegu and QAC monthly, with it indicating that a balance was owed. *See* Belegu Decl. at ¶¶ 30-31; *see also* **Exhibit 9**.

On September 16, 2024, Plaintiff terminated all 13 agreements based on a purported "default[.]" FAC at ¶ 13. Since then, Mr. Belegu and QAC ceased using the Rooterman name and Plaintiff's alleged marks. *See* Belegu Decl. at ¶ 32. Despite it not even being a franchisee, and being engaged in an entirely different line of business than Rooterman's services, Mr. Belegu

even removed the "RM" from Defendant Water Damage Restoration's name.[4]  *See* Belegu Decl. at ¶ 33.  This is despite Plaintiff not owning a word mark for "RM"—the "RM" marks identified (ECF No. 7-2) are for Reg. Nos. 6,013,441; 6,027,468; and 6,027,470 are in Class 37  (Drain cleaning services; Plumbing; Plumbing services; Drain and sewer cleaning and rootering services) and none are for just the letters "RM"—all are stylized or part of a logo.  Anything remaining, such as the Google, Yelp, and HomeAdvisor listings Plaintiff complains about (FAC at ¶ 28 (a), (b), and (c)) or in Mr. Hershner's LinkedIn profile (FAC at ¶ 31 and Ex. J. thereto (ECF No. 7-10)) are not under any of the defendants' control. *See* Belegu Decl. at ¶ 34.  Defendants do not control the comments to the 911 Sewer & Drain Google Business listing (FAC at ¶ 29 and Ex. I thereto (ECF No. 7-8) or the comments to the 911 Sewer and Drain Facebook page (FAC at ¶ 29 and Ex. H thereto (ECF No. 7-9).[5]  *See* Belegu Decl. at ¶ 35.  And Defendants do not have control over the X/Twitter handle identified in the complaint, and efforts to have X/Twitter address the issue were made.   *See*  Belegu  Decl.  at  ¶  36.    Nor  are  Defendants  using  the www.rootermanplumberservices.com domain for marketing or advertising purposes, and once Google has completed the task of updating Mr. Belegu's personally-owned website links to the new domain, he will gladly transfer it to Plaintiff.[6]  *See* Belegu Decl. at ¶ 37.

---

[4] R and M are the initials of the first names of Mr. Belegu's wife's parents, as well as the inverse of his wife's initials.

[5] In fact, Plaintiff is complaining that Mr. Belegu did what he was supposed to do—stop using the Rooterman name in those Google and Facebook listings.  Plaintiff is simply upset that Mr. Belegu generated goodwill based on the services provided (nothing Plaintiff or A Corp did).

[6] If he does it before Google completes the task, he will lose the benefit of tens of thousands of dollars spent on the website, independent of anything to do with the "Rooterman" name.  *See* Belegu Decl. at ¶¶ 38-39;  *see also*,  **Exhibit 10**, Google, *Redirects and Google Search*, https://developers.google.com/search/docs/crawling-indexing/301-redirects?hl=en&visit_id=638720510627603247-834812934&rd=1.    The  purpose  is  not  to generate revenue from the "Rooterman" name but rather ensure that Google properly locates the content owned by Mr. Belegu, none of which has the Rooterman name affixed to it.

## 2.0     Legal Standard

A preliminary injunction must (1) state the reasons why it issued; (2) state its specific terms; and (3) describe in reasonable detail the act or acts restrained or required. Fed. R. Civ. P. 65(d). Injunctive relief should only be issued if: (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff is likely to suffer irreparable harm if the injunction did not issue; (3) the balance of equities tips in plaintiff's favor; and (4) the injunction is in the public interest. *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). None of these factors favor Rooterman.

## 3.0     Analysis

Neither the Lanham Act nor contract claims are enforceable.  Rooterman has identified no irreparable harm; its only *theoretical* harm is monetary.  The equities tip in favor of Defendants, two of whom did not even have a relationship with Plaintiff.  The public interest disfavors the requested injunctive relief.  Simply put, Plaintiff is not entitled to injunctive relief.  If an injunction must issue, it must be on a bond that would fully compensate Defendants for their lost income (and, as that lawsuits such as these often stretch on for years, it would be in the millions of dollars).

### 3.1     Rooterman Will Not Succeed on the Merits

Rooterman seeks to enforce unspecified, unregistered, and unenforceable service marks it has failed to police and for which it has granted a naked license.  It also seeks to enforce a non-compete clause in a contract that is unenforceable due to prior material breach and for the clause's violation of Massachusetts law.  Plaintiff has no likelihood of success on the merits.

