IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| Rooterman, LLC<br><br>        *Plaintiff,*<br><br>  v.<br><br>Klodian Belegu, Quality Air Care Corporation, RM Water Damage Restoration LTD and 911 Sewer & Drain Corporation.<br>        *Defendants.* | Docket No. 1:24-cv-13015 |

**PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY**

Plaintiff, Rooterman, LLC ("Rooterman"), hereby submits this Notice of Supplemental Authority as further authority to address an argument of Defendants that lacks merit. As background, in the Answer and Counterclaims of Defendants Klodian Belegu, Quality Air Care Corporation, RM Water Damage Restoration LTD and 911 Sewer & Drain (collectively, "Defendants"), Defendants argue that Plaintiff's breach of contract claims (*i.e.,* its claims for breach of restrictive covenants and other breaches) are not properly asserted against 911 Sewer & Drain Corporation and/or Water Damage Restoration Ltd because neither was a party to the Franchise Agreements containing such terms. However, as Plaintiff has already argued, that is of no consequence, since Mr. Belegu, who was bound by the franchise agreements, owns both of those other corporations. In further support of Plaintiff's argument, Plaintiff gives notice of the following supplemental authority, attached hereto. See Alexander & Alexander, Inc. v. Danahy, 21 Mass. App. Ct. 488, 500 (1986) (discussing and citing cases for the principle that third party entities can be enjoined from violating noncompetition agreements even if they did not sign). In Danahy, the individual who signed the covenants was bound by the covenants (like Belegu here)

#5879487v1

was president of the non-party entity, played a dominant role at the non-party entity, could exert influence over the non-party entity's activities, and was closely identified with the non-party entity in the mind of the public. Id. Thus, the non-party entity was properly bound to the same obligations as the individual who signed the covenants.

          Respectfully submitted,

          ROOTERMAN, LLC

          By its Counsel

Dated: March 3, 2025

*/s/ Jeffrey Rosin*
Jeffrey M. Rosin, BBO# 629216
Lisbeth Valdez, BBO# 715826
O'HAGAN MEYER, PLLC
140 Kendrick Street, Bldg. C
Needham, MA 02494
Telephone: (617) 843-6800
Fax: (617) 843-6810
jrosin@ohaganmeyer.com
lvaldez@ohaganmeyer.com

#5879487v1

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of March 2025, *Plaintiff's Notice of Supplemental Authority* was electronically filed. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

*/s/ Jeffrey Rosin*
Jeffrey M. Rosin

#5879487v1

# EXHIBIT A

## *Alexander & Alexander, Inc. v. Danahy*

Appeals Court of Massachusetts, Middlesex

November 8, 1985, Argued ; January 23, 1986, Decided

M. No. 85-202

**Reporter**
21 Mass. App. Ct. 488 *; 488 N.E.2d 22 **; 1986 Mass. App. LEXIS 1363 ***

ALEXANDER & ALEXANDER, INC. v. ROBERT F. DANAHY & another [1]

**Prior History: [***1]** Civil action commenced in the Superior Court Department on November 20, 1984.

A motion for a preliminary injunction was heard by *Paul K. Connolly*, J.

**Disposition:** *So ordered*.

## Syllabus

Although in an action to enforce a noncompetition agreement some of the allegations in the verified complaint signed by the plaintiff's managing vice president were made not on personal knowledge but on information and belief and the complaint was not supported by affidavits, the judge was not thereby barred from issuing a preliminary injunction, where in addition to the complaint the judge had before him extensive memoranda and various affidavits filed by the defendants which provided sufficient facts to warrant issuance of the injunction. [493-494]

The fact that an insurance brokerage firm waited seventeen months after a former employee left to join a competing firm before bringing an action to enforce the terms of an agreement not to compete did not preclude issuance of an injunction, where the employee had given assurances that he would abide by the agreement, where there were negotiations about **[***2]** a modification of the agreement, and where the employee's breach of the agreement was not apparent for more than a year after he had left the firm. [494-495]

