1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS
2

3   ROOTERMAN LLC,                    )
                                      )
4                 Plaintiff           )
                                      )
5          -VS-                       )  CA No. 24-13015
                                      )  Pages 1 - 27
6   KLODIAN BELEGU, et al,            )
                                      )
7                 Defendants          )

8

9                **MOTION HEARING BY VIDEO**

10          BEFORE THE HONORABLE PATTI B. SARIS
                 UNITED STATES DISTRICT JUDGE
11

12

13

14

15                         United States District Court
                           1 Courthouse Way
16                         Boston, Massachusetts  02210
                           January 29, 2025, 9:31 a.m.
17

18

19

20

21

22                    LEE A. MARZILLI
                  OFFICIAL COURT REPORTER
23              United States District Court
               1 Courthouse Way, Room 7200
24                   Boston, MA  02210
                  leemarz47@gmail.com
25

1   A P P E A R A N C E S:

2

3        JEFFREY M. ROSIN, ESQ. and LISBETH VALDEZ, ESQ.,
    O'Hagan Meyer, 140 Kendrick Street, Building C, Needham,
    Massachusetts, 02494, for the Plaintiff.

4
        JAY M. WOLMAN, ESQ., Randazza Legal Group, PLLC,
5   100 Pearl Street, 14th Floor, Hartford, Connecticut, 06103,
    for the Defendants.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                      P R O C E E D I N G
2          THE CLERK:  Good morning, Judge.
3          THE COURT:  Good morning.
4          THE CLERK:  I have both sides on, so I'll call the
5    case.
6          THE COURT:  Thank you.
7          THE CLERK:  The Court calls Civil Action 24-13015,
8    Rooterman LLC v. Belegu, et al.  Could counsel please identify
9    themselves.
10         MR. ROSIN:  Good morning, your Honor.  For the
11   plaintiff, I'm Jeffrey Rosin, and with me is Lisbeth Valdez.
12         MS. VALDEZ:  Good morning, your Honor.
13         THE COURT:  Good morning.
14         MR. WOLMAN:  And good morning, your Honor.  James
15   Wolman of Randazza Legal Group for Defendants Klodian Belegu,
16   Quality Air Care Corporation, 911 Sewer & Drain Corp., and
17   Water Damage Restoration Limited, formerly known as RM Water
18   Damage Restoration.
19         THE COURT:  Thank you.  So a motion for preliminary
20   injunction has been filed, as you well know, but apparently a
21   lot has been happening in the interim, so I'm trying to figure
22   out how best to manage this case.
23         So from plaintiff's point of view, I understand your
24   initial case and the concern, but I want to know what right now
25   your thoughts are on the motion for preliminary injunction,
```

1    what's been fixed, what hasn't been fixed, and that sort of

2    thing.

3            MR. ROSIN:  Your Honor, things continue to get fixed,

4    particularly with every filing we make.  So we filed a reply

5    brief on the 14th, I believe, and we noted some evidence in the

6    reply brief that if you typed RootermanPlumberServices.com into

7    the Web page, you got 911 Sewer & Drain instead.  So now that

8    the defendants have seen that, I tried to do that an hour ago,

9    and right now my Internet says that's been disabled.  Well,

10   it's disabled seemingly for me to get to that point.  I don't

11   know if the actual ability for others to do it has been

12   disabled.

13           THE COURT:  I understand, but on a motion for

14   preliminary injunction -- and I understand it's frustrating,

15   you had to bring the suit to get people to take those steps,

16   but it strikes me -- and, really, I'm happy to hear you if it's

17   not true -- that most of the trademark issues have been

18   resolved.  You may be able to get damages going backwards, that

19   kind of thing, and we're really talking about the noncompete.

20   But tell me if I'm wrong on that.

21           MR. ROSIN:  Well, your Honor, there is still issues

22   because if you go to Facebook, for example, you go to 911 Sewer

23   & Drain's Facebook and it says -- and this is Exhibit I to our

24   amended complaint -- you know, "I hired --" it's a review of

25   911 Sewer & Drain, and it says "Hired Rooterman of New Jersey."

1    So there are still a number of things and details that a court

2    order would insure are rapidly addressed.

3            THE COURT:  I just have to get to irreparable harm,

4    and I got it in the beginning, and I'm not so sure I have it

5    there.  So why don't you give me -- it's not that I think you

6    don't have trademarks to be protected, and I'm not sure that

7    they took it down as rapidly as they could have, but I'm just

8    not sure what's currently at issue because every time you

9    pinpoint something, they seem to fix it.

10           MR. ROSIN:  Well, without a court order, your Honor, I

11   would say that --

12           THE COURT:  I know, but that's not the standard.  My

13   standard is, you may have a likelihood of success, but I have

14   to see irreparable harm.  And if you fix things as soon as you

15   tell them about it, it's a little hard to get to irreparable

16   harm right now, even though I certainly understand your

17   frustration.  So maybe you're entitled to even attorneys' fees,

18   but I need to understand what the irreparable harm is on the

19   trademark right now.

20           MR. ROSIN:  Okay, your Honor, and that would be the

21   franchisee's continued both competition and continued even

22   marginal use of the trademarks.  For example, if he's telling

23   you in his reply declaration, his opposition declaration, your

24   Honor, that he needs more time to redirect things to a

25   different site, we don't know what he's doing.  We don't know

1   if he's using our Rooterman trademark –– this is all what

2   discovery would reveal –– to do what he's doing with Google:

3   "Hi, Google, I want everything I did for the last three years

4   for Rooterman to be rerouted to 911 Sewer & Drain." He doesn't

5   have the right to do that. Everything he did through Google

6   using Rooterman he needs to start again, not transfer URLs, and

7   he said in his reply declaration he was transferring URLs. And

8   we don't know enough about that and whether –– so the cases on

9   Page 10 of our brief talk about a franchisee directly competing

10  in the same markets and there being irreparable harm when a

11  franchisee does that. It's goodwill. It's reputation.

12          THE COURT: No, no, I'm sorry, I'm sorry. You're now

13  mushing the areas. I agreed –– I started off there –– that

14  there still may be issues with respect to competition; but when

15  you started your complaint, and I understand why, your biggest

16  complaint was the continued use of Rooterman or RM. And he

17  seems –– and maybe I should get to defendant for a minute.

18          Does defendant concede he's not able to use RM

19  anymore?

20          MR. WOLMAN: One of the problems here, your Honor, is,

21  they've pointed to a host of marks, and only in the reply brief

22  do they point to a single logo mark about Rooterman's To the

23  Rescue that's allegedly infringed. They don't actually seize

24  on the name Rooterman. That's one of the things we discovered.

25  They failed to register that trademark just in the name ––

