# EXHIBIT A

*Franchise Disclosure by A Corp*

*(Monmouth & Ocean Counties)*

# FRANCHISE AGREEMENT

**Franchise Disclosure Document**



**ACORP • 268 RANGEWAY ROAD • N. BILLERICA, MA 01862 • 1-800-700-8062**



## FRANCHISE DISCLOSURE DOCUMENT

A CORP.
(a Massachusetts Corporation)
268 Rangeway Road, P. O. Box 290
North Billerica, Massachusetts 01862
(978) 667-1144 Ext 26
www.rooterman.com



There is one (1) franchise being offered: "Rooter-Man". The Rooter-Man franchise features sewer and drain cleaning services which include the maintenance and cleaning of sewer pipes, emergency plumbing repairs and other related services and products. Franchises will primarily be sold to individuals who have some experience in providing plumbing, sewer and drain cleaning services.

The total estimated initial investment necessary to begin operation of a Rooter-Man franchise ranges from $45,725.00 to $127,350.00. The initial franchise fee that will be paid to A Corp. is based upon the population of the franchisee's territory. The rate of the franchise fee is $31.80 per thousand of population, and will generally range from $3,975.00 to $39,750.00. A Corp is offering existing and new franchisees a special offer to purchase that if they purchase two (2) units of 125,000 populations, they will receive the third unit for free. The $125.00 monthly fee will still apply to each of the three units.

This disclosure document summarizes certain provisions of your franchise agreement and other information in plain English. Read this disclosure document and all accompanying agreements carefully. You must receive this disclosure document at least 14 calendar-days before you sign a binding agreement with, or make any payment to, the franchisor or an affiliate in connection with the proposed franchise sale. **Note, however, that no governmental agency has verified the information contained in this document.**

The terms of your contract will govern your franchise relationship. Don't rely on the disclosure document alone to understand your contract. Read all of your contract carefully. Show your contract and this disclosure document to an advisor, like a lawyer or an accountant.

Buying a franchise is a complex investment. The information in this disclosure document can help you make up your mind. More information on franchising, such as "A Consumer's Guide to Buying a Franchise," which can help you understand how to use this disclosure document, is available from the Federal Trade Commission. You can contact the FTC at 1-877-FTC-HELP or by writing to the FTC at 600 Pennsylvania Avenue, NW, Washington, D.C. 20580. You can also visit the FTC's home page at www.ftc.gov for additional information. Call your state agency or visit your public library for other sources of information on franchising. There may also be laws on franchising in your state. Ask your state agencies about them.

The Issuance Date:       April 14, 2020

## How to Use This Franchise Disclosure Document

Here are some questions you may be asking about buying a franchise and tips on how to find more information:

| QUESTION | WHERE TO FIND INFORMATION |
|---|---|
| **How much can I earn?** | Item 19 may give you information about outlet sales, costs, profits or losses. You should also try to obtain this information from others, like current and former franchisees. You can find their names and contact information in Item 20 or Exhibit D. |
| **How much will I need to invest?** | Items 5 and 6 list fees you will be paying to the franchisor or at the franchisor's direction. Item 7 lists the initial investment to open. Item 8 describes the suppliers you must use. |
| **Does the franchisor have the financial ability to provide support to my business?** | Item 21 or Exhibit A includes financial statements. Review these statements carefully. |
| **Is the franchise system stable, growing, or shrinking?** | Item 20 summarizes the recent history of the number of company-owned and franchised outlets. |
| **Will my business be the only Rooter Man business in my area?** | Item 12 and the "territory" provisions in the franchise agreement describe whether the franchisor and other franchisees can compete with you. |
| **Does the franchisor have a troubled legal history?** | Items 3 and 4 tell you whether the franchisor or its management have been involved in material litigation or bankruptcy proceedings. |
| **What's it like to be a Rooter Man franchisee?** | Item 20 or Exhibits D and E lists current and former franchisees. You can contact them to ask about their experiences. |
| **What else should I know?** | These questions are only a few things you should look for. Review all 23 Items and all Exhibits in this disclosure document to better understand this franchise opportunity. See the table of contents. |

## What You Need To Know About Franchising *Generally*

**Continuing responsibility to pay fees**. You may have to pay royalties and other fees even if you are losing money.

**Business model can change**. The franchise agreement may allow the franchisor to change its manuals and business model without your consent. These changes may require you to make additional investments in your franchise business or may harm your franchise business.

**Supplier restrictions**. You may have to buy or lease items from the franchisor or a limited group of suppliers the franchisor designates. These items may be more expensive than similar items you could buy on your own.

**Operating restrictions**. The franchise agreement may prohibit you from operating a similar business during the term of the franchise. There are usually other restrictions. Some examples may include controlling your location, your access to customers, what you sell, how you market, and your hours of operation.

**Competition from franchisor**. Even if the franchise agreement grants you a territory, the franchisor may have the right to compete with you in your territory.

**Renewal**. Your franchise agreement may not permit you to renew. Even if it does, you may have to sign a new agreement with different terms and conditions in order to continue to operate your franchise business.

**When your franchise ends.** The franchise agreement may prohibit you from operating a similar business after your franchise ends even if you still have obligations to your landlord or other creditors.


## Some States Require Registration

Your state may have a franchise law, or other law, that requires franchisors to register before offering or selling franchises in the state. Registration does not mean that the state recommends the franchise or has verified the information in this document. To find out if your state has a registration requirement, or to contact your state, use the agency information in Exhibit C.

Your state also may have laws that require special disclosures or amendments be made to your franchise agreement. If so, you should check the State Specific Addenda. See the Table of Contents for the location of the State Specific Addenda.

## Special Risks to Consider About *This* Franchise

Certain states require that the following risk(s) be highlighted:

1.    **Out-of-State Dispute Resolution.** The franchise agreement requires you to resolve disputes with the franchisor by mediation, arbitration and/or litigation only in Massachusetts. Out-of-state mediation, arbitration, or litigation may force you to accept a less favorable settlement for disputes. It may also cost more to mediate, arbitrate, or litigate with the franchisor in Massachusetts than in your own state.

Certain states may require other risks to be highlighted. Check the "State Specific Addenda" (if any) to see whether your state requires other risks to be highlighted.

A Corp. FDD.2020

TABLE OF CONTENTS

| ITEM | | PAGE |
|---|---|---|
| 1. | The Franchisor and any Parents, predecessors, and Affiliates | 1 |
| 2. | Business Experience | 1 |
| 3. | Litigation | 2 |
| 4. | Bankruptcy | 2 |
| 5. | Initial Fees | 2 |
| 6. | Other Fees | 3 |
| 7. | Estimated Initial Investment | 4 |
| 8. | Restrictions on Sources of Products and Services | 7 |
| 9. | Franchisee's Obligations | 8 |
| 10. | Financing | 9 |
| 11. | Franchisor's Assistance, Advertising, Computer Systems, and Training | 9 |
| 12. | Territory | 13 |
| 13. | Trademarks | 13 |
| 14. | Patents, Copyrights, and Proprietary Information | 17 |
| 15. | Obligation to Participate in the Actual Operation of the Franchise Business | 18 |
| 16. | Restrictions on What the Franchisee May Sell | 18 |
| 17. | Renewal, Termination, Transfer, and Dispute Resolution | 18 |
| 18. | Public Figures | 20 |
| 19. | Financial Performance Representations | 20 |
| 20. | Outlets and Franchisee Information | 20 |
| 21. | Financial Statements | 26 |
| 22. | Contracts | 26 |
| 23. | Receipts | Last two pages |

EXHIBITS

| A | Financial Statements |
|---|---|
| B.1 | Franchise Agreement |
| B.2 | Addendum to Franchise Agreement |
| B.3 | The Table of Content of the Operational Manual |
| C | List of State Agencies/Administrators |
| D | Rooter Man Franchisees List |
| E | Former Rooter Man Franchisees List |
| F | State Effective Dates |

**Item 1**
## THE FRANCHISOR, AND ANY PARENTS, PREDECESSORS, AND AFFILIATES

To simplify the language in this Disclosure Document, "A CORP." means the franchisor. "You" means the person who acquires the franchise. A CORP. is a Massachusetts corporation that was incorporated on March 2, 1982. A CORP. is the franchisor of "Rooter-Man". Our principal address is 268 Rangeway Road, North Billerica, Massachusetts 01862. A CORP. conducts its franchise business using the name of Rooter-Man.

As of the date of this Disclosure Document, A CORP. has 110 domestic franchises operating 662 units and 6 international franchises operating 50 units. One of the franchises (Sewer-Man, Inc.) is wholly owned by Donald MacDonald, President of A CORP., and operates under both the Rooter-Man and Sewer-Man marks. Additionally, Donald MacDonald founded AAA Ace Sanitation, Inc. in 1970. This corporation's name was changed to Sewer-Man, Inc. in 1976. Sewer-Man, Inc. does not offer franchises for sale. A CORP. has no parent company, or a predecessor.

The franchise offered is:    The Rooter-Man Franchise.    The Rooter-Man franchise provides emergency plumbing repairs and sewer and drain cleaning services to residential dwellers, commercial operations such as restaurants and hotels, and government facilities and municipalities.

You will be competing with other local companies who perform sewer, drain and pipe cleaning services and with plumbers and other individuals who provide similar services. You may also compete with national or regional companies who perform similar services or franchise or license others to do so. The market for the Services is developed in most areas and primarily consists of single and multiple dwellings. Commercial, industrial and governmental customers also utilize the Services.

There may be laws and regulations in effect in your state and in your locality which govern sewer, septic, and drain cleaning services. You and your attorney should investigate and comply with all relevant laws and regulations.

Other than the offer of Rooter-Man franchises, A CORP. does not offer franchises for sale in any other line of business. A CORP. does, however, retain the right to offer, sell and support franchises in other lines of business in the future.

The Affiliates.

Rooter-Man Corp., the original owner of the Rooter-Man franchise is presently an affiliate of A CORP. offering sale of tools, for plumbing, sewer, and drain cleaning, to the Rooter-Man franchisees. Rooter-Man Corp. is a Massachusetts corporation that was formed on January 1, 1982 to offer Rooter-Man franchises. It has a principal address of 268 Rangeway Road, North Billerica, Massachusetts 01862. Rooter-Man, Corp. assigned its outstanding franchise agreements to A CORP. in 1990. A CORP. was founded to develop franchise systems within the service industry. Rooter-Man Corp. does not offer franchises for sale.

**Item 2**
## BUSINESS EXPERIENCE

A CORP.'s directors, principal officers and other individuals who have management responsibility in connection with the sale or operation of franchises offered by this document are as follows:

A Corp. FDD.2020

1

<u>Donald F. MacDonald, President, Treasurer, Clerk and Director</u>
Donald F. MacDonald, the President, Treasurer, Clerk and a Director of A CORP. has over 45 years of experience in the sewer and drain cleaning business. He has served in each position with A CORP. since the Company began offering franchises for sale in 1990. For 45 years he served as President of Sewer-Man, Inc. and for 37 years as President of Rooter-Man Corp., affiliates of A CORP. Mr. MacDonald will conduct the training for franchisees.

<u>Crystal McCormick, Franchise Director</u>
Mrs. McCormick is the director of franchising at A CORP.'s principal business location in Massachusetts since November of 2005 and is responsible for marketing and development of the Rooter-Man franchise organization. Mrs. McCormick received her associates' degree in the business administration program from Middlesex Community College. Before Mrs. McCormick was promoted as the Franchise Director, she worked as a dispatcher and the assistant to the previous franchise director of A CORP.

## Item 3
## LITIGATION

Other than the matter cited below, which may involve the franchisor, an affiliate, and/or an officer of A CORP., there is no litigation which is required to be disclosed, pursuant to 16 CFR § 436.5(c), in this Disclosure Document.

<u>A Corp. dba Rooter Man v. Zhang et al</u>, Civil Action No. 1:16-CV-10530-IT, filed on March 16, 2016 in the United States District Court for the District of Massachusetts. A CORP. brought said action against the Defendants for trademark infringement and breach of contract. Parties reached an amicable settlement and said action was dismissed with prejudice on or about March 31, 2017.

## Item 4
## BANKRUPTCY

Neither we; any parent; predecessor; affiliate; officer or general partner of ours, nor any other person who will have management responsibility relating to the sale or operation of the franchises offered by this Disclosure Document has been involved as a debtor in proceedings under the U.S. Bankruptcy Code or any foreign bankruptcy laws required to be disclosed in this disclosure document.

## Item 5
## INITIAL FEES

You will pay an initial franchise fee based upon the population of Your territory. The rate of the fee is $31.80 per thousand of population and will generally range from $3,975.00 to $39,750.00. 125,000 population constitutes one franchise unit and the initial franchise fee for such a unit is $3,975.00. Upon receipt of your payment of the initial franchise fee, A CORP. will execute the Franchise Agreement. There are no circumstances under which A CORP. will refund the initial franchise fee. A CORP. does not offer any financing to the initial franchise fees. All initial franchise fees are due in full amount upon signing the franchise agreement.

The population in Your territory is determined by using the U.S. Census Bureau data or the data generated by Business Control Atlas, a publication updated every 5 years and distributed by the American Map Corp., Maspeth, New York.

A Corp. FDD.2020

The initial franchise fee for any additional unit that you purchase subsequent to the first unit is at the same rate as the first unit. A CORP., in its sole discretion, may finance up to 50% of Your additional franchise fee when You exercise Your option to purchase additional territories pursuant to a Promissory Note for a period of 1 to 3 years. You should consult Item 10 of this Disclosure Document for more information about the financing program.

## Item 6
## OTHER FEES

| Type of Fee | Amount | Due Date | Remarks |
|---|---|---|---|
| (1)*Continuing Royalty (Monthly franchise fee) | $1.04 per thousand population monthly | First royalty payment is due no later than the 60th day from Your execution of the Franchise Agreement. Then the continuing royalty is due by the 10th of each month. | Gross Revenues include all revenues received from the operation of Your franchise. Minimum $130.00 per month. |
| (2) Marketing Fund Contribution | $0.12 per thousand population monthly | First monthly marketing fund contribution is due no later than the 60th day from Your execution of the Franchise Agreement. Subsequent monthly marketing fund contribution is due by the 10th of each month. | Administered by A CORP. Minimum $15.00 per month. This fee covers the listings with other Rooter Man franchisees at the main franchise website www.rooterman.com. |
| (3) Locally Optimized Website Fee | $89.00 per month per locally optimized website | First payment is due no later than the 60th day from Your execution of the Franchise Agreement. Then the continuing payment is due by the 10th of each month. | Locally Optimized Website Fee covers the locally optimized website developed and supported by A Corp. |
| (4) Audit Fee (Only applicable if delinquent on monthly fee payments) | Cost of Audit plus 18% per annum on underpayment of continuing royalty and advertising fees | Immediately after audit | Audit fees are due if under-payment of monies due A CORP. Interest is always due on underpayment |
| (5) Interest Expense (Only applicable if delinquent on monthly fee payments) | 18% per annum | At the time payment is made | For all late payments of monies owed to A CORP. |
| (6) Franchisee Termination Fee (Opt-Out) Only during initial 5 year term. | $25.00 per thousand population | No later than 90 days before closing date for the territory's yellow pages advertising | De-identification by You upon termination. |
| (7) Transfer Fee | Greater of 5% of Franchise Selling Price or $2500.00 | On or before transfer date | Non-refundable |
| (8) Renewal Fee | $2500.00 | 6 months prior to expiration | Must be paid in conjunction with signing of new 10 year term Franchise Agreement (then current version) |

**A Corp. FDD.2020**

Notes:

(1)     All fees are imposed by and are payable to and collected by A CORP. All fees are non-refundable. All fees are uniformly imposed. A CORP. directly offers and sells Rooter-Man franchises, without brokers, throughout the United States and internationally. The term "Gross Revenues" as used in the Franchise Agreement, means all revenues generated by the Your business conducted upon, from or with respect to Your A CORP. franchise. Gross Revenues include monies or credit received for its services from the sale of services and products, from tangible property of every kind and nature, promotional or otherwise, and for other services performed by You. Gross Revenues do not include sales or service taxes or municipal or private disposal fees. Your first royalty payment is due no later than the sixtieth (60th) day from Your execution of the Franchise Agreement.

(2)     You are required to pay minimum $15.00 per month to A CORP. as marketing fund contribution. Your first monthly marketing fund is due no later than the sixtieth (60th) day from Your execution of the Franchise Agreement.

(3)     The Locally Optimized Websites developed and supported by A Corp. features each franchisee's contact information for their particular licensed territories without other franchisees' information.

(4)     An audit fee is triggered only upon delinquency of monthly franchise fees three months beyond payment due date.

(5)     Interest expense is triggered only upon delinquency of monthly franchise fees beyond the payment due date. Interest begins from the date that the payment was due.

(6)     The opt-out fee applies when a franchisee terminates the franchise agreement with A Corp.'s approval.

(7)     No transfer fee required if franchise is transferred to his/her own Corporation or immediate family.

(8)     The renewal fee covers execution of a renewed Franchise Agreement for a term of ten (10) years from the date of renewal.

(9)     Payment of all fees and dues other than the initial franchise fees shall be made through direct charge either through credit cards or a bank account. See Franchise Agreement, Exhibit E.

## Item 7
## ESTIMATED INITIAL INVESTMENT

### YOUR ESTIMATED INITIAL INVESTMENT

| Type of Expenditure | Amount | Method Of Payment | When Due | To Whom Payment Is to be Made |
|---|---|---|---|---|
| (1) Initial Franchise Fee | $ 3,975.00 /low $39,750.00 /high | Due by signing unless partially financed by A CORP. | At signing of Franchise Agreement and under Note | A CORP. |
| (2) Travel & Living Expenses While Training | $ 350.00 /low $ 1,600.00 /high | Credit or cash (as incurred) | During training or 30 days later | Hotels, Restaurants Airlines |

| Type of Expenditure | Amount | Method Of Payment | When Due | To Whom Payment Is to be Made |
|---|---|---|---|---|
| (3) Real Estate & Improvements | $   400.00 /low<br>$ 1,000.00 /high | (Note 3) | (Note 3) | (Note 3) |
| (4) Vehicles and Equipment | $22,000.00 / low<br>$42,000.00 /high | Vehicles may be financed | Prior to Opening | Various Vendors |
| (5) Computer Hard-ware, Office Equipment and Furniture | $ 2,500.00 /low<br>$ 5,500.00 /high | Lump Sum | Prior to Opening | Various Vendors |
| (6) Beginning Inventory | $ 1,000.00 /low -<br>$ 3,000.00 /high | Prepay/Credit terms | Prior to Opening | Various Vendors |
| (7) Signs | $   500.00 /low<br>$ 2,500.00 /high | Prepay Credit Terms | Prior to Opening | Various Vendors |
| (8) Professional Fees | $   500.00 /low<br>$ 1,000.00 /high | As Incurred | As Incurred | Attorney, Accountant |
| (9) Licenses and Permits | $   500.00 /low<br>$ 1,000.00 /high | As Incurred | As Incurred | State, Local Licensing Authorities |
| (10) Insurance | $ 1,500.00 /low<br>$ 3,500.00 /high | As Incurred | As Incurred | Insurance Company |
| (11) Miscellaneous Opening Costs | $ 1,000.00 /low<br>$ 3,000.00 /high | As Incurred | As Incurred | Suppliers, Utilities, Various Vendors |
| (12) Grand Opening Advertising (6 months) | $ 1,500.00 /low<br>$ 3,500.00 /high | As Incurred | As Incurred | Various Vendors |
| (13) Additional Working Capital Funds – [initial period] (18 months) | $10,000.00 /low<br>$20,000.00/high | | | |
| Total: | $ 46,750.00 /low<br>$137,600.00 /high | | | |

Notes:

The above charts represent the approximate expenditures which YOU will have to make before operating a Rooter-Man franchise. The amounts are designed to provide YOU with an estimated low and high amount. YOU are not required to make all the purchases that are listed in the above chart.

1. The initial franchise fee is paid to A CORP. Such initial franchise fee is not refundable.

2. The travel expenses include airfare to and from the location of Your training as well as hotel and meal expenses during the 2-day period of training for You.

3. It is not expected that You will purchase real estate to operate Your Rooter-Man franchise. You will need to have a location of approximately 240 square feet to house Your equipment and supplies. If You have large enough garage space in Your home, You may be able to have your franchise operate from Your home. You will also need approximately 120 square feet of office space. In addition, You will need yard space to park vehicles and equipment.

4. The lower figure for vehicles and equipment includes a single van equipped with the basic tools and equipment necessary to operate a Rooter-Man franchise. The higher figure includes a more expensive, heavier duty van, jetting equipment and a T.V. inspection camera. You may be able to finance the purchase of the van, in which event the initial investment figures will be reduced by the financed amount.

5. You will not be required to purchase computer hardware and related equipment, but are encouraged to do so.

A Corp. FDD.2020

5

6. The figure for the beginning inventory includes hand tools, plumbing repair parts and inventory.

7. Signage for Your local office, is applicable, is allowed to use the official Rooter Man mark and logo and in compliance with the local regulations.

8. You should seek the advice of a lawyer and an accountant before You begin to operate Your business.

9. The range in cost of securing licenses and permits reflects the substantial difference in the costs of local and state permits.

10. The figure for insurance includes the cost of comprehensive general liability coverage, product liability coverage and comprehensive motor vehicle liability insurance coverage for one vehicle. This figure does not include workers' compensation coverage.

11. The miscellaneous opening costs include the security deposit for Your telephone lines.

12. The grand opening budget includes the cost of using a mailing list service, conducting a direct mailing and placement of the announcements in the local newspaper or newspapers in Your territory.

13. A CORP. estimates that You will require approximately $10,000.00 (low) to $20,000.00 (high) as additional working capital during Your first 18 months of operation, to cover operational expenses. These figures are estimates and A CORP. cannot guarantee that you will not have additional expenses starting the business. In addition, You should have funds available to cover Your personal living expenses at least during the first 18 months. The estimated initial investment figures cited above do not include Your personal living expenses.

14. The additional funds are working capital, which may cover the cost of local advertising. Local advertising includes the yellow page advertising in all major telephone books distributed within Your territory as well as local newspaper advertising, marketing and sales materials brochures and advertising specialties. You understand and acknowledge that local and telephone directory advertising is the major sources of new customers. At the end of the year, You must furnish proof to A CORP. of all local advertising expenditures and copies of all advertisements used during the past year. You agree to expend at least 15% of Your Gross Revenues on local advertising. You are responsible for said local advertising. A CORP. is not liable for any costs in connection with any franchisee's local advertising. A CORP. provides free listing of Your purchased Rooter-Man Franchise through its franchisor's website at www.rooterman.com (the "Franchisor Website"). If You desire to have a locally optimized website to promote Your purchased Rooter-Man Franchise, You must use the internet advertisement services provided through the Franchisor Website. The monthly fee for said locally optimized website is $89.00 per month. To maintain the consistency of the brand image of A CORP, You are not allowed to independently design, develop, and maintain any other locally optimized website or register domains using A CORP's trademarks.

Other than the initial franchise fees that is not refundable, You will not make any other payment to A CORP. A CORP. has no control whether any such payment that you made to vendors other than A CORP. will be refundable or not.

A CORP. has relied on its affiliated Rooter-Man operations to compile the foregoing estimates for a single person operation. You should review these figures carefully with a business advisor before making a decision to purchase the franchise.

**A Corp. FDD.2020**

A CORP. does not offer direct financing to franchisees for any of the foregoing items except that A CORP. may provide, at its sole discretion, financing of up to 50% of Your additional franchise fees, when You exercise Your option to purchase the additional territories. See Item 5 and 10. A CORP. may provide You with referrals of suppliers that offer Rooter Man franchisees competitive prices.

## Item 8
## RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES

You must purchase a van and certain tools which meet A CORP.'s specifications as described in the latest version of the Operating Manual. A CORP. will only require You to make purchases of equipment, goods, and services which meet A CORP.'s specifications. We do not designate particular suppliers from which van markings and uniform patches may be purchased. Any van markings or uniform patches that do not deviate from our specifications are, in effect, an approved item. The above required purchases are estimated to be 15% to 20% of all purchases by YOU in establishing and operating the franchised business.

A CORP.'s affiliate, Rooter-Man Corp., owned by Mr. Donald MacDonald, is a supplier and distributor of various tools and supplies needed in the operation of a Rooter-Man franchise. A CORP is not itself an approved supplier. These tools and supplies consist of drain cleaning machines, cables, cutters, various hand tools, drain cleaning products, uniform patches, truck decals and other such items. YOU are not required to purchase these or any items from Rooter-Man Corp. nor is A CORP or the Rooter-Man Corp. required to continue supplying, selling or distributing these or any items. The source of the Rooter-Man Corp.'s revenue that is from franchisees is from sales of tools and relevant records that are maintained through Quick Books and disclosed in Rooter-Man Corp.'s annual Federal income tax return. If YOU choose to purchase the above-mentioned tools from Rooter-Man Corp., Rooter-Man Corp. will charge five (5) percentage of the sale price to cover its costs in processing the orders from the wholesale dealers. Based on the Independent Auditor's Report dated April 10, 2020 that was conducted by Steven R. Bourret, CPA, CGMA, Managing Partner Cain, Bourret, Jarry & Associates LLC, in the year ending December 31, 2019, the affiliate Rooter-Man Corp.'s total revenue amount for fiscal year 2019 was $34,808.27 and the revenue derived from franchisees for fiscal year 2019 was $34,808.27. The purchase of the ABOVE-MENTIONED items will represent 15 % of your purchases in operating a Rooter-Man franchise.

A CORP negotiates purchase arrangements with suppliers for the benefit of YOU. However, A CORP does not receive any consideration from arrangements with approved suppliers. A CORP does not provide any material benefits to YOU based on YOUR use of designated or approved sources. A CORP's affiliate Rooter-Man Corp. may earn a 5% markup on General Wire and Spring tools and miscellaneous items.

There are no purchasing or distribution cooperatives currently featured as part of the A CORP. system. A CORP. provides assistance to negotiate purchase arrangements with suppliers, including price terms, for the benefit of You and You may receive discount on the purchases. A CORP. reserves the right to approve all your advertising in advance and to establish rules, standards and procedures regarding the content, form and manner of advertising the System and Trademarks.

In 2019, A CORP. received funds for A CORP.'s franchise marketing program, including a website link on www.Rooterman.com from the following companies that are A CORP.'s approved suppliers in which none of A CORP.'s officers owns an interest:

1. $0.00 from Pivotal Payments, a credit card payment services provider.
2. $407.04 from Bionetix International, a bio liquid enzyme supplier.
3. $0.00 from VAC-CON, an equipment supplier.

A Corp. FDD.2020

7

**Item 9**
## FRANCHISEE'S OBLIGATIONS

This table lists your principal obligations under the franchise and other agreements. It will help you find more detained information about your obligations in these agreements and in other items of this disclosure document.