#### 3.1.1   Rooterman's Lanham Act Claims are not Meritorious

In the FAC, Plaintiff brings claims for purported violation of 15 U.S.C. § 1125(a), (c) & (d) (Count I) and for purported violation of 15 U.S.C. § 1114 (Count II).  In the motion, however,

Plaintiff does not assert a likelihood of success under Section 1125(c) or (d), so those will not be addressed.  The Section 1125(a) and 1114 claims lack merit.

As to Section 1125(a), Plaintiff alleges that Defendants' (without specifying which) "registration and use of the infringing domain names, and use of the infringing service marks" "constitutes unfair competition in violation of 15 U.S.C. § 1125(a)."  FAC at ¶¶ 40-41.  And as to Section 1114, Plaintiff only generically alleges that Defendants (again, without specifying which) "have used and continue[] to use the Rooterman trademarks or confusingly similar marks in its domain name, websites, and advertising for goods or services in commerce."  FAC at ¶ 48.  The only domain name identified in the FAC and the motion is www.rootermanplumberservices.com. FAC at ¶¶ 1 & 15 and Ex. A thereto (ECF No. 7-1).  As noted above, the only alleged use of a claimed mark is in the domain name, the Twitter handle, the former name of Water Damage Restoration (which doesn't compete with Rooterman), and in content controlled by third-parties (Google, Yelp, LinkedIn, etc.).

The alleged infringer's continued use of the mark is central to the inquiry. *Boston Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1, 34 (1st Cir. 2008).  Plaintiff's request for injunctive relief as to the domain, handle, and former business name is moot.  "Article III limits federal court jurisdiction to 'cases' and 'controversies.' U.S. Const. art. III, § 2." *O'Neil v. Canton Police Dep't*, 116 F.4th 25, 30 (1st Cir. 2024).  "The mootness doctrine is based in the Article III jurisdictional requirements. Mootness occurs when subsequent events unfold such that standing no longer exists." *Id.* (citation omitted).  A claim is moot when "[t]here is simply 'no ongoing conduct left for the court to enjoined.'" *Id.* at 31, quoting *Am. C. L. Union of Mass. v. U.S. Conf. of Cath. Bishops*, 705 F.3d 44, 53 (1st Cir. 2013).  Plaintiff attempts to sidestep mootness in a footnote, arguing that an injunction would nevertheless "help ensure that all violations of

Plaintiff's rights, whatever they may be, must cease." (ECF No. 10 at 11 n. 2). However, that is not how Constitutional standing works, otherwise everyone could come into court, seeking an injunction against a theoretical, unspecified future injury. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013) as quoted in *O'Neil, supra* at 31 ("no standing existed where alleged injury was 'based on hypothetical future harm that is not certainly impending.'") And, where a defendant has "made clear that they do not wish to continue using the plaintiffs' trademarks" there is "neither a likelihood of success on the merits nor a prospect of irreparable harm." *RE/MAX of New Eng., Inc. v. Prestige Real Estate, Inc*., 2014 U.S. Dist. LEXIS 91499, at *4 (D. Mass. July 7, 2014).

Similarly, the claim as to the Yelp, Google, Facebook, and HomeAdvisor matters is non-redressable by the requested injunction. "The redressability element of standing requires that the plaintiff allege that a favorable resolution of its claim would likely redress the professed injury. This means that it cannot be merely speculative that, if a court grants the requested relief, the injury will be redressed." *Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc*., 958 F.3d 38, 47 (1st Cir. 2020) (cleaned up). In *Dantzler,* the plaintiffs failed to prove redressability because their injury "depend[ed] in large part, if not in total, on the conduct of [nonparty] ocean freight carriers" and it was "far from certain" a court order would change that conduct. 958 F.3d at 47. Here, an injunction against the defendants would not change what the third-parties post.