The validity of covenants against competition contained in an agreement whereby an insurance brokerage firm acquired all the assets of an insurance agency and employed the agency's owner was to be determined according to the standards applicable to covenants against competition arising out of the sale of a business, rather than covenants in an employment agreement. [495-497]

In an action by an insurance brokerage firm seeking to enforce covenants against competition contained in an agreement between the firm and the defendant whereby the firm had acquired all the assets of an insurance agency and had employed the defendant, and the defendant had agreed for a period of five years after termination of his employment with the firm to refrain from certain acts of competition, the judge did not err in issuing a preliminary injunction to enforce the terms of the covenants, including a five-year ban on doing business with or accepting or receiving business from customers and actively solicited prospective customers of the agency **[***3]** or the firm. [498-499]

In an action by an insurance brokerage firm seeking to enforce a noncompetition agreement against a former employee and a corporation engaged in the insurance brokerage business, the judge did not err in enjoining the corporation from violating the noncompetition agreement, even though the corporation was not a party to it, where the corporation knew the full extent of the agreement when it hired the individual defendant as its president, where the individual defendant was in a position to exert influence over the corporation's activities, and where the injunction did no more than prevent the corporation from obtaining benefits from its president's violation of the noncompetition convenants. [499-501]

In an action by an insurance brokerage firm against a former employee and a corporation engaged in the insurance brokerage business to enjoin violation of a noncompetition agreement between the plaintiff and the individual defendant, the judge did not abuse his discretion in issuing a preliminary injunction against the defendants based on his balancing of the risk of harm to the parties in light of their respective chances of success on the merits, even **[***4]** though he failed to make any reference to the effect of the injunction on the

---

[1] Rollins Burdick Hunter of Massachusetts, Inc.

Case 1:24-cv-13015-PBS    Document 27    Filed 03/03/25    Page 6 of 11

21 Mass. App. Ct. 488, *488; 488 N.E.2d 22, **22; 1986 Mass. App. LEXIS 1363, ***4

public interest. [501]

**Counsel:** *John K. Markey*, for Rollins Burdick Hunter of Massachusetts, Inc.

*Jerome Gotkin* (*Steven M. Sayers & Gordon P. Katz* with him), for the plaintiff.

*Paul W. Goodrich, James J. Moran, Jr., & Joanne P. Keating*, for Robert F. Danahy, submitted a brief.

*Richard D. Glovsky & Sharon D. Meyers*, for Kevin M. Daly, submitted a brief.

**Judges:** Grant, Armstrong, & Fine, JJ.

**Opinion by:** FINE

## Opinion

 [*489]  [**25] This case involves a dispute among several major forces in the insurance brokerage business in Massachusetts. A Superior Court judge allowed a motion for a preliminary injunction to enforce covenants not to compete. A single justice of this court modified the injunction. From the order as further modified (see note 4, *infra*) the defendants have appealed. We [*490] apply the standards for appellate review of the issuance of a preliminary injunction set forth in *Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 615-616 (1980)*. Thus, while we accord weight to the judge's exercise of discretion, to the extent that the order was based upon [***5] documentary evidence, we draw our own conclusions. See *Edwin R. Sage Co. v. Foley, 12 Mass. App. Ct. 20, 25-26 (1981)*. The conclusions we have drawn lead us to affirm.

The plaintiff, Alexander & Alexander, Inc. (A&A), a Massachusetts corporation, is an insurance brokerage firm operating in Massachusetts. It is a wholly owned subsidiary of Alexander & Alexander Services, Inc. (A&AS), a Maryland corporation engaged in the insurance brokerage business nationwide and overseas. On November 20, 1984, A&A filed suit against Robert F. Danahy and his employer, Rollins Burdick Hunter of Massachusetts, Inc. (RBH).[2] RBH, a Massachusetts corporation engaged in the insurance brokerage business in Massachusetts, is also a subsidiary of a large national insurance agency (Combined Insurance Company of America). RBH is a competitor of A&A's.