```
1              THE COURT:  I don't know you want to go to town on

2       that because at least for a PI, whether they own it, they have

3       been using it, and you as a franchisee agreed to abandon it

4       when you were no longer with them.  So what it looked like your

5       response was saying was, "We're trying our best to fix it."

6              MR. WOLMAN:  Yes, your Honor.  My point is simply

7       moving on.  And, you know, they've got their own brand-new

8       domain name, and they basically left a forwarding address with

9       Google for, you know, if that's how the Court might like to

10      think of it, so that way that traffic looking for them finds

11      them not using the Rooterman name but simply using that it

12      would find his services, the services of the companies

13      providing through Mr. Belegu.

14              And as to competition, I mean --

15              THE COURT:  You're fudging with me.  Have you gone to

16      Google and said, "Don't use the name Rooterman anymore in

17      connection with our services"?  In other words, if someone

18      punches in "Rooterman," does it switch it to your people?

19              MR. ROSIN:  Your Honor, may I?

20              THE COURT:  No, no, you may not.  I'm asking --

21              MR. WOLMAN:  What they did was a redirect, so that

22      way, Google, in its ordinary course of just doing its business,

23      would learn about basically the notice of forwarding address.

24      That's essentially what just happened.  And so now that I

25      see -- thank you, Mr. Rosin, I was not actually aware that as
```

1   of yet, the Rooterman Plumber Services is now not redirecting

2   there anymore -- it looks like that seems to be complete,

3   whatever process there was.

4           THE COURT:  In what, Google or Facebook?  It's very

5   unclear to me, okay?  I understand there's a noncompete issue.

6   That's the second bucket.  But for the first bucket, it strikes

7   me that from all the submissions -- and it's really hard for me

8   to follow -- that the defendant is essentially acknowledging

9   that they can't use Rooterman, they can't use RM, and it is

10  essentially trying to fix forwarding addresses.  Is that right?

11          MR. WOLMAN:  I won't say that we're acknowledging that

12  we can't, but, yes, we are doing the whole forwarding address

13  thing, and --

14          THE COURT:  Can we get an affidavit to that effect?

15          MR. WOLMAN:  In our opposition, we did have an

16  affidavit declaration from Mr. Belegu where he says that -- let

17  me see here.

18          THE COURT:  I'm not sure I got -- the concern is that,

19  and if necessary I'll just give an order on it if there's a

20  debate about it, but I had thought there was an agreement that

21  you couldn't type in "Rooterman" and then somehow get moved to

22  your website.

23          MR. ROSIN:  May I, your Honor?

24          THE COURT:  No.  I'm asking --

25          MR. WOLMAN:  Well, we're not --

1          THE COURT:  Where does it say in the affidavit?
2    Because if I have to, I'll do an injunction.  You shouldn't be
3    using Rooterman or RM.  And I had thought there was just
4    general agreement on that so the irreparable harm went away.
5          MR. WOLMAN:  Well, he's not using it now.  The last
6    thing it appeared to be was this domain name, and I should note
7    that they haven't actually brought 1125(c) as part of the PI
8    motion, even though --
9          THE COURT:  I don't know what 1125(c) is off the top
10   of my head.  What is that?
11         MR. WOLMAN:  Cybersquatting under the Lanham Act.
12   They've brought it in the complaint but not as part of the PI
13   motion.
14         So it doesn't look like we are using it.  What they
15   mention about Facebook reviews, that appears like they're
16   trying to have the Court issue an order to change a third
17   party's speech.
18         THE COURT:  Right, I can't do that, but what I can do
19   is stop you, if someone types in "Rooterman," having it then
20   transferred to your client.
21         MR. WOLMAN:  It doesn't right now.  The very website
22   that Mr. Rosin was referring to does not currently redirect.
23         THE COURT:  Okay.
24         MR. WOLMAN:  And in fact it currently --
25         THE COURT:  Is that as of this morning?

1              MR. WOLMAN:  I can't tell you as of when, but it does

2    say the domain has expired.

3              THE COURT:  Okay.  So the second issue is the one

4    that's a little bit more pressing for me because it seems as if