### FRANCHISEE'S OBLIGATIONS

| Obligation | Section in Franchise Agreement | Disclosure Document Item |
|---|---|---|
| a. Site selection and acquisition/lease | Section 10 | Items 6 and 11 |
| b. Pre-opening purchasing/leases | Section 11 | Item 8 |
| c. Site development and other pre-opening requirements | None | Items 6, 7 and 11 |
| d. Initial and ongoing training | Sections 9.1 and 9.3D | Item 11 also see note #2 of Item 7 |
| e. Opening | Sections 9.3 | Item 11 |
| f. Fees | Sections 1.9, 1.10, 1.11, 1.12, 1.14, 5, 6.1, Exhibit E | Items 5 and 6 |
| g. Compliance with standards and policies/ Operations Manual | Sections 9.3 and 12 | Item 11 |
| h. Trademarks and proprietary information | Sections 8 and 12.1 | Items 13 and 14 |
| i. Restrictions on products/ services offered | Sections 1.8 and 12.4 | Item 16 |
| j. Warranty and customer service requirements | Section 12.3 | Item 11 |
| k. Territorial development and sales quotas | None | |
| l. Ongoing product/service purchases | Section 12.4 | Item 8 |
| m. Maintenance, appearance and remodeling requirements | Not applicable | Item 11 |
| n. Insurance | Section 12.6 | Items 6 and 8 |
| o. Advertising | Sections 6 and 7 | Items 6 and 11 |
| p. Indemnification | Sections 19.4A and 19.9 | Item 6 |
| q. Owner's participation/ management /staffing | Sections 12.5 | Items 11 and 15 |
| r. Records/reports | Section 13 | Item 6 |
| s. Inspections/audits | Section 13.4 | Items 6 and 11 |
| t. Transfer | Section 14.2 | Item 17 |
| u. Renewal | Section 4.2 | Item 17 |
| v. Post-termination obligations | Sections 15.1 and 15.2 | Item 17 |
| w. Non-competition covenants | Section 18.1 | Item 17 |
| x. Dispute resolution | Section 19.7 | Item 17 |
| y. Owner/shareholders guarantee | Section 14.2 C4 and Exhibit A to the Franchise Agreement | Item 15 |
| z. Other | N/A | N/A |

Note:    See Items 6 and 8

**A Corp. FDD.2020**

8

## Item 10
## FINANCING

A CORP. may finance up to 50% of Your additional franchise fee when You exercise Your option to purchase the additional territories pursuant to a Promissory Note for a period of 1 to 3 years (please see Exhibit C of the Franchise Agreement which contains the Promissory Note, the financing terms are contained in the first paragraph). Interest will be at 12% APR (Annual Percentage Rate). There is no prepayment penalty. A CORP. will hold Your business telephone numbers and Your franchised rights as security until You have paid Your Promissory Note in full. The individual who owns 5% or more of a franchise entity will be jointly and severally responsible for the amount owed. There are no waivers of Your legal rights and You are not barred from asserting a defense against A CORP. If you do not pay on time, You hereby agree that A CORP. can call the loan and demand immediate payment of the full outstanding balance and obtain court costs and attorney's fees if a collection action is necessary.

A CORP. has no current practice or interest to sell, assign or discount to a third party all or part of the financing arrangement.

Other than above-mentioned financing, A CORP. does not offer direct financing nor does A CORP. arrange financing from other sources. A CORP. does not guarantee Your note, lease or obligation if You finance Your franchise investment through a third party.

**See Item 22 - Franchise Agreement (Exhibit B) for a specimen copy of this Promissory Note.**

### Summary of Financing Offered

| Item Financed | Source of Financing | Amount Financed | Down Payment | Term (Yrs.) | APR % | Monthly Payment | Prepay Penalty | Security Required | Liability Upon Default | Loss of legal rights on Default |
|---|---|---|---|---|---|---|---|---|---|---|
| Franchise Fee for purchase of additional territories | A CORP. | Up to 50% | **50%** | 1- 3 | 12 | - | None | Your business telephone numbers and Your Franchise Rights | Loss of Franchise; Loss of Telephone Numbers; Liable for unpaid Loan, Atty Fees. | None |

## Item 11
## FRANCHISOR'S OBLIGATIONS

**Except as listed below, A CORP. is not required to provide you with any assistance**.

**Pre-Opening Assistance:**   before You open Your business, A CORP. will:
1. Designate a geographic market which will serve as Your Licensed Territory (Franchise Agreement - Sections 1.3 and 3.1).

2. Provide You with guidelines and specifications for the operation of Your A CORP. franchise (Franchise Agreement - Section 9.3).

3. Provide an initial training program, as described more fully later in this Item (Franchise Agreement - Section 9.1).

4. Lend to You a single copy of A CORP.'s Operations Manual, which includes standards

A Corp. FDD.2020

and specifications for procedures, equipment, supplies, management, marketing and operations, which A CORP. will amend from time to time (Franchise Agreement - Section 9.3A and 12.1).

The Table of Contents of the Operations Manual is attached as Exhibit B.3 to this Disclosure Document. There are 55 pages in the Manual.

The typical length of time from Your signing of the franchise agreement to the opening of Your business is approximately 3 months. The factors that may affect the time period include without limitation execution of the franchise agreement and related documents; ability to obtain financing, or building permits, zoning and such other permit under local ordinances; creation of a business entity; establishment of banking and accounting services; yellow page advertisements; etc.

**Assistance During Operation of Your A CORP. Franchise:**

During the operation of Your Franchised Business, A CORP. will provide you with updates, revisions and amendments to A CORP.'s Operations Manual (Franchise Agreement - Section 12.1); provide general advisory assistance in the on-going operation of the Franchised Business (Franchise Agreement - Sections 9.3); and Coordinate and conduct periodic seminars for A CORP.'s network of franchisees (Franchise Agreement - Section 9.3D). Since office location is not an important component of Your franchise operation, A CORP. will not be assisting You in finding a business office location, however your business office location must be within your licensed territory. In addition, A CORP will provide the following assistance:

1. Advertising:

   a. Collect and expend monies collected under the Marketing Fund. A CORP. will expend all monies collected when the Fund is formed. (Franchise Agreement - Section 6.1). Also see Item 6 - note 2. YOU do not have to participate in any other advertising fund. A CORP. does not use any portion to solicit new franchise sales.

   b. A CORP. uses national media, such as the Internet and national magazines to advertise its Rooter Man franchises. A CORP. has an in-house advertising department as the source of the advertising. A CORP. is not obligated to advertise in YOUR Licensed Territories. A CORP. allows YOU to use YOUR own advertising materials which must contain the official Rooter Man name and logo. There is no advertising council composed of Rooter Man franchisees that advises A CORP. on advertising policies. A CORP. does not require YOU to participate in a local or regional advertising cooperative. YOU are not required to participate in any other advertising fund.

   c. The Marketing Fund is audited by our CPA within 120 days of the end of each fiscal year and the audited financials of A Corp., attached to this FDD as Exhibit A, contains the relevant audited information. The information is also available for franchisees' review upon reasonable request. As in every fiscal year, in 2017, the entire Marketing Fund was spent on the cost and expenses relating to: (i) maintenance of the franchise website at www.rooterman.com; (ii) the advertising and franchise marketing cost; (iii) telephone call forwarding services to forward the calls received at the general Rooter Man 1-800 number listed on www.rooterman.com to the local franchisee's phone number when the caller enter the local zip code over the phone; (iv) maintenance of the telephone numbers used to forward potential customer

**A Corp. FDD.2020**

calls to the local franchisees. There is no unspent marketing fund received in the last fiscal year carried over to the current fiscal year. There are no broken-down percentage numbers in the audited financial statements. It is our estimate that approximately: (i) 70% of the marketing funds were spent on administrative expenses including production to build the Rooter Man franchisees' webpages within the Rooter Man website, to do the advertisement search, optimization and social media; and (ii) 30% on media placement to build the Rooter Man brand.

d. The company-owned units are usually the units that the franchisees cannot operate because of their family and/or health issues and we take such units temporarily until they are sold to the new franchises. Said company-owned units do not contribute to the Marketing Fund. Our office management staff administrate the Marketing Fund, which is audited by our CPA each year.

e. In addition to the Marketing Fund, we advertise for the entire Rooter Man franchises on our expenses to advertise the brand, which is also audited by our CPA each year.

2. Cash Registers and Computer Systems:
   a. Provide equipment requirements for the tools and van for the Rooter-Man franchise. Currently, there are no specifications for computer equipment, although A CORP. encourages You to acquire a personal computer for use in the operation of Your franchise. (Franchise Agreement - Section 12.1).

   b. A CORP. does not require YOU to buy or use electronic cash registers or computer systems.

3. Operation Manual
   a. The Table of Contents of the Operations Manual is attached as Exhibit B.3 to this Disclosure Document. There are 55 pages in the Manual.

4. Training:
   a. The A CORP. training program will consist of 2 days of training for a Rooter-Man franchise.

A CORP.'s training programs are as follows:

## TRAINING PROGRAM

| Subject | Hours of Classroom Training | Hours of On-the-Job Training | Location |
|---------|----------------------------|------------------------------|----------|
| Operations Manual | 2 | 8-16 / Optional at Your location, see notes. | N. Billerica, Massachusetts or as parties agree, see notes. |
| Service Manual | 2 | 8-16 / Optional at Your location, see notes. | N. Billerica, Massachusetts or as parties agree, see notes. |
| Management Manual | 2 | 8-16 / Optional at Your location, see notes. | N. Billerica, Massachusetts or as parties agree, see notes. |

A Corp. FDD.2020

| Subject | Hours of Classroom Training | Hours of On-the-Job Training | Location |
|---|---|---|---|
| Marketing Manual | 2 | 8-16 / Optional at Your location, see notes. | N. Billerica, Massachusetts or as parties agree, see notes. |
| Advertising Manual | 2 | 8-16 / Optional at Your location, see notes. | N. Billerica, Massachusetts or as parties agree, see notes. |
| Personal Policy Manual | 2 | 8-16 / Optional at Your location, see notes. | N. Billerica, Massachusetts or as parties agree, see notes. |
| Employee Handbook | 0.5 | 8-16 / Optional at Your location, see notes. | N. Billerica, Massachusetts or as parties agree, see notes. |
| Service Man Training Manual | 2 | 8-16 / Optional at Your location, see notes. | N. Billerica, Massachusetts or as parties agree, see notes. |
| Phone Operator Training Manual | 1 | 8-16 / Optional at Your location, see notes. | N. Billerica, Massachusetts or as parties agree, see notes. |
| Dispatcher Training Manual | 0.5 | 8-16 / Optional at Your location, see notes. | N. Billerica, Massachusetts or as parties agree, see notes. |
| TOTAL | 16 | 8-16 / Optional at Your location, see notes. | |

The materials used in the training will include oral presentations, course materials and the following additional manuals:

(a)     How to Develop an Employee Training Program
(b)     First Rate Customer Service Wins Customers for Life

**Notes**:

The training program will be conducted as soon as possible after You execute Your Franchise Agreement and it must be successfully completed by You or Your A CORP. approved designated representative before You begin operating your franchise.  Training will be conducted by Donald MacDonald, who has over 32 years experience in sewer and drain cleaning services and has served as the President and CEO of A Corp. since 1982.  Training will be conducted in the vicinity of A CORP.'s home office located in North Billerica, Massachusetts or any other area as designated by A CORP.  Training programs are held free of charge two to three times each year.  However, You must pay Your travel and living expenses to attend the training programs.  The owner of Your franchise business and/or a full time operating manager must attend the training programs.  Additional training programs or refresher courses are not required, but encouraged. You may attend unlimited additional training and/or refresher courses as you choose free of charge although You are responsible for your expenses to attend such courses.

In addition to the above free two training programs, on-the-job training is optional.  Upon Your request, such training may be conducted at Your location.  Hours of on-the-job training varies from 8 to 16 hours depending upon each franchisee's past experiences.  You must pay for the travel, hotel stay, and meal for the instructor who will conduct such training.  Additionally, for the instructor to conduct the on-the-job

A Corp. FDD.2020

training, You must add the instructor's name as an "additional insured" on Your worker's compensation insurance policy prior to the training.

## ITEM 12
## TERRITORY

You will receive an exclusively Licensed Territory, consisting of unit(s) based on population. A minimum of 125,000 populations constitute one unit. You may purchase as many additional units as you wish for your exclusively Licensed territory. Before You enter into a Franchise Agreement, a map or description of the exclusively Licensed Territory will be attached to the Franchise Agreement. The Licensed Territory will be defined by zip codes and/or related boundaries and will be defined in the Franchise Agreement. A CORP. will not grant another Rooter-Man franchise in Your exclusively Licensed Territory. A CORP. reserves the rights to offer a franchise by another brand or concept of A CORP., through channels such as mail order, catalog sales, telemarketing, Internet, television, newspaper, and magazines, to customers located anywhere including those residing in Your territory. A CORP., however, does not have any specific plan to do so at this time.

You are restricted from actively soliciting customers outside Your Licensed Territory without A CORP.'s prior written consent. However, you may be granted a license to solicit customers and operate in additional territory contiguous to your initial unit of territory by execution of the Addendum to the Rooter-Man Franchise Agreement (See Exhibit B.2). This Addendum gives you the option to purchase all or any portion of said additional territory at the expiration of the 18-month option period, which commences on the execution date of the Franchise Agreement. There is no restriction on channels of YOUR advertisement, such as Internet, catalog sales, telemarketing, or other direct marketing. YOU may accept orders from outside YOUR territories only in two situations: (1) when there is no other Rooter Man franchisees within such area; or (2) the other existing Rooter Man franchisee in such area does not provide the services that is ordered.

There are no minimum sales quotas, except that You must pay a minimum continuing royalty of $110.00 a month per unit. Additionally, you shall pay A CORP. a monthly marketing fund contribution in the minimum amount of $15.00 per unit. You maintain rights to Your Licensed Territory even though the population may increase.

In determining the location of Your franchised business, You select the location and A CORP. usually will grant such location if it has not been granted to another Rooter-Man franchise. A CORP. usually approves the relocation of the franchised business or the franchisee's establishment of additional franchised units upon franchisees' request. As to the additional franchise units, the existing franchise in the immediate area will have rights of first refusal.

## ITEM 13
## TRADEMARKS

A CORP. licenses You to use the "Rooter Man" marks. These marks include our current and future trademarks in the operation of Your A CORP. Rooter-Man franchise. By trademarks, A CORP. means trade names, trademarks, service marks and logos used to identify Your Rooter-Man Franchised Business.

The trademarks listed below were registered on the United States Patent and Trademark Office Principal Register by A CORP.

A Corp. FDD.2020

13

"ROOTER-MAN"
Registration Date: September 3, 1991
Registration No.: 1,655,782



"A ROOTER-MAN TO THE RESCUE"
Registration Date: August 20, 1991
Registration No.: 1,654,512



"ROTOR-MAN"
Registration Date: August 2, 1991
Registration No.: 1,848,341



"ROOTER-MAN PLUMBERS TO THE RESCUE"
Registration Date: August 14, 2012
Registration No.: 4,189,503



A Corp. FDD.2020

14

"SEWER MAN"
Registration Date: January 18, 2000
Registration No. 2308796



"ROOTERMAN (words only)"
Registration Date: October 12, 2010
Registration No. 3,859,654



"ROOTERMAN TO THE RESCUE"
Registration Date: March 17, 2020
Registration No. 6,013,446



"RM"
Registration Date: March 17, 2020
Registration No. 6,013,441



A Corp. FDD.2020

"RM (and design)"
Registration Date: April 7, 2020
Registration No. 6,027,468



"RM (and design)"
Registration Date: April 7, 2020
Registration No. 6,027,470



The trademarks listed below were registered with Canadian Intellectual Property Office by A CORP.:

"ROOTER-MAN"
Registration Date:  June 25, 2002
Registration No.:   TMA563953



**A Corp. FDD.2020**

"ROOTER-MAN PLUMBERS TO THE RESCUE"
Registration Date: October 2, 2002
Registration No.: TMA568429



You must follow all of A CORP.'s rules when You use any of these marks. You cannot use the mark as part of a corporate name or with any modifying words, designs or symbols, except for those which A CORP. expressly licenses to You. You may not use the marks in connection with the sale of an unauthorized product or service or in any manner not expressly authorized in writing by A CORP.

No agreements limit A CORP.'s right to use or license the use of A CORP.'s trademarks.

You must notify A CORP. immediately when You learn about an infringement of, or challenge to, Your use of Our marks. A CORP. will take the action we think appropriate. A CORP. is not required to defend You against a claim against Your use of Our trademarks. A CORP. will not reimburse You for Your liability and costs in connection with defending A CORP.'s marks.

You must modify or discontinue the use of the trademarks if A CORP. modifies or discontinues its use. If this happens, A CORP. will not reimburse You for Your tangible cost of compliance, including, for example, the changing of signage and other trademarked materials. You may not directly or indirectly contest our rights to the trademarks, trade secrets or business techniques that are part of our licensed business. You may not file or acquire any registration (state, federal or international) for Our Marks or any trademark or service mark (or variation thereof) confusingly similar to Our Marks.

Except as set forth below, A CORP. does not know of any infringing uses that could materially affect Your use of the A CORP. marks. To A CORP.'s knowledge, there are conflicting uses of the Rooter-Man mark in Arizona, California, Louisiana, Ohio, and Utah. However, the Rotor-Man trademark can be used in conflicting areas.

There are no effective material determinations of the United States Patent and Trademark Office, the Trademark Trial and Appeal Board, or any state trademark administrator or court that are required to be disclosed in this disclosure document. Nor is there any pending infringement, opposition, or cancellation proceeding affecting A CORP.'s ownership of its marks. There are no currently effective agreements that limit A CORP.'s rights to use or license the use of A CORP.'s marks listed in this section in a manner material to the franchise.

### ITEM 14
### PATENTS, COPYRIGHTS AND PROPRIETARY INFORMATION

You do not receive the right to use an item covered by a patent or copyright, but You can use the proprietary information contained in A CORP.'s Operations Manual. The Operations Manual is described in Item 11. Although A CORP. has not filed an application for a copyright registration for training programs or the Operations Manual, it claims a copyright and deems the information contained in the training programs and manual to be proprietary. You must also promptly tell us when You learn about an unauthorized use of this proprietary information. A CORP. is not obligated to take any action, but will respond to this information

**A Corp. FDD.2020**

17

as we think appropriate. There is no current material determination of the United States Patent and Trademark Office, the United States Copyright Office, or a court that affects ACORP.'s franchise business. There is no agreement limiting the use of the patent or copyrights. A CORP. does not know of any patent or copyright infringement that could materially affect You.

The Operations Manual was most recently updated in 2005.

## ITEM 15
## OBLIGATION TO PARTICIPATE IN THE ACTUAL OPERATION OF THE FRANCHISE BUSINESS

A CORP. requires that You directly supervise the Franchise Business, or alternatively, oversee and supervise a full-time manager who has successfully completed A CORP.'s training program and signed a written agreement to maintain the same degree of confidentiality as is required of You.

Each individual who owns a 5% or greater interest in the franchise must sign an agreement assuming and agreeing to discharge all of the obligations of the franchisee under the Franchise Agreement. If you are a corporation or partnership, your principal shareholders or partners must personally guarantee your obligations under the Franchise Agreement and also agree to be personally bound by, and personally liable for the breach of, every provision of the Franchise Agreement.

## ITEM 16
## RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL

A CORP. requires You to offer and sell only those services that A CORP. has approved. (See Item 9)

You must offer all services that A CORP. designates for its franchisees. For the Rooter-Man franchise, this includes plumbing, sewer and drain cleaning and maintenance services and the sale of authorized drain cleaning products to Your customers. (See Item 8)

There are no limits on A CORP.'s right to change the products and services that You are required to offer, provided that they are suitable for the specific A CORP. franchise that You operate. You are limited to servicing customers who reside or who are located within Your Licensed Territory.

## ITEM 17
## RENEWAL, TERMINATION, TRANSFER AND DISPUTE RESOLUTION

### THE FRANCHISE RELATIONSHIP
**This table lists certain important provisions of the franchise and related agreements. You should read these provisions in the agreements attached to this Disclosure Document.**

| Provision | Section in Franchise Agreement or other agreement | Summary |
|---|---|---|
| a. Length of the franchise term | Section 4.1 | 5 years provided that you are in good standing. |
| b. Renewal or extension of the term | Section 4.2 | Additional terms of 10 years provided you are in good standing |
| c. Requirements for You to renew or extend | Section 4.2 | Notice, no material default or money owed, sign then current Franchise Agreement. |

A Corp. FDD.2020

| Provision | Section in Franchise Agreement or other agreement | Summary |
|---|---|---|
| d. Termination by You during the initial 5 year term. | Section 15.5 | At least 90 days before yellow pages closing and payment of Franchisee Termination Fee |
| e. Termination by A CORP. without cause | None | - |
| f. Termination by A CORP. with cause | Sections 15.1, 15.2 | See g and h below |
| g. "Cause" defined – curable defaults | Section 15.2 | Includes failure to pay, file reports, or comply operationally |
| h. "Cause" defined – non-curable defaults | Section 15.1 | Include insolvency, unapproved transfer, material misrepresentation violation of non-compete, non-disclosure |
| i. Your obligations on termination/non-renewal | Section 16 | Pay all fees, return materials, cease use of trademarks, proprietary information |
| j. Assignment of contract by A CORP. | Section 14.1 | Freely assignable |
| k. "Transfer" by You - definition | Section 14.2 | Sale, assignment transfer, mortgage pledge |
| l. A CORP.'s approval of transfer by franchisee | Section 14.2A | Transferee must have financial resources, appropriate background, etc. |
| m. Conditions for A CORP.'s approval of transfer | Section 14.2A | See l, above |
| n. A CORP.'s right of first refusal to acquire your business | Section 14.2A (1) | 30 days on same terms as bona fide offer |
| o. A CORP.'s option to purchase your business | None | - |
| p. Your death or disability | Section 14.2B | Transfer as soon as reasonably possible |
| q. Non-competition covenants during the term of the franchise | Section 18.1 | In business offering services comprising A CORP. System |
| r. Non-competition covenants after the franchise is terminated or expires | Section 18.1 | 3 years in business within 100 miles of Your Licensed Territory or other franchised or affiliated territory |
| s. Modification of the agreement | Section 19.3 | Only by agreement by both parties |
| t. Integration/merger clause | Section 19.2 | Only the terms of the franchise agreement are binding (subject to state law). Any representations or promises outside of the disclosure document and franchise agreement may not be enforceable. |
| u. Dispute resolution by arbitration or mediation | Section 19.7 | Mediation first. Then binding arbitration |
| v. Choice of forum | Section 19.7 | Arbitration, or any litigation, in Boston, Massachusetts |
| w. Choice of law | Section 19.7 | Massachusetts law |

A Corp. FDD.2020

19

Notes:

(c) Renewal: upon renewal, YOU may be required to sign a franchise agreement containing terms and conditions that could be materially different from the original franchise agreement.

(t) Nothing in the Franchise Agreement or in any related agreement is intended to disclaim the franchisor's representation made in the franchise disclosure document.

## ITEM 18
## PUBLIC FIGURES

A CORP. does not use any public figure to promote its franchises.

## ITEM 19
## FINANCIAL PERFORMANCE REPRESENTATIONS

The FTC's Franchise Rule permits a franchisor to provide information about the actual or potential financial performance of its franchised and/or franchisor-owned outlets, if there is a reasonable basis for the information, and if the information is included in the disclosure documents. Financial performance information that differs from that included in Item 19 may be given only if: (1) a franchisor provides the actual records of an existing outlet you are considering buying; or (2) a franchisor supplements the information provided in this Item 19, for an example, by providing information about possible performance at a particular location or under particular circumstances.

A CORP. does not make any representation about a franchisee's future financial performance or the past financial performance of company-owned or franchised outlets. A CORP. also does not authorize its employees or representatives to make any such representations either orally or in writing. If YOU are purchasing an existing outlet, however, A CORP. may provide you with the actual records of that outlet. If YOU receive any other financial performance information or projections of YOUR future income, YOU should report it to A CORP.'s management by contacting Mr. Donald MacDonald, at 268 Rangeway Road, N. Billerica, Massachusetts 01862, (978) 667-1144; the Federal Trade Commission, and the appropriate state regulatory agencies.

## ITEM 20
## OUTLETS AND FRACNHISEE INFORMATION

### Table No. 1
### Systemwide Outlets Summary in the U.S.
### For years January 1, 2017 to December 31, 2019

| Outlet Type | Year | Outlets at the Start of the Year | Outlets at the End of the Year | Net Change |
|---|---|---|---|---|
| Franchised | 2017 | 532 | 539 | +7 |
| | 2018 | 539 | 595 | +56 |
| | 2019 | 595 | 637 | +42 |
| Company-owned | 2017 | 22 | 46 | +24 |
| | 2018 | 46 | 43 | -3 |
| | 2019 | 43 | 25 | -18 |
| Total Outlets | 2017 | 554 | 585 | +32 |
| | 2018 | 585 | 638 | +53 |
| | 2019 | 638 | 662 | +24 |

A Corp. FDD.2020

International Outlet Summary
For years 2017 to 2019

| | | Canada | | |
|---|---|---|---|---|
| Outlet Type | Year | Outlets at the Start of the Year | Outlets at the End of the Year | Net Changes |
| Franchised | 2017 | 56 | 56 | 0 |
| | 2018 | 56 | 60 | +4 |
| | 2019 | 60 | 50 | -10 |
| Company-Owned | 2017 | 0 | 0 | -10 |
| | 2018 | 0 | 0 | 0 |
| | 2019 | 0 | 0 | 0 |
| Canadian Total Outlets | 2017 | 56 | 56 | 0 |
| | 2018 | 56 | 60 | +4 |
| | 2019 | 60 | 50 | -10 |

| | | Bermuda | | |
|---|---|---|---|---|
| Outlet Type | Year | Outlets at the Start of the Year | Outlets at the End of the Year | Net Changes |
| Franchised | 2017 | 1 | 1 | 0 |
| | 2018 | 1 | 1 | 0 |
| | 2019 | 1 | 1 | 0 |
| Company-Owned | 2017 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 |
| | 2019 | 0 | 0 | 0 |
| Bermuda Total Outlets | 2017 | 1 | 1 | 0 |
| | 2018 | 1 | 1 | 0 |
| | 2019 | 1 | 1 | 0 |
| Total International Outlets | 2017 | 57 | 57 | 0 |
| | 2018 | 57 | 61 | +4 |
| | 2019 | 61 | 51 | -10 |

Table No. 2
Transfers of Outlets from Franchisees to New Owners (other than A CORP.)
For years January 1, 2016 to December 31, 2019

| State | Year | Number of Transfers |
|---|---|---|
| Arizona | 2017 | 0 |
| | 2018 | 2 |
| | 2019 | 0 |
| California | 2017 | 6 |
| | 2018 | 9 |
| | 2019 | 0 |
| Florida | 2017 | 0 |
| | 2018 | 3 |
| | 2019 | 0 |

A Corp. FDD.2020

| State | Year | Number of Transfers |
|---|---|---|
| Illinois | 2017 | 3 |
| | 2018 | 0 |
| | 2019 | 0 |
| Massachusetts | 2017 | 0 |
| | 2018 | 0 |
| | 2019 | 3 |
| Pennsylvania | 2017 | 0 |
| | 2018 | 2 |
| | 2019 | 0 |
| South Carolina | 2017 | 2 |
| | 2018 | 0 |
| | 2019 | 0 |
| Texas | 2017 | 0 |
| | 2018 | 0 |
| | 2019 | 4 |
| Total | 2017 | 11 |
| | 2018 | 32 |
| | 2019 | 7 |

**Table No. 3**
**Status of Franchised Outlets**
**For years January 1, 2017 to December 31, 2019**

| State | Year | Outlets at Start of Year | Outlets Opened | Terminations | Non-Renewals | Reacquired by A CORP. | Ceased Operations – Other Reasons[1] | Outlet at End of the Year |
|---|---|---|---|---|---|---|---|---|
| Alabama | 2017 | 5 | 0 | 0 | 0 | 0 | 0 | 5 |
| | 2018 | 5 | 0 | 0 | 0 | 0 | 0 | 5 |
| | 2019 | 5 | 15 | 0 | 0 | 0 | 0 | 20 |
| Arizona | 2017 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| | 2018 | 2 | 4 | 0 | 0 | 0 | 2 | 4 |
| | 2019 | 4 | 0 | 0 | 0 | 0 | 0 | 4 |
| California | 2017 | 72 | 12 | 0 | 0 | 3 | 6 | 75 |
| | 2018 | 75 | 37 | 0 | 0 | 0 | 6 | 106 |
| | 2019 | 106 | 5 | 0 | 0 | 0 | 4 | 107 |
| Colorado | 2017 | 5 | 0 | 0 | 0 | 0 | 0 | 5 |
| | 2018 | 5 | 0 | 0 | 0 | 0 | 2 | 3 |
| | 2019 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
| Connecticut | 2017 | 13 | 6 | 0 | 0 | 0 | 0 | 19 |
| | 2018 | 19 | 1 | 0 | 0 | 0 | 0 | 20 |
| | 2019 | 20 | 0 | 0 | 0 | 0 | 0 | 20 |
| Florida | 2017 | 40 | 4 | 0 | 0 | 0 | 12 | 32 |
| | 2018 | 32 | 3 | 0 | 0 | 0 | 6 | 29 |
| | 2019 | 29 | 3 | 0 | 0 | 0 | 4 | 28 |
| Georgia | 2017 | 7 | 0 | 0 | 0 | 0 | 2 | 5 |
| | 2018 | 5 | 0 | 0 | 0 | 0 | 0 | 5 |
| | 2019 | 5 | 0 | 0 | 0 | 0 | 0 | 5 |

[1] Such reasons include sales of the business by the franchisees.