Neither can Plaintiff succeed in its claims against Water Damage Restoration Ltd ("WDR") and 911 Sewer & Drain Corporation ("911"); they are New Jersey based non-parties to the franchise agreements and Plaintiff is attempting to reverse veil pierce without establishing the necessary elements. There is "no published case recognizing reverse veil piercing under New Jersey law." *Russo v. Creations by Stefano*, 2020 N.J. Super. Unpub. LEXIS 1615, at *14 n.10 (Super. Ct. App. Div. Aug. 20, 2020). New Jersey federal courts have recognized such a claim

Opposition to Plaintiff's Renewed Motion for Preliminary Injunction
1:24-cv-13015

and utilize the same factors for both traditional and reverse veil piercing.  *See Bowers v. Taylor*, 2024 U.S. Dist. LEXIS 132419, at \*13 (D.N.J. June 28, 2024).    In New Jersey, "two elements must be shown to pierce the corporate veil: 'First, there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist. Second, the circumstances must indicate that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice.'" *Linus Holding Corp. v. Mark Line Indus., LLC*, 376 F. Supp. 3d 417, 425 (D.N.J. 2019) (quoting *State Capital Title & Abstract Co. v. Pappas Bus. Servs., LLC*, 646 F. Supp. 2d 668, 679 (D.N.J. 2009)).  Plaintiff makes no allegation as to unity of interest and ownership that would suggest WDR or 911 no longer have separate personalities from Mr. Belegu.  Nor do circumstances to recognize their individuality sanction a fraud or promote injustice.  Similarly, "[t]he Massachusetts Supreme Judicial Court has never explicitly, or even inferentially, adopted reverse veil piercing in any form." *Shea v. Millett*, 2019 U.S. Dist. LEXIS 6390, at \*6 (D. Mass. Jan. 14, 2019) (cleaned up).  Assuming, *arguendo*, such a claim exits, in Massachusetts, courts holistically consider twelve factors when determining whether piercing the corporate veil is appropriate:

> (1) common ownership; (2) pervasive control; (3) confused intermingling of business assets; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporation's funds by dominant shareholder; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud.

*Id.* at \* 7 *quoting AG v. M.C.K., Inc*., 432 Mass. 546, 736 N.E.2d 373, 380 n.19 (Mass. 2000).  Plaintiff makes no attempt to allege any of these in the FAC and argues none of it in the motion, except to note Mr. Belegu's ownership.  Thus, Plaintiff is unlikely to succeed in its claims against WDR or 911 based solely on what Mr. Belegu may have done.

Even if Plaintiff had standing to seek injunctive relief or it could engage in reverse veil piercing, its claims under §§ 1114 & 1125(a) fail. As noted by Plaintiff, Rooterman "must prove (1) the mark is entitled to trademark protection, and (2) use by another in commerce that is likely to cause confusion as to the source or sponsorship of the goods or services." ECF No. 10 at 9, quoting *Polar Corp. v. PepsiCo, Inc.*, 789 F. Supp. 2d 219, 226 (D. Mass. 2011). As noted above, none of the defendants are using any mark that Plaintiff claims rights in. All of the cases cited by Plaintiff require continued use, which is absent here. At most, there was a single domain name and a twitter handle, which are no longer being used. And as to Water Damage Restoration, it must be noted that Plaintiff's own caselaw shows that the likelihood of confusion analysis argument only applies in the operation of "a business identical to that of her form[erly] licensed franchise." ECF No. 10 at 10, quoting *Curves Int'l v. Fox*, 2013 U.S. Dist. LEXIS 66235, at *4 (D. Mass. May 9, 2013). At no point was Water Damage Restoration f/k/a RM Water Damage Restoration engaged in the plumbing and drainage business. *See* Belegu Decl. at ¶ 40.

More important, Plaintiffs alleged marks are not entitled to protection. First, Plaintiff handwaves over its Exhibit B to the FAC (ECF No. 7-2) without identifying which mark it alleges is being infringed. At no point, however, does Plaintiff allege that any of the design marks referenced in Exhibit B were infringed. Crucially, unlike its better-known competitor, Roto-Rooter,[7] Plaintiff does not have a word mark; it only has design marks. "This is an important distinction. The ownership of a word mark entitles the owner exclusive rights in the word for the class of goods specified on the trademark. In contrast, ownership of a design mark limits the owner's rights exclusively to the specific design trademarked." *Rise Basketball Skill Dev., LLC v. K Mart Corp.*, 2017 U.S. Dist. LEXIS 179695, at *8-9 (N.D. Cal. Oct. 27, 2017) citing *Pom*

---

[7] Reg. No. 1221194.