 [***6] A&A made the following allegations in its complaint. In 1979, Danahy was president and principal stockholder of the John T. Keyes Insurance Agency, Inc. (KIA). On August 3, 1979, A&A, A&AS, KIA and Danahy agreed to an arrangement which in its essence accomplished a transfer to A&A of all of KIA's assets, including its good will, in exchange for stock in A&AS worth approximately $ 2,200,000. The written agreement covering this transaction included the following provisions:

> [*491] 5.5.2 For a period of five years after termination of [Danahy's] employment with A&A, [Danahy] will not, directly or indirectly, solicit, sell, serve, divert or receive insurance business to or from any customer or actively solicited prospective customer of KIA as of [August 3, 1979];
>
> 5.5.3 For a period of five years after termination of [Danahy's] employment with A&A, [Danahy] will not, directly or indirectly, solicit, sell, serve, divert or receive insurance agency, insurance brokerage, actuarial, or employee-benefit reporting business to or from any corporation, partnership or other person which was a customer or actively solicited prospective customer or any A&AS office [***7] in which [Danahy] worked on a full-time basis within one year prior to termination of his employment and which customer or prospect was such a customer or prospect of A&AS within one year prior to the date of such termination.

Also included in the agreement was a provision that A&A would be entitled to an injunction restraining any breach of the covenants. KIA thereafter dissolved, and the A&AS shares were distributed to KIA's shareholders, consisting of Danahy and members of his family. Danahy personally received A&AS stock worth approximately $ 1,500,000.

---

[2] Kevin M. Daly, also a former A&A employee and now an employee of RBH, was also named as a defendant. He was included in the preliminary injunction, and he joined in the appeal. However, by stipulation between Daly and A&A, the suit against Daly has been dismissed, and he has agreed to abide by the noncompetition covenant which was part of his employment agreement with A&A. Because of that stipulation, and because Daly (unlike Danahy) is a salesman and not in a managerial position at RBH, we view a continuation of the injunction against RBH concerning Daly's covenant not to compete as unnecessary.

Case 1:24-cv-13015-PBS   Document 27   Filed 03/03/25   Page 7 of 11

21 Mass. App. Ct. 488, *491; 488 N.E.2d 22, **25; 1986 Mass. App. LEXIS 1363, ***7

Upon the execution of the agreement, Danahy became employed by A&A. First he worked as a senior vice president and, for a short time in 1983, as president. Throughout his employment with A&A, [**26] Danahy was active in producing insurance business. In the spring of 1983, while still an A&A employee, Danahy was awarded additional stock in A&A's parent company. In consideration for that stock and for his continued employment by A&A, on May 24, 1983, Danahy executed an additional noncompetition agreement. It provided that for two years after the termination of his employment with [*492] A&A [3] he would not [***8] "in any capacity whatsoever . . . solicit, sell, service, divert, accept or receive" insurance business from any customer or active prospect of A&A's which he had handled, serviced, or solicited during the two years prior to the termination of his employment.

On June 28, 1983, Danahy notified A&A by letter that he was resigning from A&A to join RBH. RBH was aware of Danahy's noncompetition agreements. In his letter of resignation, Danahy wrote, "In my new position with another respected insurance broker, I will fully comply with all contractual commitments to A&A." The next day, Danahy began work as president of RBH and, since [***9] at least July 30, 1984, he has also been a director of that company. At various times after his departure from A&A and before suit was filed, Danahy attempted unsuccessfully to negotiate exceptions to the noncompetition covenants. Assurance was given by Danahy to A&A that he would not violate the agreements. Nevertheless, for the benefit of himself and RBH, according to A&A's allegations, Danahy has violated the covenants and continues to do so. The alleged violations include soliciting from, and conducting business with, A&A customers and prospective customers, and encouraging one Edward W. Marvel, Jr., a former A&A employee, to join RBH.