5    most of the first issue has been taken care of, not in terms of

6    damages -- maybe they're entitled to damages -- but in terms of

7    irreparable harm.  But the second one is the debate -- and I'll

8    start with plaintiff on this -- is the debate on whether or not

9    the noncompete for three years needs to be enforced and whether

10   or not they're on the same field.  That was less clear to me in

11   the record.

12             MR. ROSIN:  Your Honor, I'll answer that question

13   first.  There is direct competition in the identical markets

14   via 911 Sewer & Drain and RM Water Damage Restoration.  The 911

15   Sewer & Drain, we have evidence in the record, including all

16   the exhibits to the Amended Complaint and the reply declaration

17   of Nathan King, that literally show 911 Sewer & Drain being

18   Mr. Belegu's new Rooterman of New Jersey.

19             May I also address one other prior question?

20             THE COURT:  Can I just -- you know what?  It was very

21   complicated because the record kept changing as time went on

22   between the opposition and the reply.  So it's your position

23   that the defendant is directly competing in violation of the

24   noncompete?

25             MR. ROSIN:  That's correct, your Honor.

1          THE COURT:  Three years seems like a long time, and
2     most, at least the current case law in the area of employment,
3     which is not franchises but it's adjacent, is that three years
4     is too long, especially in something that sort of looks like an
5     employment arrangement.
6          MR. ROSIN:  So, your Honor, this is --
7          THE COURT:  What are you asking for?
8          MR. ROSIN:  We are asking for the three years because
9     it's business to business, it's the termination of a business,
10    so it's like buying a business.  The person you buy doesn't get
11    to turn around and start competing.  So those restrictive
12    covenants in the franchise contracts are regularly upheld.  So
13    we're looking for a three-year, your Honor.  And we didn't
14    overreach.  The restrictive covenant allows us to ask for 100
15    miles from not just his franchise zip codes but any franchise
16    zip codes.  We did not overreach.  We are just saying, don't
17    compete in the exact zip codes that are attached as Exhibit B
18    to the reply declaration of Nathan King.
19         And, your Honor, I will just say that the injunctive
20    relief that we seek on the trademark is also very narrowly
21    tailored.  It simply says, "Don't use it, return it," and do
22    what Section 1116 requires, which is report within 30 -- 1116
23    says 30 days, but we left it for your Honor -- report with --
24         THE COURT:  You know, I have hundreds of cases, so I
25    don't know what 1116 is.

1          MR. ROSIN:  Sorry, your Honor.  15 U.S.C., Section 1116

2    basically says that a defendant who is ordered to not misuse

3    trademarks can also be ordered to report to the court -- and

4    the statute says 30 days -- 30 days about their efforts, file a

5    declaration under that statute that says "Here's what I've

6    done."  And that is very sort of soft but important part of the

7    order that we seek.  We're certainly looking to shut them down

8    from using our trademarks, but we're not looking for an order

9    that asks for anything more than that.

10         THE COURT:  All you want, you want that declaration?

11         MR. ROSIN:  We want that declaration and the order

12   that he not use our trademarks.

13         THE COURT:  The problem I'm running into, okay -- I'm

14   just feeling frustrated because I feel like a broken record --

15   it sounds like they agree and they've done it, and so you want

16   some verification that they've done it.  And so I understand

17   that, and maybe that's a way to resolve the trademark thing.

18   It's not like there's even a dispute here.  It's part of the

19   franchise agreement:  They can't use the trademark.  They can't

20   use RM.  They can't use Rooterman.  They can't have someone

21   punch in "Rooterman" to the Google and then have it switch over

22   to 911.

23         I'm not hearing, and maybe I'm wrong, a debate about

24   that.  They agree they need to do it, and they've been doing

25   it.  So maybe what I need is an affidavit, to your point, of

1   what they've done.

2        MR. ROSIN:  Thank you, your Honor.

3        THE COURT:  So I feel a little frustrated here because

4   there are four prongs to a preliminary injunction.  One is

5   irreparable harm, and if in fact the harm has gone away, maybe