A Corp. FDD.2020

22

| State | Year | Outlets at Start of Year | Outlets Opened | Terminations | Non-Renewals | Reacquired by A CORP. | Ceased Operations – Other Reasons[2] | Outlet at End of the Year |
|---|---|---|---|---|---|---|---|---|
| Hawaii | 2017 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2018 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2019 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Idaho | 2017 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| | 2018 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| | 2019 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| Illinois | 2017 | 28 | 3 | 0 | 0 | 0 | 3 | 28 |
| | 2018 | 28 | 2 | 0 | 10 | 0 | 3 | 17 |
| | 2019 | 17 | 3 | 0 | 0 | 0 | 0 | 20 |
| Indiana | 2017 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2018 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2019 | 1 | 4 | 0 | 0 | 0 | 0 | 5 |
| Kansas | 2017 | 2 | 4 | 0 | 0 | 0 | 0 | 6 |
| | 2018 | 6 | 6 | 0 | 0 | 0 | 0 | 12 |
| | 2019 | 12 | 0 | 0 | 0 | 0 | 0 | 12 |
| Louisiana | 2017 | 6 | 0 | 0 | 0 | 0 | 0 | 6 |
| | 2018 | 6 | 0 | 0 | 0 | 0 | 4 | 2 |
| | 2019 | 2 | 4 | 0 | 0 | 0 | 0 | 6 |
| Maine | 2017 | 6 | 0 | 0 | 0 | 0 | 0 | 6 |
| | 2018 | 6 | 0 | 0 | 0 | 0 | 0 | 6 |
| | 2019 | 6 | 0 | 0 | 0 | 0 | 0 | 6 |
| Maryland | 2017 | 9 | 0 | 0 | 0 | 0 | 0 | 9 |
| | 2018 | 9 | 0 | 0 | 0 | 0 | 0 | 9 |
| | 2019 | 9 | 0 | 0 | 0 | 0 | 0 | 9 |
| Massachusetts | 2017 | 46 | 0 | 0 | 0 | 0 | 0 | 46 |
| | 2018 | 46 | 0 | 0 | 0 | 0 | 0 | 46 |
| | 2019 | 46 | 3 | 0 | 0 | 0 | 3 | 46 |
| Michigan | 2017 | 18 | 3 | 0 | 0 | 0 | 0 | 21 |
| | 2018 | 21 | 0 | 0 | 0 | 0 | 0 | 21 |
| | 2019 | 21 | 0 | 0 | 0 | 0 | 0 | 21 |
| Minnesota | 2017 | 13 | 5 | 0 | 0 | 0 | 0 | 18 |
| | 2018 | 18 | 0 | 0 | 0 | 0 | 0 | 18 |
| | 2019 | 18 | 0 | 0 | 0 | 0 | 0 | 18 |
| Mississippi | 2017 | 1 | 2 | 0 | 0 | 0 | 0 | 3 |
| | 2018 | 3 | 1 | 0 | 0 | 0 | 0 | 4 |
| | 2019 | 4 | 0 | 0 | 0 | 0 | 0 | 4 |
| Missouri | 2017 | 4 | 0 | 0 | 0 | 0 | 0 | 4 |
| | 2018 | 4 | 0 | 0 | 0 | 0 | 0 | 4 |
| | 2019 | 4 | 0 | 0 | 0 | 0 | 0 | 4 |
| Nebraska | 2017 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
| | 2018 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
| | 2019 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
| Nevada | 2017 | 8 | 0 | 0 | 0 | 0 | 0 | 8 |
| | 2018 | 8 | 0 | 0 | 0 | 0 | 0 | 8 |
| | 2019 | 8 | 0 | 0 | 0 | 0 | 0 | 8 |
| New Hampshire | 2017 | 7 | 0 | 0 | 0 | 0 | 1 | 6 |
| | 2018 | 6 | 0 | 0 | 0 | 0 | 0 | 6 |
| | 2019 | 6 | 0 | 0 | 0 | 0 | 0 | 6 |
| New Jersey | 2017 | 25 | 0 | 0 | 0 | 18 | 0 | 7 |
| | 2018 | 7 | 0 | 0 | 0 | 0 | 0 | 7 |
| | 2019 | 7 | 18 | 0 | 0 | 0 | 0 | 25 |
| New Mexico | 2017 | 4 | 0 | 0 | 0 | 0 | 4 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

[2] Such reasons include sales of the business by the franchisees.

A Corp. FDD.2020

| State | Year | Outlets at Start of Year | Outlets Opened | Terminations | Non-Renewals | Reacquired by A CORP. | Ceased Operations – Other Reasons[3] | Outlet at End of the Year |
|---|---|---|---|---|---|---|---|---|
| New York | 2017 | 13 | 4 | 0 | 0 | 0 | 0 | 17 |
| | 2018 | 17 | 10 | 0 | 0 | 0 | 0 | 27 |
| | 2019 | 27 | 2 | 0 | 0 | 0 | 0 | 29 |
| North Carolina | 2017 | 15 | 0 | 0 | 0 | 0 | 0 | 15 |
| | 2018 | 15 | 0 | 0 | 2 | 0 | 0 | 13 |
| | 2019 | 13 | 0 | 0 | 0 | 0 | 0 | 13 |
| Ohio | 2017 | 21 | 4 | 0 | 0 | 0 | 0 | 25 |
| | 2018 | 25 | 21 | 0 | 0 | 0 | 0 | 46 |
| | 2019 | 46 | 2 | 0 | 0 | 0 | 0 | 48 |
| Oklahoma | 2017 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
| | 2018 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
| | 2019 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
| Oregon | 2017 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2018 | 1 | 0 | 0 | 1 | 0 | 0 | 0 |
| | 2019 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania | 2017 | 18 | 4 | 0 | 0 | 0 | 0 | 22 |
| | 2018 | 22 | 18 | 0 | 0 | 0 | 18 | 22 |
| | 2019 | 22 | 2 | 0 | 0 | 0 | 0 | 24 |
| Rhode Island | 2017 | 8 | 0 | 0 | 0 | 0 | 0 | 8 |
| | 2018 | 8 | 0 | 0 | 0 | 0 | 0 | 8 |
| | 2019 | 8 | 0 | 0 | 0 | 0 | 0 | 8 |
| So. Carolina | 2017 | 23 | 2 | 0 | 0 | 0 | 2 | 23 |
| | 2018 | 23 | 3 | 0 | 0 | 0 | 0 | 26 |
| | 2019 | 26 | 0 | 0 | 0 | 0 | 0 | 26 |
| Tennessee | 2017 | 15 | 0 | 0 | 0 | 0 | 0 | 15 |
| | 2018 | 15 | 0 | 0 | 0 | 0 | 0 | 15 |
| | 2019 | 15 | 0 | 0 | 0 | 0 | 0 | 15 |
| Texas | 2017 | 29 | 6 | 0 | 0 | 0 | 0 | 35 |
| | 2018 | 35 | 4 | 0 | 0 | 0 | 0 | 39 |
| | 2019 | 39 | 4 | 0 | 0 | 0 | 4 | 39 |
| Vermont | 2017 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2018 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2019 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Virginia | 2017 | 25 | 0 | 0 | 0 | 0 | 0 | 25 |
| | 2018 | 25 | 0 | 0 | 0 | 0 | 0 | 25 |
| | 2019 | 25 | 0 | 0 | 0 | 0 | 0 | 25 |
| Washington | 2017 | 20 | 0 | 0 | 0 | 3 | 0 | 17 |
| | 2018 | 17 | 0 | 0 | 0 | 0 | 0 | 17 |
| | 2019 | 17 | 0 | 0 | 0 | 0 | 8 | 9 |
| Washington D.C. | 2017 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| | 2018 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| | 2019 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| Wisconsin | 2017 | 12 | 0 | 0 | 0 | 0 | 0 | 12 |
| | 2018 | 12 | 0 | 0 | 0 | 0 | 0 | 12 |
| | 2019 | 12 | 0 | 0 | 0 | 0 | 0 | 12 |
| The U.S. Total | 2017 | 532 | 61 | 0 | 0 | 24 | 30 | 539 |
| | 2018 | 539 | 110 | 0 | 13 | 0 | 41 | 595 |
| | 2019 | 595 | 65 | 0 | 0 | 0 | 23 | 637 |

---

[3] Such reasons include sales of the business by the franchisees.

**A Corp. FDD.2020**

### International Franchises

| State | Year | Outlets at Start of Year | Outlets Opened | Terminations | Non-Renewals | Reacquired by A CORP. | Ceased Operations – Other Reasons[4] | Outlet at End of the Year |
|---|---|---|---|---|---|---|---|---|
| Canada | 2017 | 56 | 0 | 0 | 0 | 0 | 0 | 56 |
| | 2018 | 56 | 6 | 0 | 0 | 0 | 2 | 60 |
| | 2019 | 60 | 0 | 0 | 0 | 0 | 10 | 50 |
| Bermuda | 2017 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2018 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2019 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| International Total | 2017 | 57 | 0 | 0 | 0 | 0 | 0 | 57 |
| | 2018 | 57 | 6 | 0 | 0 | 0 | 2 | 61 |
| | 2019 | 61 | 0 | 0 | 0 | 0 | 10 | 51 |

### Grand Total

| State | Year | Outlets at Start of Year | Outlets Opened | Terminations | Non-Renewals | Reacquired by A CORP. | Ceased Operations – Other Reasons[5] | Outlet at End of the Year |
|---|---|---|---|---|---|---|---|---|
| Grand Total | 2017 | 589 | 59 | 0 | 0 | 24 | 30 | 596 |
| | 2018 | 596 | 116 | 0 | 13 | 0 | 43 | 656 |
| | 2019 | 656 | 65 | 0 | 0 | 0 | 33 | 688 |

### Table No. 4
### Status of Company-Owned Outlets
### For years January 1, 2017 to December 31, 2019

| State | Year | Outlets at Start of the Year | Outlets Opened | Outlets Reacquired from Franchisee | Outlets Closed | Outlets Sold to Franchisee | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|
| Alaska | 2017 | 3 | 0 | 0 | 0 | 0 | 3 |
| | 2018 | 3 | 0 | 0 | 0 | 0 | 3 |
| | 2019 | 3 | 0 | 0 | 0 | 0 | 3 |
| California | 2017 | 0 | 0 | 3 | 0 | 0 | 3 |
| | 2018 | 3 | 0 | 0 | 0 | 3 | 0 |
| | 2019 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 2017 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2018 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2019 | 1 | 0 | 0 | 0 | 0 | 1 |
| New Jersey | 2017 | 0 | 0 | 18 | 0 | 0 | 18 |
| | 2018 | 18 | 0 | 0 | 0 | 0 | 18 |
| | 2019 | 18 | 0 | 0 | 0 | 18 | 0 |
| New York | 2017 | 18 | 0 | 0 | 0 | 0 | 18 |
| | 2018 | 18 | 0 | 0 | 0 | 0 | 18 |
| | 2019 | 18 | 0 | 0 | 0 | 0 | 18 |

---

[4] Such reasons include sales of the business by the franchisees.
[5] Such reasons include sales of the business by the franchisees.

A Corp. FDD.2020

| State | Year | Outlets at Start of the Year | Outlets Opened | Outlets Reacquired from Franchisee | Outlets Closed | Outlets Sold to Franchisee | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|
| Washington | 2017 | 0 | 0 | 3 | 0 | 0 | 3 |
| | 2018 | 3 | 0 | 0 | 0 | 0 | 3 |
| | 2019 | 3 | 0 | 0 | 0 | 0 | 3 |
| Totals | 2017 | 22 | 0 | 24 | 0 | 0 | 46 |
| | 2018 | 46 | 0 | 0 | 0 | 3 | 43 |
| | 2019 | 43 | 0 | 0 | 0 | 18 | 25 |

**Table No. 5**
**Projected Openings as of December 31, 2020**

| State | Franchise Agreements Signed But Outlet Not Opened | Projected New Franchised Outlet in the Next Fiscal Year | Projected New Company-owned Outlet in the Next Fiscal Year |
|---|---|---|---|
| New Jersey | 0 | 7 | 0 |
| North Carolina | 0 | 2 | 0 |
| North Dakota | 0 | 2 | 0 |
| Pennsylvania | 0 | 2 | 0 |
| **Total** | 0 | 13 | 0 |

The Rooter Man Franchisees' information is disclosed in **Exhibit D** attached to this disclosure document. The information of Former Rooter Man Franchisees who had a unit terminated, canceled, not renewed, or otherwise voluntarily or involuntarily ceased to do business under the franchise agreement during the year of 2019 is disclosed **Exhibit E** attached to this disclosure document.

If You buy this franchise, Your contact information may be disclosed to other buyers when you leave the franchise system. A CORP. does not own any operating units and is not selling any previously-owned franchised outlet now under its control. A CORP. does not have any franchisees who entered into a confidentiality agreement to restrict them from disclosing their experiences with A CORP. However, the franchise agreement includes a confidentiality clause prohibiting the franchisee from disclosing the proprietary information of A CORP. including without limitation the A CORP'S trade secrets.

A CORP. is developing a Rooter Man franchisee association and all existing Rooter Man franchisees are eligible to participate.

### ITEM 21
### FINANCIAL STATEMENTS

Attached as Exhibit A are the audited financial statements for the fiscal years ended December 31, 2019, 2018, and 2017.

### ITEM 22
### CONTRACTS

Attached as Exhibit B.1 You will find a copy of the A CORP. Franchise Agreement which A CORP. will execute with each of its franchisees.

A Corp. FDD.2020

**EXHIBIT A**

**Financial Statements for the Fiscal Years Ended**
**December 31, 2019, 2018, and 2017**

Prepared by:  Cain, Bourret & Palmer, LLP

**A Corp**

*FINANCIAL STATEMENTS*

**DECEMBER 31, 2019 AND 2018**

# A CORP
## TABLE OF CONTENTS
### DECEMBER 31, 2019 AND 2018

|  | INDEX |
|---|---|
| **INDEPENDENT AUDITORS' REPORT** | 2 |
| **FINANCIAL STATEMENTS** | |
| Balance Sheets | 3 |
| Statements of Operations | 4 |
| Statements of Changes in Shareholder's Equity | 5 |
| Statements of Cash Flows | 6 |
| Notes to Financial Statements | 7 - 12 |

# CAIN, BOURRET, JARRY & ASSOCIATES, LLC
## CERTIFIED PUBLIC ACCOUNTANTS

Stephen A. Cain, CPA
Steven R. Bourret, CPA
Renee B. Plummer, CPA

Beth A. Weeks, EA
Kevin T. Jarry, CPA, MBA, MST
Kristin M. Cressman, CPA, MST

David A. Jarry, CPA, MST
Frederic G. Holdsworth, CPA
Carmel Pappas, CPA

### INDEPENDENT AUDITORS' REPORT

To The Shareholder
A CORP
North Billerica, Massachusetts

We have audited the accompanying financial statements of A CORP (a Massachusetts S corporation), which comprise the balance sheets as of December 31, 2019 and 2018, and the related statements of operations, changes in shareholder equity, and cash flows for the years then ended, and the related notes to the financial statements.

### MANAGEMENT'S RESPONSIBILITY FOR THE FINANCIAL STATEMENTS

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

### AUDITORS' RESPONSIBILITY

Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinions.

### OPINION

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of A CORP as of December 31, 2019 and 2018, and the results of its operations and its cash flows for the years then ended in accordance with accounting principles generally accepted in the United States of America.

*Cain, Bourret, Jarry & Associates, LLC*
Dracut, Massachusetts
April 10, 2020

### A CORP
### BALANCE SHEETS
### DECEMBER 31, 2019 AND 2018

### ASSETS

|  | 2019 | 2018 |
|---|---|---|
| **CURRENT ASSETS** | | |
| Cash | $ 589,404 | $ 562,613 |
| Accounts receivable, (net of allowance of $4,772 in 2019 and 2018) | 74,639 | 42,249 |
| Notes receivable, current portion | 520 | 1,714 |
| **Total Current Assets** | 664,563 | 606,576 |
| **PROPERTY AND EQUIPMENT** | | |
| Vehicles | 65,106 | 44,293 |
| Equipment | 6,484 | 6,484 |
| Office equipment | 24,494 | 24,494 |
| Leasehold improvements | 34,796 | 26,504 |
|  | 130,880 | 101,775 |
| Less: accumulated depreciation | (74,708) | (71,151) |
| **Net Property and Equipment** | 56,172 | 30,624 |
| **OTHER ASSETS** | | |
| Notes receivable, net of current portion | 1,930 | 2,452 |
| **TOTAL ASSETS** | $ 722,665 | $ 639,652 |

### LIABILITIES AND SHAREHOLDER'S EQUITY

|  | 2019 | 2018 |
|---|---|---|
| **CURRENT LIABILITIES** | | |
| Accounts payable | $ 15,162 | $ 6,103 |
| Accrued expenses | 3,162 | 9,726 |
| Customer deposits | 13,463 | 14,028 |
| Deferred revenue | - | 7,155 |
| **Total Current Liabilities** | 31,787 | 37,012 |
| **SHAREHOLDER'S EQUITY** | | |
| Common Stock, no par value, 15,000 shares authorized; | | |
| 100 issued and outstanding | 100 | 100 |
| Retained earnings | 736,322 | 631,703 |
| Accumulated other comprehensive income (loss) | (45,544) | (29,163) |
| **Total Shareholder's Equity** | 690,878 | 602,640 |
| **TOTAL LIABILITIES AND SHAREHOLDER'S EQUITY** | $ 722,665 | $ 639,652 |

A CORP
## STATEMENTS OF OPERATIONS
### FOR THE YEARS ENDED DECEMBER 31, 2019 AND 2018

|  | 2019 | 2018 |
|---|---|---|
| **SALES AND REVENUE** | | |
| Franchise fee purchases, net | $ 154,857 | $ 133,675 |
| Franchise fee income, net | 522,719 | 468,292 |
| Franchise renewal fees | 25,000 | 27,500 |
| Sales transfer and opt out fees | 2,500 | 23,450 |
| Marketing fund and advertising income | 76,875 | 71,322 |
| Website purchase and webhosting income | 199,002 | 186,108 |
| **Total Sales and Revenue** | 980,953 | 910,347 |
| **OPERATING EXPENSES** | | |
| Advertising and franchise marketing costs | 86,795 | 77,442 |
| Automobile and travel expenses | 11,544 | 12,119 |
| Bad debt expense | 21,172 | 28,008 |
| Depreciation | 3,557 | 1,286 |
| Dues and subscriptions | 2,169 | 1,481 |
| Insurance | 16,638 | 14,932 |
| Insurance - employee benefits | 24,938 | 20,677 |
| Licenses and fees | 11,587 | 7,785 |
| Office supplies and expenses | 32,863 | 34,338 |
| Payroll taxes | 12,445 | 11,277 |
| Postage | 4,815 | 7,037 |
| Professional fees | 23,145 | 28,108 |
| Rent and other occupancy costs | 30,000 | 30,000 |
| Repairs and maintenance | 6,584 | 5,206 |
| Salaries and wages | 143,916 | 137,182 |
| State excise tax | 2,121 | 1,013 |
| Telephone expense | 8,962 | 13,179 |
| Trade shows | 1,695 | 1,324 |
| Training | 6,852 | 14,252 |
| Utilities | 4,184 | 4,240 |
| **Total Operating Expenses** | 455,982 | 450,886 |
| **INCOME FROM OPERATIONS** | 524,971 | 459,461 |
| **OTHER INCOME (EXPENSES)** | | |
| Interest income | 1,940 | 3,525 |
| Other income | 4,265 | 3,705 |
| **Total Other Income ( Expenses)** | 6,205 | 7,230 |
| **NET INCOME** | $ 531,176 | $ 466,691 |

A CORP
STATEMENTS OF CHANGES IN SHAREHOLDER'S EQUITY
FOR THE YEARS ENDED DECEMBER 31, 2019 AND 2018

|  | COMMON STOCK | RETAINED EARNINGS | ACCUMULATED OTHER COMPREHENSIVE INCOME (LOSS) | TOTALS |
|---|---|---|---|---|
| Balances at December 31, 2017 | $ 100 | $ 358,993 | $ (13,881) | $ 345,212 |
| Net income | - | 466,691 | - | 466,691 |
| Shareholder Distributions | - | (193,981) | - | (193,981) |
| Foreign currency translation | - | - | (15,282) | (15,282) |
| Balances at December 31, 2018 | $ 100 | $ 631,703 | $ (29,163) | $ 602,640 |
| Net income | - | 531,176 | - | 531,176 |
| Shareholder Distributions | - | (426,557) | - | (426,557) |
| Foreign currency translation | - | - | (16,381) | (16,381) |
| Balances at December 31, 2019 | $ 100 | $ 736,322 | $ (45,544) | $ 690,878 |

STATEMENTS OF CASH FLOWS
FOR THE YEARS ENDED DECEMBER 31, 2019 AND 2018

|  | 2019 | 2018 |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Cash received from franchisees | $ 946,824 | $ 915,028 |
| Cash paid to suppliers, vendors and employees | (449,930) | (451,767) |
| Interest and dividends received | 1,940 | 3,525 |
| Net Cash Provided (Used) By Operating Activities | 498,834 | 466,786 |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Purchase of fixed assets | (29,105) | (5,324) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Shareholder distributions | (426,557) | (193,981) |
| **NET INCREASE (DECREASE) IN CASH** | 43,172 | 267,481 |
| **CASH, BEGINNING OF YEAR** | 562,613 | 310,414 |
| Effect of foreign currency translation | (16,381) | (15,282) |
| **CASH, END OF YEAR** | $ 589,404 | $ 562,613 |
| **RECONCILIATION OF NET INCOME TO NET CASH** | | |
| **PROVIDED (USED) BY OPERATING ACTIVITIES** | | |
| Net Income | $ 531,176 | $ 466,691 |
| ADJUSTMENTS TO RECONCILE NET INCOME TO NET CASH | | |
| PROVIDED (USED) BY OPERATING ACTIVITIES | | |
| Depreciation and amortization | 3,557 | 1,286 |
| Allowance for doubtful accounts | - | (443) |
| (Increase) decrease in accounts receivable | (32,390) | (11,422) |
| (Increase) decrease in notes receivable | 1,716 | 3,462 |
| Increase (decrease) in accounts payable | 9,059 | (910) |
| Increase (decrease) in accrued expenses | (6,564) | (1,257) |
| Increase (decrease) in customer deposits | (565) | 2,224 |
| Increase (decrease) in deferred revenue | (7,155) | 7,155 |
| Total adjustments | (32,342) | 95 |
| **NET CASH PROVIDED (USED) BY OPERATING ACTIVITIES** | $ 498,834 | $ 466,786 |

A CORP
NOTES TO FINANCIAL STATEMENTS
DECEMBER 31, 2019

## NOTE 1.    ORGANIZATION

The Company was incorporated on March 3, 1982 under the laws of the Commonwealth of the State of Massachusetts. The Company is engaged in the business of franchising the Rooter-Man trademark, which specializes in plumbing, sewers, drains, and maintenance and repair services. The Rooter-Man franchises were originally sold by Rooter-Man Corp, and in 1990 the company assigned its outstanding franchise agreements and all future rights to sell the Rooter-Man franchise to A Corp. The Company is registered in the following states as required: California, Florida, Hawaii, Illinois, Indiana, Kentucky, Maryland, Michigan, Minnesota, New York, North Dakota, Oregon, Rhode Island, South Dakota, Utah, Virginia, Washington and Wisconsin.

## NOTE 2.    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Basis of Accounting

The Company's financial statements are prepared using the accrual method of accounting. In accordance with this method of accounting, revenue is recognized in the period in which it is earned and expenses are recognized in the period in which they are incurred. All revenue and expenses which are applicable to future periods have been presented as deferred or prepaid in the accompanying financial statements.

### Use of Estimates

The preparation of financial statements in conformity with generally accepted accounting principles in the United States of America requires management to make estimates and assumptions that affect the certain reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities, and the reported amounts of revenues and expenses during the reporting period. Actual results could vary from those estimates.

### Accounts Receivable and Allowance for Doubtful Accounts

Trade receivables are recognized when franchises are sold or services rendered. The Company extends credit terms to certain customers based on historical dealings with those customers and to other customers after a review of various credit indicators, including the customers' credit rating. The Company grants credit to its franchisees throughout the United States, including Alaska and Hawaii. An allowance for doubtful accounts is established for all or any portion of an account where collections are considered to be at risk and reserves are evaluated on an annual basis to determine their adequacy. Judgments relative to at-risk accounts include the customers' current financial condition, the customers' historical relationship with the company and current and projected economic conditions. Trade receivables are written off when the account is deemed uncollectible. The risk of loss on the accounts receivable is the balance owed at the time of default. The Company considers balances past due after 90-days, and the Company does not require collateral for these receivables. Interest is charged at 18% per annum after 30 days on overdue balances.

See independent auditors' report.
Page 7

## A CORP
### NOTES TO FINANCIAL STATEMENTS (CONTINUED)
### DECEMBER 31, 2019

### NOTE 2.    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

#### Cash and Equivalents

For the purposes of the statements of cash flows, cash and cash equivalents include cash on hand, cash on deposit, and certificates of deposit, if any, with original maturities of three months or less.

#### Compensated Absences

Employees of the Company are entitled to paid vacation, sick days and other time off depending on job classification, length of service and other factors.  It is impractical to estimate the amount of compensation for future absences and, accordingly, no liability has been recorded in the financial statements.  The Company's policy is to recognize the costs of compensated absences when paid to employees.

#### Property and Equipment

Property and equipment have been recorded at cost. Depreciation is computed using the declining balance and straight-line methods over the estimated useful life of the asset. Major classifications of property and equipment and their estimated useful lives are as follows:

|  | Estimated Life |
|---|---|
| Motor vehicles and equipment | 5 years |
| Leasehold improvements | 39 years |

Expenses for maintenance and repairs that do not materially extend the useful lives of the assets are charged against income as incurred.

#### Advertising Costs

Advertising and franchise marketing costs are included in operating expenses, and it is the Company's policy to expense these costs as incurred.

#### Income Taxes

The Company, with the consent of its shareholder, elected to be a Subchapter S corporation under the Internal Revenue Code effective January 1, 2005.  As a result, income and losses of the Company are passed through to its shareholder for federal and state income tax purposes.  Instead of paying corporate income taxes, the shareholder of a Subchapter S corporation is taxed individually on their proportionate share of the Company's taxable income.  Accordingly, no provision or liability for federal or state income taxes has been included in these financial statements.

### A CORP
### NOTES TO FINANCIAL STATEMENTS (CONTINUED)
### DECEMBER 31, 2019

## NOTE 2.    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

### Income Taxes (Continued)

The Company accounts for income taxes and evaluates all significant tax positions in accordance with accounting principles generally accepted in the United States of America. The Company follows the statutory requirements for their income tax accounting and generally avoids risks associated with potentially problematic tax positions that may be challenged upon examination. If an event occurred where the Subchapter S election was revoked or inadvertently terminated, the Company may be required to record unrecognized tax benefits or liabilities in the accompanying financial statements. The Company would recognize interest and penalties, if applicable, associated with uncertain tax positions as part of the income tax provision. The Company's open audit periods are years 2016 through 2019.

### Revenue Recognition

Revenues are recorded in accordance with the guidance provided by Financial Accounting Standards Board ASC Topic 606 – *Revenue from Contracts with Customers*. All privately-held companies are required to comply with the new revenue recognition standard and report on these standards for fiscal years beginning after December 15, 2018.

The core principles that are in the roadmap to recognizing the revenue are: 1) identify the customer contract; 2) identify the performance obligations in the contract; 3) determine the contract price; 4) allocate the contract price; and 5) recognize the revenue when the company satisfies the performance obligations.

In accordance with ASC Topic 606, the accompanying financial statements include all revenues at December 31, 2019 (Note 6).

### Reclassification

Certain reclassifications have been made to the 2018 financial statements in order for them to conform to the 2019 presentation.