*Wonderful FFL v. Hubbard*, 775 F.3d 1118, 1125 (9th Cir. 2014).  In fact, "[s]tandard character registrations 'are federal mark registrations that make no claim to any particular font style, color, or size of display.'"  *Pom Wonderful, supra* at 1125, quoting *Citigroup Inc. v. Capital City Bank Grp., Inc.*, 637 F.3d 1344, 1349 (Fed. Cir. 2011).  That is, "because a word registered in standard characters is not limited to any particular rendition of the mark, the registration covers the word per se."  *Pom Wonderful, supra* at 1125 (cleaned up) citing *In re Mighty Leaf Tea*, 601 F.3d 1342, 1348 (Fed. Cir. 2010) and 3 McCarthy on Trademarks and Unfair Competition § 19:58 (4th ed.) (updated Sept. 2014); *see also* 37 C.F.R. § 2.52(a); Trademark Manual of Examining Procedure ("TMEP") § 1207.01(c)(iii) ("If a mark (in either an application or a registration) is presented in standard characters, the owner of the mark is not limited to any particular depiction of the mark.").  None of Plaintiff's claimed marks are word/standard character marks; they are all design marks. *See* Composite **Exhibit 11**; Declaration of Cassidy Flavin ("Flavin Decl.") at ¶¶ 3-4.  In fact, only an apparent early franchisee, Rooterman, Inc. of Ohio, ever filed, and then abandoned, an application for a word mark in "Rooterman", Serial No. 73456290.  *See* **Exhibit 12**; Flavin Decl. at ¶¶ 5-6.  Thus, Plaintiff has no exclusive rights in just the words "Rooterman" or "RM."  Simply put, Plaintiff does not claim Defendants infringed any of the designs; it only claims infringement in "Rooterman" and "RM," but since it lacks registration in those marks, Defendants cannot violate rights that Plaintiff does not possess.

Assuming *arguendo* there is some valid registration for the words, any rights it may have had have been lost.  The mark is not distinctive.  In Reg. No. 3859654 for a stylized rendering of "Rooter * Man," Plaintiff's predecessor in interest explicitly disclaimed the word "rooter" as the Examining Attorney for the U.S.P.T.O, determined "rooter" was merely "descriptive of applicant's services, which feature rooter-based plumbing and cleaning services – indeed, various third parties

have previously disclaimed the same term for the same (or related) services." **Exhibit 13**; Flavin Decl. at ¶¶ 7-8.    Presumably, this is why the basic word mark application was abandoned—one cannot acquire incontestable rights in a mark "which is the generic name for the goods or services or a portion thereof, for which it is registered."  15 U.S.C. § 1065(4).  A rooter man is a man who performs rootering services; there can be nothing more generic than that.

To the extent that Plaintiff or A Corp. had rights in any claimed marks, they were lost due to the naked license granted to Mr. Belegu and other franchisees.  *See Barcamerica Int'l USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589, 596 (9th Cir. 2002) ("[W]here the licensor fails to exercise adequate quality control over the licensee, a court may find that the trademark owner has abandoned the trademark, in which case *the owner would be estopped from asserting rights to the trademark.*" (emphasis added) (quotation marks and citation omitted)).  A registration may be canceled "at any time if the registered mark . . . has been abandoned," 15 U.S.C. § 1064(3) (1994), and a mark shall be deemed abandoned "when any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name of the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark," id. § 1127.  As explained in *Blake v. Prof'l Coin Grading Serv.*:

> Naked licensing refers to the abandonment of a mark "by allowing others to use the mark without exercising 'reasonable control over the nature and quality of the goods, services, or business on which the [mark] is used by the licensee.'" *Eva's Bridal Ltd. V. Halanick Enters., Inc.*, 639 F.3d 788, 789 (7th Cir. 2011) (quoting Restatement (Third) of Unfair Competition § 33 (1995)); *see Rey v. Lafferty*, 990 F.2d 1379, 1392 n.10 (1st Cir. 1993). "To be a valid license, the licensor must adequately control the quality of the goods and services provided by the licensee under the mark." *Boathouse Grp., Inc. v. TigerLogic Corp.*, 777 F. Supp. 2d 243, 250 (D. Mass. 2011) (Gorton, J.). "[F]ailure to control the quality of licensed goods can constitute an abrogation of the licensor's duty to protect the informational value of the mark," and the trademark holder may lose protection of the mark. *Rey*, 990 F.2d at 1392 n.10 (citations omitted).