The plaintiff's complaint was signed by the managing vice president of A&A, who verified that all the allegations were true to his personal knowledge, except for those relating to KIA's liquidation and violations of the covenants, which allegations he believed to be true.

The motion for preliminary injunctive relief against Danahy and RBH was heard on November 26, 1984. In addition to the verified complaint, the judge had before him extensive memoranda and various affidavits filed by the defendants. In addition, the judge was presented with [***10] a copy of an advertisement [*493] for RBH which all parties conceded had appeared in the Boston Globe and elsewhere in the summer of 1984. Photographs of Danahy (identifying him as president of RBH), Marvel, and Kevin M. Daly, another former A&A employee (see note 2, *supra*), appeared in the advertisement along with a list of new RBH accounts, among which were some former A&A clients. On December 14, 1984, the judge entered an order enjoining both Danahy and RBH from violating the terms of the noncompetition covenants. In a careful memorandum of decision, the judge considered the likelihood of A&A's success on the merits and balanced the risk of irreparable harm to the plaintiff against the risk of harm to the defendants. A motion by RBH for reconsideration, supported by additional affidavits, was heard on January 2, 1985, and denied. After a hearing before a single justice of this court, the injunction was modified on January 29, 1985, so as to refer only to customers specified on lists which were to be provided by A&A, which lists were to be treated as confidential. We were informed at oral argument that such a list has been agreed to by the parties. It includes A&A's [***11] customers as of the relevant date and slightly in excess of one hundred of A&A's active prospects. The single justice also remanded the case to the motion judge for further consideration of the issue of security under Mass.R.Civ.P. 65(c), 365 Mass. 833 (1974). On remand, [**27] a surety bond in the amount of $500,000 was ordered and filed by A&A. [4]

*Preliminary Matters*.

We deal first with two issues raised by the defendants on appeal which do not go to the merits of the controversy. The defendants argue first that the factual material before the court provided insufficient support for issuance of the injunction because some of the allegations in the verified complaint were made not on personal knowledge but on information and belief, and the complaint was not supported by affidavits.

None of the parties requested [***12] an evidentiary hearing. A preliminary injunction is usually based upon affidavits, but it [*494] may be based upon a verified

---

[3] That two-year period has now expired. Thus, the question of the validity of the preliminary injunction, insofar as it prohibited violations of that covenant, is moot. No argument has been made that the injunction should be extended to give A&A the benefit of having the covenant *enforced* for a full two-year period. See Wells v. Wells, 9 Mass. App. Ct. 321, 328 (1980).

[4] The order was again modified in the Superior Court on March 14, 1985, with A&A's assent, to allow RBH to accept insurance business from two companies on the agreed list of customers.

Case 1:24-cv-13015-PBS   Document 27   Filed 03/03/25   Page 8 of 11

21 Mass. App. Ct. 488, *494; 488 N.E.2d 22, **27; 1986 Mass. App. LEXIS 1363, ***12

complaint. Mass.R.Civ.P. 65. See K-2 Ski Co. v. Head Ski Co., 467 F.2d 1087, 1088 (9th Cir. 1972). The defendants' contention would have merit if all that supported the order were allegations made on information and belief. See Bowles v. Montgomery Ward & Co., 143 F.2d 38, 42 (7th Cir. 1944); Marshall Durbin Farms Inc. v. National Farmers Organization, Inc., 446 F.2d 353, 357 (5th Cir. 1971). That is not the case here, however. The facts alleged in the verified complaint on the basis of personal knowledge establish the existence of the noncompetition agreements and the background circumstances. The facts are not controverted. Nor is the fact of RBH's newspaper advertisements controverted or the correspondence in which the parties discussed the agreements after Danahy joined RBH. The verified complaint and the affidavits together clearly establish that RBH and A&A are in competition with each other; that Danahy serves as RBH's president and is involved in the production of new business; that RBH, under Danahy's direction, [***13] intends to compete with A&A for A&A's active prospects, and with A&A's existing customers for different insurance product lines; that Danahy, as RBH's president, had contact with representatives of at least one of A&A's former customers; that Marvel, for over twelve years a broker employed by A&A, left A&A and joined RBH as a broker in December of 1983; and that RBH had knowledge of the relevant terms of Danahy's noncompetition agreements with A&A.