6   you get monetary damages -- I'm not dealing with that -- but I

7   don't issue an injunction if they've stopped.  So I feel like --

8   and maybe I'm not drilling home the point well enough, but it

9   sounds like you found one glitch on Facebook, but that's a

10  third-party comment.

11       So I'm now moving on to the noncompete, which you may

12  have a strong argument on.  I may not do it for three years,

13  but I don't know that you can just jump into a competition

14  where the franchise agreement says you can't, so why don't we

15  try and deal with that one.

16       Let me ask defense first.  Are you willing to give us

17  a declaration within 30 days that you've done everything you

18  can to take down the trademark Rooterman or RM?  And if that's

19  not satisfactory or he continues to find violations, maybe what

20  I'll do is, I'll revisit this issue.  But I now want to deal

21  with the noncompete, which is really the gist of the current

22  dispute where there is a debate about it, right?

23       MR. ROSIN:  That's right, your Honor.  And I do

24  appreciate your Honor's question of the defense.  The one thing

25  I would just also add to that on the irreparable harm point is,

1    if you tell Google, like I said earlier, "Please redirect

2    everything to my new site," if a consumer types in "Rooterman

3    of New Jersey" and they get "911 Sewer & Drain" because Google

4    is using that prior information, that's what we have no

5    certainty of.

6         THE COURT:  I understand the concern, and they can't

7    do that, and I want to make sure.  He's saying that they've

8    stopped it, but maybe it was just as of this morning.  I don't

9    know.

10        MR. ROSIN:  No, your Honor.  The admission in his

11   declaration is that he is transferring URLs that he had while

12   he was a franchisee.  He's admitted that he's using the same

13   things he used as a franchisee to take advantage of what Google

14   is doing now because of his tens of thousands of dollars --

15        THE COURT:  I don't understand what you just said.

16   When you say "using the URLs," as long as he's not using

17   Rooterman, and as long as if you type in Rooterman it doesn't

18   transfer over to your thing, I don't know why it matters if

19   he's using the same URL.

20        MR. ROSIN:  Because the URL would have been the

21   Rooterman URLs, and he did not --

22        THE COURT:  But they're not called Rooterman, right?

23   They're called 911.

24        MR. ROSIN:  He never gave that detail in his

25   declaration.

1      THE COURT:  All right, fair enough, you've got to give

2  it in the new one.  Fine, fair enough.

3      MR. WOLMAN:  Your Honor, I'd be happy to share my

4  screen to show when you type "Rooterman of New Jersey" into

5  Google, "911" does not pop up, at least on the first screen.

6      THE COURT:  All right, you know what?  I've been

7  through this.  Right now I'm denying the preliminary injunction

8  motion on the trademark without prejudice, and you will be

9  filing a declaration on exactly what you've done within

10  30 days.

11      But now I've got the much weightier thing, since that

12  seems to be what triggered this lawsuit, but now the bigger

13  issue is, your guy, at least allegedly, is directly competing

14  in the same field in the same area with the same services, and

15  the franchise agreement says he can't do it for three years.

16      MR. ROSIN:  That's correct.

17      MR. WOLMAN:  Your Honor, that --

18      THE COURT:  Is that right from plaintiff's point of

19  view?

20      MR. ROSIN:  I'm sorry?

21      THE COURT:  Is that the basic plaintiff's argument --

22      MR. ROSIN:  That's exactly --

23      THE COURT:  -- to narrow it to just the zip code?

24  I've got concerns about the three years, but the basic question

25  is, are you directly competing?

1          MR. ROSIN:  The answer is "yes," your Honor.

2          THE COURT:  Okay, so --

3          MR. ROSIN:  Not only is he competing --

4          THE COURT:  Does your affidavit say that?

5          MR. ROSIN:  Yes, your Honor.

6          THE COURT:  That they're directly competing with both

7    the Restoration and the 911?

8          MR. ROSIN:  Yes, your Honor.  The verified complaint

9    and the affidavit does.

10          THE COURT:  So what's the defense there?

11          MR. WOLMAN:  Your Honor, thank you.  A couple of

12    significant points.  One, 911 and Water Damage Restoration are

13    not parties to any franchise agreements, so therefore they are

14    free to compete.  Secondly, Water Damage Restoration --