## NOTE 3.    CONSIDERATION OF CREDIT RISK

The Company maintains its cash balances in bank accounts at high quality credit financial institutions. The balances, at times, may exceed federally insured limits (FDIC). Pursuant to Section 343 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act), the standard maximum insurance amount was permanently raised to $250,000. At December 31, 2019 the Company exceeded the FDIC insured limit by approximately $342,000. The Company has not experienced any losses in such accounts and believes it is not exposed to any significant credit risk. The Company monitors the credit-worthiness of the financial institutions in which it deposits money.

## A CORP
## NOTES TO FINANCIAL STATEMENTS (CONTINUED)
## DECEMBER 31, 2019

**NOTE 4.    NOTES RECEIVABLE**

The Company will periodically finance the purchase price when existing franchisees exercise their option to purchase additional territories by executing a note receivable. The notes typically range from 1 to 3 years and payments are required either weekly or monthly, and carry an interest rate of 12% per annum. Management believes fair value of the notes receivable would approximate the balance due the company.

At December 31, 2019 the notes receivable balances were as follows:

| | |
|---|---|
| Notes from Franchisees | $  2,450 |
| Less current portion | (     520) |
| Long-Term Portion | $   1,930 |

**NOTE 5.    RELATED PARTY TRANSACTIONS**

The Company's sole shareholder owns and controls four other non-related companies. No transactions occurred between the companies during 2019; however, the shareholder is able to influence the Company's operations for the benefit of the other companies under his control.

In October 2018 the Financial Accounting Standards Board issued Accounting Standards Update No. 2018-17, *Targeted Improvements to Related Party Guidance for Variable Interest Entities,* which allows, but no longer requires, nonpublic companies to apply variable entity guidance to certain common control leasing arrangements if certain criteria is met. The Company meets these criteria and has elected to not apply the variable interest guidance. The Company believes this accounting alternative is preferable because it more closely aligns with the needs of the primary users of the financial statements. Accordingly, the financial statements have been prepared as if consolidation had never been required.

The Company leases its office space from the sole shareholder and President of the Company as a tenant-at-will. The rental agreement can be cancelled by either party with verbal or written notice. For the year ended December 31, 2019 the Company paid the related party $30,000 for rent.

**NOTE 6.    FRANCHISE FEES AND REVENUE RECOGNITION**

Initial franchise fees, which are $31.80 per thousand populations, and will generally range from $3,975 to $39,750, are due when the Company licenses its federal trademark of Rooter-Man and the franchise business system and training incidental to the license transaction is completed or finalized. When initial fees are collected over an extended period of time it is the Company's policy to recognize the sale when made. Interest charged on these installment notes is recorded in revenue for the period received.

**A CORP**
**NOTES TO FINANCIAL STATEMENTS (CONTINUED)**
**DECEMBER 31, 2019**

**NOTE 6.**    **FRANCHISE FEES AND REVENUE RECOGNITION (Continued)**

Initial franchise fees, net of allowances, amounted to $154,857, for franchise sales occurring during 2019. The Company updates its Franchise Disclosure Document filing on April 1 of each year. The Company had 110 domestic franchise dealers operating 662 territories in the United States and 6 international franchise dealers operating 50 territories in Canada and 1 in Bermuda as of December 31, 2019.

There are three components to the franchise fees:

a.  The Initial Purchase - The franchisee must make an initial payment that is based on the population of the territory purchased. At its discretion the Company may upon the existing franchisees' exercise of their option to purchase additional territories, finance up to 50% of the additional purchase pursuant to a 1 to 3 year promissory note at 12%, to assist in the purchase.

b.  Continuing Fees - The franchisee is required to pay an ongoing fee in monthly installments. A portion of the fees is designated for the marketing campaign.

c.  Renewal Fees – After the initial five years the franchisee has the option to extend the agreement for ten years by making a contract renewal payment.

**NOTE 7.**    **FAIR VALUE OF INSTRUMENTS**

Generally accepted accounting principles establish a framework for measuring fair value.

Fair value is the amount that would be received to sell an asset, or paid to settle a liability, in an orderly transaction between market participants at the measurement date. Accounting principles require the use of observable market data, when available, in making fair value measurements. Valuation techniques used need to maximize the use of observable inputs and minimize the use of unobservable inputs.

The Company's financial instruments, none of which are held for trading purposes, consist primarily of cash and cash equivalents, accounts receivable, accounts payable and accrued expenses. The Company estimates the carrying amount of these financial instruments approximate their fair value recorded in the accompanying financial statements due to their short-term nature.

The carrying amount of the Company's note receivables generally approximates its fair value at December 31, 2019 as its current interest rate exceeds market rates.

## A CORP
## NOTES TO FINANCIAL STATEMENTS (CONTINUED)
## DECEMBER 31, 2019

### NOTE 8.    OTHER SIGNIFICANT MATTERS

The Company protects its trademark, and those of its franchisees, by monitoring unauthorized use of its name, and will file action when deemed necessary. The Company protected its right to collect by sending default and termination notices to various franchisees whose accounts were in arrears during the year.

### NOTE 9.    SUBSEQUENT EVENTS

Management has evaluated events and transactions for subsequent events that would impact the financial statements for the year ended December 31, 2019 through April 10, 2020, the date the financial statements were first available to be issued. There were no subsequent events that require recognition or disclosure in the financial statements.

# A Corp

## *FINANCIAL STATEMENTS*

**DECEMBER 31, 2018 AND 2017**

<u>A CORP</u>
<u>TABLE OF CONTENTS</u>
<u>DECEMBER 31, 2018 AND 2017</u>

<u>INDEX</u>

**INDEPENDENT AUDITORS' REPORT**                                    2

**FINANCIAL STATEMENTS**

  Balance Sheets                                              3

  Statements of Operations                                    4

  Statements of Changes in Shareholder Equity                 5

  Statements of Cash Flows                                    6

  Notes to Financial Statements                            7 - 11

# CAIN, BOURRET, JARRY & ASSOCIATES, LLC

## CERTIFIED PUBLIC ACCOUNTANTS

Stephen A. Cain, CPA
Steven R. Bourret, CPA
Renee B. Plummer, CPA

David A. Jarry, CPA, MST
Frederic G. Holdsworth, CPA
Kathleen M. Resmini, CPA

## INDEPENDENT AUDITORS' REPORT

To The Shareholder
A CORP
North Billerica, Massachusetts

We have audited the accompanying financial statements of A CORP (a Massachusetts S corporation), which comprise the balance sheets as of December 31, 2018 and 2017, and the related statements of operations, changes in shareholder equity, and cash flows for the years then ended, and the related notes to the financial statements.

## MANAGEMENT'S RESPONSIBILITY FOR THE FINANCIAL STATEMENTS

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

## AUDITOR'S RESPONSIBILITY

Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

## OPINION

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of A CORP as of December 31, 2018 and 2017, and the results of its operations and its cash flows for the years then ended in accordance with accounting principles generally accepted in the United States of America.

*Cain, Bourret, Jarry & Associates, LLC*

Dracut, Massachusetts
March 11, 2019

1595 Lakeview Avenue • Dracut, MA 01826 • Voice: (978) 957-1421 • Fax: (978) 957-3480

A CORP
## BALANCE SHEETS
### DECEMBER 31, 2018 AND 2017

### ASSETS

|  | 2018 | 2017 |
|---|---|---|
| **CURRENT ASSETS** | | |
| Cash | $ 562,613 | $ 310,414 |
| Accounts receivable, (net of allowance of $4,772 in 2018 and $5,215 in 2017) | 42,249 | 30,384 |
| Notes receivable, current portion | 1,714 | 1,411 |
| **Total Current Assets** | 606,576 | 342,209 |
| **PROPERTY AND EQUIPMENT** | | |
| Vehicles | 44,293 | 60,482 |
| Equipment | 6,484 | 6,484 |
| Office equipment | 24,494 | 24,494 |
| Leasehold improvements | 26,504 | 21,180 |
|  | 101,775 | 112,640 |
| Less: accumulated depreciation | (71,151) | (86,055) |
| **Net Property and Equipment** | 30,624 | 26,585 |
| **OTHER ASSETS** | | |
| Notes receivable, net of current portion | 2,452 | 6,217 |
| **TOTAL ASSETS** | $ 639,652 | $ 375,011 |

### LIABILITIES AND SHAREHOLDER'S EQUITY

|  | 2018 | 2017 |
|---|---|---|
| **CURRENT LIABILITIES** | | |
| Accounts payable | $ 6,103 | $ 7,013 |
| Accrued expenses | 9,726 | 10,983 |
| Customer deposits | 14,028 | 11,803 |
| Deferred revenue | 7,155 | - |
| **Total Current Liabilities** | 37,012 | 29,799 |
| **SHAREHOLDER'S EQUITY** | | |
| Common Stock, no par value, 15,000 shares authorized; | | |
| 100 issued and outstanding | 100 | 100 |
| Retained earnings | 631,703 | 358,993 |
| Accumulated other comprehensive income | (29,163) | (13,881) |
| **Total Shareholder's Equity** | 602,640 | 345,212 |
| **TOTAL LIABILITIES AND SHAREHOLDER'S EQUITY** | $ 639,652 | $ 375,011 |

A CORP
STATEMENTS OF OPERATIONS
FOR THE YEARS ENDED DECEMBER 31, 2018 AND 2017

|  | 2018 | 2017 |
|---|---|---|
| **SALES AND REVENUE** | | |
| Franchise fee purchases, net | $ 133,675 | $ 75,525 |
| Franchise fee income, net | 468,292 | 433,645 |
| Franchise renewal fees | 27,500 | 20,000 |
| Sales transfer and opt out fees | 23,450 | 10,000 |
| Marketing fund and advertising income | 71,322 | 66,791 |
| Website purchase and webhosting income | 186,108 | 169,043 |
| | | |
| **Total Sales and Revenue** | 910,347 | 775,004 |
| | | |
| **OPERATING EXPENSES** | | |
| Advertising and franchise marketing costs | 77,442 | 61,666 |
| Automobile and travel expenses | 12,119 | 13,405 |
| Bad debt expense | 28,008 | 2,209 |
| Depreciation | 1,286 | 1,263 |
| Dues and subscriptions | 1,481 | 1,395 |
| Insurance | 14,932 | 15,452 |
| Insurance - employee benefits | 20,677 | 18,049 |
| Licenses and fees | 7,785 | 8,332 |
| Office supplies and expenses | 34,338 | 23,915 |
| Payroll taxes | 11,277 | 13,041 |
| Postage | 7,037 | 7,446 |
| Professional fees | 28,108 | 29,796 |
| Rent and other occupancy costs | 30,000 | 31,423 |
| Repairs and maintenance | 5,206 | 4,575 |
| Salaries and wages | 137,182 | 155,499 |
| State excise tax | 1,013 | 2,655 |
| Telephone expense | 13,179 | 15,593 |
| Trade shows | 1,324 | 269 |
| Training | 14,252 | 8,456 |
| Utilities | 4,240 | 3,772 |
| | | |
| **Total Operating Expenses** | 450,886 | 418,211 |
| | | |
| **INCOME FROM OPERATIONS** | 459,461 | 356,793 |
| | | |
| **OTHER INCOME (EXPENSES)** | | |
| Interest income | 3,525 | 1,063 |
| Other income | 3,705 | 8,424 |
| | | |
| **Total Other Income ( Expenses)** | 7,230 | 9,487 |
| | | |
| **NET INCOME** | $ 466,691 | $ 366,280 |

**A CORP**

STATEMENTS OF CHANGES IN SHAREHOLDER EQUITY
FOR THE YEARS ENDED DECEMBER 31, 2018 AND 2017

| | COMMON STOCK | RETAINED EARNINGS | ACCUMULATED OTHER COMPREHENSIVE INCOME | TOTALS |
|---|---|---|---|---|
| Balances at December 31, 2016 | $ 100 | $ 474,543 | $ - | $ 474,643 |
| Net income (loss) | - | 366,280 | - | 366,280 |
| Shareholder Distibutions | - | (481,830) | - | (481,830) |
| Foreign currency translation | - | - | (13,881) | (13,881) |
| Balances at December 31, 2017 | $ 100 | $ 358,993 | $ (13,881) | $ 345,212 |
| Net income (loss) | - | 466,691 | - | 466,691 |
| Shareholder Distibutions | - | (193,981) | - | (193,981) |
| Foreign currency translation | - | - | (15,282) | (15,282) |
| Balances at December 31, 2018 | $ 100 | $ 631,703 | $ (29,163) | $ 602,640 |

STATEMENTS OF CASH FLOWS
FOR THE YEARS ENDED DECEMBER 31, 2018 AND 2017

|  | 2018 | 2017 |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Cash received from franchisees | $ 915,028 | $ 795,595 |
| Cash paid to suppliers, vendors and employees | (451,767) | (405,908) |
| Interest and dividends received | 3,525 | 1,063 |
| Net Cash Provided (Used) By Operating Activities | 466,786 | 390,750 |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Purchase of fixed assets | (5,324) | - |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Shareholder distributions | (193,981) | (481,830) |
| **NET INCREASE (DECREASE) IN CASH** | 267,481 | (91,080) |
| **CASH, BEGINNING OF YEAR** | 310,414 | 415,375 |
| Effect of foreign currency translation | (15,282) | (13,881) |
| **CASH, END OF YEAR** | $ 562,613 | $ 310,414 |

**RECONCILIATION OF NET INCOME TO NET CASH PROVIDED (USED) BY OPERATING ACTIVITIES**

|  | | |
|---|---|---|
| Net Income | $ 466,691 | $ 366,280 |
| ADJUSTMENTS TO RECONCILE NET INCOME TO NET CASH PROVIDED (USED) BY OPERATING ACTIVITIES | | |
| Depreciation and amortization | 1,286 | 1,263 |
| Allowance for doubtful accounts | (443) | (30,078) |
| (Increase) decrease in accounts receivable | (11,422) | 38,059 |
| (Increase) decrease in notes receivable | 3,462 | 3,238 |
| (Increase) decrease in prepaid expenses | - | 3,195 |
| Increase (decrease) in accounts payable | (910) | 6,468 |
| Increase (decrease) in accrued expenses | (1,257) | 1,377 |
| Increase (decrease) in customer deposits | 2,224 | 948 |
| Increase (decrease) in deferred revenue | 7,155 | - |
| **Total adjustments** | 95 | 24,470 |
| **NET CASH PROVIDED (USED) BY OPERATING ACTIVITIES** | $ 466,786 | $ 390,750 |

### A CORP
### NOTES TO FINANCIAL STATEMENTS
### DECEMBER 31, 2018

## NOTE 1.  ORGANIZATION

The Company was incorporated on March 3, 1982 under the laws of the Commonwealth of the State of Massachusetts. The Company is engaged in the business of franchising the Rooter-Man trademark, which specializes in plumbing, sewers, drains, and maintenance and repair services. The Rooter-Man franchises were originally sold by Rooter-Man Corp, and in 1990 the company assigned its outstanding franchise agreements and all future rights to sell the Rooter-Man franchise to A Corp. The Company is registered in the following states as required: California, Florida, Hawaii, Illinois, Indiana, Kentucky, Maryland, Michigan, Minnesota, New York, North Dakota, Oregon, Rhode Island, South Dakota, Utah, Virginia, Washington and Wisconsin.

## NOTE 2.  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Basis of Accounting

The Company's financial statements are prepared using the accrual method of accounting. In accordance with this method of accounting, revenue is recognized in the period in which it is earned and expenses are recognized in the period in which they are incurred. All revenue and expenses which are applicable to future periods have been presented as deferred or prepaid in the accompanying financial statements.

### Use of Estimates

The preparation of financial statements in conformity with generally accepted accounting principles in the United States of America requires management to make estimates and assumptions that affect the certain reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities, and the reported amounts of revenues and expenses during the reporting period. Actual results could vary from those estimates.

### Accounts Receivable and Allowance for Doubtful Accounts

Trade receivables are recognized when franchises are sold or services rendered. The Company extends credit terms to certain customers based on historical dealings with those customers and to other customers after a review of various credit indicators, including the customers' credit rating. The Company grants credit to its franchisees throughout the United States, including Alaska and Hawaii. An allowance for doubtful accounts is established for all or any portion of an account where collections are considered to be at risk and reserves are evaluated on an annual basis to determine their adequacy. Judgments relative to at-risk accounts include the customers' current financial condition, the customers' historical relationship with the company and current and projected economic conditions. Trade receivables are written off when the account is deemed uncollectible. The risk of loss on the accounts receivable is the balance owed at the time of default. The Company considers balances past due after 90-days, and the Company does not require collateral for these receivables. Interest is charged at 18% per annum after 30 days on overdue balances.

See independent auditors' report.
Page 7

**A CORP**
**NOTES TO FINANCIAL STATEMENTS (CONTINUED)**
**DECEMBER 31, 2018**

## NOTE 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

### Cash and Equivalents

For the purposes of the statements of cash flows, cash and cash equivalents include cash on hand, cash on deposit, and certificates of deposit, if any, with original maturities of three months or less.

### Compensated Absences

Employees of the Company are entitled to paid vacation, sick days and other time off depending on job classification, length of service and other factors. It is impractical to estimate the amount of compensation for future absences and, accordingly, no liability has been recorded in the financial statements. The Company's policy is to recognize the costs of compensated absences when paid to employees.

### Property and Equipment

Property and equipment have been recorded at cost. Depreciation is computed using the declining balance and straight-line methods over the estimated useful life of the asset. Major classifications of property and equipment and their estimated useful lives are as follows:

|  | Estimated Life |
|---|---|
| Motor vehicles and equipment | 5 years |
| Leasehold improvements | 39 years |

Expenses for maintenance and repairs that do not materially extend the useful lives of the assets are charged against income as incurred.

### Advertising Costs

Advertising and marketing costs are included in operating expenses, and it is the Company's policy to expense these costs as incurred.

### Income Taxes

The Company, with the consent of its shareholder, elected to be a Subchapter S corporation under the Internal Revenue Code effective January 1, 2005. As a result, income and losses of the Company are passed through to its shareholder for federal and state income tax purposes. Instead of paying corporate income taxes, the shareholder of a Subchapter S corporation is taxed individually on their proportionate share of the Company's taxable income. Accordingly, no provision or liability for federal or state income taxes has been included in these financial statements.

## A CORP
## NOTES TO FINANCIAL STATEMENTS (CONTINUED)
## DECEMBER 31, 2018

### NOTE 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

#### Income Taxes (Continued)

The Company accounts for income taxes and evaluates all significant tax positions in accordance with accounting principles generally accepted in the United States of America. The Company follows the statutory requirements for their income tax accounting and generally avoids risks associated with potentially problematic tax positions that may be challenged upon examination. If an event occurred where the Subchapter S election was revoked or inadvertently terminated, the Company may be required to record unrecognized tax benefits or liabilities in the accompanying financial statements. The Company would recognize interest and penalties, if applicable, associated with uncertain tax positions as part of the income tax provision. The Company's open audit periods are years 2015 through 2018.

#### Reclassification

Certain reclassifications have been made to the 2017 financial statements to conform to the 2018 presentation.

### NOTE 3. CONSIDERATION OF CREDIT RISK

The Company maintains its cash balances in bank accounts at high quality credit financial institutions. The balances, at times, may exceed federally insured limits (FDIC). Pursuant to Section 343 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act), the standard maximum insurance amount was permanently raised to $250,000. At December 31, 2018 the Company exceeded the FDIC insured limit by approximately $316,320. The Company has not experienced any losses in such accounts and believes it is not exposed to any significant credit risk. The Company monitors the credit-worthiness of the financial institutions in which it deposits money.

### NOTE 4. NOTES RECEIVABLE

The Company will periodically finance the purchase price when existing franchisees exercise their option to purchase additional territories by executing a note receivable. The notes typically range from 1 to 3 years and payments are required either weekly or monthly, and carry an interest rate of 12% per annum. Management believes fair value of the notes receivable would approximate the balance due the company.

At December 31, 2018 the notes receivable balances were as follows:

| | | |
|---|---|---|
| Notes from Franchisees | $ | 4,166 |
| Less current portion | ( | 1,714) |
| Long-Term Portion | $ | 2,452 |

A CORP
NOTES TO FINANCIAL STATEMENTS (CONTINUED)
DECEMBER 31, 2018

## NOTE 5.    RELATED PARTY TRANSACTIONS

The Company's sole shareholder owns and controls four other non-related companies. No transactions occurred between the companies during 2018; however, the shareholder is able to influence the Company's operations for the benefit of the other companies under his control. One of the companies owned by the sole shareholder reimburses the Company for accounting and bookkeeping work performed by one of his employees. For year ended December 31, 2018 the balance paid to the company was $800.

In October 2018 the Financial Accounting Standards Board issued Accounting Standards Update No. 2018-17, *Targeted Improvements to Related Party Guidance for Variable Interest Entities,* which allows, but no longer requires, nonpublic companies to apply variable entity guidance to certain common control leasing arrangements if certain criteria is met. The Company meets this criteria and has elected to not apply the variable interest guidance. The Company believes this accounting alternative is preferable because it more closely aligns with the needs of the primary users of the financial statements. Accordingly, the financial statements have been prepared as if consolidation had never been required.

The Company leases its office space from the sole shareholder and President of the Company as a tenant at will. The annual lease cost is $30,000. The lease can be cancelled by either party with verbal or written notice. For the year ended December 31, 2018 the Company paid the related party $30,000 for rent.

## NOTE 6.    FRANCHISE FEES AND REVENUE RECOGNITION

Initial franchise fees, which are $31.80 per thousand populations, and will generally range from $3,975 to $39,750, are due when the Company licenses its federal trademark of Rooter-Man and the franchise business system and training incidental to the license transaction is completed or finalized. When initial fees are collected over an extended period of time it is the Company's policy to recognize the sale when made. Interest charged on these installment notes is recorded in revenue for the period received.

Initial franchise fees, net of allowances, amounted to $133,675 for franchise sales occurring during 2018. The Company updates its Franchise Disclosure Document filing on April 1 of each year. The Company had 101 domestic franchise dealers operating 638 territories in the United States and 6 international franchise dealers operating 61 territories in Canada and 1 in Bermuda as of December 31, 2018.

There are three components to the franchise fees:

a. **The Initial Purchase -** The franchisee must make an initial payment that is based on the population of the territory purchased. At its discretion the Company may upon the existing franchisees' exercise of their option to purchase additional territories, finance up to 50% of the additional purchase pursuant to a 1 to 3 year promissory note at 12%, to assist in the purchase.

A CORP
NOTES TO FINANCIAL STATEMENTS (CONTINUED)
DECEMBER 31, 2018

## NOTE 6.    FRANCHISE FEES AND REVENUE RECOGNITION (Continued)

    b.  Continuing Fees - The franchisee is required to pay an ongoing fee in monthly installments.    A portion of the fees is designated for the marketing campaign.

    c.  Renewal Fees – After the initial five years the franchisee has the option to extend the agreement for ten years by making a contract renewal payment.

## NOTE 7.    FAIR VALUE OF INSTRUMENTS

Generally accepted accounting principles establish a framework for measuring fair value.

Fair value is the amount that would be received to sell an asset, or paid to settle a liability, in an orderly transaction between market participants at the measurement date.  Accounting principles require the use of observable market data, when available, in making fair value measurements.  Valuation techniques used need to maximize the use of observable inputs and minimize the use of unobservable inputs.

The Company's financial instruments, none of which are held for trading purposes, consist primarily of cash and cash equivalents, accounts receivable, accounts payable and accrued expenses.  The Company estimates the carrying amount of these financial instruments approximate their fair value recorded in the accompanying financial statements due to their short-term nature.

The carrying amount of the Company's note receivables generally approximates its fair value at December 31, 2018 as its current interest rate exceeds market rates.

## NOTE 8.    OTHER SIGNIFICANT MATTERS

The Company protects its trademark, and those of its franchisees, by monitoring unauthorized use of its name, and will file action when deemed necessary.  The Company protected its right to collect by sending default and termination notices to various franchisees whose accounts were in arrears during the year.

## NOTE 9.    SUBSEQUENT EVENTS

Management has evaluated events and transactions for subsequent events that would impact the financial statements for the year ended December 31, 2018 through March 11, 2019, the date the financial statements were first available to be issued.  There were no subsequent events that require recognition or disclosure in the financial statements.

EXHIBIT B.1

## A CORP.

## ROOTER-MAN FRANCHISE AGREEMENT

FA 4/20 – Copyright © 2000-2020 A CORP.  All rights reserved.

## TABLE OF CONTENTS

| ITEMS | PAGE |
|---|---|
| A CORP FRANCHISE AGREEMENT | 1 |
| 1. FUNDAMENTAL FRANCHISE AGREEMENT PROVISIONS | 2 |
|     1.1 Date of Franchise Agreement | 2 |
|     1.2 Parties | 2 |
|     1.3 Licensed Territory | 2 |
|     1.4 Total Population | 2 |
|     1.5 Commencement Date | 2 |
|     1.6 Expiration Date | 2 |
|     1.7 Initial Franchise Fee | 2 |
|     1.8 Licensed Businesses | 2 |
|     1.9 Continuing Royalty | 2 |
|     1.10 Advertising Contribution | 2 |
|     1.11 Renewal Fee | 2 |
|     1.12 Transfer Fee | 2 |
|     1.13 Active Owners | 2 |
|     1.14 Franchise Termination Fee | 2 |
| 2. GRANT OF FRANCHISE | 3 |
|     2.1 Grant | 3 |
|     2.2 Limited License | 3 |
| 3. LICENSED TERRITORY | 3 |
|     3.1 Territory Defined | 3 |
|     3.2 Interterritorial Policy | 3 |
|     3.3 Rights Retained | 3 |
| 4. TERM OF FRANCHISE AGREEMENT, RENEWAL OPTION | 4 |
|     4.1 Term | 4 |
|     4.2 Renewal | 4 |
|     4.3 Notice Required by Law | 4 |
| 5. FRANCHISE FEE AND CONTINUING ROYALTY | 5 |
|     5.1 Initial Fee | 5 |
|     5.2 Continuing Royalty | 5 |
| 6. FRANCHISE SYSTEM MARKETING MATERIAL FUND | 5 |
|     6.1 Contribution by Franchisee | 5 |
|     6.2 Advertising Report | 5 |
| 7. FRANCHISEE ADVERTISING, PROMOTION AND IDENTIFICATION | 5 |
|     7.1 Local Advertising | 5 |
|     7.2 Interterritorial Advertising | 6 |
|     7.3 Display | 7 |
|     7.4 Identity as Franchisee | 7 |
|     7.5 Sale of Franchise | 7 |
| 8. TRADEMARKS | 7 |
|     8.1 Grant of License | 7 |

FA 4/20 – Copyright © 2000-2020 A CORP. All rights reserved.

8.2  Name of Business ...................................................................... 7
8.3  No Other Names ...................................................................... 7
8.4  Change of the Trademarks ......................................................... 8
8.5  Trademark Prosecution ............................................................. 8

9.    TRAINING AND OPERATING ASSISTANCE ............................... 8
9.1  Initial Training Program ........................................................... 8
      A. The Program ..................................................................... 8
      B. Expenses .......................................................................... 8
      C. Waiver ............................................................................. 8
9.2  Staff Training ......................................................................... 8
9.3  Additional Assistance ............................................................... 9
      A. Operating Manual ............................................................... 9
      B. Grand Opening Promotional Program ...................................... 9
      C. Advertising Materials .......................................................... 9
      D. Seminars .......................................................................... 9
      E. On-Going Assistance and Supervision ..................................... 9
      F. Initial Sales Assistance ......................................................... 9
      G. Product Offerings ............................................................... 9

10.  FRANCHISE OFFICE LOCATION ........................................... 10

11.  VEHICLES, EQUIPMENT AND SUPPLIES .................................. 10
11.1  Vehicles .............................................................................. 10
11.2  Equipment ........................................................................... 10
11.3  Uniforms ............................................................................. 10

12.  OPERATION of the FRANCHISE ............................................ 10
12.1  Operations Manual ................................................................ 10
       A. Incorporation of Operations Manual ..................................... 10
       B. Confidentiality of Operations Manual .................................... 10
       C. Modifications ................................................................... 11
12.2  Hours of Operation ............................................................... 11
12.3  Resolution of Customer Problems ............................................. 11
12.4  Cleaning and other Supplies ................................................... 11
12.5  Franchise Management ........................................................... 11
12.6  Insurance ........................................................................... 11
       A. Notice ............................................................................ 12
       B. Insurance and Step-In-Rights ............................................... 12
12.7  Bookkeeping Standards .......................................................... 12
12.8  Franchisor Inspection ........................................................... 12
12.9  Compliance with Law ............................................................ 12
12.10  No Suggested Service Fees .................................................... 12
12.11  Franchise Telephone Service and Directory Listings .................... 13

13.  RECORDS ........................................................................... 13
13.1  Sales Records and Tax Returns ................................................ 13
13.2  Periodic Reports ................................................................... 13
13.3  Additional Recording Systems ................................................. 13
13.4  Inspection and Audit ............................................................. 13

FA 4/20 – Copyright © 2000-2020 A CORP. All rights reserved.