RANDAZZA | LEGAL GROUP

898 F. Supp. 2d 365, 385 n.13 (D. Mass. 2012) (Young, J.). "[I]t is well established that where a trademark owner engages in naked licensing, without any control over the quality of goods produced by the licensee, such a practice is inherently deceptive and constitutes abandonment of any rights to the trademark by the licensor." *Barcamerica*, 289 F.3d at 598 (citation omitted). In *Barcamerica,* the plaintiff was deemed to have granted a naked license in a wine's name by failing to sample, in any organized way, an adequate number of bottles bearing the mark, and thus failed to exercise quality control. The same type of failure to control occurred here. Mr. Belegu and QAC were given their franchises and neither A Corp. nor Plaintiff took any steps to exercise quality control, ignoring the right to inspect operations and records retained in Section 12.8 of the franchise agreement. Belegu Decl. at ¶ 41. They never inspected the work performed. *Id.* at ¶ 42. They never accompanied employees on the job to ensure that services were performed to expectations. *Id.* at ¶ 43. In fact, they set no expectations and provided absolutely no training in performing the rootering and plumbing services marketed under the Rooter-Man name. *Id.* at ¶ 44. They cannot be found to have exercised reasonable control because they exercised no control. *Id.* at ¶ 45. Even though the franchise agreement (ECF No. 7-3 at § 11) purported to direct which vehicles, equipment, and uniforms should be used, A Corp and Plaintiff did not actually undertake to do so. *Id.* at ¶ 46. Thus, Plaintiff's trademark rights, if any, were lost to abandonment through their naked license.

Whichever mark is at issue is subject to cancellation pursuant to 15 U.S.C. §§ 1064 & 1119 for failure to police. To establish the defense of abandonment by failure to police a trademark, "it is necessary to show either the owner's intent to abandon the mark, or a course of conduct on the part of the owner causing the mark to become generic or lose its significance as a mark." *Hermes Int'l v. Lederer de Paris Fifth Avenue, Inc.*, 219 F.3d 104, 110 (2d Cir. 2000). Here, Plaintiff and

RANDAZZA | LEGAL GROUP

A Corp. were given numerous opportunities to address former franchisees who were reaping the benefits of Mr. Belegu and QAC's territories through the Google listings using the Rooter Man name. They failed to act, requiring Mr. Belegu to attempt to take it into his own hands. Belegu Decl. at ¶ 47. It was A Corp. and Plaintiff's responsibility to police the marks, not Mr. Belegu's, and by throwing up their hands, they abandoned the marks, failing to police them.

For all of the foregoing reasons, Plaintiff is not likely to succeed on the merits of its Lanham Act claims at issue and it is not entitled to injunctive relief.

### 3.1.2   Rooterman's Contract Claim is Meritless

In its third count, Plaintiff brings a claim for breach of contract, allegedly using confidential information/trade secrets, failing to return proprietary information, competing post-termination, soliciting customers, and "failing to disassociate from Plaintiff's trademarks[.]" FAC at ¶ 54. In the motion, however, Plaintiff is only claiming a likelihood of success on the trademark issue and for purported violation of Section 18.1 of the Franchise Agreement—competition in the counties where Mr. Belegu and QAC previously had franchise territories. ECF No. 10 at 12-13.

As for the trademark issue, it is moot or otherwise non-redressable for the reasons set forth above.[8] Neither are Mr. Belegu or QAC liable for breach of the non-compete agreement. Although Mr. Belegu applied for a service mark in 911 Sewer & Drain (word mark) in 2022 and organized 911 Sewer & Drain Corporation in February 2024, this was for cautionary purposes; 911 Sewer & Drain did not begin active operations until after the franchise agreements were terminated. *See* Belegu Decl. at ¶ 48. In fact, one need only look at the USPTO application, Serial No. 97346878,

---

[8] Plaintiff also gives lip service to a claim that proprietary and/or confidential materials were not returned, but none are identified. To the extent Plaintiff is referring to out-of-date, generic business operation materials received from A Corp., Mr. Belegu is happy to provide them to Plaintiff and such does not require a court order.

which shows that a) the mark had not been yet used in commerce, and Mr. Belegu's specimen was refused because he could not show the mark actually being used in commerce. **Exhibit 14**; Flavin Decl. at ¶¶ 9-10.

Now, Mr. Belegu operates 911. Assuming, *arguendo*, such violates Section 18.1 of the franchise agreement, which purports to prohibit Mr. Belegu from "directly or indirectly engag[ing] in, hold[ing] any interest in, or be[ing] involved in any way with any of the services comprising the A CORP. System" for 3 years, within 100 miles of any A Corp. (now Rooterman) territory (FAC Ex. C (ECF No. 7-3)), that provision is unenforceable.