That the allegations of widespread violations of the covenants by Danahy were based only on information and belief in these circumstances ought not to defeat A&A's right to preliminary injunctive relief. One would not expect an A&A official to possess extensive direct personal knowledge of those facts. Moreover, the purpose of the injunction is to prevent whatever future violations are likely to occur.

Further, the defendants argue that it was not proper to award A&A injunctive relief because it waited seventeen months after Danahy joined RBH before bringing this action. Unexplained delay in seeking relief for allegedly wrongful conduct may indicate an absence of irreparable harm and may make an injunction **[*495]** based upon that **[***14]** conduct inappropriate. See USAchem, Inc. v. Goldstein, 512 F.2d 163, 168-169 (2d Cir. 1975); Klauber Bros. v. Lady Marlene Brassiere Corp., 285 F. Supp. 806, 808 (S.D.N.Y. 1968); 11 Wright & Miller, Federal Practice & Procedure: Civil § 2948, at 438 (1973). The delay here was not without justification, however. When he terminated with A&A in June of 1983, Danahy assured his former employer that he would abide by his contractual commitments not to compete. A&A could reasonably rely on that assurance until it had knowledge to the contrary. Beginning in the summer of 1983, there was an effort made by Danahy to negotiate a modification of the covenants. It wasn't until October 2, 1984, that one former client wrote A&A to say that it had switched its business to RBH. The RBH advertisement featuring Danahy, Marvel and Daly began to appear in August of 1984. Suit was filed in November, 1984, accompanied by an immediate **[**28]** request for an injunction. The period covered by the agreements being a finite one, the defendants apparently benefited from the delay. In any event, what delay there was was not so egregious as to form the basis for denial of any injunctive **[***15]** relief. Parties to a business dispute deserve praise, not penalty, for attempting to negotiate their differences before knocking on the courthouse door.

*The Merits*.

We caution at the outset that our comments deal only with the likelihood of A&A's ultimate success on the merits. A full trial of the issues is contemplated. Evidence may unfold at the trial on any of the issues discussed justifying a different result.

1. *Whether the covenants not to compete should be viewed primarily as arising out of the sale of the business or out of the employment relationship*. The covenants in issue were included in the written agreement for the sale of the business. But the agreement also contemplated that Danahy would be employed by A&A, and the period during which the covenants were to run was to begin with the termination of that employment. Thus, the covenants not to compete arose out of an arrangement that had aspects of both a sale of a business and a contract of employment.

 **[*496]** It is important to identify at the outset to which aspect of the arrangement the covenants not to compete primarily related. This is because there are considerations which dictate that **[***16]** noncompetition covenants arising out of the sale of a business be enforced more liberally than such covenants arising out of an employer-employee relationship. See Wells v. Wells, 9 Mass. App. Ct. 321 (1980), and authorities cited at 324-325; *Restatement (Second) of Contracts § 188* (1981). In the former situation there is more likely to be equal bargaining power between the parties; the proceeds of the sale generally enable the seller to support himself