15          THE COURT:  Let me stop you here.  I mean, are they

16    doing the exact same thing they did when they -- I mean, it

17    can't just be a change of name because that they were required

18    to do as well.  Is it the same office and the same people and

19    the same phone number and all that sort of stuff?

20          MR. WOLMAN:  What I know -- I don't have specific

21    answers for that.  I can tell you that Quality Air Care

22    Corporation and Mr. Belegu individually were the franchisees,

23    not 911 Sewer & Drain and not Water Damage Restoration.

24    Additionally, Water Damage Restoration performs, as its name

25    indicates, water damage restoration services.  While Rooterman

1    now claims that that's their business, that's nowhere what the

2    public or anybody knows to be their business.  It was not in

3    the franchise agreement written down as restoration services,

4    so the restoration services are a separate line of trade.  The

5    franchise agreement and Item 16 in the predicate package speaks

6    about plumbing, sewer and drain maintenance, and the sale of

7    drain-cleaning products.  Restoring properties is not any of

8    those services, so, no --

9           (Overlapping speech.)

10          THE COURT:  Are they also providing services that they

11    did before as Rooterman?

12          MR. WOLMAN:  They weren't providing services as

13    Rooterman.  They --

14          THE COURT:  Excuse me.  When their name was Rooterman,

15    were they providing the same services?

16          MR. WOLMAN:  Neither of those two entities were

17    providing services under the name Rooterman.  Only Quality Air

18    Care Corporation and Mr. Belegu individually.

19          THE COURT:  So is Mr. Belegu running these other two

20    companies?

21          MR. WOLMAN:  Yes.

22          THE COURT:  And is that other company, Air whatever

23    it's called, is that still in existence?

24          MR. WOLMAN:  I believe it's still in existence, but I

25    don't believe it's currently performing services.

1          THE COURT:  So the narrow legal question is, if you

2    basically render the franchisee defunct, and the same man sets

3    up two other companies under a different name but does the same

4    thing, whether or not they're bound by the franchise agreement;

5    is that it?

6          MR. WOLMAN:  Well, it's a couple things.  First, Water

7    Damage Restoration isn't engaged in competition, as we've

8    noted.  And so the next question becomes the enforceability of

9    the franchise agreement itself, whether or not the Court is

10   able to blue pencil it.  It is restraining ordinary competition,

11   but they have failed to show that it's an enforceable

12   noncompete because --

13         THE COURT:  Is it governed by Mass. law?  Do we know?

14         MR. WOLMAN:  It's governed by --

15         THE COURT:  The *Dunkin' Donuts* case?  I mean --

16         MR. WOLMAN:  Yeah, the *Dunkin' Donuts* case was

17   specifically -- and the *REMAX* case and the *Dunkin' Donuts* case.

18   The *Dunkin' Donuts* case involved confidential information.

19   That's what the court found.  Whereas, *REMAX* found that there

20   was no confidential information; it was merely restraining

21   ordinary competition.  And while they've used the word

22   "confidential information was provided," they haven't submitted

23   that to the Court.  The only thing that's been submitted as

24   supposedly confidential information is the agreement itself

25   which they published, but there's nothing to say my client is

1    using anything that any other plumbing or drain company

2    wouldn't use in its ordinary course.  There's nothing special

3    about what they do.  Dunkin' Donuts has their way of doing

4    things.  Rooterman just said, "Go ahead and do your services,"

5    just like --

6            THE COURT:  Let me ask you this:  So as I understand

7    it, yes, the new companies are doing some of the same things

8    that Rooterman did, but you're saying that water restoration is

9    something different from what Rooterman did.

10           MR. WOLMAN:  Correct.

11           THE COURT:  So let me go turn back to the plaintiff.

12   So is there something in the franchise agreement that would

13   pick up two new corporations?

14           MR. ROSIN:  Yes, your Honor.  Two things.  Number one,

15   "water damage restoration" is right on the Rooterman website.

16   I direct you to Paragraph 4 of Nathan King's reply declaration

17   for that site.  Water damage restoration has always been a part