**14. ASSIGNMENT AND RIGHT OF FIRST REFUSAL** ............................................. 14
    **14.1 Assignment by A CORP** ......................................................................... 14
    **14.2 Assignment by Franchisee** ................................................................... 14
        **A. Permitted Transfers** ..................................................................... 14
        **B. Transfer Upon Death or Permanent Incapacity** ....................... 15
        **C. Transfer to Franchisee's Corporation** ...................................... 15
        **D. Non-Waiver of Claims** ................................................................ 16

**15. DEFAULT AND TERMINATION** ...................................................................... 16
    **15.1 Immediate Termination** ....................................................................... 16
    **15.2 Termination with Notice** ..................................................................... 17
    **15.3 Conformity with Law** ......................................................................... 18
    **15.4 Cross Default** ...................................................................................... 18
    **15.5 Franchise Termination Option** ........................................................... 18

**16. RIGHTS AND DUTIES OF PARTIES UPON EXPIRATION OR TERMINATION** ...... 19

**17. STEP-IN-RIGHTS** ............................................................................................ 20
    **17.1 Cause for Step-In** ............................................................................... 20
    **17.2 Duties of Parties** ................................................................................. 20

**18. NON-COMPETITION AND NON-DISCLOSURE COVENANTS** ........................... 20
    **18.1 Non-Competition** ................................................................................ 20
    **18.2 Non-Disclosure** ................................................................................... 20

**19. GENERAL CONDITIONS AND PROVISIONS** ..................................................... 21
    **19.1 Titles for Convenience** ........................................................................ 21
    **19.2 Entire Agreement** ................................................................................ 21
    **19.3 Amendment in Writing** ....................................................................... 21
    **19.4 Relationship** ........................................................................................ 21
    **19.5 No Waiver** ........................................................................................... 21
    **19.6 Governing Law** ................................................................................... 22
    **19.7 Mediation and Arbitration** ................................................................. 22
    **19.8 Notices** ................................................................................................ 23
    **19.9 Indemnification** ................................................................................... 24
    **19.10 Limitation of Liability of A CORP** ................................................... 24
    **19.11 Late Payment Fees** ............................................................................ 24
    **19.12 Survival of Covenants** ....................................................................... 24

**20. CAVEAT** ........................................................................................................ 24

**21. RELEASE** ....................................................................................................... 25

**APPENDIX 1 – LICENSED TERRITORY** ................................................................. 27
**EXHIBIT A – GUARANTY OF PERFORMANCE** ....................................................... 28
**EXHIBIT B – POWER OF ATTORNEY** .................................................................... 29
**EXHIBIT C – PROMISSORY NOTE** ........................................................................ 30
**EXHIBIT D – WAIVER OF TRAINING PROGRAM PARTICIPATION** ........................ 31
**EXHIBIT E – AUTHORIZATION TO CHARGE CREDIT CARD OR CHECKING ACCOUNT** ..... 32

**FA 4/20 – Copyright © 2000-2020 A CORP. All rights reserved.**

## A CORP.
## FRANCHISE AGREEMENT

**AGREEMENT** entered into this **10th** day of **September, 2020**, by and between:

**A CORP.**
a Massachusetts Corporation
268 Rangeway Road
Box 290
North Billerica, MA  01862
(**"A CORP."**)

and

**Quality Air Care Corporation**
**692 Sussex Ct**
**Toms River, NJ 08753**

_____
(**"FRANCHISEE"**)

**WHEREAS:**

**A CORP.** has developed and is continuing to develop certain unique training, marketing and management methods relating to various service industries which offer services to the public through a franchise system (the " **A CORP. System** ") as it evolves from time to time; and

**A CORP.** has successfully established a reputation, demand and goodwill for its System under various registered names and marks which **A CORP.** owns, including without limitation, **Rooter-Man, Rooter-Man to the Rescue, Rotor-Man** and such other valuable trade names, service marks, trademarks, logotypes and designs (the "Trademarks") which **A CORP.** may develop and license for use through the **A CORP. System**; and

**A CORP.**'s trademarks and methods of operations and other business practices and policies relating to the operation of the **A CORP.** System (collectively the "Business System") constitute confidential and valuable trade secrets; and

**FRANCHISEE** desires to enter into the business of operating an **A CORP.** franchise utilizing some or all the Trademarks, the Business System and all advantages of the **A CORP.** System franchise program upon the terms and conditions contained in this agreement.

**THEREFORE**, in consideration of the mutual agreements, covenants and promises contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree to be bound legally as follows:

1.    **FUNDAMENTAL FRANCHISE AGREEMENT PROVISIONS**

|  |  |  |  |
|---|---|---|---|
| **1.1** | **Date of Franchise Agreement**: | | September 10, 2020 |
| **1.2** | **Parties**: | **FRANCHISOR:**<br>A CORP.<br>268 Rangeway Road<br>N. Billerica, Ma 01862 | **FRANCHISEE:**<br>Quality Air Care Corporation<br>692 Sussex Ct<br>Toms River, NJ 08753 |
| **1.3** | **Licensed Territory**: | | Defined in the attached Appendix 1 |
| **1.4** | **Total Population**: | | 501,008 |
| **1.5** | **Commencement Date**: | | August 19, 2020 |
| **1.6** | **Expiration Date**: | | August 19, 2025 |
| **1.7** | **Initial License Fee**: | | $7,950.00<br>($31.80 per thousand of population) |
| **1.8** | **Businesses Licensed (By Trademark)**: | | **Rooter-Man**<br>**Rooter-Man to the Rescue**<br>**Rotor-Man** |
| **1.9** | **Continuing Royalty**: | | $520.00 per month.<br>($1.04 per thousand of population) |
| **1.10** | **Marketing Fund Contribution**: | | $60.00 per month.<br>($ .12 per thousand of population monthly) |
| **1.10.1** | **Locally Optimized Website** | | $89.00 per month |
| **1.11** | **Franchise Renewal Fee**: | | $2500.00 |
| **1.12** | **Transfer Fee**: | | Greater of 5% of Franchise Selling Price or $2,500.00 |
| **1.13** | **Active Owners**: | | Klodian Belegu |
| **1.14** | **Franchisee Termination Fee: (Opt Out)** | | $25.00 per thousand population |

2.  **GRANT OF FRANCHISE**

2.1 **GRANT**. **A CORP.** hereby grants to **FRANCHISEE**, and **FRANCHISEE** hereby accepts, a license to conduct the business listed in Section 1.8 (the "**A CORP.** System Franchise") for the term described below, according to the provisions of this Agreement and any related agreements.

2.2 **LIMITED LICENSE**. This franchise is a limited grant of rights. Upon termination for any reason or upon expiration of this Agreement, all rights of **FRANCHISEE** to operate the **A CORP.** System franchise shall cease and the license set forth above shall terminate.

## 3. LICENSED TERRITORY

3.1 **TERRITORY DEFINED**

   A. The franchise granted by this Agreement to operate the **A CORP.** System franchise shall be within the Territory set forth in Section 1.3 (the "Territory"). **FRANCHISEE** shall offer the services of the **A CORP.** System franchise **only** in the Territory.

   B. **FRANCHISEE** agrees to diligently, faithfully and in a business like manner, promote, market and conduct the franchised business within the Territory so as to fully develop and maximize the business potential of the Territory and shall devote **FRANCHISEE's** full time, attention and best efforts to achieve that end. **FRANCHISEE's** failure to do so shall be deemed a material breach of this Agreement as specified in Section 15.2.

   C. **FRANCHISEE** shall not engage in marketing activities or solicitation of business outside the Territory. In order for **FRANCHISEE** to engage in such activities within an unlicensed territory, **FRANCHISEE** must execute a separate Franchise Agreement and pay an additional franchise fee.

   D. **FRANCHISEE** shall establish and maintain an office within the Territory to conduct his or her franchise. **FRANCHISEE** shall not establish an office outside of the Territory.

   E. **A CORP.** agrees that during the term it will not license any other person or entity to operate the same **A CORP.** system franchise in the Territory, and will not itself establish the same **A CORP.** system franchise in the Territory.

3.2 **INTERTERRITORIAL POLICY**. **A CORP.** shall have the right to adopt and implement policies and procedures prohibiting or strictly limiting **FRANCHISEE's** conduct and solicitation of business and marketing activities outside the Territory. With the exception of interterritorial advertising, as described in Section 7.2 of this Agreement, **FRANCHISEE** is prohibited from advertising, soliciting or maintaining a business phone number or office outside of the Territory.

3.3 **RIGHTS RETAINED**. Notwithstanding Section 3.2, **A CORP.** shall, however, have the right to: a) refer work to other franchisees, to itself, its parent, subsidiary or affiliated companies or to unaffiliated subcontractors, whether within or outside of the Territory, which **FRANCHISEE** is not licensed, not equipped or not expressly authorized to render; and b) sell, rent or authorize others to sell or rent, drain cleaning, products, and equipment, or render services which are not the subject of this Agreement within or outside of the Territory.

## 4. TERM OF FRANCHISE AGREEMENT AND RENEWAL OPTION

**4.1**  **TERM**.  The term of this Franchise Agreement shall be 5 years from the date of execution of this Agreement, unless terminated sooner for a reason set forth in Section 15. At the expiration of this term, **FRANCHISEE** may exercise the Renewal Option set forth in Section 4.2.

**4.2**  **RENEWAL**.  **FRANCHISEE** shall have the option to renew this franchise for additional 10 year terms subject to the following conditions:

   **A.** **FRANCHISEE** shall give **A CORP.** written notice of his or her desire to exercise the option to continue as a franchisee no later than 6 months prior to the expiration of the initial term of this Agreement and each renewal term.

   **A CORP.** shall furnish **FRANCHISEE** with a copy of **A CORP.**'s then current Franchise Agreement (and related agreements), which Agreement **FRANCHISEE** must execute no later than 3 months prior to the expiration of this Agreement.  The Renewal Franchise Agreement shall not include an Initial License Fee but may include an increase in the Continuing Royalty and Marketing Contribution.  Such increase, if any, shall be calculated by multiplying the current fee by the percentage change in the Consumer Price Index (hereinafter, "Change In CPI") if any.  The Change In CPI shall be calculated using the formula set forth in Section 4.2 B.

   **B.** **A CORP.** shall calculate the Change In CPI by creating a fraction, the numerator of which is the Consumer Price Index for December of the most recently completed year and the denominator of which is the Consumer Price Index for December of the year in which the Franchise Agreement became effective.

   The fraction will then be determined by dividing the numerator by the denominator.  If the fraction is less than or equal to 1, then no change in fees will occur.  If the fraction is greater than 1 (a "CPI Increase"), then a Change in CPI shall have occurred in the amount of the CPI Increase.

   **C.** **FRANCHISEE** shall pay to **A CORP.** upon execution of the renewal Franchise Agreement, the Renewal Fee set forth in Section 1.11.

   **D.** Notwithstanding the foregoing, **FRANCHISEE** shall not have the right to exercise the Renewal Option unless **FRANCHISEE** has paid in full all monies then currently due to **A CORP.**, and no other default under the terms of this Agreement exists uncured.  **A CORP.** may elect to revoke the renewal option if **FRANCHISEE** shall have received 3 or more notices of default within any 12-month period during the initial term of this Agreement.

   **E.** As a condition to this renewal, **FRANCHISEE** shall be required to maintain the services that he is licensed for and to invest in the proper equipment or vehicles to provide those licensed services.

**4.3**  **NOTICE REQUIRED BY LAW**.  If applicable law requires that A **CORP.** give notice to **FRANCHISEE** prior to the expiration of the initial term, then the Franchise Agreement shall remain in effect on a month to month basis until **A CORP.** has given **FRANCHISEE** the notice required by applicable law.

## 5.  INITIAL LICENSE FEE AND CONTINUING ROYALTY

5.1 **INITIAL FEE. FRANCHISEE**, upon execution of this Agreement, shall pay to **A CORP.** the Initial License Fee set forth in Section 1.7. **FRANCHISEE** acknowledges that the sole consideration for such fee is the grant of the franchise. Such fee shall be fully earned upon execution of this Agreement and shall not be refunded or forgiven.

5.2 **CONTINUING ROYALTY. FRANCHISEE** shall pay to **A CORP.** each month the Continuing Royalty set forth in Section 1.9, subject to a $110.00 per unit each month. **FRANCHISEE** shall also pay to **A CORP.** each month the marketing fund contribution in the amount of $15.00 per unit. The Continuing Royalty will commence thirty (30) days after the execution of the Franchise Agreement. When **A CORP.** adopts an electronic funds transfer program, all Continuing Royalty payments shall be made by electronic funds transfer, pursuant to the program established and amended from time to time by **A CORP.** Each payment shall be accompanied by the financial reports specified in Section 13.2.

## 6. FRANCHISE SYSTEM MARKETING MATERIALS FUND

6.1 **CONTRIBUTION BY FRANCHISEE. FRANCHISEE** agrees to pay to **A CORP.** the Marketing Fund Contribution set forth in Section 1.10 for the design of marketing materials. **FRANCHISEE** shall pay such Marketing Fund Contribution in the same manner specified in Section 5.2. **A CORP.** shall have the sole right to determine how to expend these funds, and shall expend all Marketing Materials funds collected. All monies collected from **FRANCHISEE** pursuant to this Section shall be placed in a separate account.

6.2 **MARKETING MATERIALS FUND REPORT. A CORP.** shall furnish to **FRANCHISEE** within 90 days of each calendar year end, a Fund financial report for the preceding year, prepared and certified to be correct by an officer of **A CORP.**, setting forth the funds collected, and the expenditures made during such calendar year.

## 7. FRANCHISEE ADVERTISING, PROMOTION AND IDENTIFICATION

7.1 **LOCAL ADVERTISING. FRANCHISEE** acknowledges that advertising and promotion represents the major source of new clientele for the **A CORP.** System franchise and a major expense of the franchise operation. **FRANCHISEE** shall formulate and effect local advertising and promotion subject to the format, content and media designations contained in the Operations Manual.

A. **FRANCHISEE** shall list itself in those telephone directories which are usually and customarily distributed in the Licensed Territory, under the appropriate headings, as designated by **A CORP. FRANCHISEE** shall not place advertisements or listings in telephone directories which are usually and customarily distributed only outside of the Licensed Territory. **FRANCHISEE** shall expend a minimum of 15% of the franchise's Gross Revenues on local advertising, which advertising will include yellow page listings, local newspaper advertising, marketing and sales materials and the Marketing Fund Contribution. For the purposes of this Agreement, the term "Gross Revenues" shall mean all revenues generated by **FRANCHISEE's** business conducted upon, from, or with respect to **FRANCHISEE's** franchise, whether such sales are evidenced by cash, check, credit, charge account or exchange. Gross Revenues shall include, without limitation, monies or credit received, for services, from the sale of products, from tangible property of every kind and nature, promotional or otherwise, and for other services performed by **FRANCHISEE** in

accordance with the Business System. Gross Revenues shall not include sales or service taxes or municipal or private disposal fees.

**B.**   **FRANCHISEE** understands and acknowledges that local and telephone directory advertising and internet advertising are the major sources of new clientele. At the end of the calendar year, **FRANCHISEE** must furnish proof to the **A CORP.** of all local advertising expenditures and copies of all advertisement used during that year ended. **A CORP** provides free listing of **FRANCHISEE** through **A CORP.**'s franchisor website at www.rooterman.com (the "Franchisor Website"). If **FRANCHISEE** desires to have a local optimized website to promote the System using **ACORP.**'s Trademarks, **FRANCHISEE** must use the internet advertisement services provided through the "Franchisor Website". Upon **FRANCHISEE**'s purchase of the **A CORP** System Franchise, **A CORP** shall design certain website pages linked to the Franchisor Website with **FRANCHISEE**'s information (the "**FRANCHISEE** Webpages") and shall activate the **FRANCHISEE** Webpages in a timely manner.   To maintain the consistency of the brand image of **A CORP**, **FRANCHISEE** is not allowed to independently design, develop, and maintain any other locally optimized website or register any domain name using **A CORP's** trademarks including without limitation the Rooter Man trademark.

**C.**   **FRANCHISEE** agrees to advertise and promote actively and continuously the System and the Trademarks within the Licensed Territory. **A CORP.** reserves the right to direct **FRANCHISEE** to modify or discontinue advertisements that **A CORP.** believes to present a risk of misleading prospective customers as to the authorized services which **FRANCHISEE** can offer or to the territory in which **FRANCHISEE** can operate. **FRANCHISEE** shall promptly comply with any such directive.

**7.2**   **INTERTERRITORIAL ADVERTISING**.   In areas (the "Region") where advertising media reach prospective clientele in more than 1 licensed territory, the franchisees operating in this Region may enter into an interterritorial advertising agreement (the "Interterritorial Agreement"). Such Interterritorial Agreements shall provide for the following:

**A.**   Advertising fees shall be shared by participating franchisees based upon the percentage of the Region's population that falls within each individual franchisee's Territory. The failure of **FRANCHISEE** to pay his pro rata share under an agreed-upon program shall be considered a default under this Franchise Agreement.

**B.**   The format, content and media designations chosen by the participating franchisees for use in the Region shall conform to those requirements specified by **A CORP.** in the Operations Manual; and

**C.**   **FRANCHISEE** shall indemnify **A CORP.** from and against any and all claims, demands, losses, damages (including punitive damages), costs, suits, judgments, penalties, expenses and liabilities of any kind or nature arising directly or indirectly out of or in connection with the operation of the Interterritorial Agreement.

**D.**   Local advertising shall be FRANCHSIEE's sole responsibility and FRANCHISEE shall not list A CORP. as a party of its local advertising agreement or as list A CORP. under any billing information.

**7.3**   **DISPLAY**.   **FRANCHISEE** acknowledges that vehicle advertising is an important source


8.4    **CHANGE OF THE TRADEMARKS**.  If it appears to **A CORP.** that any of the names or marks are no longer viable commercially or legally, **A CORP.** has the right to change any of its names or marks to others of similar marketing impact.  In such event, **FRANCHISEE** agrees to cooperate with **A CORP.** in changing all signs, graphics, and supplies, including those painted onto **FRANCHISEE's** vehicles.  **FRANCHISEE** agrees to assume all reasonable costs connected with such changes, and to effectuate such changes within the reasonable time frame established by **A CORP.**

8.5    **TRADEMARK PROSECUTION**

A.    In the event that **FRANCHISEE** shall learn that a third party, who not a licensee of **A CORP,** is using **A CORP's** Trademarks or any variation, **FRANCHISEE** shall promptly notify **A CORP** of the facts relating to infringing use.

B.    With **A CORP's** permission, **FRANCHISEE** may institute litigation to protect **FRANCHISEE's** interest in the Trademark.  In the event that the **FRANCHISEE** chooses to bring action, and **A CORP,** in its sole discretion, grants permission, **FRANCHISEE** shall be responsible for all costs of litigation and shall have a right to any damages collected for infringing use in **FRANCHISEE's** Territory.

9.    **TRAINING AND OPERATING ASSISTANCE**

9.1    **INITIAL TRAINING PROGRAM**.  **A CORP** shall furnish, and **FRANCHISEE** shall complete to **A CORP's** satisfaction, in its sole discretion exercised in good faith, **A CORP's** training program on the operation of the **A CORP** System franchise.

A.    **THE PROGRAM.**    Such training shall consist of 2 days of instruction at **A CORP's** headquarters or at such place or places designated by **A CORP**.    Participation of **FRANCHISEE** in the training program shall be required unless participation is waived by **A Corp** as specified in Section 9.1C below.  If **A CORP** determines that **FRANCHISEE** requires additional training, the **FRANCHISEE** shall attend such additional program at **FRANCHISEE's** own expense.

B.    **EXPENSES. FRANCHISEE's** shall be solely responsible for **FRANCHISEE's** own travel, living expenses and salary during the training period.

C.    **WAIVER.**    **FRANCHISEE's** participation in the **A CORP** training program, as described in Section 9.1A, may be waived by **A CORP** if **A CORP** determines in its sole discretion that **FRANCHISEE** has sufficient prior business experience to excuse him from participation in **A CORP's** training program.

9.2    **STAFF TRAINING.**    **FRANCHISEE** shall implement a training program for his  other employees, in accordance with the training standards and procedures prescribed by **A CORP.** **FRANCHISEE** shall employ at all times during the term of this Agreement only employees so trained to offer the franchised services.  **FRANCHISEE** alone shall assume all expenses associated with staff training.

9.3    **ADDITIONAL ASSISTANCE.**    **A CORP** shall furnish **FRANCHISEE** with the

following additional operating assistance.

A. **OPERATIONS MANUAL.**    A CORP will provide a copy of its Operations Manual (as defined in Section 12.1), which at all times will remain the property of **A CORP**, for use by **FRANCHISEE** in the operation of the **A CORP's** System franchise.

B. **GRAND OPENING PROMOTIONAL PROGRAM.**    A CORP shall consult with **FRANCHISEE** concerning a grand opening promotional program, which program shall be conducted by **FRANCHISEE** at his or her sole cost and expense.

C. **ADVERTISING MATERIALS.**    A CORP may, from time to time, at its discretion, develop and provide **FRANCHISEE** with the art work for advertising materials to be used by **FRANCHISEE** in the promotion of **FRANCHISEE's  A CORP** System franchise.

D. **SEMINARS.**    A CORP may from time to time, at its sole discretion, conduct refresher training seminars for the purpose of informing franchisee's of new developments and improvements in the Business System relating to various aspects of the franchise operations, including new product lines and profit centers, new marketing techniques, and revised operational and management standards and techniques.  Unless otherwise approve in writing by **A CORP,  A CORP** shall have the right to require **FRANCHISEE** to attend at least 1 such seminar or a regional meeting during each year of this Agreement.  There shall be no additional charge for such seminars or meetings, but all travel and living costs incurred by **FRANCHISEE** shall be borne by **FRANCHISEE.**

E. **ON-GOING ASSISTANCE AND SUPERVISION.**    A CORP shall furnish to **FRANCHISEE** from time to time such operating assistance and training, as is, in **A CORP's** sole discretion, reasonably necessary.  Operating assistance and training may include, by way of illustration, advice and guidance with respect to modifications or additions in the Business System, new marketing programs, the establishment of administrative, bookkeeping, accounting and general operating procedures, and such other advice as shall reasonably pertain to the operation of the franchise.  **A CORP** retains the right to license additional services and programs which **FRANCHISEE** might offer to its customers.

F. **INITIAL SALES ASSISTANCE.**    Upon **FRANCHISEE's** written request and **A CORP's** consent,    **A CORP** shall furnish, for not less than 2 days during the first weeks of **FRANCHISEE's** operations, a representative to train and assist **FRANCHISEE** and his sales staff by calling on prospective customers within the Territory.  **A CORP** shall require a reasonable fee for providing such initial sales assistance.  Such fee shall include, without limitation, all expenses incurred by **A CORP** in providing initial sales assistance.

G. **A CORP** presently offers products through **A CORP's** affiliate, **Rooter-Man Corp.,** which is a supplier and distributor of various tools and supplies needed in the operation of a **Rooter-Man** franchise. These tools and supplies consist of drain cleaning machines, cables, cutters, various hand tools, drain cleaning products, logo patches, truck decals, and other such items. **FRANCHISEES** are not required to purchase these or any items from the **Rooter-Man Corp.** nor is **A CORP** or the **Rooter-Man Corp.** required to continue supplying, selling or distributing these or any items.

10. **FRANCHISE OFFICE LOCATION.**    Since the location of **FRANCHISEE's** office is not an important aspect of the operation of the **A CORP** System franchise,  **FRANCHISEE** shall only be

obligated to secure an adequate facility to house **FRANCHISEE's** vehicles, equipment and supplies. Such facility must be located within the Territory and such facility shall comply with all local, state and federal regulations as well as A CORP's Operations Manual. Specifically, but without limitation, such facility shall be maintained by **FRANCHISEE** in strict compliance with all local, state and federal regulations pertaining to the storage of hazardous and non-hazardous chemicals.

## 11. VEHICLES, EQUIPMENT AND UNIFORMS

**11.1**  **VEHICLES**.  Prior to the commencement of business by **FRANCHISEE, FRANCHISEE** shall purchase or lease the number and variety of vehicles to be used in the operation of the **A CORP.** System franchise as reasonably prescribed by **A CORP.** All vehicles must meet **A CORP.**'s requirements for appearance, color and other appropriate specifications and must be fully equipped as required by the Operations Manual. **FRANCHISEE** expressly agrees to display all Trademarks required by **A CORP.** on such vehicles.  All vehicles must be maintained in sound physical condition and the appearance of such vehicles must be well maintained at all times in order to uphold the integrity of the Trademarks. **FRANCHISEE** shall promptly, upon request, provide **A CORP.** with photographs, copies of invoices and other evidence satisfactory to **A CORP.**, confirming that such vehicles conform to **A CORP.**'s specifications.

**11.2**  **EQUIPMENT**.  Prior to the commencement of the business, **FRANCHISEE** shall at its sole cost and expense lease or purchase, all of the tools, equipment, uniforms, drain cleaning products, supplies, computer equipment, software, forms and other equipment and materials recommended by **A CORP.**, but purchased from suppliers of **FRANCHISEE**'s choice.

**11.3**  **UNIFORMS**.  In order to present a neat and clean appearance while performing the services of the **A CORP.** System franchise, **FRANCHISEE** and each employee of **FRANCHISEE** shall wear a uniform approved by **A CORP.**

## 12.  OPERATION OF THE FRANCHISE

**12.1**  **OPERATIONS  MANUAL**.  **FRANCHISEE** acknowledges that nationwide uniform standards of service are vital to the protection of the **A CORP.** System and the Trademarks, and are necessary to ensure that the public receives the quality of service associated with the **A CORP.** System and the Trademarks.  **FRANCHISEE** therefore agrees that in order to protect the reputation and the goodwill associated with the Trademarks, and to maintain the uniform standards of operation by all **A CORP.** System franchisees, **FRANCHISEE** shall conduct the franchise in strict accordance with **A CORP.**'s proprietary Operations Manual (the "Operations Manual").

**A**.  **INCORPORATION OF OPERATIONS MANUAL**.  The Operations Manual is intended to further the purposes of this Agreement, and is specifically incorporated into this Agreement.

**B**.  **CONFIDENTIALITY OF OPERATIONS MANUAL**.  **FRANCHISEE** shall at all times treat as confidential and shall not at any time disclose, copy, duplicate, record or otherwise reproduce in whole or in part, or otherwise make available to an unauthorized person or persons, the contents of the Operations Manual. The Operations Manual, including all new updated and old superseded pages, shall at all times remain the sole property of **A CORP.**  **A CORP.** shall amend and update the Operations Manual and shall provide such updated

version to **FRANCHISEE** at no cost to **FRANCHISEE**. **FRANCHISEE** agrees to insert all new pages immediately in their proper places and to remove completely the superseded pages at the same time for return to **A CORP. FRANCHISEE** shall promptly return the Operations Manual upon the expiration or other termination of this Agreement.

C. **MODIFICATIONS.** **FRANCHISEE** recognizes and agrees that **A CORP.** may from time to time change or modify its standards of operation, including the adoption of new procedures and programs, as outlined in the Operations Manual. **FRANCHISEE** shall accept and conform to such changes or modifications, and shall make all reasonable expenditures necessitated by the changes or modifications, within the time periods reasonably established by **A CORP.**

12.2 **HOURS OF OPERATION.** **FRANCHISEE** shall provide prompt and courteous service at all times during normal working hours and shall provide emergency service that will adequately meet the needs of customers for such service within the Licensed Territory. During customary business hours, **FRANCHISEE** agrees to have its telephone(s) answered by a trained employee. **FRANCHISEE** agrees to use a telephone answering service only after customary business hours.