Section 19.6 states that agreement is governed by and construed under Massachusetts law. In Massachusetts, a non-compete provision in a franchise agreement is enforceable only if "it is necessary to protect a legitimate business interest, reasonably limited in time and space, and consonant with the public interest." *Boulanger v. Dunkin' Donuts, Inc*., 442 Mass. 635, 639, 815 N.E.2d 572 (2004). Notably, "[a] covenant not to compete designed to protect a party from ordinary competition does not protect a legitimate business interest." *Id.* at 641. "Courts will not enforce non-compete provisions if their sole purpose is to limit ordinary competition." *RE/MAX*, 2014 U.S. Dist. LEXIS 91499, at *5. In *Boulanger*, the non-compete was deemed enforceable because Dunkin' Donuts had a legitimate interest in protecting confidential information, which

> "included operating manuals and similar information contained in videotapes, CD-ROMs, and websites; recipes for coffee and baked goods; financial information and data; marketing and promotion strategy; new product development; and the location of sites for new stores and building plans. [And] district meetings were held several times a year, often involving the dissemination of confidential information such as financial data and profitability of particular stores, new product development, and marketing and promotion strategies."

442 Mass. At 642. In contrast, the non-compete in *RE/MAX* was unenforceable because there were "no trade secrets involved here" and the best argument was that the former franchisee only knew

its "general business strategies" without any convincing evidence that the defendants' good will was due to RE/MAX branding or methods, as opposed to the work and personal relationship of the franchisee. 2014 U.S. Dist. LEXIS 91499, at *7. Although Plaintiff's motion (and the FAC) repeatedly uses the terms "confidential information" and "trade secrets," the purported nature of this alleged confidential information and/or trade secrets is absent from the record. *See, generally*, ECF Nos. 7 & 10.

There are no trade secrets or confidential information here. Neither A Corp. nor Plaintiff provided Mr. Belegu or QAC with the training program described in Section 9.1 of the Agreement. Even what the franchise agreement purports to be confidential—the franchise agreement itself (Section 18.2)—is not, else Plaintiff would have filed a redacted version or sought to file it under seal. And despite Section 18.2 mentioning "formulas," there are no formulas here—in fact, what set Mr. Belegu's and QAC's rootering business apart from competitors was the service provided and the uncommon use of jet machines and cameras, which is not something that came from A Corp. or Plaintiff. *See* Belegu Decl. at ¶ 49. In short, the non-compete is unenforceable as it only protects against ordinary competition.

Plaintiff is otherwise unlikely to succeed. It comes to this Court with unclean hands[9]. "An employer may act so arbitrarily and unreasonably in exercising his right of termination that a court of equity will refuse aid in enforcing for his benefit other parts of the contract." *Econ. Grocery Stores Corp. v. McMenamy*, 290 Mass. 549, 552, 195 N.E. 747, 748 (1935) (refusing to enforce a

---

[9] While unclean hands is ordinarily not a defense to an action at law for breach of contract, *Likousas v. Makris*, 99 Mass. App. Ct. 1128, 170 N.E.3d 356 (2021), Plaintiff is seeking the equitable remedy of a preliminary injunction and equitable defenses should apply at this stage. "The unclean-hands doctrine, like other equitable defenses, is appropriately considered by a court in determining whether to issue a preliminary injunction." *Great Lakes Consortium v. Michigan*, 2006 U.S. Dist. LEXIS 93942, at *16-17 (W.D. Mich. Dec. 29, 2006).

Opposition to Plaintiff's Renewed Motion for Preliminary Injunction
1:24-cv-13015

non-compete where employee's efforts built up department prior to arbitrary termination). Here, it was Mr. Belegu and QAC that built up the business without the necessary assistance of PSB/Plaintiff. *See* Belegu Decl. at ¶ 50. Rather than performing its end of the bargain, Plaintiff unreasonably terminated the agreements, likely so that it could charge a successor franchisee a higher fee, based on the goodwill created by Mr. Belegu and QAC.