Case 1:24-cv-13015-PBS   Document 27   Filed 03/03/25   Page 9 of 11

21 Mass. App. Ct. 488, *496; 488 N.E.2d 22, **28; 1986 Mass. App. LEXIS 1363, ***16

temporarily without the immediate practical need to enter into competition with his former business; and a seller is usually paid a premium for agreeing not to compete with the buyer. Where the sale of the business includes good will, as this sale did, a broad noncompetition agreement may be necessary to assure that the buyer receives that which he purchased. Even in the absence of an express covenant not to compete, in such circumstances an agreement by the seller not to depreciate the value of good will may be implied so as to prevent the seller from taking back that which he purported to sell. Tobin v. Cody, 343 Mass. 716, 720-724 (1962). United Tool & Industrial Supply Co. v. Torrisi, 356 Mass. 103, [***17] 106-107 (1969). Mohawk Maintenance Co. v. Kessler, 52 N.Y.2d 276, 283-287 (1981). On the other hand, an ordinary employee typically has only his own labor or skills to sell and often is not in a position to bargain with his employer. Postemployment restraints in such cases must be scrutinized carefully to see that they go no further than necessary to protect an employer's legitimate interests, such as trade secrets or confidential customer information. See Marine Contractors Co. v. Hurley, 365 Mass. 280, 287-288 (1974); National Hearing Aid Centers, Inc. v. Avers, 2 Mass. App. Ct. 285, 288-291 (1974).

It is not at all unusual for the seller of a business to join the new enterprise in an employment capacity. There are obvious advantages to both sides which flow from such an arrangement. It enables the purchaser to carry on the old business with the least possible dislocation and loss of good will. Established [*497] customers of the business sold could be expected to patronize the successor business. And such an arrangement provides the seller with the opportunity to be productive in the work with which he is familiar, and to gain income.

We have [***18] no difficulty reaching the conclusion that, in reviewing the present covenants, we should apply the standards applicable to covenants arising out of the sale of a business. Pitman v. J.C. Pitman & [**29] Sons, 324 Mass. 371, 374 (1949). Accord Kraft Agency, Inc. v. Delmonico, 110 A.D.2d 177, 182-183 (N.Y. 1985). See Levin, Non-Competition Covenants in New England: Part II, 40 B.U.L. Rev. 210, 227-228 (1960). Good will is of great importance in the insurance brokerage business. Customers have repeated and multiple insurance needs. Prompt service, integrity, and loyalty are of some importance to customers who would tend to rely on key personnel who have demonstrated those qualities in the past. A broad noncompetition agreement would be an important part of any agreement to sell an insurance agency. The agreement of which the covenants were part provided that the covenants were "granted to A&A to protect [the] good will" enjoyed by A&A and that the covenants were "not severable from such good will." True, it was the good will of KIA which was sold, and that good will may have diminished to some extent over the years following the dissolution of that corporation. [***19] Nevertheless, Danahy's association with A&A during those years must have meant that some of KIA's good will remained. Moreover, the usual inequality of bargaining power between employer and employee was not present when these noncompetition covenants were entered into. The proceeds of the sale provided an ample cushion for Danahy for the period during which the covenant was to be in effect, whether that period be the five years immediately following the sale or some five-year period after Danahy's employment with A&A ceased. In short, the covenants not to compete were treated as an integral part of the agreement for the sale of the business, and there is no reason for us to view them as something other than what they purport to be.

[*498] 2. *Validity of the covenants*. Our characterization of the covenants as ones arising primarily out of the sale of a business does not necessarily lead us to conclude that the covenants would be fully enforceable as written. Although we look less critically at such covenants, and although the elements that must be considered differ, any covenant restricting competition is to be enforced only to the extent that it is reasonable in time [***20] and space, necessary to protect legitimate interests, and not an obstruction of the public interest. See Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 102-103 (1979); Wells v. Wells, 9 Mass. App. Ct. at 323-325. We proceed to examine the defendants' claim of unreasonableness in terms of these criteria.

Considering the magnitude of the sale, the significance of good will to this type of business, and the high level position Danahy held in both business entities, we are not convinced that five years is an unreasonably long period for the covenant to run. We note, however, that only a temporary order is in issue. Trial may be had well within the five-year period. On a more complete record a judge may determine that the longest period the covenants could reasonably run would be something less than five years. If so, there will be time later to shape the appropriate form of injunctive relief.