18   of the Rooterman offering, and that shows that.  And in the

19   franchise agreement, the franchisee, who is Belegu, can't

20   compete --

21           THE COURT:  All right, so I don't have it right in

22   front of me, I'm sorry, but Belegu is the named franchisee?

23           MR. ROSIN:  He or Quality Air Care Corporation, he

24   guarantees, so it's really him, he guarantees Quality Air Care

25   Corporation's obligations.

1          THE COURT:  Who's the named franchisee?

2          MR. ROSIN:  It's Belegu or Quality Air, but he also

3    guarantees --

4          THE COURT:  So the noncompete would go against Belegu.

5    He couldn't do it?

6          MR. ROSIN:  He couldn't do it, but he's got two

7    companies doing it that he owns, and he doesn't deny that here.

8          THE COURT:  I see, I see, I see.

9          MR. ROSIN:  And on Page 14 of our brief, your Honor,

10   you'll see a slew of cases that a franchisee doing what he's

11   doing is both protection of a legitimate business interest and

12   irreparable harm, that there is --

13         THE COURT:  No, I understand.  The noncompete is what

14   I thought was the more serious one because they were fixing the

15   trademark issue, and the name, they really weren't refuting

16   that.

17         MR. ROSIN:  May I add one more, your Honor?

18         THE COURT:  The big issue is this noncompete.  Yes, go

19   ahead.

20         MR. ROSIN:  So we also in our proposed order asked for

21   the return of the phone numbers, the return of the information,

22   manuals, the training manuals and everything that he hasn't

23   returned; and that's an obligation of the franchise agreement

24   as well.

25         THE COURT:  Yes, it is, so can you -- all right, this

1    is what I suggest we do here:  I am going to take this under

2    advisement.  I've already told you what I'm going to do on the

3    trademark.

4          Does defense have a problem with returning all the

5    training manuals and the phone numbers, et cetera, et cetera?

6          MR. WOLMAN:  I can't -- I don't know about the phone

7    numbers belonging to them.  However, as to training manuals and

8    what not, I'm happy to return them.  I just don't have an

9    address to return them to.

10         THE COURT:  You know, that could have been found out

11   pretty easily.  But, anyway, let's do this.  Let's do this.

12         MR. WOLMAN:  If counsel would like to provide me an

13   address, that's fine.

14         MR. ROSIN:  Your Honor, if I might, the phone numbers

15   are called for being returned in the cite to the franchise

16   agreement.  I'd like to get --

17         THE COURT:  All right, whatever is in that franchise

18   agreement should be returned, but let me --

19         MR. ROSIN:  And the phone numbers.

20         THE COURT:  Excuse me.  Let's do this:  First of all,

21   I am allowing discovery to start immediately, and, in my

22   opinion, that means taking a deposition of Mr. Belegu to

23   establish certain things, just to make sure that everything has

24   been returned and that the names aren't being used and all

25   good-faith efforts have been made to take them down.  So you

1    can take a deposition right away.

2            On the noncompete, right now it sounds as if I may

3    blue pencil it, I may not do three years; but it does strike me

4    that it is a -- if in fact the franchisee is Mr. Belegu and he

5    owns the other two companies, that's a violation of the

6    noncompete.  And what I really think you should do, and what I

7    want you to sit down and do, is to think about how you can

8    settle this case.  I've not dealt with a franchise in a while,

9    but I have dealt with many employment disputes, and typically

10   it's usually a year or at most two years.  It's never three

11   years that I do that, and I'm not likely to allow that.  I

12   think that's basically preventing competition for too long a

13   period of time, but one year seems fair.

14           In any event, can you two sit down and actually -- a

15   lot of money has already been spent on attorneys' fees, and a

16   lot more is about to be spent.  Can you all talk about possible

17   settlement here?

18           MR. ROSIN:  Yes, your Honor.

19           THE COURT:  Is defendant interested at all?

20           MR. WOLMAN:  I'm happy to do so, your Honor.

21           THE COURT:  Okay, so why don't --

22           MR. WOLMAN:  And if I may just ask, just because it's

23   my practice, if your Honor is inclined to issue any form of

24   preliminary injunction, I would ask that it be stayed pending

25   appeal.