12.3 **RESOLUTION OF CUSTOMER PROBLEMS.** **FRANCHISEE** and his employees shall provide prompt, competent and courteous service to customers. **FRANCHISEE** shall respond to any dissatisfied customers within 24 hours after the complaint is received, whenever possible.

12.4 **DRAIN CLEANING PRODUCTS AND OTHER SUPPLIES.** **FRANCHISEE** shall utilize only those drain cleaning products and other supplies, including forms, authorized by **A CORP.**

12.5 **FRANCHISEE MANAGEMENT.** **FRANCHISEE** shall at all times during the term of this Agreement operate the **A CORP.** System franchise on a full-time basis or employ on a full-time basis at least one trained individual. **FRANCHISEE** or such individual shall devote his entire time during normal business hours, as defined in the Operations Manual, to the management, operation and development of **FRANCHISEE's A CORP.** System franchise. The individual managing the franchise shall not engage in any other business or investment requiring active participation during normal business hours. **A CORP.** has entered into this Agreement in reliance upon the representation of **FRANCHISEE** that during the term of the Agreement, the individuals named in Section 1.14 will be the owners who are in active, full-time charge of **FRANCHISEE's** franchise and who are responsible for adhering to the terms of this Agreement.

12.6 **INSURANCE.** It is understood and agreed that the protection of the goodwill of the **A CORP.** system, Trademarks and the financial security of both **FRANCHISEE** and **A CORP.** requires the existence of public liability insurance coverage for **FRANCHISEE**. **FRANCHISEE** shall procure and maintain in full force and effect Commercial General Liability insurance coverage (including premises/operations coverage, product liability coverage, completed operations coverage and contractual liability coverage) and comprehensive motor vehicle liability insurance coverage (including hired and non-owned motor vehicle coverage) in the name of **FRANCHISEE**, with **A CORP.** named as an additional insured, at **FRANCHISEE's** sole cost and expense. The insurance coverage shall be in the following minimum amounts:

| 1. Bodily Injury | $1,000,000.00 | Each person |
| | $1,000,000.00 | Each occurrence |
| 2. Property damage | $500,000.00 | Each occurrence |
| 3. Workers' Compensation coverage | | As required by law |

As an alternative to the foregoing, **FRANCHISEE** may obtain a single limit policy in the amount of no less than $1,000,000.00.

A. **NOTICE**. All insurance purchased by **FRANCHISEE** shall provide that **A CORP**. be given at least 30 days prior written notice of any termination, amendment, cancellation or modification. **FRANCHISEE** shall promptly provide **A CORP**. with certificates of insurance evidencing such coverage no later than 14 days prior to the date that **FRANCHISEE** shall be open for business to the public, as well as annual certificates throughout the term of the franchise evidencing continuing coverage.

B. **INSURANCE AND STEP-IN-RIGHTS**. If **FRANCHISEE** fails or refuses to purchase insurance conforming to the standards and limits prescribed in Section 12.5, **FRANCHISEE** shall be in default of this Agreement as set forth in Section 15.2A and E.

12.7 **BOOKEEPING STANDARDS**. **FRANCHISEE,** all financial statements prepared by or for **FRANCHISEE**, and all reports submitted by **FRANCHISEE** shall conform to the current standards and requirements as described in the Operations Manual. All such bookkeeping and accounting records and financial statements, for such periods as may from time to time be prescribed in the Operations Manual, shall be made available for inspection by **A CORP**. during normal business hours.

12.8 **FRANCHISOR INSPECTION**. **A CORP**. shall have the right from time to time, and without prior notice to **FRANCHISEE** to send representatives to **FRANCHISEE'S** office in order to inspect **FRANCHISEE**'s operations and records and to determine the faithfulness of **FRANCHISEE**'s compliance with the provisions of this Agreement and the Operations Manual.

12.9 **COMPLIANCE WITH LAW. FRANCHISEE** shall operate his **A CORP**. System franchise in strict compliance with applicable laws, rules and regulations of all governmental authorities. **FRANCHISEE** shall comply with all applicable laws and regulations of the federal, state or local governments, and shall prepare and file all necessary tax returns, and pay promptly all taxes imposed upon **FRANCHISEE** and upon **FRANCHISEE**'s franchised business. **FRANCHISEE** may be required to be licensed for some or all of the components of the **A CORP**. System and is solely responsible for securing and maintaining such licenses

12.10 **NO SUGGESTED SERVICE FEES. FRANCHISEE** acknowledges that any and all service fees included in the Operations Manual or other operating memoranda, are intended by **A CORP**. to be illustrative only and are not intended to be suggestive of fees to be charged by **FRANCHISEE** for particular services. **FRANCHISEE** further acknowledges that **A CORP**. does not set or enforce a fee schedule of any type. **FRANCHISEE**, in its sole discretion, shall determine the fees to be charged for licensed services performed under the **A CORP**. System.

12.11 **FRANCHISEE TELEPHONE SERVICE AND DIRECTORY LISTINGS. FRANCHISEE** shall at its sole expense maintain telephone service for the franchise and

shall have all of **FRANCHISEE**'s telephone numbers continuously listed and advertised in those "white pages" and "yellow page" directories which are usually and customarily distributed within the Licensed Territory, as **A CORP**. may designate or approve. All such listings shall be in the manner, style and type size and shall contain all other characteristics as **A CORP**. may designate in the Operations Manual or in operating memoranda. In all advertising placed by **FRANCHISEE** in which such listed numbers appear, there shall not appear any other telephone numbers subscribed for by **FRANCHISEE** for personal use or for the conduct of any other business. **FRANCHISEE** shall not, without **A CORP**.'s express written consent, cause or allow itself to be listed in any directories outside of the Territory. **A CORP**. shall have the right to recommend the type of telephone service, the number of telephone lines, and all matters related to the telephone service for the franchise, and **FRANCHISEE** shall promptly comply with all specifications and directives of **A CORP**. as established or modified from time to time. **FRANCHISEE** hereby irrevocably appoints **A CORP**. as its Attorney-in-Fact to assign all such telephone numbers to **A CORP**. and expressly authorizes the applicable telephone company to make such assignment upon termination or expiration of this Franchise Agreement. **FRANCHISEE** agrees to indemnify **A CORP**. as specified in Section 19.9.

## 13. RECORDS.

**13.1**    **SALES RECORDS AND TAX RETURNS. FRANCHISEE** shall record all sales and shall keep and maintain accurate records. **FRANCHISEE** shall provide **A CORP**. annually with copies of federal, state and local (if applicable) income tax returns.

**13.2**    **PERIODIC REPORTS.** In order to assist and advise **FRANCHISEE** with respect to the operation of his business, **A CORP**. shall, at its sole discretion, require **FRANCHISEE** to furnish **A CORP**. within 15 days after the expiration of each calendar month with a profit and loss statement of the Franchise for the preceding calendar month. All such financial statements shall be prepared in accordance with the format established by **A CORP**. in the Operations Manual, and shall be certified by **FRANCHISEE** or in the case of a corporate **FRANCHISEE**, by **FRANCHISEE**'s chief executive officer or chief financial officer, as being true and correct and as being prepared in accordance with generally accepted accounting principles consistently applied from applicable period to period. In addition, within 90 days after the end of each calendar year, **FRANCHISEE** shall furnish **A CORP**. with an annual balance sheet, profit and loss statement and statement of changes in financial position, which have been certified as correct by **FRANCHISEE** and which have been prepared by an independent accountant. **A CORP**. agrees to maintain in confidence **FRANCHISEE**'s financial information and shall not disclose **FRANCHISEE**'s identity in connection with **FRANCHISEE**'s financial information.

**13.3**    **ADDITIONAL RECORDING SYSTEMS. FRANCHISEE** agrees to furnish to **A CORP**. all other information pertaining to the franchised business and clientele through the system developed by **A CORP**. or as **A CORP**. may, from time to time, specify in the Operations Manual. **A CORP**. shall be granted full and complete access to all records and information created by such system, including without limitation, by direct telephone, the Internet or other data communications links.

**13.4**    **INSPECTION AND AUDIT. FRANCHISEE** shall keep and preserve for 5 years all business records, including ledgers, credit card statements and other tax returns, bank statements, duplicate deposit slips and other evidence of gross revenues and business transactions for each such year. **A CORP**. shall have the right at any time during regular

business hours to enter **FRANCHISEE**'s premises to inspect, audit and make copies of any books of accounts, bank statements, documents, records, tax returns, papers and files of **FRANCHISEE** relating to gross revenues and business transactions. Upon the request by **A CORP.**, **FRANCHISEE** shall make any such material available for inspection at **FRANCHISEE**'s premises and **FRANCHISEE** shall allow **A CORP.** and its representatives to remove temporarily **FRANCHISEE**'s records solely for copying, review and/or audit purposes. If **A CORP.** determines that there has been an underpayment of fees by **FRANCHISEE**, **FRANCHISEE** shall pay the amount of understatement plus interest at the rate of 18% per annum and the cost of the audit.

## 14. ASSIGNMENT AND RIGHT OF FIRST REFUSAL

**14.1    ASSIGNMENT BY A CORP.**    **A CORP.** may freely transfer or assign its rights and obligations under this Agreement to any person, corporation or other entity. Such transfer or assignment shall be binding upon and inure to the benefit of **A CORP.**, its successors and assigns.

**14.2    ASSIGNMENT BY FRANCHISEE.**    **FRANCHISEE** acknowledges that the rights provided for in this Agreement are personal to **FRANCHISEE** and that this franchise has been granted by **A CORP.** in reliance upon the particular skills, knowledge and business ability of **FRANCHISEE**. **FRANCHISEE** agrees that he shall not sell, assign, transfer, give, mortgage, pledge or otherwise encumber any interest in the assets of the franchise or **FRANCHISEE** collectively referred to herein as a "transfer" except as permitted herein. Any sale, assignment, transfer or encumbrance of this Agreement, of any of the rights granted under this Agreement, or in the ownership of the **FRANCHISE**, which is not in accordance with the terms and conditions provided in this Section 14.2 shall constitute a breach of this Agreement and shall permit **A CORP.** to terminate this Agreement immediately as provided for in Section 15.1 of this Agreement.

**A. PERMITTED TRANSFERS.**    **A CORP.** shall not unreasonably withhold its consent to a Transfer of any interest of **FRANCHISEE** or the franchise, but shall, as a condition precedent to such consent, require that:

**1.** **FRANCHISEE** first offers to sell such interest to **A CORP.** at the same price and on the same terms and conditions as it proposes to sell such interest to a third party. **FRANCHISEE** shall furnish a signed and notarized copy of the third party's offer to purchase. **A CORP.** shall have 30 days after receipt of such bona fide offer in which to exercise its right of first refusal. The failure by **A CORP.** to exercise its option shall in no way be construed to affect **A CORP.**'s decision to approve a proposed transferee. If **A CORP.** fails to exercise its option and the Franchise is not subsequently sold to the proposed transferee for any reason, **A CORP.** shall continue to have, upon the same conditions, a first option to purchase the Franchise upon the terms and conditions of a subsequent offer.    **A CORP.** shall have 30 additional days following **A CORP.**'s rejection of its right of first refusal to review the Transfer, based upon the qualifications set forth in Section 14.2A (4).

**2.** All monetary obligations of **FRANCHISEE** to **A CORP.** as of the proposed date of the Transfer have been or will be paid as of such date.

**3.** By the closing date for said transfer, **FRANCHISEE** shall have executed a general

release under seal, in a form satisfactory to **A CORP.**, of all claims against **A CORP.**, its stockholders, directors, officers, employees and assigns.

4. The transferee, in the reasonable judgment of **A CORP.**, has the financial resources, relevant work experience, character and ability to conduct successfully the business of the Franchise. The transferee shall fully disclose its financial position and obligations and other background information prior to any such Transfer.

5. The transferee shall execute **A CORP.**'s then current Franchise Agreement and related documents to govern the remaining term of the Franchise, including a copy of the Guaranty to this Agreement executed by each shareholder of the transferee, if the transferee is a corporation.

6. **FRANCHISEE** shall pay to **A CORP.** the Transfer Fee as set forth in Section 1.12; unless the transfer is to an immediate family member of **FRANCHISEE** (i.e., spouse, children or parents only); and

7. The transferee shall complete **A CORP.**'s training programs in the manner then required of new franchisees, and shall pay **A CORP.** the then required fee, unless **A CORP.** shall waive **FRANCHISEE**'s participation in the training program as specified in Section 9.1C.

B. **TRANSFER UPON DEATH OR PERMANENT INCAPACITY.** Immediately upon the death or permanent incapacity of **FRANCHISEE** or if **FRANCHISEE** is a corporation, upon its dissolution or upon the death of any person with a substantial or controlling interest in the Franchise, if requested by **FRANCHISEE**'s heirs, **A CORP.** or its agent, at its sole discretion shall be entitled to assume the operation of the Franchise in accordance with Section 17. As soon as possible thereafter, and in any event within a reasonable time, the executor, administrator, trustee or other representative of such person or entity shall transfer such interest to the heirs or beneficiaries or to a third party in accordance with Section 14.2 A above. **A CORP.**'s right to assume the operation of the Franchise shall continue until the Franchise has been transferred to an accepted transferee as provided in Section 14.2. **FRAN-CHISEE** shall reimburse **A CORP.** for **A CORP.**'s reasonable expenses in connection with this subsection, including reasonable attorney's fees, and **A CORP.** shall receive the Transfer Fee (as specified in Section 1.12). However, if a franchise is transferred to a party who is a member of **Franchisee**'s immediate family, (i.e., spouse, children or parents only) who will continue the operation of the franchise under the terms of this Agreement, then no transfer fee shall be required. Permanent incapacity shall mean that **FRANCHISEE** cannot perform his duties under this Agreement for a period of 6 months or longer.

C. **TRANSFER TO FRANCHISEE'S CORPORATION.** If the proposed Transfer is to a corporation at least 75% percent of the stock of which is owned by **FRANCHISEE**, then **A CORP.** shall approve such Transfer provided that the transferee corporation meets the following requirements:

1. The Corporate charter and by-laws shall provide that its activities are limited to the operation of the Franchise. Copies of the charter, by-laws, any other agreements affecting stockholder rights, such as stock restriction agreements, and resolutions authorizing execution of this Agreement shall be delivered to **A CORP.** prior to execution of this Agreement, or when otherwise requested in writing by **A CORP.**

2. The ownership of the stock of such corporation shall be disclosed in writing prior to the execution of this Agreement and the charter and by-laws shall reflect that no stock shall be sold, transferred, pledged or otherwise similarly affected without compliance with this Agreement.

3. Each stock certificate shall bear the following legend: "THE TRANSFER OF THE SHARES REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE TERMS AND CONDITIONS OF A CERTAIN FRANCHISE AGREEMENT BETWEEN THE CORPORATION AND **A CORP.** REFERENCE IS MADE TO SUCH FRANCHISE AGREEMENT AND TO RESTRICTIVE PROVISIONS IN THE CHARTER OF THIS CORPORA TION."

4. The principal stockholders of **FRANCHISEE**, as determined by **A CORP.**, shall personally guarantee the payment and performance of all obligations of **FRANCHISEE** under this Agreement, and shall execute such documents as **A CORP.** may reasonably require to reflect such guaranty; and

5. In addition, **FRANCHISEE** must serve as the principal executive officer of the transferee corporation, all other shareholders of the transferee must meet the requirements of **A CORP**. and the transferee corporation must execute a new Franchise Agreement for the duration of the term, using **A CORP.**'s then current agreement. All acts and the delivery of all documents shall take place before the Transfer. Transfer to **A CORPORATION** shall be approved in a prior writing by **A CORP. FRANCHISEE** shall reimburse **A CORP**. for **A CORP.**'s reasonable expenses in connection with this section, including reasonable attorney's fees.

D. **NON-WAIVER OF CLAIMS. A CORP.**'s consent to a transfer of any interest in the Franchise granted herein shall not constitute a waiver of any claims that it may have against **FRANCHISEE** or against any guarantor of this Agreement.

## 15. DEFAULT AND TERMINATION

15.1 **IMMEDIATE TERMINATION. FRANCHISEE** acknowledges that the occurrence of one or more of the following events would cause harm to the franchise system and thereby lessen its value. **FRANCHISEE** agrees that **A CORP.** shall have the right upon the occurrence of one of the following events to terminate this Agreement immediately upon notice:

A. If **FRANCHISEE** becomes insolvent or surrenders substantial control of the franchised business or a major portion of its assets by virtue of a voluntary or involuntary proceeding in bankruptcy or receivership, or by assignment for the benefit of creditors, or in the event of a similar circumstance or legal process, and such proceeding is not terminated within 30 days;

B. If **FRANCHISEE** attempts to sell, assign, transfer, give, mortgage, pledge or otherwise encumber any interest in, or substantially all of the assets of the Franchise or FRANCHISEE except as permitted by Section 14.2;

C. If **FRANCHISEE** shall violate any provision of the Non-Competition Covenant contained in Section 18. 1;

**D.** **If FRANCHISEE** shall violate any provision of the Non-Disclosure Covenant contained in Section 18.2;

**E.** **If FRANCHISEE** makes any material misrepresentations relating to the acquisition of the Franchised Business;

**F.** **If FRANCHISEE** is convicted of a felony, a crime involving moral turpitude, or any other crime or offense that A CORP. believes is reasonably likely to have an adverse effect upon the Franchise, the Trademarks and their associated goodwill, or the A CORP. System; or

**G.** **If FRANCHISEE** fails, for a period of 30 days after having received notification of noncompliance from A CORP. or any governmental or quasi -governmental agency or authority, to comply with any Federal, State or Local law or regulation applicable to the operation of the Franchised Business.

**15.2**  **TERMINATION WITH NOTICE. FRANCHISEE** acknowledges that the occurrence of one or more of the events specified in this Section 15.2 would cause harm to the franchise system and thereby lessen its value. Therefore, **FRANCHISEE** agrees that **A CORP.**, in addition to all other remedies at law or in equity, may terminate this Agreement if **FRANCHISEE** shall become in default of any provision of this Section 15.2 or any other provision of this Agreement, and if **FRANCHISEE** shall not cure such default within 30 calendar days for nonpayment of monies, or for other defaults after receipt of a written notice to cure from **A CORP.**, or for a longer period if so mandated by the laws of the state in which **FRANCHISEE** operates. In the event **FRANCHISEE** is in default of this Agreement within 12 months after a prior default (even if cured), and **A CORP.** has served **FRANCHISEE** with a Notice to Cure with respect to such prior default, upon notice, **A CORP.** may terminate this Agreement upon the occurrence of such subsequent default. **A CORP.** need not allow **FRANCHISEE** the opportunity to cure such subsequent default. In addition to the foregoing, **A CORP.** may, at its option, exercise its Step-In-Rights (as specified in Section 17) in the event of any default contained in this Section 15.2.

**FRANCHISEE** shall become in default under this Agreement:

**A.**    **If FRANCHISEE** fails, refuses or neglects to pay promptly all monies owing to **A CORP.** on the date due;

**B.**    **If FRANCHISEE** fails, refuses or neglects to pay promptly all monies owing to other Franchisees under any Interterritorial Agreement (as specified in Section 7.2) on the date due;

**C.**    **If FRANCHISEE** fails, refuses or neglects to pay promptly all monies owing to other creditors on the date due;

**D.**    **If FRANCHISEE** fails to submit reports or financial data which **A CORP.** requires under this Agreement, including but not limited to those specified in Section 13;

**E.**    **If FRANCHISEE** fails to obtain and maintain in effect the minimum insurance requirements specified in Section 12.6;

**F.**    Upon the closing of **FRANCHISEE's** operations for a period of 10 or more

consecutive days without the prior written approval of **A CORP.**;

G. If **FRANCHISEE** fails to submit to binding arbitration of disputes as specified in Section 19.7;

H. If **FRANCHISEE** changes any aspect of the **A CORP.** system or offers any service or product which has not been approved in a prior writing by **A CORP.**;

I. IF **FRANCHISEE** fails to diligently, faithfully and in a business like manor, promote, market and conduct the Franchised Business within the Territory as specified in Section 3. 1B; or

J. If **FRANCHISEE** fails to comply with any of the duties imposed by this Agreement, the Operations Manual or other operations memoranda issued by **A CORP.** including, without limitation, the failure to cure an operational problem.

15.3    **CONFORMITY WITH LAW.** Notwithstanding anything to the contrary contained in this Section, in the event any valid, applicable law or regulation of a competent governmental authority having jurisdiction over this Franchise and the parties shall limit A CORP.'s rights of termination or shall require longer notice periods than those set forth above, this Agreement shall be deemed amended to conform to the minimum notice periods required by such laws and regulations. **A CORP.** shall not, however, be precluded from contesting the validity, enforceability or application of such laws or regulations in any action, hearing or dispute relating to this Agreement or its termination.

A. **FRANCHISEE** Shall be solely responsible for the conduct of its business and for compliance with all the laws, statutes, ordinances, orders or codes of any public or governmental authority pertaining to **FRANCHISEE** and its business operated pursuant hereto and for the payment of all taxes, permits, licenses and registration fees and other charges or assessments arising out of the establishment and operation of **FRANCHISEE'S** business.

15.4    **CROSS DEFAULT. If FRANCHISEE** shall be in default of any other agreement between **A CORP.** or its affiliated companies including, without limitation, any Promissory Note, then **FRANCHISEE** shall be deemed in default of this Agreement.

15.5    **FRANCHISEE TERMINATION OPTION. FRANCHISEE** shall have the option to terminate this Agreement, only during the initial five (5) year term, subject to adherence to the following terms and conditions:

A. **FRANCHISEE** shall notify **A CORP.** in writing of his intent to terminate the Agreement no later than 90 days prior to the closing date for placement of advertisements in the yellow page book or books distributed in **FRANCHISEE**'s Territory. If **FRANCHISEE** fails to notify **A CORP.** on or before such 90 day period commences, then **A CORP.** shall exercise its right pursuant to the Power of Attorney, Exhibit B, to retain all of **FRANCHISEE**'s operating telephone numbers.

B. **FRANCHISEE** shall pay in full all outstanding monies due to **A CORP.**, and shall as well pay a one-time Franchisee Termination Fee as specified in Section 1. 14 herein.

C. **FRANCHISEE** shall de-identify all aspects of **FRANCHISEE**'s business operation,

including without limitation all forms of advertisements, all vehicle displays, and all invoices, business cards and forms, and shall choose a trade name or trade names which shall not be confusingly similar to **A CORP**'s Trademarks or which might give the general public the impression that **FRANCHISEE** is continuing to operate under the **A CORP**. System. **FRANCHISEE** shall further comply with the terms of Section 16 below.

**D.**     Provided **FRANCHISEE** performs all of the foregoing obligations, **A CORP**. shall agree to waive its rights to enforce the non-competition covenant contained in Section 18.1 and its rights to enforce the Power of Attorney. If **FRANCHISEE** however, fails to perform any of the foregoing obligations or if **FRANCHISEE** attempts to utilize any aspect of **A CORP**.'s Trademarks or System, then **A CORP**. shall retain all rights of enforcement under Section 18.1.

## 16.    RIGHTS AND DUTIES OF PARTIES UPON EXPIRATION OR TERMINATION

Upon termination or expiration of this Agreement, **FRANCHISEE** shall within 30 calendar days:
**A.**     Pay all Continuing Royalty Fees, Advertising Contributions and all other charges or debts owed to **A CORP**., including the balance due on financing or other extension of credit granted or given by **A CORP** to **FRANCHISEE**.

**B.**     Cease to hold himself or herself out as an **A CORP**. System franchise, cease the use of the Trademarks, logos, designs, materials, methods, promotional materials whether or not furnished by **A CORP**. and all other advertising, including without limitation, all forms of telephone directory advertising, and remove all signs, and Trademarks, in whatever form, from the location of the **A CORP**. office licensed by this Agreement and from all vehicles. **FRANCHISEE** shall contact the internet service provider or website, which provide internet advertisement services, and request the change or deletion of the Trademarks, logos, and designs from the internet advertisement, listings, or domains and, within 60 days, work to ensure that the change or deletion is completed.

**C.**     Return to **A CORP**. all manuals and printed materials belonging to **A CORP.** or bearing the Trademarks.

**D.**     Except with respect to termination under Section 15.5, at the option of **A CORP.**, **FRANCHISEE** shall:

**1.**     Remove all equipment, furnishings and printed materials from the office premises; or
**2.**     Sell such equipment, furnishings and printed materials to **A CORP**. at their then current fair market value, as determined by **A CORP**. In no event shall **A CORP**. be liable for payment to **FRANCHISEE** for intangibles including, without limitation, goodwill;
**3.**     Assign to **A CORP**. the lease for the franchised premises; and
**4.**     Execute such documents as **A CORP**. may reasonably require to effectuate termination of the Franchise and **FRANCHISEE**'s rights to use the Trademarks and the **A CORP**. System including, without limitation, release documents.

**A CORP**. retains the right to enforce the Power of Attorney executed in conjunction with this agreement.

## 17.    STEP-IN-RIGHTS

17.1 **CAUSE FOR STEP-IN.** **A CORP.**, at its sole discretion, may exercise the following Step-In Rights in order to prevent an interruption of the Franchised Business which would cause harm to the franchise system and thereby lessen its value. In the event of **FRANCHISEE**'s default (as specified in Section 15 herein) or in the event of the death or permanent incapacity of **FRANCHISEE** (as specified in Section 14.2 B), **FRANCHISEE** authorizes **A CORP.** to operate his franchise for as long as **A CORP.** shall deem necessary and practical or upon transfer to an approved franchisee under Section 14.2. Such Step-In Rights shall be exercised without waiver of any other rights or remedies which **A CORP.** may have under this Agreement.

17.2 **DUTIES OF PARTIES.** **A CORP.** shall keep in a separate account all monies generated by the operation of **FRANCHISEE**'s business by **A CORP.**'s representatives. **A CORP.** shall deduct all expenses of the business, including reasonable compensation and expenses for **A CORP.**'s representatives from this separate account. **FRANCHISEE** agrees to indemnify **A CORP.** as specified in Section 19.9.

## 18.    NON-COMPETITION AND NON-DISCLOSURE COVENANTS

18.1 **NON-COMPETITION.** **FRANCHISEE** agrees that from the date hereof until 3 years following the termination of the Franchise for whatever reason and expiration, neither **FRANCHISEE** nor any of his family members or its officers, directors, other key personnel, employees or stockholders, if applicable, shall directly or indirectly engage in, hold any interest in, or be involved in any way with any of the services comprising the **A CORP.** System. Such obligation shall apply within the Territory, within 100 miles of the Territory or within 100 miles of any territory covered by another **FRANCHISEE** of **A CORP.** or operated by **A CORP.**'s affiliates. **FRANCHISEE** further agrees that from the date hereof until 3 years following the termination of the Franchise for whatever reason and expiration, **FRANCHISEE** and the persons covered by this section shall not attempt to solicit for employment any person who is, at the time of such solicitation, employed by **A CORP.** or any other franchisee of **A CORP.**, nor induce any such person to leave his or her employment. **FRANCHISEE** agrees that as a condition of his affiliation with **A CORP.**, its key personnel and stockholders, if applicable, shall execute covenants not to compete embodying these terms on forms provided by **A CORP**. **FRANCHISEE** acknowledges that such prohibitions are necessary to protect **A CORP.**'s trade secrets and to otherwise insure the integrity of the **A CORP**. System and the rights of **A CORP.**'s other franchisees. The amounts of time and distance set forth above may be deemed to be divisible into units of one month and one mile and may be reduced should a court find them to be unreasonable. **A CORP.**, in addition to such other rights it may have, shall have the right to injunctive relief to enforce its rights pursuant to this provision. The violation of this provision during the term of the Agreement shall result in the automatic termination of the franchise as specified in Section 15.1.