Similarly, "[i]t is well established that a material breach by one party excuses the other party from further performance under the contract." *Ward v. Am. Mut. Liab. Ins. Co.*, 15 Mass. App. Ct. 98, 100, 443 N.E.2d 1342, 1343 (1983). Mr. Belegu repeatedly gave A Corp. and Plaintiff notice of potential infringement under Section 8.5(A) of the Agreement. *See* Belegu Decl. at 51. At no point did A Corp. or Plaintiff take action to protect any marks or grant Mr. Belegu or QAC permission under Section 8.5(B) to do so themselves. *See* Belegu Decl. at ¶ 52. By failing to act, A Corp. and Plaintiff essentially granted a license to others to operate a Rooterman franchise in Mr. Belegu/QAC's territories, in violation of Section 3.1(E). As noted, at no point did A Corp. or Plaintiff provide the training promised in Section 9.1. At no point did A Corp. or Plaintiff provide the Additional Assistance of the Grand Opening Promotional Program (9.3(A)), Seminars (9.3(D)), On-Going Assistance and Supervision (9.3(E)), Initial Sales Assistance (9.3(F)), or the tools and supplies (9.3(G)). *See* Belegu Decl. at ¶ 53. And Plaintiff utterly failed to replace the microsites as promised. *See* Belegu Decl. at ¶ 54. Thus, due to these prior material breaches, the agreements are unenforceable. In sum, Plaintiff lacks any likelihood of success on the merits of its claims.

### 3.2    Plaintiff Does Not Face Irreparable Harm

Plaintiff has failed to show irreparable harm. "[A] preliminary injunction is not warranted by a tenuous or overly speculative forecast of anticipated harm." *Ross-Simons of Warwick, Inc. v.*

*Baccarat, Inc.,* 102 F.3d 12, 19 (1st Cir. 1996). As to the contract claim, Plaintiff simply claims that "direct competition with Rooterman and flagrant misuse of trade secrets" would cause irreparable harm. ECF No. 10 at 16. No trade secrets were identified, let alone alleged to have been misused. "That is, they have not shown the inadequacy of a damages remedy." *RE/MAX,* 2014 U.S. Dist. LEXIS 91499, at *7 *citing Charlesbank Equity Fund II v. Blinds To Go, Inc*., 370 F.3d 151, 162 (1st Cir. 2004).

Similarly, as to the purported Lanham Act claim, where a defendant has "made clear that they do not wish to continue using the plaintiffs' trademarks" then the plaintiff has not demonstrated "a prospect of irreparable harm. *RE/MAX,* 2014 U.S. Dist. LEXIS 91499, at *7 citing *Boston Duck Tours, supra*. Defendants are using none of Plaintiff's actual registered marks and they have no intent to use them.

### 3.3    The Balance of Equities Favors Defendants

Two of the defendants were not franchisees, and it would be wholly inequitable to enjoin them for the alleged acts of others. Moreover, Plaintiff's arguments as to the balance of equities otherwise lacks merit.

This is not a case of Defendants claiming lost profits by not being allowed to infringe—they are not infringing. They are not using any "trade secrets" or "confidential information"—Plaintiff has identified no such use. Thus, Plaintiff's case citations are inapposite.

While Plaintiff claims that Mr. Belegu cannot just "change the sign on the door" to reap "Plaintiff's investment in those markets", Plaintiff made no such investment and offers no evidence of such, merely argument of counsel. All of the labor and effort was by Mr. Belegu and QAC; it would be inequitable for this Court to disregard that. As in *McMenamy, supra*, it was Mr. Belegu and QAC who built up the business in the territories, not Plaintiff. In fact, A Corp. and

Plaintiff worked against Mr. Belegu and QAC, failing to stop Google from directing those searching for "Rooterman" to its former franchisees, rather than to Mr. Belegu or QAC. Defendants built up their customer base despite A Corp./Plaintiff, not because of them.

Although Plaintiff correctly cites to *Dunkin' Donuts Franchised Rests. LLC v. Wometco Donas Inc.*, which stated that the "potential of lost profits alone does not constitute sufficient hardship for this inquiry, *Wometco* was incomplete in its statement of the law. 53 F. Supp. 3d 221, 232 (D. Mass. 2014). *Wometco* directly cited to *Concrete Machinery Co., Inc. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 612 (1st Cir. 1988), in support of that proposition. That was a case where the First Circuit was addressing the harm of allowing a likely copyright infringer to continue infringing. However, the First Circuit then qualified the issue by reaffirming that "a court's findings regarding likelihood of success … should be placed in the scales when it weighs the balance of the harms. … [I]t allows consideration of relative hardships to be a significant, and perhaps determinative, factor when the defendant has shown it may suffer significant harm and the plaintiff has made only a marginal showing of likelihood of success." 843 F.2d at 612. Here, Plaintiff failed to show any likelihood of success on any claim and, where Plaintiff seeks to put three out of the four defendants out of business (under the meritless non-compete claim). Thus, the balance favors Defendants.