It was not unreasonable to include prospective customers within the ban. A&A had a legitimate interest

Case 1:24-cv-13015-PBS   Document 27   Filed 03/03/25   Page 10 of 11

21 Mass. App. Ct. 488, *498; 488 N.E.2d 22, **29; 1986 Mass. App. LEXIS 1363, ***20

in extending its business to them. See *Wells v. Wells, 9 Mass. App. Ct. at 326*; *Kroeger v. Stop & Shop Cos., 13 Mass. App. Ct. 310, 317 (1982)*. The references **[\*\*\*21]** in the covenants to A&A's customers, without distinguishing the particular kind of insurance purchased by the customer through A&A, do not make the covenants unreasonably broad. A&A would have a legitimate expectation that it might in the future sell an existing customer a new line of insurance.

The most troublesome claim is that the covenants are unreasonably restrictive because they prevent Danahy from *receiving* business even in the absence of any direct or indirect participation by him in obtaining the business for RBH. Thus, if a present or former customer of KIA or A&A should wish, because of genuine dissatisfaction with A&A or another insurance **[\*499]** **[\*\*30]** firm, to move its business, Danahy would, by the terms of the covenant, be barred from accepting that business. There is conflicting authority as to enforceability of covenants not to compete to the extent that they prohibit merely accepting or receiving business. For cases holding that such acts may be enjoined, see *Girard v. Rebsamen Ins. Co., 14 Ark. App. 154 (1985)*, and *Kraft Agency, Inc. v. Delmonico, 110 A.D.2d at 185*. For cases holding that such injunctive relief is improper, all of **[\*\*\*22]** which cases, however, concern covenants arising out of employment relationships not involving the sale of a business, see *Evans Labs. v. Melder & Cingolani, 262 Ark. 868, 871 (1978)*, *Singer v. Habif, Arogeti & Wynn P.C., 250 Ga. 376, 377 (1982)*, and *Diamond Match Division v. Bernstein, 196 Neb. 452 (1976)*.

As a practical matter, the difference between accepting and receiving business, on the one hand, and indirectly soliciting on the other, may be more metaphysical than real, particularly where Danahy held prominent executive positions in KIA and A&A and is now president of RBH, and where his association with RBH has been widely publicized. We recognize that, construed to bar mere receipt of business, the agreement may be an impediment to Danahy's employment in the insurance brokerage business in the type of high level customer development position he holds with RBH. He agreed to the terms, however, in what appears at this preliminary stage of the proceedings to have been a fair bargain freely entered into with the benefit of counsel. No clear reason has emerged at this stage of the proceedings why Danahy should not be held to his bargain.

3. *Whether* **[\*\*\*23]** *the injunction may extend to RBH.*

RBH claims that, even if the injunction is proper to prevent Danahy from violating his covenants, it is overbroad because it prevents RBH, a stranger to the covenants, from engaging freely in the insurance brokerage business through its other employees. The order enjoins each of the parties from violating the terms of the noncompetition covenants. The injunction against RBH, however, is only as broad as Danahy's noncompetition agreement. As president and a director, Danahy is closely identified **[\*500]** with the corporate entity. The injunction against RBH would dissolve of its own weight should Danahy leave RBH. Should Danahy assume a different role in RBH's business, the effect of the injunction on RBH and its other insurance salesmen would also change. If Danahy were to become a sales representative, without over-all responsibility for RBH's sales performance and without supervisory authority over other members of the sales force, RBH would be free, through its other sales personnel, to do business which the injunction presently prohibits.