```
1              THE COURT:  I don't know what I'm going to do yet.  I
2    want to go through the record on the noncompete.  You haven't
3    given me a good reason about why I shouldn't issue some form of
4    an injunction on the noncompete.  But it may be because what I
5    would really like is to look at the record and see whether
6    you're in the same line of business.  And if it is a competition
7    agreement, I'm likely to blue pencil it -- that's your term,
8    but it's one I've used as well -- and to bring it down.  And I
9    am likely also to impose some sort of a bond.
10             So I'm quite concerned on that level about whether or
11   not they're actually in competition.  And if there's a dispute
12   of fact on water restoration services, I may not grant the
13   injunction on that.  But if it's straight-up plumbing services,
14   Mr. Belegu has signed a franchise agreement.
15             So in the meantime, you're going to return all the
16   stuff, the training manuals and phone numbers and stuff in the
17   franchise agreement.
18             So can you talk in the next two weeks and see if you
19   can work something out?  And if not, I am going to get to work
20   on whether I am going to grant a PI or not.
21             MR. ROSIN:  Yes, your Honor.
22             THE COURT:  Because I will stay it pending an appeal
23   because, frankly, with the First Circuit, it takes a year to
24   two years to get an appeal resolved, just saying, and that
25   destroys the benefit of the franchise agreement.  In other
```

1    words, it will take you past the one year I'm likely to impose.

2    It takes a very long time to get to the First Circuit, so I

3    don't know that I would, but I certainly would impose a bond,

4    and you might want to give me a number that makes sense.

5         But what I really want to do is move beyond this.  And

6    I don't know where the bulk of the businesses come from.  I

7    don't know if it's just straight-up plumbing services, if it's

8    just the zip code.  I think that's a reasonable proposal

9    actually, as opposed to 100 miles.  And I also think that three

10   years is too long.  And if I have any latitude under *Dunkin'*

11   *Donuts*, I will probably blue pencil it.

12        So I'm just giving you that as broad outlines, but it

13   will take me, just saying, maybe three months to write this

14   opinion.  So this is not something I'm just going to whip off,

15   and it gives you time to try and settle it.

16        MR. WOLMAN:  Understood.

17        MR. ROSIN:  Your Honor, thank you.  Understood.

18        THE COURT:  So you'll give me a status report in two

19   weeks.  And as I said, I'm right now jump starting discovery,

20   even though probably -- has the complaint been answered yet?  I

21   forgot to check.

22        MR. ROSIN:  It has not, your Honor.

23        MR. WOLMAN:  We have not -- there was a waiver of

24   service, and I think we have actually a couple more weeks.

25        THE COURT:  Yes, I don't want to wait for the whole

 1    scheduling conference thing.

 2         THE CLERK:  Allow discovery to proceed, Judge,

 3    immediately?

 4         THE COURT:  Yes.  Especially I'm most interested in

 5    the deposition of the principal, and perhaps you'd like a

 6    deposition of -- who's the key player at Rooterman?

 7         MR. ROSIN:  We'll find it out, your Honor.  It could

 8    be one of the marketing people, but I would have to get back to

 9    defense counsel on that.

10         THE COURT:  Maybe you can exchange depositions, maybe

11    that would be the agreement, before you decide whether to

12    settle it?  I mean, that seems like one reasonable way to go.

13    But let me know.  You talk and within two weeks give me a

14    status update, okay?

15         THE CLERK:  By the 12th, Judge?

16         THE COURT:  Yes.  I think that that's good.  Another

17    possibility, just to mention it, is we have magistrate judges

18    here who mediate, and I could try and get in the front door

19    with them.

20         So the to-do list includes a declaration within

21    30 days of all the steps that have been taken to root out

22    Rooterman from the defendants' new companies.  The second would

23    be a status report within two weeks on possible settlement, and

24    a third is whether or not you might want a magistrate judge.

25    And once I've seen all that, I will get to work on an opinion.