18.2 **NON-DISCLOSURE.** **FRANCHISEE** acknowledges that disclosure of any aspect of the System or duplication or disclosure of this Agreement, or the Operations Manual could substantially harm **A CORP., FRANCHISEE** and other franchisees of **A CORP. FRANCHISEE** agrees that at no time during or after the term of this Agreement or early termination for whatever reason will he or she disclose, either orally or in writing or by any other medium, or duplicate or in any way make available the contents of the Operations Manual, this Agreement, any other documents, videotapes, materials, or any trade secrets, formulas or other aspects of the System to any person, corporation or other entity other than

**FRANCHISEE** attorneys, accountants or similar parties. Such persons may have access to such materials only to the extent necessary for the transaction of business by **FRANCHISEE**. No such person shall be permitted to retain any software, materials or copies of or notes concerning any such materials. All of the foregoing shall be returned to **A CORP**. immediately upon termination or expiration of this Agreement. The prohibition of this section applies equally to all stockholders, directors, officers, and employees of **FRANCHISEE**. **A CORP**. shall have the right to injunctive relief to enforce the provisions of this Section. The violation of this provision during the term of the Agreement shall result in the automatic termination of the Franchise, as specified in Section 15. 1.

## 19. GENERAL CONDITIONS AND PROVISIONS

### 19.1 TITLES FOR CONVENIENCE. Section and paragraph titles used in this Agreement are for convenience only and are not deemed a part of the text.

### 19.2 ENTIRE AGREEMENT. This Agreement, including appendices and attachments, constitutes the entire agreement of the parties (and into which all prior negotiations, commitments, representations and undertakings of the parties with respect to the subject matter are merged) and except as otherwise provided, there are no other oral or written understandings or agreements between the parties relating to the Franchise. Nevertheless, nothing in this Agreement or in any related agreement is intended to disclaim the representation that we have made in the franchise disclosure document.

### 19.3 AMENDMENT IN WRITING. No amendment or other modification of this Agreement shall be valid or binding on either party, unless reduced to writing and executed by the parties.

### 19.4 RELATIONSHIP

A. **FRANCHISEE** is an independent contractor and is not the agent, joint venturer, partner or employee of **A CORP**. and, except as expressly provided in this Agreement, **A CORP**. shall not be obligated by any agreements, representations or warranties made by **FRANCHISEE** to any person, nor with respect to any other action of **FRANCHISEE**, nor shall **A CORP**. be obligated for damages or monetary obligations of any sort to any person whether caused by **FRANCHISEE's** action, failure to act, negligence, or willful conduct.

B. Except as expressly set forth herein, **A CORP**. does not reserve control over nor take responsibility for the conduct or actions of any of **FRANCHISEE's** owners, directors, or employees, nor shall      **A CORP**. have any control over the employment, discharge, compensation or working conditions of any such owner, director or employee of **FRANCHISEE**.

C. **FRANCHISEE** shall identify himself in all aspects of his business operation, including on all forms and in all advertisements, as being: "Independently Owned and Operated".

### 19.5 NO WAIVER. No waiver by **A CORP**. of any breach or series of breaches or defaults in performance by **FRANCHISEE**, and no failure, refusal or neglect of **A CORP**. to exercise any right, power or option given to it or to insist upon strict compliance with or performance of **FRANCHISEE's** obligations, under this Agreement or the Operations Manual, shall constitute a waiver of any provision of this Agreement or the Operations Manual with respect to any subsequent breach or a waiver by **A CORP**. of its right at any time thereafter to

require exact and strict compliance with the provisions of this Agreement.

**19.6**     **GOVERNING LAW**. This Agreement shall be governed and construed under and in accordance with the laws of the Commonwealth of Massachusetts. **A CORP** and **FRANCHISEE** agree that any action arising out of or relating to this agreement will be brought by the parties only in a Massachusetts state court of Middlesex County, Massachusetts or the United States District Court for the District of Massachusetts in Boston, Massachusetts. **A CORP** and **FRANCHISEE** hereby consent to the jurisdiction of such Courts and further agree to waive any rights or objections to the jurisdiction or venue of any such actions when filed in such courts. If any part or provision of this Agreement is held or declared invalid by a court of competent jurisdiction, such holding or declaration shall affect only that particular part or provision of this Agreement and all other parts or provisions of this Agreement shall continue in full force and effect.

**19.7**     **MEDIATION AND ARBITRATION. A CORP**. and **FRANCHISEE** agree as a condition to this Agreement to engage in mediation and arbitration prior to the commencement of any court action, except as set forth in Section 19.7 H. **FRANCHISEE**'s failure to submit to mediation and arbitration, shall be deemed a default under Section 15.2. If **A CORP**. must engage an attorney to enforce its rights under this Agreement, **FRANCHISEE** shall reimburse **A CORP**. for all of its reasonable attorney's fees, court costs and expenses incurred in connection with such legal action.

   **A.** Before the commencement of any arbitration, **FRANCHISEE** and **FRANCHISOR** shall submit to the following mediation process:

     **1.**    **FRANCHISEE** shall promptly submit in writing the nature of his grievance with A CORP. along with any reasonable suggestions for the dispute's possible resolution; and

     **2.** Within 30 days, the **FRANCHISEE** shall attend a mediation meeting with **A CORP**. in Boston, Massachusetts to discuss in detail the dispute and to work towards its possible resolution. **A CORP**. shall select the mediator. **FRANCHISEE** and **A CORP**. shall share equally in the cost of the mediation session.

     If the parties are unable to reach an amicable solution, then the dispute shall be submitted to arbitration as described below:

   **B.** Prior to any arbitration proceeding taking place, **A CORP.** and **FRANCHISEE** shall, have the arbitrator conduct, in a separate proceeding prior to the actual arbitration, a preliminary hearing, at which hearing testimony and other evidence may be presented and briefs may be submitted, including without limitation a brief setting forth the then applicable statutory or common law methods of measuring damages in respect to the controversy or claim being arbitrated. These hearings shall be held in Boston, Massachusetts.

   **C.** Except as otherwise set forth in this Agreement, any controversy or claim arising out of or relating to this Agreement, or any breach, including without limitation, any claim that this Agreement or any part, is invalid, illegal or otherwise voidable or void, shall be submitted to arbitration before and in accordance with the arbitration rules of the American Arbitration Association in accordance with its commercial arbitration rules, or any other mutually agreeable arbitration association. **A CORP.** and **FRANCHISEE** agree that arbitration shall be conducted on an individual and not a class-wide basis.

**D**. If, however, a court of competent jurisdiction determines that any such provisions of this Agreement are unlawful-in any way, such court may modify or interpret such provisions to the minimum extent necessary to have them comply with the law. Notwithstanding any provision of this Agreement by which this Agreement shall be governed by and construed under Massachusetts law, all issues relating to arbitration or the enforcement of this Agreement to arbitrate contained herein shall be governed by the United States Arbitration Act, 9 U.S.C. § I et seq., and the federal common law of arbitration.

**E**. Judgment upon an arbitration award may be entered in any court having competent jurisdiction and shall be binding, final and non-appealable. Except as provided for in Sections 19.9 and 19. 10,    **A CORP**. and **FRANCHISEE** (and their respective owners and guarantors, if applicable) hereby waive to the fullest extent permitted by law, any right to or claim for any punitive or exemplary damages against the other and agree that in the event of a dispute between them each shall be limited to the recovery of any actual damage sustained by it.

**F**. This arbitration provision shall be deemed to be self-executing and shall remain in full force and effect after expiration or termination of this Agreement. In the event either party fails to appear at any properly noticed arbitration proceeding, an award may be entered against such party by default or otherwise notwithstanding said failure to appear. The arbitration proceedings shall take place in Boston, Massachusetts unless otherwise agreed by **A CORP.** and **FRANCHISEE.**

**G**. **A CORP.** and **FRANCHISEE** agree that no action (whether for arbitration, damages, injunctive, equitable or other relief, including but not limited to rescission) will be maintained by any party to enforce any liability or obligation of the other party, whether arising from this agreement or otherwise, unless brought before the expiration of the earlier of 1 year after the date of discovery of the facts resulting in such alleged liability or obligation or 2 years after the date of the first act or omission giving rise to such alleged liability or obligation, except that where state or federal law mandates or makes possible by notice or otherwise a shorter period, such shorter period shall apply.

**H**. The obligation to arbitrate or mediate shall not be binding upon either party with respect to claims relating to **A CORP**.'s trademarks, service marks, patents or copyrights; request for temporary restraining orders, preliminary injunctions or other procedures in a court of competent jurisdiction to obtain interim relief when deemed necessary by such court to preserve the status quo or prevent irreparable injury pending resolution by arbitration of the actual dispute between the parties.

**19.8    NOTICES**.
All written notices to **A CORP**. permitted or required to be delivered by the provisions of this Agreement or the Operations Manual shall be deemed so delivered 3 days after being placed in the United States Mail, by Certified Mail, Return Receipt Requested, or by receipted overnight carrier to **A CORP**., 268 Rangeway Road, P.O. Box 290, N Billerica, Massachusetts 01862, Attn. President or to such other address or addresses as **A CORP**. shall from time to time designate in the Operations Manual or in writing to **FRANCHISEE**  at the location described in Section 1.2 above, or to such other address as **FRANCHISEE** may from time to time designate in writing to **A CORP**.

**19.9    INDEMNIFICATION. FRANCHISEE** agrees to hold **A CORP**. harmless and indemnify **A CORP**. and its officers, agents and employees of and from all suits, actions, claims and

other proceedings brought by any and all persons or entities as a result of services, representations, conduct or work performed by **FRANCHISEE**, its agents, employees, subcontractors or assigns, or in the event **A CORP**. exercises the Step-In-Rights specified in Section 17. **FRANCHISEE** agrees to pay any and all expenses or fees, including reasonable attorney's fees, incurred by **A CORP**., its affiliates, subsidiaries or agents, resulting from any and all claims brought by or against **FRANCHISEE**, its officers, directors, employees or stockholders.

**FRANCHISEE** shall indemnify and hold **A CORP**. harmless of and from any claim made by any telephone company, telephone directory publisher and other related persons or entities with which **FRANCHISEE** conducts business, including all costs, damages, attorney's fees, expenses and liabilities which may be incurred or sustained in connection with or as a result of any action taken in reliance of Exhibit B, Power of Attorney.

The above indemnification provisions shall not be construed, with regard to a particular claim, to apply to any claim where its operation would be against public policy. It is the intent of the provisions above to permit the maximum indemnification of **A CORP**. by **FRANCHISEE** as permitted by law.

19.10    **LIMITATION OF LIABILITY OF A CORP.**  If **A CORP**. shall be found liable to **FRANCHISEE** for any claim based upon this Agreement, **A CORP**.'s liability shall be limited to the amount of the initial Franchise Fee (specified in Section 1.7 herein) that has actually been paid by **FRANCHISEE** at the time of judgment.

In no event will **A CORP**., any affiliate, agent, or employee of **A CORP**. be liable for any other damages including, but not limited to, loss of business, revenues or profits. **FRANCHISEE** agrees that this limitation of liability will apply to any claim **FRANCHISEE** shall have against **A  CORP** limited to, claims based on contract violations, torts (such as negligence) or strict liability.

19.11    **LATE PAYMENT FEES**. If **FRANCHISEE** fails to pay **A CORP.** all or any portion of the Continuing Royalty, or Marketing Fund Contribution or any other obligation due to **A 1CORP.**, promptly when due, **FRANCHISEE** shall pay to **A CORP.** a late payment fee equal to 18% per annum of such delinquent payments. Notwithstanding the foregoing, if the amount of the late payment fee shall be greater than any such charge permitted by applicable law, such charge shall be reduced to an amount equal to the maximum lawful charge, it being the intention of the parties that such late charge shall in no event be greater than that permitted by law.

19.12    **SURVIVAL OF COVENANTS.**  The covenants contained in this Agreement which, by their terms, require performance by the parties after the expiration or termination of  this Agreement, shall be enforceable notwithstanding the expiration or other termination of this Agreement for any reason whatsoever.

20.    **CAVEAT**

The success of the business venture contemplated to be undertaken by **FRANCHISEE** by virtue of this Agreement is speculative and depends to a large extent upon the ability of **FRANCHISEE** as an independent business person as well as other factors.  **A CORP.** does not make any representation or warranty as to the potential success of the business venture contemplated by this Agreement.

Rooter Man Franchise Agreement.2019                24

**FRANCHISEE** acknowledges that he or she has entered into this Agreement after making an independent investigation of **A CORP.**'s operations and not upon a representation by **A CORP.** as to profits which **FRANCHISEE** might expect to realize. **FRANCHISEE** acknowledges that prior to the execution of this Agreement, **FRANCHISEE** has had the opportunity to contact existing franchisees of **A CORP.**

## 21. RELEASE

**FRANCHISEE**, his heirs and assigns, hereby remises, releases and forever discharges **A CORP.**, its affiliated companies, their principals, officers, directors, employees and agents of and from all debts, demands, actions, causes of action, suits, accounts, covenants, contracts, warranties, agreements, damages and any and all claims, demands and liabilities whatsoever of every name and nature, both in law and in equity, which **FRANCHISEE**, his heirs and assigns now have or ever had against **A CORP.**, its affiliated companies, their principals, officers, directors, employees and agents, from the beginning of time until this day.

*[The remainder of the page intentionally left blank]*
*[Signature page follows on the next page]*

**IN WITNESS WHEREOF** the parties intending to be bound legally, have fully executed, sealed and delivered this Agreement as of the day and year first above written.

**A CORP., FRANCHISOR**

Witness    By:    _____
Officer

01/12/21
Date

Witness    By:    **Quality Air Care Corporation, FRANCHISEE**

Klodian Belegu

Officer – Klodian Belegu

01/11/2021

Date

## APPENDIX 1

The Licensed Territory defined below is granted to **FRANCHISEE** on the condition that **FRANCHISEE** performs the obligations set forth in the Agreement to which this Appendix is attached:

| STATE | COUNTY | CITY/TOWN | ZIP CODES | POPULATION |
|-------|--------|-----------|-----------|------------|
| NJ | Monmouth | Red Bank | 07701 | 23,813 |
| NJ | Monmouth | Shrewsbury | 07702 | 3,809 |
| NJ | Monmouth | Fort Monmouth | 07703 | 690 |
| NJ | Monmouth | Fair Haven | 07704 | 6,133 |
| NJ | Monmouth | Allenhurst | 07711 | 1,533 |
| NJ | Monmouth | Asbury Park | 07712 | 39,158 |
| NJ | Monmouth | Deal | 07723 | 1,020 |
| NJ | Monmouth | Eatontown | 07724 | 21,710 |
| NJ | Monmouth | Englishtown | 07726 | 42,508 |
| NJ | Monmouth | Freehold | 07728 | 56,527 |
| NJ | Monmouth | Lincroft | 07738 | 6,095 |
| NJ | Monmouth | Little Silver | 07739 | 5,938 |
| NJ | Monmouth | Long Branch | 07740 | 31,038 |
| NJ | Monmouth | Monmouth Beach | 07750 | 3,279 |
| NJ | Monmouth | Oakhurst | 07755 | 6,363 |
| NJ | Monmouth | Oceanport | 07757 | 5,356 |
| NJ | Monmouth | West Long Branch | 07764 | 8,097 |
| NJ | Monmouth | Belmar | 07715 | 0 |
| NJ | Monmouth | Avon By the Sea | 07717 | 1,901 |
| NJ | Monmouth | Belmar | 07719 | 21,538 |
| NJ | Monmouth | Bradley Beach | 07720 | 4,298 |
| NJ | Monmouth | Colts Neck | 07722 | 10,209 |
| NJ | Monmouth | Farmingdale | 07727 | 7,050 |
| NJ | Monmouth | Howell | 07731 | 38,304 |
| NJ | Monmouth | Neptune | 07753 | 37,554 |
| NJ | Monmouth | Neptune | 07754 | 0 |
| NJ | Monmouth | Ocean Grove | 07756 | 3,342 |
| NJ | Monmouth | Spring Lake | 07762 | 8,403 |
| NJ | Monmouth | Allentown | 08501 | 6,582 |
| NJ | Monmouth | Millstone Township | 08510 | 5,231 |
| NJ | Monmouth | Cream Ridge | 08514 | 4,477 |
| NJ | Monmouth | Imlaystown | 08526 | 0 |
| NJ | Monmouth | Millstone Township | 08535 | 5,385 |
| NJ | Monmouth | Roosevelt | 08555 | 877 |
| NJ | Monmouth | Allenwood | 08720 | 843 |
| NJ | Monmouth | Brielle | 08730 | 4,774 |
| NJ | Monmouth | Manasquan | 08736 | 12,578 |
| NJ | Monmouth | Sea Grit | 08750 | 3,528 |
| NJ | Ocean | Jackson | 08527 | 54,392 |
| NJ | Ocean | New Egypt | 08533 | 6,945 |

Total Unit(s)[1] Population: 501,008

Initials: _____
**A CORP**

Date: 01/12/21

Initials: _____
**FRANCHISEE**

Date: 01/11/2021

Initials: _____
**FRANCHISEE**

Date: _____

---

[1] One unit is equal to 125,000 populations.

**EXHIBIT A**

**GUARANTY OF PERFORMANCE**

The undersigned, who each own 5% or more of **FRANCHISEE**, jointly and severally guaranty the performance of **FRANCHISEE** pursuant to this Franchise Agreement.

By: _____

Date: _____

By: _____

Date: _____

To Be Executed By Principal Stockholder(s) If Franchisee Is a Corporation.

The undersigned, principal stockholder(s) of the above Franchisee, for value received, hereby absolutely and unconditionally guarantee(s) full performance and payment when due of all of Franchisee's obligations to A CORP pursuant to the above Agreement.

**Quality Air Care Corporation, FRANCHISEE**

By: *Klodian Belegu*
Klodian Belegu

Date: 01/11/2021

By: _____

Date: _____

**EXHIBIT B**

**POWER OF ATTORNEY**

I, **Klodian Belegu**, doing business as **RooterMan** or any successor entity, in the City of **Toms River,** in the County of **Ocean**, and in the State of **New Jersey,** hereby appoint Donald MacDonald of **A CORP.,** 268 Rangeway Road, P.O. Box 290, North Billerica, MA 01862, or his designated successor, as my Attorney-In-Fact to act in my capacity to do any and all of the following:

1.     To act in my place and stead with any telephone service company and any telephone listing and advertising directory company in order to transfer to **A CORP.** or its designee, all right, title and interest I may have in such telephone numbers or telephone directory listings and advertising relating to any franchise granted to me by **A CORP.** or to direct the telephone service company to disconnect such telephone numbers.

2.     To perform all other acts necessary to be done in regard to such powers.

3.     To appoint a substitute attorney to perform any of the acts that my attorney by this instrument is authorized to perform, with the right to revoke such appointment of substituted attorney.

The rights, powers and authority of my Attorney-In-Fact herein granted shall commence and be in full force and effect on **September 10, 2020,** and, in consideration of the franchise granted to me, shall be irrevocable.

This Power of Attorney shall include a full indemnification of **A CORP.** by the signatory below of and from any claim made by any telephone company, telephone directory publisher and other related persons or entities with which **FRANCHISEE** conducts business, including all costs, damages, attorney's fees, expenses or liabilities which may be incurred or sustained in connection with or as a result of any action taken in reliance on this Exhibit B, Power of Attorney.

**A CORP.** shall be entitled to obtain equitable relief to enforce this Power of Attorney. The signatory below agrees to pay all attorneys' fees and costs incurred in connection with enforcement of this Power of Attorney.

By:     _Klodian Belegu_
        Klodian Belegu
Date:   01/11/2021

## EXHIBIT B

## POWER OF ATTORNEY

I, **Klodian Belegu**, doing business as **RooterMan** or any successor entity, in the City of **Toms River,** in the County of **Ocean**, and in the State of **New Jersey,** hereby appoint Donald MacDonald of **A CORP.**, 268 Rangeway Road, P.O. Box 290, North Billerica, MA 01862, or his designated successor, as my Attorney-In-Fact to act in my capacity to do any and all of the following:

1. To act in my place and stead with any telephone service company and any telephone listing and advertising directory company in order to transfer to **A CORP.** or its designee, all right, title and interest I may have in such telephone numbers or telephone directory listings and advertising relating to any franchise granted to me by **A CORP.** or to direct the telephone service company to disconnect such telephone numbers.

2. To perform all other acts necessary to be done in regard to such powers.

3. To appoint a substitute attorney to perform any of the acts that my attorney by this instrument is authorized to perform, with the right to revoke such appointment of substituted attorney.

   The rights, powers and authority of my Attorney-In-Fact herein granted shall commence and be in full force and effect on **September 10, 2020,** and, in consideration of the franchise granted to me, shall be irrevocable.

This Power of Attorney shall include a full indemnification of **A CORP.** by the signatory below of and from any claim made by any telephone company, telephone directory publisher and other related persons or entities with which **FRANCHISEE** conducts business, including all costs, damages, attorney's fees, expenses or liabilities which may be incurred or sustained in connection with or as a result of any action taken in reliance on this Exhibit B, Power of Attorney.

**A CORP.** shall be entitled to obtain equitable relief to enforce this Power of Attorney. The signatory below agrees to pay all attorneys' fees and costs incurred in connection with enforcement of this Power of Attorney.

By: _____

Klodian Belegu

Date: _____

## EXHIBIT C

## PROMISSORY NOTE

$_____                                                    _____, 2020

For value received and in consideration of a Franchise Agreement signed between the parties dated

_____, **2020**, **FRANCHISEE** promises to pay to the order of **A CORP.** ("Holder") at 268

Rangeway Road, North Billerica, MA  01862  the sum of _____ ($_____) Dollars plus interest

accruing at the ANNUAL PERCENTAGE RATE (APR) of twelve percent (12%).

The payments shall be made as follows:          (Please refer to loan analysis at Exhibit E.)

|  |  |
|---|---|
| Principal Amount Financed: | $ |
| Annual Interest: | 12% |
| Duration of Loan: | 5 years |
| Start Date of Loan: | |
| Monthly Payment: | $ |
| Total Number of Payments: | 60 |
| Principal Amount: | $ |
| Finance Charges: | |
| Total Cost: | $ |

In no event shall any monies continue to be owing after _____, **2025**.  Any unpaid balance may be pre-paid at any time without penalty.

If the note is not paid in full each month when due, if a proceeding in bankruptcy, receivership or insolvency shall be instituted by or against the undersigned, or if the underlying Franchise Agreement for which the parties have entered into this Promissory Note is terminated for any reason, then the entire amount of this note shall become due and payable immediately, and the payment and acceptance of any sum on account of this note shall not be considered a waiver of such right of election.

If the note shall not be paid when due and shall be placed by the Holder in the hands of any agent or attorney for collection through legal proceedings or otherwise, the undersigned will pay to the Holder the costs and reasonable expenses of collection, including without limitation, reasonable attorney's fees.

The undersigned hereby acknowledges receipt of a filled-in copy of this note.

_____          _____

**A CORP.**                                          **FRANCHISEE**

_____          _____

Witness                                          Witness

**EXHIBIT B3**

**Rooter Man**
**Table of Content of the Operational Manual**

## EXHIBIT B.3
## Table of Contents for the Operations Manual[1]

| CHAPTER | PAGE NUMBER |
|---|---|
| TIME TABLE CHECK LIST | 2 |
| START UP | 2 |
| 2.1 Post Office | 3 |
| 2.2 Licenses | 3 |
| 2.3 Accountant | 3 |
| 2.4 Phone Numbers | 3 |
| 2.5 Yellow Pages | 4 |
| 2.6 Banking | 4 |
| 2.7 Insurance | 4 |
| 2.8 Prices | 5 |
| 2.9 Answering Service | 5 |
| PHONES | 5 |
| YELLOW PAGES | 6 |
| TRADEMARKS AND LOGOS | 6 |
| AREA OF OPERATIONS | 7 |
| COOPERATION WITH OTHER DEALERS | 7 |
| MANAGEMENT | 7 |
| MARKETING | 10 |
| 9.1 Service Description | 12 |
| 9.2 Marketing Environment | 13 |
| 9.3 The Market | 14 |
| 9.4 Strategy | 14 |
| 9.5 Economic Considerations | 15 |
| 9.6 Implementation | 15 |
| ADVERTISING | 16 |
| 10.1 Newspapers | 17 |
| 10.2 Television | 17 |
| 10.3 Radio | 17 |
| 10.4 Direct Mail | 17 |
| 10.5 Personal Contact | 18 |
| 10.6 Business Associations | 18 |
| 10.7 Company Logos | 18 |
| CUSTOMER RELATIONS | 19 |
| 11.1 What is a Customer? | 19 |
| 11.2 How to Acquire Customers | 20 |
| 11.3 Customer Satisfaction | 22 |
| 11.4 Customer Bill of Rights | 27 |
| EMPLOYEE RELATIONS | 28 |
| QUALITY SERVICE | 29 |
| ATTITUDE | 35 |
| TRAINING | 39 |
| PRODUCTIVITY | 45 |
| MOTIVATION | 48 |
| MACHINES AND EQUIPMENT | 54 |
| FRANCHISE INSPECTION | 55 |
| GOVERNMENT REGULATIONS | 55 |
| ROYALTIES | 55 |
| RECORD KEEPING | 55 |
| CONFLICT OF INTEREST | 55 |

---

[1] Operations Manual to be received upon joining the franchise.