### 3.4    Injunctive Relief is Not in the Public Interest

Defendants are not representing themselves as Rooterman, thus there is no confusion in the marketplace. Plaintiff's reliance on *Wometco* is, once more, misplaced, as no defendant is operating under the franchisor's name, unlike the defendant in *Wometco*. Even the *Wometco* defendant was not barred from operating a coffee shop—they just could not hold themselves out as a Dunkin' Donuts.

Rather, as *Wometco* observed, "[i]f there is no measurable effect on the public interest, the Court relies more heavily on the other criteria." 53 F. Supp. 3d at 232 citing *Ross-Simons of Warwick, Inc. v. Baccarat, Inc*., 102 F.3d 12, 15 (1st Cir. 1996). The proposed injunction only benefits Plaintiff, it does not benefit the public. If anything, it harms the public because it would deprive the public of the services they've come to expect from Mr. Belegu. There is a shortage of plumbers available for the public to retain.[10] This is an endemic problem and the plaintiff seeks to remove a plumbing company from circulation and availability for what? To exact an advantage in litigation? That is not in the public interest.

Thus, as the other factors favor Defendants, the Court should rely more heavily on those.

### 3.5    A Significant Bond Should be Required

Rule 65 provides that a court cannot enter injunctive relief unless the moving party "gives security in the amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). In other words, a bond should be required if the enjoined party will suffer any harm from the issuance of the injunction. *See Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 285 (4th Cir. 2002).

When a plaintiff seeks to enforce a non-compete agreement, an appropriate bond is the monetary loss that would be suffered. *See, e.g., Aspect Software, Inc. v. Barnett*, 787 F. Supp. 2d 118, 132 (D. Mass. 2011)(setting $500,000 bond, equivalent to the salary the employee would

---

[10]    *See* Samantha DeAlmeida Roman, *It's no joke: Shortage of plumbers could clog up economy*, ROINJ (June 4, 2024), https://www.roi-nj.com/2024/06/04/opinion/op-ed/its-no-joke-shortage-of-plumbers-could-clog-up-economy/ ; Andrew Dorn, *Labor crisis: Why is there a shortage of plumbers and electricians?,* NEWSNATION (April 11, 2024), https://www.newsnationnow.com/us-news/education/labor-shortage-trades-jobs-plumber-electrician/ ; Enda Curran, *US Plumbing Shortage Is a Generational Problem*, BLOOMBERG (March 14, 2024), https://www.bloomberg.com/news/newsletters/2024-03-14/plumbing-jobs-available-as-retirements-outnumber-apprentices .

Opposition to Plaintiff's Renewed Motion for Preliminary Injunction
1:24-cv-13015

otherwise enjoy).  If the Court does see fit to issue a preliminary injunction, then the bond should be at least a year's lost income for Defendants.  Such is at least $3,000,000.  Belegu Decl. at ¶ 55.

## 4.0    Conclusion

PSB squeezed out highly successful franchisees, and it can now profit off the goodwill Mr. Belegu and QAC created.  The Court should not go further and penalize them for having had the audacity to demand what they were entitled to.  There is no mark to enforce—there is no word mark and the issue is moot—and the marks have otherwise been abandoned for naked license and failure to enforce.  The non-compete agreement is unenforceable as it only prohibits ordinary competition, Plaintiff comes with unclean hands, and Plaintiff committed a prior material breach. There is no irreparable harm.  The balance of equities favors Defendants.  The public has no interest in the injunction, and in fact has an interest in it *not* being entered.  If one must be granted, a bond of $3,000,000.00 should be required.

WHEREFORE Defendants respectfully request the motion be DENIED.

Dated: January 13, 2025.                    Respectfully Submitted,

/s/ Marc J. Randazza
Marc J. Randazza, BBO# 651477
mjr@randazza.com, ecf@randazza.com
Jay M. Wolman, BBO# 666053
jmw@randazza.com
RANDAZZA LEGAL GROUP, PLLC
30 Western Avenue
Gloucester, MA 01930
Tel: (978) 801-1776

*Attorneys for Defendants.*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on January 13, 2025, the foregoing document was served on all parties

or their counsel of record through the CM/ECF system.

<u>/s/ Marc J. Randazza</u>
Marc J. Randazza