RBH knew the full extent of Danahy's noncompetition agreements when Danahy was hired. Depending **[\*\*\*24]** upon the circumstance, a stranger to a noncompetition agreement who is aware of the agreement may be enjoined from violating the agreement. *Old Corner Bookstore v. Upham, 194 Mass. 101, 106 (1907)*. *Suburban Coat, Apron & Linen Supply Co. v. LeBlanc, 300 Mass. 509, 512 (1938)*. *Sulmonetti v. Hayes, 347 Mass. 390, 396 (1964)*. *Ingredient Technology Corp. v. Nay, 532 F. Supp. 627, 632 (E.D. N.Y. 1982)*. *West Shore Restaurant Corp. v. Turk*, 101 So.2d 123, 128-129 (Fla. 1958). *Bates Chevrolet Corp. v. Haven Chevrolet, Inc., 13 A.D.2d 27, 31 (N.Y. 1961)*, aff'd *13 N.Y.2d 644 (1963)*. *Wells v. Powers, 354 S.W.2d 651, 654 (Tex. Civ. App. 1962)*. It is true that all the cases cited involved either business entities created for the purpose of competing, or parties who, because of a family or other close relationship, were viewed as the "alter ego" of a party to the agreement. We do not think, however, that the right to have a third party enjoined from violating a noncompetition agreement is necessarily limited to those particular situations. What is reasonable must be decided on a case by case basis. The facts in this case are yet to be proved. **[\*\*\*25]** Among the relevant facts that persuade us that A& **[\*\*31]** A is likely to prevail ultimately against RBH are the facts that Danahy, as president, plays a dominant role in RBH and is in a position to exert influence over its activities, and that, because of the advertisements, Danahy is closely identified with RBH in the mind of the public. This injunction does no more than **[\*501]** to prevent RBH

Case 1:24-cv-13015-PBS     Document 27     Filed 03/03/25     Page 11 of 11

21 Mass. App. Ct. 488, *501; 488 N.E.2d 22, **31; 1986 Mass. App. LEXIS 1363, ***25

from obtaining benefits from Danahy's violation of the noncompetition covenants.

4. *Balancing of the risk of irreparable harm to the respective parties*. The trial judge did not abuse his discretion in the way he balanced the risk of harm to the parties in light of their respective chances of success on the merits, in concluding that the balance cut in favor of the plaintiff, and in concluding that money damages would not provide an adequate remedy to the plaintiff.

Absent from the judge's discussion, however, was any reference to the public interest, a factor which ought to have been considered. See *All Stainless, Inc. v. Colby, 364 Mass. 773, 778 (1974)*. Relying on *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. deLiniere, 572 F. Supp. 246, 249 (N.D. Ga. 1983)*, **[***26]** the defendants argue that the injunction deprives the insurance buying public of the right to select the broker of their choice, a right they ought to be able to exercise freely. See also *Alexander & Alexander, Inc. v. Wohlman, 19 Wash. App. 670, 687 (1978)*. But compare *O'Sullivan v. Conrad, 44 Ill. App.3d 752, 758 (1976)*. Based upon our reading of Danahy's supplemental affidavit, which describes how the insurance brokerage business operates, we would not necessarily equate the customer-insurance broker relationship with the client-stockbroker relationship discussed in *Merrill Lynch, Pierce, Fenner & Smith, supra.* Nor, in light of the number of competing firms in the industry and the size of the market still available to RBH, is the injunction a significant restraint on ordinary competition.

We note that Danahy, with the benefit of counsel and for substantial consideration, freely signed the agreement which included a provision that A&A would be entitled to an injunction in the event of a breach or a threatened breach of the noncompetition covenants. RBH, knowing of the existence of the covenants, had at least constructive notice of the provision regarding A&A's **[***27]** right to an injunction. While such a provision would not require a court to issue an injunction in the absence of equitable considerations justifying that relief, its existence is a factor properly added to the scale in weighing the equities.

**[*502]** For the reason indicated in note 2, *supra*, that part of the modified order enjoining RBH from violating the terms of the noncompetition agreement between A&A and Daly is to be vacated, and, as so further modified, the order is affirmed.

*So ordered*.

End of Document