```
 1              MR. ROSIN:  Your Honor, may I ask one other question?
 2              THE COURT:  Yes.
 3              MR. ROSIN:  You would like that declaration before we
 4    take Mr. Belegu's deposition, so would it be possible --
 5              THE COURT:  Then wait till after you get it in
 6    30 days.  That's fine.
 7              MR. ROSIN:  I was going to ask for a shorter time,
 8    15 days.
 9              THE COURT:  You're the one who told me the statute
10    says 30 days.  And what I suggest you do in good faith among
11    counsel, which I'm sure you are, tell -- I mean, it may be that
12    you personally found out about the Facebook?  Was it Facebook?
13    What was it you found out?
14              MR. ROSIN:  Facebook.
15              THE COURT:  Yes, Facebook.  Well, that's a third
16    party, and they can't do anything about a third party saying
17    something; but if you find other things that are just
18    violative, in your view, then just tell him, and they'll get
19    rid of it.
20              MR. ROSIN:  Okay.  Well, your Honor, I think what you
21    can do is write to Facebook and say, "We would like you to take
22    down the following posts because they are based on --"
23              THE COURT:  I don't know if I'm going to go that far,
24    that's a new thought, but maybe what you can do is work out
25    some settlement where you could do something like that.  It
```

1    strikes me that's yesterday's news.  It's in the process of

2    being fixed.  The big issue is, do I stop him from doing

3    business for a year?  That's the big issue.

4           MR. ROSIN:  And, your Honor, the complaint was filed

5    in early December, and we gave counsel additional time to

6    respond.  We think that he doesn't need 30 days to write his --

7           THE COURT:  All right, overruled.  Thirty days was

8    your suggestion, and that's where I'm sticking.  And in the

9    meantime, feed him anything you see that's a violation.  I'm

10   wanting this to work out.  But if not, that's why I'm here.

11          And when you say at the end of December, as far as I'm

12   concerned, my having a full-blown preliminary injunction

13   hearing and full-blown briefing within 30 days is as fast as

14   justice moves.

15          MR. ROSIN:  Thank you, your Honor.

16          THE COURT:  Okay, so there it is, and I look forward

17   to hearing your status report.  Hopefully you'll just settle it

18   or agree to go to mediation, but if that doesn't work out, then

19   I will get to work on a PI order.

20          MR. ROSIN:  Thank you, your Honor.

21          MR. WOLMAN:  Thank you, your Honor.

22          THE COURT:  All right, bye-bye.

23          (Adjourned, 10:09 a.m.)

24

25

1                       C E R T I F I C A T E

2


3
UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS   ) ss.
    CITY OF BOSTON              )
5

6


7            I, Lee A. Marzilli, Official Federal Court Reporter,

8   do hereby certify that the foregoing transcript, Pages 1

9   through 27 inclusive, was recorded by me stenographically at

10  the time and place aforesaid in CA No. 24-13015-PBS, Rooterman

11  LLC v. Klodian Belegu, et al, and thereafter by me reduced to

12  typewriting and is a true and accurate record of the

13  proceedings.

14           Dated this 6th day of March, 2025.

15

16

17

18

19           /s/ Lee A. Marzilli
             _____
20           LEE A. MARZILLI, CRR
             OFFICIAL COURT REPORTER
21

22

23

24

25