**EXHIBIT C**

**List of State Agencies / Administrators**

**EXHIBIT C**
**STATE AGENCIES/ AGENTS**
**FOR SERVICE OF PROCESS**

| | |
|---|---|
| **California** Department of Corporations<br>71 Stevenson Street, Suite 2100<br>San Francisco, CA 94105-2980<br>1-(866) ask-corp<br>(415) 972-8559 | **Florida Dept. of Agricultural and Consumer Services**<br>Division of Consumer Services<br>2005 Apalachee Parkway<br>Rhodes Building<br>Tallahassee, FL 32399 |
| Commissioner of Securities of the State of **Hawaii**<br>**Department** of Commerce and Consumer Affairs<br>Business Registration Division<br>Securities Compliance Branch<br>335 Merchant St., Rm. 203<br>Honolulu, HI **96813** | **Illinois** Office of Attorney General<br>Franchise Examiner - Franchise Bureau<br>500 S. Second Street<br>Springfield, IL 62706<br>Effective: April 30, 1998 |
| **Indiana** Secretary of State<br>Securities Division - Room E-111<br>302 West Washington Street<br>Indianapolis, IN 46204<br>Effective: March 31, 1995,<br>as amended August 30, 1998 | **Commonwealth of Kentucky**<br>Consumer Protection Division<br>1024 Capital Center Drive<br>Suite 200<br>Frankfort, KY 40601 |
| **Maryland**<br>Service of Process:<br>Securities Commissioner<br>Division of Securities<br>200 Saint Paul Place<br>Baltimore, MD 21202-2020<br><br>Monitoring Agency:<br>Office of the Attorney General<br>Securities Division<br>200 St. Paul Place<br>Baltimore, MD 21202 | **Michigan** Attorney General<br>Consumer Protection Division<br>Franchise Division<br>670 Law Building<br>Lansing, MI 48913<br>Effective: July 10, 1998 |
| **Minnesota** Dept. of Commerce<br>Registration Division – Franchise Division<br>133 East Seventh Street<br>St. Paul, MN 55101<br>Effective: April 14, 1998 | **North Dakota**<br>Franchise Examiner<br>State of North Dakota<br>Securities Department<br>600 East Boulevard Avenue<br>State Capitol – 5th Floor<br>Bismarck, ND 58505-0510 |

| | |
|---|---|
| **Nebraska**<br>Department of Banking and Finance<br>Bureau of Securities<br>The Atrium<br>1200 "N" Street, Suite 311<br>P.O. Box 95006<br>Lincoln, NE 68508-5006 | **New York**<br>Service of Process:<br>Secretary of State of New York<br>99 Washington Ave.<br>Albany, NY 10005<br><br>Monitoring Agency:<br>NYS Department of Law<br>Investor Protection Bureau<br>28 Liberty St., 21st Fl.<br>New York, NY 10005<br>(212) 416-8285 |
| **Oregon** Corporation Division<br>Commerce Building<br>Salem, OR 97310<br>Effective: March 31, 1995,<br>as amended August 30, 1998 | **Rhode Island** Dept. of Business Regulation<br>Securities Division – Franchise Office<br>233 Richmond Street, Suite 232<br>Providence, RI 02903-4232 |
| **South Dakota**<br>Division of Insurance<br>Securities Regulation<br>124 S. Euclid Suite 104<br>Pierre, SD 57501<br>(605) 773-3563 | **Texas** Secretary of State<br>Corporations Section<br>P.O. Box 13697<br>Austin, TX 78711<br>Effective: September 1, 1997 |
| **Utah** Secretary of State<br>Department of Commerce<br>Division of Consumer Protection<br>Heber M. Wells Building<br>160 E. 300 South, SM Box 146704<br>Salt Lake City, UT 84111-6704<br>Effective: April 30, 2001 | **Virginia**<br><br>State Agency:<br>State Corporation Commission<br>Division of Securities and Retail Franchising<br>1300 East Main Street, 9th Floor<br>Richmond, VA 23219<br><br>Agent for Service of Process:<br>Clerk of the State Corporation Commission<br>1300 East Main Street, 1st Floor<br>Richmond, VA 23219 |
| **Washington** Dept. of Financial Institutions<br>Securities Administrator<br>150 Israel Rd. SW<br>Tumwater, WA 98501 | **Wisconsin** Division of Securities<br>Department of Financial Institutions<br>4th Floor, P. O. Box 1768<br>Madison, WI 53701-1768<br>Effective: March 31, 1995,<br>as amended August 30, 1998 |

**EXHIBIT D**

Rooter Man Franchisees List

## EXHIBIT D

### Rooter Man Franchisees List as of December 31, 2019

| STATE | FRANCHISEE | NUMBER OF UNITS OWNED |
|---|---|---|
| **ALABAMA** | Shaun Gonzales<br>1110 Putnam Drive NW<br>Huntsville, AL 35816<br>(256) 837-4379 | 5 |
| | Jason Harris<br>For Every Season Lawn Care<br>334 Merrill Rd.<br>Vincent, AL 35178<br>(205) 229-2949 | 11 |
| | Gordon Sinift<br>1264 Meriwether Rd.<br>Montgomery, AL 36117<br>(713) 248-9441 | 4 |
| **ALASKA** | | |
| | A Corp.<br>268 Rangeway Road<br>N. Billerica, MA 01962<br>(978) 667-1144 | 3 |
| **ARIZONA** | | |
| | Mark & Jamie Dittrick<br>11780 N. 91 St. Ave. #2<br>Peoria, AZ 85345<br>(623) 322-2230 | 4 |
| **CALIFORNIA** | | |
| | Eric Brockmire<br>Brockmire Plumbing Services<br>P.O.Box 2399<br>Ramona, CA 92065<br>(858) 679-0585 | 8 |
| | Alexander Griffin<br>1661 A South Gate Ave.<br>Daly City, CA 94015<br>(415) 431-3300 | 2 |

1

| STATE | FRANCHISEE | NUMBER OF UNITS OWNED |
|---|---|---|
| | Aram Madoian<br>Express Plumbing & Rooter<br>7949 Ajay Dr.<br>Sun Valley, CA 91352<br>(888) 565-0616 | 64 |
| | John McCartney<br>McCartney Plumbing<br>P.O. Box 3684<br>Walnut Creek, CA 94598<br>(925) 465-0010 | 4 |
| | Mike Mehenni<br>30010 S. MacArthur Dr.<br>Tracy, CA 95377<br>(209) 431-8527 | 2 |
| | Tony / Hannah Morales<br>1760 Shelley Dr.<br>Santa Rosa, CA 95401<br>(707) 495-3214 | 4 |
| | Ralph Rowe<br>P.O. Box 9832<br>Truckee, CA 96162<br>(775) 322-3232 | 13 |
| | Abed ABL Sarari<br>Yaffa Investments<br>815 W. Simplicidad St.<br>Mountain House, CA 95391<br>(510) 696-3879 | 4 |
| | Dan Shetler<br>135 Naomi Ave.<br>Pismo Beach, CA 93449<br>(805) 709-5504 | 1 |
| | Kai Viti Plumbing LLC<br>5765 Sculptor Court<br>Sunvalley, NV 89433<br>(831) 291-7209 | 2 |
| | Vladimir Zolotarev<br>All City Plumbers LLC<br>5917 Hesperia Ave.<br>Encino, CA 91316<br>(818) 938-4343 | 3 |

| STATE | FRANCHISEE | NUMBER OF UNITS OWNED |
|---|---|---|
| **COLORADO** | | |
| | Northern Colorado Plumbing<br>Rod Henrichsen<br>1281 E. Magnolia St., Unit D #113<br>Fort Collins, CO 80524<br>(970) 221-0873 | 1 |
| | Craig Widegren<br>Rooterman of Montrose<br>16874 6300 Road<br>Montrose, CO 81403<br>(970) 240-9154 | 2 |
| **CONNECTICUT** | | |
| | John Davidson, Jr.<br>65 Raymond Schoolhouse Rd.<br>Canterbury, CT 06331<br>(860) 336-9352 | 3 |
| | Tom Delucia<br>P.O. Box 3684<br>Milford, CT 06460<br>(203) 468-2008 | 13 |
| | Daniel Allen & Lisa Sheltz<br>711 North Mountain Rd., Ste. B<br>Newington, CT 06111<br>(860 227-1928 | 4 |
| **FLORIDA** | | |
| | Joey Crews<br>6061 Oglesby Rd.<br>Milton, FL 32570<br>(251) 286-7046 | 5 |
| | Rooter-Man of Tampa Bay<br>Peter Allard<br>12879 66th St.<br>Largo, FL 33773<br>(727) 572-7101 | 23 |
| **GEORGIA** | | |
| | Scott Thompson<br>Scotty's Potty, Inc.<br>P.O. Box 549<br>Guyton, GA 31312<br>(912) 236-3333 | 3 |

3

| STATE | FRANCHISEE | NUMBER OF UNITS OWNED |
|---|---|---|
| | Roger / Jennifer Milner<br>Americas Plumbing & Sewer<br>4308 S. Terrace Dr.<br>Chattanooga, TN 37412<br>(423) 855-2828 | 2 |
| **HAWAII** | | |
| | Rooter-Man of Hawaii<br>Nelson and Allison Gagnon<br>P.O. Box 4158<br>Hilo, HI 96720<br>(808) 935-1763 | 1 |
| **IDAHO** | | |
| | Coats Rooter Service<br>Darin Coats<br>813 South 2400 West<br>Weston, ID 83286<br>(208) 747-3928 | 1 |
| | Hunter's Drain Cleaning<br>Lavar Hunter<br>447 N. 1800 East<br>Saint Anthony, ID 83445<br>(208) 656-0623 *82 | 1 |
| **ILLINOIS** | | |
| | Misch Excavating<br>Jeff & Kathy Misch<br>P.O. Box 181<br>Downs, IL 61736<br>(309) 829-0003 | 5 |
| | Reginald Jennings<br>J3 Enterprises LLC<br>604 Ganim Dr..<br>Belleville, IL 6221<br>(636) 431-8784 | 2 |
| | Justin Potts & Brenda Raymer<br>BRJP Company<br>1940 Strawberry Lane<br>Raleigh, IL 62977<br>(618) 997-9973<br>(618) 932-3462 | 3 |

4

| STATE | FRANCHISEE | NUMBER OF UNITS OWNED |
|---|---|---|

Phill McDowell
D-N-P Plumbing Services, Inc.
9384 Schaefer Rd.
Staunton, IL 62088
(618) 465-3170                                    7

Kylie Stricklin
Pipeworks
2350 Leamington Rd
Equality, IL 62934
(618) 253-9179                                    3

**INDIANA**

Rooter-man of Michiana
Mark and Beverly Kuta
6183 East US 20
Rolling Prairie, IN 46371
(219) 778-8255                                    1

Kevin Thomas
4151 Kessler Bld. E. Dr.
Indianapolis, IN 46220
(312) 656-8190                                    4

**KANSAS**

David Darrough
P.O. Box 65
Maize, KS 67101
(316) 208-9470                                    4

Jerry & Petrina Murphree
Murphree Enterprises, Inc.
624 E. Main St.
Meriden, KS 66512
(785) 286-2470                                    8

**LOUISIANA**

David & Sheila Murphy
MER LLC
14306 Thorn Briar Dr.
Baton Rouge, LA 70817
(225) 454-7668                                    4

Joshua Odom
Accurate Plumbing & Drain
P.O. Box 1123
Iowa, LA 70647
(337) 304-8112                                    2

5

| STATE | FRANCHISEE | NUMBER OF UNITS OWNED |
|---|---|---|
| **MAINE** | | |
| | Steve Sewall | |
| | M2 Service Group | |
| | 151 Epping Rd. | |
| | Exeter, NH 03833 | |
| | (603) 580-2848 | 6 |
| **MARYLAND** | | |
| | A.A. Rooter | |
| | Adem and Katie Buyukacar | |
| | 2323 Twinvalley Lane | |
| | Silver Spring, MD 20906 | |
| | (301) 924-3033 | 9 |
| | A Corp | |
| | P.O. Box 290 | |
| | N. Billerica, MA 01862 | |
| | (978) 667-1144 | 1 |
| **MASSACHUSETTS** | | |
| | Chris & Tracey Brennan | |
| | CB Plumbing & Repair | |
| | 236 Stowell Rd. | |
| | Ashburnham, MA 01430 | |
| | (888) 707-6060 | 6 |
| | BNV Enterprise | |
| | Vincent and Brenda MacDonald | |
| | P.O. Box 293 | |
| | Billerica, MA 01821 | |
| | (800) 698-2244 | 12 |
| | Daigle Enterprises | |
| | Glenn and Suzanne Daigle | |
| | 46 Portland St. | |
| | Lawrence, MA 01843 | |
| | (978) 688-1181 | 2 |
| | DCL Enterprises | |
| | Darrell Charlesworth | |
| | 615 School Street | |
| | Mansfield, MA 02048 | |
| | (800) 920-7668 | 6 |

| STATE | FRANCHISEE | NUMBER OF UNITS OWNED |
|-------|------------|----------------------|

Sewer-Man, Inc.
Donald MacDonald (100% Stockholder)
Vincent MacDonald
Brian MacDonald
Charlene McLaughlin
268 Rangeway Road
Billerica, MA 01862
(978) 667-7771                    2

NLG Enterprises
Nelson and Allison Gagnon
P.O. Box 471
Peabody, MA 01960
(978) 532-4744                    2

Rooter-Man of Framingham
Bill and Elaine O'Donnell
972 B. Waverly St.
Framingham, MA 01702
(508) 877-8344                    3

Rotor Man
Vincent and Brenda MacDonald
P.O. Box 293
Billerica, MA 01821
(978) 667- 7771·                  9

Peter Galligani
P.O. Box 306
West Harwich, MA 02671-9998
(508) 360-7268                    4

**MICHIGAN**

Rooter-man of Carleton
Lonnie and Debra McComas
1920 Monroe St.
Carleton, MI 48117
(734) 654-2590                    10

Kevin Snyder
14578 Renton Rd
Battle Creek, MI 49015
(269) 963-2167                    3

John's Plumbing, Inc.
Paul Venema
P.O. Box 189
Fenton, MI 48430
(810) 629-5425                    8

7

| STATE | FRANCHISEE | NUMBER OF UNITS OWNED |
|---|---|---|
| **MINNESOTA** | | |
| | Robin Hanson | |
| | Hanson's Plumbing & Heating | |
| | P.O. Box 301 | |
| | Perham, MN 56573-0301 | |
| | (218) 346-3226 | 1 |
| | | |
| | Jason Schmidt | |
| | 113 Hill Street | |
| | Montrose, MN 55363 | |
| | (763) 587-5762 | |
| | (320) 593-8339 | 13 |
| | | |
| | Rick Schmidt | |
| | 1301 Wood Circle | |
| | Buffalo, MN 55313 | |
| | (320) 200-9009 | 4 |
| **MISSISSIPPI** | | |
| | Rooter-Man of Holly Springs | |
| | Brian and Christine McLaughlin | |
| | 3383 Hwy 72 | |
| | Hollysprings, MS 38635 | |
| | (662) 429-9920 | 1 |
| | | |
| | Ronald Smith | |
| | Coast Construction Services | |
| | 601 Forest Ave. | |
| | Long Beach, MS 39560 | |
| | (228) 223-4648 | 3 |
| **MISSOURI** | | |
| | Dave Humphrey | |
| | 936 Grupp Rd | |
| | Des Peres, MO 63131 | |
| | (314) 956-1966 | 4 |
| **NEBRASKA** | | |
| | Bill Thomas | |
| | 20202 Patton St., Suite B | |
| | Gretna, NE 68028 | |
| | (402) 592-3978 | 3 |
| **NEVADA** | | |
| | Eduardo Arredondo | |
| | CAT Detailing, LLC | |
| | 1027 S. Rainbow Blvd. | |
| | Las Vegas, NV 89145 | |
| | (702) 860-2025 | 4 |

8

| STATE | FRANCHISEE | NUMBER OF UNITS OWNED |
|-------|-----------|----------------------|
| | Rooter-Man of Reno<br>Ralph and Suzie Rowe<br>2890 Vassar St., Unit B12<br>Reno, NV 89502<br>(775) 322-3232 | 4 |
| **NEW HAMPSHIRE** | | |
| | Nelson Gagnon<br>NLG Enterprises<br>P.O. Box 471<br>Peabody, MA 01960<br>(978) 532-4744 | 4 |
| | Steve Sewall<br>M2 Service Group<br>151 Epping Rd.<br>Exeter, NH 03833<br>(603) 772-9796 | 2 |
| **NEW JERSEY** | | |
| | Arbina Asani<br>Nisa Affilate Inc.<br>35 Mandeville, Ave.<br>Pequannock, NJ 07440<br>(973) 666-5240 | 4 |
| | Klodian Belegu<br>Quality Air Care Corporation<br>692 Sussex Ct.<br>Toms River, NJ 08753<br>(732) 551-0708 | 14 |
| | Stephen Carmona<br>J& C Plumbing & Sewer Service<br>20 Momar Dr.<br>Bergenfield, NJ 07621<br>(201) 881-9840 | 7 |
| **NEW YORK** | | |
| | A Corp.<br>P.O. Box 290<br>N. Billerica, MA 01862<br>(978) 667-1144 | 18 |
| | Shawn Bonilla<br>216 Lee Place<br>Bellmore, NY 11710<br>(516) 974-8488 | 2 |

9

| STATE | FRANCHISEE | NUMBER OF UNITS OWNED |
|---|---|---|
| | Paul Kitchen<br>277 Sugar Hill Rd.<br>Rexford, NY 12148<br>(518) 583-9233 | 6 |
| | Santiago Beato<br>Topnotch Sewer<br>182 Tibbetts Rd.<br>Yonkers, NY 10705<br>(914) 384-1443 | 5 |
| | Robert Sottilare & Tom Ahrens<br>165 Stuyvesant Ave.<br>N. Merrick, NY 11566<br>(516) 546-2643 | 6 |
| | John Tuseo<br>Wet Out Now Cleaning & rest<br>17 Cambridge Ave.<br>Beth Page, NY 11714<br>(516) 439-8608 | 10 |
| NORTH CAROLINA | | |
| | Kevin Batelle<br>6539 Fly Away Dr.<br>Denver, NC 28037<br>(704) 728-6075 | 3 |
| | Steve Harmon<br>Harmon Plumbing Services, Inc.<br>P.O. Box 71665<br>Durham, NC 27722<br>(919) 286-1221 | 6 |
| | Rooter-Man of Salisbury<br>Tia and Bob Livengood<br>P.O. Box 1402<br>Salisbury, NC 28145<br>(704) 647-0105 | 4 |
| OHIO | | |
| | AA Plumbing Inc.<br>Mary and Frank Salem<br>6701 Dixie Hwy<br>Fairfield, OH 45014<br>(513) 942-6161 | 12 |

10

| STATE | FRANCHISEE | NUMBER OF UNITS OWNED |
|---|---|---|
| | Rocky Hood<br>3979 Thistlewood Dr.<br>Grove City, OH 43123<br>(614) 483-3949 | 3 |
| | Pamela Brown<br>P.O. Box 904<br>Mansfield, OH 44901<br>(419) 522-3856 | 3 |
| | George Kanaan<br>P.O. Box 13635<br>Fairlawn, OH 44334<br>(330) 701-9104 | 2 |
| | Debra King<br>4179 Lambert Rd.<br>Cleveland, OH 44121<br>(216) 548-2004 | 10 |
| | James & April English<br>162 Lokomski Road<br>Hookstown, PA 15050<br>(412) 670-0697 | 18 |
| **OKLAHOMA** | Anthony Graham<br>P.O. Box 75413<br>Oklahoma City, OK 73147<br>(405) 409-8493 | 3 |
| **PENNSYLVANIA** | Andrea, David, Nolan & Tyson Stahl<br>620 East Main St. Ext.<br>Grove City, PA 16127<br>(814) 476-3097 | 22 |
| | John Page<br>Page Industries, LLC<br>517 Church Hill Rd.<br>Kintnersville, PA 18930<br>(484) 833-1086 | 2 |
| **RHODE ISLAND** | Edward Freeman<br>2211 Hartford Ave.<br>Johnston, RI 02919<br>(401) 919-0980 | 8 |

11

| STATE | FRANCHISEE | NUMBER OF UNITS OWNED |
|-------|------------|----------------------|

**SOUTH CAROLINA**

C&J
Jim and Cheryl Arpaia
6 Sherbrook Court
Columbia, SC 29223
(803) 699-6909                                6

Ray Fletcher
805 Chesnee Hwy
Spartanburg, SC 29303
(864) 585-0093                                7

Kenneth Hart
484 Brown road
York, SC 29745
(803) 627-7241                                3

Steve & Karen Harmon
Harmon Plumbing Services, Inc.
P.O. Box 71665
Durham, NC 27722 - 1665
(919) 286-1221                                2

Nelson Huggins
P.O. Box 30098
Charleston, SC 29417
(843) 766-3311                                7

Scott / Laura Thompson
Thomson & Thompson Service
P.O. Box 549
Guyton, GA 31312
(912) 236-3333                                1

**TENNESSEE**

A Mrs & Me Service Corp
Brian and Christine McLaughlin
P.O. Box 281047
Memphis, TN 38168-1047
(901) 681-0888                                6

Thomas Cambron
10641 Braden Dickey Ln., Suite 5
Knoxville, TN 37932
(865) 932-1949                                5

| STATE | FRANCHISEE | NUMBER OF UNITS OWNED |
|---|---|---|
| | Robert Combs<br>713 Austin Springs Road<br>Johnson City, TN 37602<br>(423) 538-9000 | 1 |
| | Roger Milner<br>America's Plumbing & Sewer<br>4308 S. Terrace Dr.<br>Chattanooga, TN 37412<br>(423) 855-2828 | 3 |
| TEXAS | | |
| | Edmond's Plumbing, Inc.<br>Kevin and Madonna Edmond<br>P.O. Box 823<br>Magnolia, TX 77353-0823<br>(281) 351-4422 | 12 |
| | David Coucke<br>15503 Patricia St.<br>Austin, TX 78728<br>(937) 287-0910 | 11 |
| | Richard Marchuk<br>3360 Standard Loop<br>Belton, TX 76513<br>(254) 654-7940 | 5 |
| | Aguilera, Antonio, and Edmun Nanez<br>Total Services LLC<br>1900 Victory Dr.<br>Sunland Park, NM 88063<br>(915) 588-1671 | 3 |
| | Gordon Sinift[1]<br>1264 Meriwether Rd.<br>Montgomery, AL 36117<br>(713) 248-9441 | 4 |
| | Hamid Zarnani<br>6102 Jereme TRL<br>Dallas, TX 75252<br>(214) 394-5276 | 4 |

[1] Gordon Sinift owns franchised units in Alabama and Texas, 4 units in each state.

13

| STATE | FRANCHISEE | NUMBER OF UNITS OWNED |
|---|---|---|
| **VERMONT** | | |
| | Rooter-Man of Burlington | |
| | Patrick O'Brien and Michael Johnson & Mike Minoli | |
| | P.O. Box 2068 | |
| | S. Burlington, VT 05407 | |
| | (802) 660-9393 | 1 |
| **VIRGINIA** | | |
| | Nicholas King | |
| | P.O. Box 3453 | |
| | Lynchberg, VA | |
| | (434) 509-6776 | 2 |
| | John Stemmle | |
| | Stemmle Plumbing Repair | |
| | 10900 Paulbrook Blvd. | |
| | Midlothian, VA 23112 | |
| | (804) 641-3123 | 23 |
| **WASHINGTON** | | |
| | Rooter-Man of Puyallup | |
| | Robert and Lynda Hanson | |
| | 5310 80th Street East | |
| | Tacoma, WA 98443 | |
| | (866) 700-5435 | 9 |
| | A Corp. | |
| | 268 Rangeway Rd. | |
| | N. Billerica, MA 01862 | |
| | (978) 667-1144 | 3 |
| **WASHINGTON D.C.** | | |
| | Daanen Strachan | |
| | 2705 Bladensburg Rd. NE | |
| | Washington, DC 20018 | |
| | (202) 909-6790 | 2 |
| **WISCONSIN** | | |
| | Darrell Kiel | |
| | N41 W23416 Century Farm Rd. | |
| | Pewaukee, WI 53072 | |
| | (414) 455-7637 | 12 |

**U.S. STATES: 40     TOTAL FRANCHISEES:     110  TOTAL UNITS:  662**

Rooter Man International Franchisees List as of December 31, 2018

| COUNTRY | FRANCHISEE | NUMBER OF UNITS OWNED |
|---|---|---|
| **CANADA** | | |
| | Mark Brosowski<br>Weber Septic Service<br>3828 Chilligo Road RR2<br>Breslau, ON<br>Canada N0B 1M0<br>(519) 648-2510 | 4 |
| | Kory Kozak<br>248-195 Marquis Court<br>Saskatoon, Saskatchewan<br>Canada, S7P 0G4<br>(306) 651-2564 | 2 |
| | Stephen Brodar<br>1156 Jezero Cres<br>Oakville, ON<br>Canada L6H 0B4<br>(416) 703-5060 | 34 |
| | Mark Pacifici<br>95 Hempstead Drive #15<br>Hamilton, ON<br>Canada, L8W 2Y6<br>(905) 388-8768 | 4 |
| | Rooter-man Ottowa<br>Randy Todd<br>5871 McCordick Rd.<br>Richmond, Ontario<br>CANADA, K0A 2Z0<br>(613) 860-7668 | 6 |
| **BERMUDA** | | |
| | Bermuda Sanitation & Engineering<br>Anthony Foster<br>P.O. Box CR 228<br>Crawl, Bermuda<br>CR BX<br>(441) 293-4357 | 1 |

**FOREIGN COUNTRIES: 2      TOTAL FRANCHISEES: 6    TOTAL UNITS: 51**

15

**EXHIBIT E**

**Former Rooter Man Franchisees List**

## EXHIBIT E

Rooter Man Former Franchisees List as of December 31, 2019[1]

| STATE | FRANCHISEE | NUMBER OF UNITS OWNED |
|-------|-----------|------------------------|
| **CALIFONIA** | | |
| | Robert & Anna Park<br>Ameriserve Repiping<br>16837 Parthenia St.<br>Northridge, CA 91343<br>(818) 399-4663 | 4 |
| **FLORIDA** | | |
| | Albert Kycyku<br>A&L Sewer and Drain Services<br>13443 Hidden Forest Circle<br>Orlando, FL 32828<br>(407) 259-8496 | 4 |
| **TEXAS** | | |
| | John & Patricia Burley<br>14019 SW Freeway 301216<br>Sugar Land, TX 77478<br>(713)791-8750 | 4 |

| **U.S. STATES: 3** | **TOTAL FRANCHISEES:** | **3** | **TOTAL UNITS:** | **12** |
|---|---|---|---|---|

---

[1] Former Rooter Man Franchisees refer to those who had an unit terminated, canceled, not renewed, or otherwise voluntarily or involuntarily ceased to do business under the franchise agreement during the year of ended December 31, 2018 or who has not communicated with the franchisor within 10 weeks of the disclosure document issuance date.

1

EXHIBIT F

## STATE EFFECTIVE DATES

**EXHIBIT G**
**STATE EFFECTIVE DATES**

The following states require that the Franchise Disclosure Document be registered or filed with the state, or be exempt from registration: California, Hawaii, Illinois, Indiana, Maryland, Michigan, Minnesota, New York, North Dakota, Rhode Island, South Dakota, Virginia, Washington, and Wisconsin.

This Franchise Disclosure Document is registered, on file or exempt from registration in the following states having franchise registration and disclosure laws with the following effective dates:

| State | Effective Dates |
|---|---|
| California | May 20, 2019 |
| Hawaii: | April 30, 2019 |
| Illinois: | May 18, 2019 |
| Indiana: | June 13, 2019 |
| Maryland: | July 22, 2019 |
| Minnesota: | May 13, 2019 |
| New York: | Pending |
| North Dakota: | June 3, 2019 |
| Rhode Island: | May 5, 2019 |
| South Dakota: | June 7, 2019 |
| Virginia: | June 19, 2019 |
| Washington: | September 16, 2019 |
| Wisconsin: | April 23, 2019 |

**ITEM 23**
**RECEIPT**

This disclosure document summarizes certain provisions of the franchise agreement and other information in plain language. Read this disclosure document and all agreements carefully.

If A CORP. offers you a franchise, it must provide this disclosure document to you 14 calendar-days before you sign a binding agreement with, or make a payment to, the franchisor or an affiliate in connection with the proposed franchise sale

If A CORP. des not deliver this disclosure document on time or if it contains a false or misleading statement, or a material omission, a violation of federal law and state law may have occurred and should be reported to the Federal Trade Commission, Washington, D.C. 20580 and your state agency.

You may contact the following franchise seller offering the franchise:

> Mr. Donald MacDonald
> A Corp d/b/a Rooter Man
> 268 Rangeway Road
> N. Billerica, MA 01862
> (978) 667-1144 Ext. 26

Issuance date of this Disclosure Document is April 14, 2020. A CORP. authorizes its local agent to receive service process, as listed in Exhibit C.

I received a disclosure document dated _____ that included the following Exhibits:

| | |
|---|---|
| Exhibit A: | Financial Statements |
| Exhibit B.1: | Franchise Agreement |
| Exhibit B.2: | Addendum to Franchise Agreement |
| Exhibit B.3 | The Table of Content of the Operational Manual |
| Exhibit C: | List of State Agencies / Administrators |
| Exhibit D: | Rooter Man Franchisees List |
| Exhibit E: | Former Rooter Man Franchisees List |
| Exhibit F: | State Effective Dates |

_____
Witness

Signed: _____

Address: _____

_____

Dated: _____

Franchisor Copy
**FDD. 2020**

A Corp. FDD.2020

1

## ITEM 23
## RECEIPT

This disclosure document summarizes certain provisions of the franchise agreement and other information in plain language. Read this disclosure document and all agreements carefully.

If A CORP. offers you a franchise, it must provide this disclosure document to you 14 calendar-days before you sign a binding agreement with, or make a payment to, the franchisor or an affiliate in connection with the proposed franchise sale.

If A CORP. des not deliver this disclosure document on time or if it contains a false or misleading statement, or a material omission, a violation of federal law and state law may have occurred and should be reported to the Federal Trade Commission, Washington, D.C. 20580 and your state agency.

You may contact the following franchise seller offering the franchise:

> Mr. Donald MacDonald
> A Corp d/b/a Rooter Man
> 268 Rangeway Road
> N. Billerica, MA 01862
> (978) 667-1144 Ext. 26

Issuance date of this Disclosure Document is April 14, 2020. A CORP. authorizes its local agent to receive service process, as listed in Exhibit C.

I received a disclosure document dated _____ that included the following Exhibits:

| | |
|---|---|
| Exhibit A: | Financial Statements |
| Exhibit B.1: | Franchise Agreement |
| Exhibit B.2: | Addendum to Franchise Agreement |
| Exhibit B.3 | The Table of Content of the Operational Manual |
| Exhibit C: | List of State Agencies / Administrators |
| Exhibit D: | Rooter Man Franchisees List |
| Exhibit E: | Former Rooter Man Franchisees List |
| Exhibit F: | State Effective Dates |

_____          Signed:    _____
Witness
                                         Address:   _____

                                                    _____

                                         Dated:     _____

Franchisee Copy
**FDD. 2020**

A Corp. FDD.2020



**ACORP • 268 RANGEWAY ROAD • N. BILLERICA, MA 01862 • 1-800-700-8062**

COPYRIGHT © 1999-2007 A-CORP. All Rights Reserved.